**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

_____

IN RE GENERAL MOTORS ONSTAR
LITIGATION

_____

THIS DOCUMENT RELATES TO:  All Actions

_____

:
:
:
:
:   Master File No. 07-1867
:
:
:
:
:

**<u>MASTER AMENDED CLASS ACTION COMPLAINT</u>**

**<u>Introduction</u>**

1.    Plaintiffs bring this class action against General Motors Corporation ("GM"), American Honda Motor Company ("Honda"), Subaru of America ("Subaru") and Volkswagen of America ("VW") (collectively the "Manufacturer Defendants") and OnStar Corporation ("OnStar") due to the failure of analog OnStar equipment in their vehicles and the resulting termination of OnStar service.

2.    OnStar is a unique in-vehicle telecommunication safety system that provides automatic crash notification to emergency responders, stolen vehicle location, remote door unlock and remote diagnostics in the event of problems with airbags, anti-lock brakes or other systems.  According to OnStar:

> [OnStar provides] critical communications links among members of the public, emergency medical service providers and emergency dispatch providers; public safety, fire service and law enforcement officials, and hospital emergency and trauma care facilities.

> * * *

> The life-saving benefits of OnStar are intended not only for initial vehicle purchasers but also for subsequent owners over the life of the vehicle.

3.     In August 2002, the Federal Communications Commission ("FCC") ruled that cellular telephone companies need not continue to carry analog cellular signals.  The FCC allowed for a "sunset" period to allow companies whose products were reliant upon analog signals to transition to digital equipment.

4.     In 2002 the Defendants' OnStar equipment relied on analog cellular signals to function.

5.     All of the Defendants knew by August 2002 that their analog-based OnStar equipment would stop working on February 18, 2008.  Despite the knowledge that their equipment would stop working in 2008, Defendants continued to sell analog equipment to customers without notifying those customers that the equipment would cease to function. Defendants intentionally concealed from consumers the material fact that their equipment would stop working on February 18, 2008.

6.     After selling consumers equipment they knew would stop working, Defendants belatedly began warning consumers that their equipment was going to stop working by February 2008.  Defendants required those customers whose equipment could be upgraded to a digital signal to pay to for such upgrades to keep their OnStar equipment working.

7.     Because of Defendants' intentional concealment of the material fact that the equipment they sold to consumers would stop working in 2008, hundreds of thousands of consumers across the country either have equipment that is now useless or have paid to purchase new digital equipment.

8.     As a result of the Defendants' actions, Plaintiffs and thousands of other owners and lessees of OnStar equipped vehicles have lost the benefits of this safety system and are exposed to an increased risk of serious personal injury and harm, or were forced to pay for

upgrades to keep their systems functioning.  Plaintiffs seek damages for themselves and all others similarly situated.

## The Parties

### Plaintiffs

9.      Plaintiff Jack Jacovelli is a citizen and resident of New Jersey.  His address is 5 Dorado Road, Laurel Springs, NJ.

10.      Plaintiff Bruce Johnson is a citizen and resident of the State of Washington.  His address is P.O. Box 670 Edmonds, Washington.

11.      Plaintiff Walter Rochow is a citizen and resident of Connecticut.  His address is 25 Hamden Hills Drive, Hamden, Connecticut.

12.      Plaintiff Irene Nary is a citizen and resident of Ohio.  Her address is 31 Periwinkle Drive, Olmsted Falls, Ohio.

13.      Plaintiffs Susan Nelson and Norman Nelson ("Susan and Norman Nelson") are citizens and residents of California. Their address is 6405 Bonsall Dr., Malibu, California.

14.      Plaintiff David Busch is a citizen and resident of New York.  His address is 43 Moffat Road, Washingtonville, New York.

15.      Plaintiffs Marhjory Gill and Larnell Gill are citizens and residents of California. Their address is 4081 Bairnsdale Way, Sacramento, California.

16.      Plaintiff John Irvine is a citizen and resident of California.  His address is 3622 Delancey Lane, Concord, California.

17.      Plaintiff Sandra Williams is a citizen and resident of California.  Her address is 3101 82nd Avenue, Oakland, California.

18.     Plaintiff Carey Stein is a citizen and resident of Illinois.  Her address is 1000 Portwine Road, Riverwoods, Illinois.

19.     Plaintiff Wanda Hoover is a citizen and resident of Illinois.  Her address is 1912 W. Hood Avenue, Apt. 2B, Chicago, Illinois.

20.     Plaintiff Cheryl Nicholas is a citizen and resident of Louisiana.

21.     Plaintiff Sharon Schueter is a citizen and resident of Missouri.  Her address is 1410 Summerhaven Drive, St. Louis, Missouri.

22.     Plaintiffs Michael and Jacqueline Tchoukaleff are citizens and residents of Illinois.  Their address is 1506 Paris Drive, Godfrey, Illinois.

23.     Plaintiff Bradley Reich is a citizen and resident of Colorado.  His address is 3713 S. Andes Way, Aurora, Colorado.

24.     Plaintiff Angela Imbierowicz is a citizen and resident of Illinois.  Her address is 1301 W. 22nd Street, Oakbrook, Illinois.

25.     Plaintiff John C. Kuller is a citizen and resident of Washington.  His address is 581 Pinecrest Drive, Port Townsend, Washington.

26.     Plaintiff Charlie Allenson is a citizen and resident of New York.  His address is 315 E. 68th Street, 7F, New York, New York

27.     Plaintiff Robert Golish is a citizen and resident of California.  His address is 501 N. Clementine, Anaheim, California.

28.     Plaintiff Connie Haywood is a citizen and resident of California.  Her address is 2312 Tulane Avenue, Long Beach, California.

29.     Plaintiff Mark Vamos is a citizen and resident of Texas.  His address is 5112 Victor Street, Dallas, Texas.

30.     Plaintiff Robert Schatz is a citizen and resident of Colorado.  His address is 5678 Alkire Street, Arvada, Colorado.

31.     Plaintiff Christian P. Borum is a citizen and resident of Virginia.  Her address is 257 E. 40th Street, Norfolk, Virginia.

32.     Plaintiffs Gordon and Ann Erdenberger are citizens and residents of Pennsylvania.  Their address is 220 Farm Lane, Doylestown, Pennsylvania.

33.     Plaintiff Murle Kemp is a citizen and resident of Oregon.  His address is 3355 N. Delta Highway #9, Eugene, Oregon.

34.     Plaintiff R. S. Reishman is a citizen and resident of West Virginia.  He resides in Kanawha County.

**<u>Defendants</u>**

35.     Defendant GM is a Delaware corporation with its principal place of business and national headquarters located at 300 Renaissance Center, Detroit, Michigan.  GM designs, tests, manufactures, markets, advertises, warrants, distributes, sells or leases cars, trucks and sports utility trucks under several prominent brand names, including, but not limited to: GMC, Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, Saturn and Saab throughout the United States.

36.     Defendant VW is a corporation engaged in the sale and distribution of motor vehicles in the United States under various brands and models including Audi and Volkswagen Phaetons and Passats. Audi of America is a wholly-owned subsidiary of VW. VW maintains corporate headquarters in Auburn Hills, Michigan.

37.     Defendant Honda is a corporation engaged in the sale and distribution of motor vehicles in the United States under various brands, including "Acura".  Honda maintains corporate headquarters at 1919 Torrance Boulevard, Torrance, California.

38.     Defendant Subaru is the exclusive United States marketer of Subaru products manufactured by Fuji Heavy Industries Ltd. of Japan.  Subaru is headquartered in Cherry Hill, New Jersey.  GM owned 20 percent of Fuji Heavy Industries from 1999-2005.

39.     Defendant OnStar is a wholly owned subsidiary of GM and was at all times expressly and impliedly controlled and directed by GM.  OnStar also maintains headquarters in Detroit, Michigan.

40.     At all relevant times, OnStar engaged in co-ventures with each of the Manufacturer Defendants with respect to the sale and distribution of OnStar equipment.

41.     At all relevant times, Defendants acted by and through their agents, servants, workers and employees who were then and there acting within the course and scope of their permission, agency, employment and authority, in furtherance of Defendants' businesses, and otherwise on behalf of Defendants.

### Jurisdiction and Venue

42.     Plaintiffs bring this action seeking class-action status and alleging violations of the Michigan Consumer Fraud Act, violations of the consumer fraud laws of each of the 50 states, breach of express and implied warranties, and violations of the Magnuson-Moss Warranty Act.  This Court has jurisdiction over these claims pursuant to 28 U.S.C. 1332 (d).

43.     Venue is proper in this District because Defendants GM, VW and OnStar are headquartered in this District and many of the acts and transactions giving rise to the violations of law alleged herein occurred within and emanated from Defendants' offices in this District. Specifically, the marketing and sales materials discussing OnStar, and containing the material misstatements and omissions alleged herein, were designed, developed and approved by GM, VW and OnStar personnel at facilities in this District.

6

44.     Additionally, the OnStar subscription agreements expressly provide that Michigan law will apply.

**<u>Background</u>**

45.     In the 1990s OnStar developed the OnStar telematic system.

46.     The OnStar telematic system is a cellular communication and global positioning device that is incorporated into motor vehicles as factory installed equipment.  The OnStar system enables occupants of vehicles with OnStar equipment and service to receive emergency service and information anywhere in the United States and portions of Canada.  OnStar describes the system on its website this way:

> OnStar's in-vehicle safety, security, and information services use Global Positioning System (GPS) satellite and cellular technology to link the vehicle and driver to the OnStar Center. At the OnStar Center, advisors offer real-time, personalized help 24 hours a day, 365 days a year.

> http://www.onstar.com/us_english/jsp/explore/onstar_basics/technology.jsp

47.     OnStar has developed and operated the OnStar system throughout the United States and Canada since about 1998.

48.     At all relevant times, each of the Manufacturer Defendants maintained the policy and practice of manufacturing and selling OnStar equipped vehicles and providing service and parts for safety components through a network of authorized dealers.

49.     OnStar equipment and service for Manufacturer Defendants' vehicles is unique and is not available from other sources or as an after-market product.

50.     By December 2006 there were approximately two and a half million OnStar subscribers who owned or leased vehicles manufactured by Defendants GM, VW, Honda and Subaru with analog equipment.

### The Types Of OnStar Equipment Sold By Defendants

51.     OnStar's cellular system used both the Advanced Mobile Phone System ("AMPS") and the Code Division Multiple Access ("CDMA") cellular standards. AMPS is analog; CDMA is digital. Although the two standards are not compatible, by 2001 most cellular equipment (i.e, cell phones) had both capabilities and could switch back and forth, depending on the kind of signal available.

52.     OnStar and the Manufacturer Defendants touted and sold analog OnStar systems as standard and optional equipment that would provide added safety, security and convenience. When sold as optional equipment, customers would be charged fees of several hundred dollars for the OnStar equipment.

53.     At various times, OnStar capable vehicles were equipped with three types of wireless cellular equipment: a) Analog-Only; b) Analog/Digital-Ready; and c) Dual-Mode (Analog/Digital).

54.     Vehicles with analog-only equipment were manufactured to operate only on analog wireless networks.  The Defendant Manufacturers are not offering their customers any opportunity to upgrade analog-only equipment to operate on digital networks.  Analog-only telematics systems ceased working on or about December 31, 2007.

55.     Vehicles with analog/digital-ready equipment have wiring and sensors that permit the vehicle to operate on digital networks by replacing the communications module with dual-mode (analog/digital) modules.  All Defendant Manufacturers are charging their customers to upgrade their analog/digital-ready equipment.

56.     At the time of purchase, the Manufacturer Defendants did not disclose to Plaintiffs and other purchasers and lessees the type of OnStar equipment installed in their vehicles.  Thus, Plaintiffs and class members did not know that the OnStar equipment in their vehicles was analog-only and would not function on digital cellular systems, or that their equipment was analog/digital-ready and would not function on digital cellular systems without substantial expenditure.

### Defendants Knew That Analog OnStar Systems Would be Inoperable as of February 2008

57.     On May 17, 2001, the FCC proposed eliminating the requirement that wireless phone carriers operate analog-based networks, and allowing carriers to provide only digital-based networks.  *Notice of Proposed Rule Making,* 16 FCC Rcd. 11169 (May 17, 2001).

58.     Defendants were aware of the FCC's proposed rule change and understood that such a rule change would result in wireless carriers ceasing to provide analog networks.

59.     Despite this, Defendants chose to not disclose to their customers that their vehicles had analog OnStar systems that would be rendered inoperable and/or obsolete once this switch to a digital network infrastructure took place.  Instead, Defendants pocketed the money for the sale of the OnStar equipment and the monthly subscription fees, all the while omitting this material fact.

### The Defendants' Statements to the FCC

60.     Defendants' knowledge of the impending switch to a digital network infrastructure and its adverse impact on OnStar users is evidenced by the fact that OnStar and the Manufacturer Defendants made various presentations and submissions to the FCC concerning the elimination of analog service.

9

61.     Indeed, GM and OnStar filed comments and objections to the FCC's proposal on July 2, 2001 and August 1, 2001.  These comments reveal GM and OnStar's knowledge that a shift away from analog service would harm their customers.

62.     On or about March 29, 2002, OnStar submitted to the FCC a document entitled, "Re: Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service And Other Commercial Mobile Radio Services, WT Docket No. 01-108."

63.     In its March 29, 2002 *Ex Parte* submission, OnStar explicitly recognized that a shift to a digital network infrastructure (to the exclusion of analog network capability), as was being contemplated at the time, would adversely affect OnStar customers.  In this regard, OnStar submitted to the FCC that:

> If the Commission uses this proceeding to establish or propose a phase out AMPS, OnStar urges the Commission to *take into account the consequences for the initial owners as well as the second and subsequent owners of the fleet of vehicles with installed analog systems.*  By the end of model Year 2006, Onstar estimates the industry installed analog base is likely to be six to seven million vehicles.  *Onstar believes any Commission action establishing a phase out for the analog compatibility requirement should permit these consumers the maximum opportunity to secure the safety, security and other benefits from their investment before implementing regulatory changes that could potentially strand that investment.*  Existing embedded analog systems are not susceptible to being easily replaced with digital technology and compatible antennas.  *With the ownership of a new vehicle averaging three to four years for lessees, and six to seven years for purchasers, the five-year time frame proposed by some commentators in this proceeding is insufficient to allow even the first owners of 2005 or 2006 model year vehicles with analog systems any substantial benefit from the safety and security features provided by their embedded telematics systems.*

(emphasis added).

64.     Following that *Ex Parte* submission, representatives from OnStar met with representatives from the FCC to discuss the adverse impact that would be borne by owners and lessees of vehicles equipped with analog OnStar equipment if a complete switch to an exclusively digital network infrastructure were to happen.   As a follow-up to one of these meetings, OnStar submitted a letter to the FCC, memorializing the discussions between OnStar and FCC personnel.   In that May 21, 2002 letter, OnStar again reiterated that:

> In addition, OnStar expressed the belief that any change to the analog compatibility standard should also take into account the investment of the owners of the current fleet of vehicles with analog systems.   OnStar reiterated its recommendation that the Commission should not take action that would potentially strand that consumer investment before the owners have an opportunity to benefit from the investment for a reasonable period of time considering the average ownership and lease periods of vehicles over their product life.

65.     Further, OnStar's comments to the FCC acknowledged that the average car had a lifespan of 8-9 years, and that almost 40 percent of vehicles on the road were over 10 years old. OnStar also acknowledged that the "life saving benefits of OnStar are intended not only for initial vehicle purchasers but for subsequent owners over the life of the vehicle."   OnStar stated that its analog equipment would not work without an analog wireless phone network.

66.     On July 30, 2002 the President of GM North America, Gary Cowger, wrote to the FCC to say that GM and OnStar were moving to digital equipment, but that the transition would take at least three years.

67.     Mr. Cowger then addressed the "difficult issue of a legacy fleet" and advised that, due to the cost and practicability, retrofitting future and current vehicles "appears impractical."

68.     While GM, through OnStar, told these important facts to the FCC, GM elected not to tell its customers.   GM never told its customers that their equipment was analog-only and

11

would not operate over digital only cellular networks. Instead, GM continued to sell its vehicles with analog telematic equipment and with the promise that its OnStar product would continue to provide "emergency services."

69.     Furthermore, on July 31, 2002, a News Release from GM touted the benefits of a new version of OnStar by stating that "the next-generation GM automatic crash notification system linked with OnStar will assist even more customers by taking this potentially life-saving service beyond air bag deployments."   GM's news release did not mention the fact that its new system was still analog and would not operate after 2007.  That critical fact was not revealed to GM's customers.

### Volkswagen and Honda Statements to FCC:

70.     Volkswagen/Audi and Honda also filed comments and objections in attempt to persuade the FCC to abandon its proposed May 17, 2001 Rule Change.

71.     On May 2, 2002, Audi filed comments with the FCC asserting that "Audi believes initial and subsequent owners of these vehicles should have a reasonable opportunity to benefit from their investment in the safety and security features of these vehicles before the Commission takes any action that could have the potential effect of stranding their investment." *Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket No. 01-108.

72.     Thus, Audi argued that if the FCC adopted the May 17, 2001 Rule Change, its customers who purchased the analog-based OnStar equipment would not be receiving the benefits of the equipment that they bargained for, as the Rule Change would have the "effect of stranding their investment."

73.     Likewise, on June 24, 2002, Honda filed comments with the FCC stating that "Honda believes that both the first and subsequent owners of vehicles with embedded telematics systems should have a reasonable opportunity to benefit from the safety and security features in which they have invested, prior to any Commission action." *Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket No. 01-108.

74.     Thus, Honda also acknowledged in June 2002 that its customers with analog-based equipment would not be receiving the full benefits of OnStar.

### The FCC Rule Change is Announced

75.     On August 24, 2002 the FCC issued a Report and Order announcing that it would modify its rules to eliminate the requirement that wireless carriers provide analog service for mobile phone networks.  The FCC provided for a 5 year transition period, which ended on February 18, 2008.

76.     The FCC Order made it clear that analog service would not be available after February 2008. The FCC stated that the purpose was to switch all cellular service to digital and provided for a 5-year sunset provision to allow sufficient time to accomplish this goal.  For example, the FCC stated:

"We need not keep in place a twenty year-old technical standard to ensure roaming, as we are confident that demand from consumers for ubiquitous access generally will provide sufficient incentive to cellular carriers to resolve problems relating to roaming and interoperability." ; and

"…the elimination of the cellular analog requirement will increase the demand for the development and commercial implementation of multimode/multiband handsets, <u>a process that is already occurring</u>."

77.     In fact, CTIA (the cellular providers trade association) as well as AT&T and Cingular specifically told the FCC that "….due to the growth of the mobile telephony services market and increased competitiveness, the analog standard has served its original purposes and is no longer necessary."  They based their position on the fact that the previous rule requiring analog cellular service had significant costs and creates inefficiency.

78.     No ruling of the FCC or any other agency regulates whether any of the Manufacturer Defendants or OnStar is permitted to sell an analog OnStar system without disclosing that the system may be rendered obsolete or inoperable by Defendants' actions.

79.     Thus, by August 24, 2002, each Manufacturer Defendant and OnStar knew of the FCC ruling, and thus knew or should have known that its analog OnStar equipment was certain to become useless and would stop working on February 18, 2008, was not fit for its ordinary and intended use, and would not perform in accordance with the advertisements, marketing materials and warranties they disseminated, nor with the reasonable expectations of ordinary consumers.

80.     However, even though all of the Manufacturer Defendants knew that their equipment would become useless in a relatively short period, they intentionally failed to advise their customers and concealed from them that their OnStar equipment was analog and would not work as of a date certain, or would require a costly upgrade to function and remain operable. Defendants continued to equip their vehicles with, and provide customers, analog equipment, all the while touting OnStar as an important safety feature, and with knowledge that they would not provide or make available compatible equipment, upgrades or repairs.

14

81.     On its website OnStar admits that it was aware of the FCC rule change and the pending loss of analog service.  In the FAQ (Frequently Asked Questions) section, OnStar lists the question "Why Didn't OnStar Begin to Utilize Digital Technology Sooner."   OnStar's answer is not that it did not realize that analog technology would not be available; rather, OnStar's answer is that at the time of the FCC ruling there were competing digital technologies, and that OnStar could not determine which one would prevail:

http://www.onstar.com/us_english/jsp/explore/onstar_basics/helpful_info.jsp?info-view=tech_equip

**Defendants' Affirmative Representations And Warranties**

82.     At the time of purchase or lease, Manufacturer Defendants expressly and impliedly represented to Plaintiffs and the Class that their OnStar equipment would provide safety and security and would function and be available for the life of their vehicles.

83.     OnStar, along with the Defendant Manufacturers, designed and prepared "OnStar Owner's Guides" for each Manufacturer Defendants' dealers to distribute with OnStar equipped vehicles at the time of purchase.

84.     In the OnStar Owner's Guide, OnStar and the Manufacturer Defendants represented that:

(a)     OnStar is a safety device that "uses sophisticated … technology to provide the communications link and seamless integration into their vehicle" so that OnStar "Advisors" can provide plaintiffs with "a range of helpful services to protect [Plaintiffs] and [their] vehicle";

(b)     OnStar will put "Safety, Security and Convenience at [plaintiff's] Fingertips";

(c)     "The ease of the hands-free communications service allows [plaintiff] to enjoy an even greater level of safety, security and convenience while driving";

(d)     OnStar's service center and Advisors are available "24 hours a day, seven days a week.… Even on weekends and holidays, there is always someone ready to help";

(e)     Plaintiffs can renew their Safe & Sound plan "for excellent protection, 24/7, 365 days a year"; and

(f)     "If [Plaintiffs] purchased additional years [of service] or upgraded [their] OnStar service, when [Plaintiffs] dispose of the vehicle, [Plaintiffs]…may transfer the remaining service to the new owner."

85.     At various times, OnStar also told its customers that OnStar hardware was warranted as part of the manufacturer's new vehicle limited warranty.

## GM's Warranties

86.     At the time of purchase or lease, GM provided all Plaintiffs and Class members with a "Bumper to Bumper" warranty covering "the complete vehicle" for three years or 36,000 miles, whichever occurs first.  These warranties were expressly extended to subsequent owners and lessees.

87.     In its new vehicle and extended warranties, GM expressly represented and warranted to the purchasers, lessees, and subsequent owners and lessees that during the warranty period GM would provide repairs, upgrades and, if necessary, replacement, to "correct any vehicle defect related to materials or workmanship" at no cost to them.

88.     In December 2006 GM's North American President, Troy Clark, affirmatively stated that GM would not "walk away from" its analog OnStar customers or leave them "in the

16

lurch."   These statements expressly extended GM's various warranties for its analog OnStar equipment.

## VW's Warranties

89.     At the time of sale or lease, VW provided Plaintiffs and all Class members who purchased or leased VW vehicles with a new car warranty.  These warranties provided owners and lessees with the following:

> The New Vehicle Warranty period is 4 years or 50,000 miles, whichever occurs first.

> \* \* \*

> This warranty covers any repair to correct a manufacturer's defect in material or workmanship.

> \* \* \*

> Repairs under this warranty are free of charge.   Your authorized Volkswagen dealer will repair the defective part or replace it with a new or remanufactured genuine Volkswagen part.

90.     The New Vehicle Warranty also specifically provided that "OnStar hardware is warranted as part of the New Vehicle Limited Warranty".

91.     At the time of purchase or lease, VW expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system.

## Subaru's Warranties

92.     At the time of sale or lease, Subaru provided Plaintiffs and all Class members who purchased or leased Subaru vehicles with a new car warranty.  These warranties cover any "repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occurs under normal use" including "Subaru Optional Accessories

installed on the car prior to delivery." The "Basic Coverage" is for 3 years or 36,000 miles, whichever comes first.

93.     In its new vehicle and extended warranties, Subaru expressly represented and warranted to the purchasers, lessees, and subsequent owners and lessees that during the warranty period Subaru would provide repairs, upgrades and if necessary, replacement, to "correct any vehicle defect related to materials or workmanship" at no cost to them.

94.     At the time of purchase or lease, Subaru expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system.

### Honda's Warranties

95.     At the time of sale or lease, Honda provided Plaintiffs and all Class members who purchased or leased Acura vehicles with a new car warranty. The Acura warranty stated:

**Time and Mileage Period**

This warranty begins on the date the vehicle is put into use …

Your vehicle is covered for 4 years or 50,000 miles, whichever comes first.

**Warranty Coverage**

Acura will repair or replace any part that is defective in material or workmanship under normal use…. All repairs/replacements made under his warranty are free of charge. The replaced or repaired parts are covered only until this New Vehicle Warranty expires.

**Accessory Limited Warranty**

This warranty applied to any accessory distributed by American Honda and purchased from an Acura automobile dealer in the United States, Puerto Rico, or the U.S. Virgin Islands.

**Time and Mileage Period**

**Accessories Installed Prior to Retail Sale:**

This warranty begins on the same date as the New Vehicle Limited Warranty (see page 11).  All accessories are covered for the length of the New Vehicle Limited Warranty: 4 years or 50,000 miles, whichever comes first.

\* \* \*

**Warranty Coverage**

Acura will repair or replace any Acura accessory that is defective in material or workmanship under normal use. Acura will decide if an accessory will be repaired or replaced.  If the accessory was installed by an Acura dealer, all parts and labor costs are covered. If the accessory was installed by someone else, the cost of all parts to repair or replace it are covered by Acura, but you must pay the labor cost.

96.     At the time of purchase or lease, each Manufacturer Defendant expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system.

97.     Each Manufacturer Defendant's implied warranties included its custom and practice of providing repair parts and service for defective safety components for the reasonable life of a vehicle.  This custom and practice was part of Plaintiffs' bargain to purchase their vehicles.

98.     Thus, the OnStar equipment in Plaintiffs' vehicles and the vehicles of all Class members was covered by their new vehicle warranties and various implied warranties.

**Defendants' Refusal to Honor their Warranties**

99.     Plaintiffs and all Class members purchased and leased their vehicles and purchased OnStar service for personal, family and household use.

100.    Plaintiffs and the Class have performed all of their obligations with respect to their OnStar accounts.

101.    Plaintiffs and all Class members purchased the same or similar defective and unsuitable analog OnStar equipment, received the same representations, have the same express and implied agreements for OnStar equipment and warranties, received the same notices of termination, and have or will sustain the same or similar damages.

102.    The analog OnStar equipment in Plaintiffs' vehicles and all Class members' vehicles was manufactured with poor workmanship, and at the time of purchase and/or lease was faulty, defective and dysfunctional.    These defects and poor workmanship occurred and manifested themselves during the relevant warranty period and were made known to Manufacturer Defendants' during the relevant warranty period.

103.    The analog OnStar equipment in Plaintiffs' vehicles and all Class members' vehicles is not suited for its intended purpose and is unmerchantable.

104.    Defendants have refused to provide Plaintiffs and all Class members with OnStar safety and security products as promised, and have failed and refused to provide necessary repairs.

105.    Contrary to the Manufacturer Defendants written warranties, the Manufacturer Defendants and OnStar have stated on the OnStar website that they do not believe the imminent failure of the analog OnStar equipment is covered under any applicable warranty.

**Defendants Required Plaintiffs and the Class to Pay for the Fix**

106.    Beginning in about January 2007, OnStar and the Defendant Manufacturers began notifying Plaintiffs and the Class that their vehicles had analog equipment and that unless their vehicles were upgraded, their equipment would cease to function and OnStar service would terminate after December 31, 2007.

107.    All Manufacturer Defendants and OnStar continued to mislead customers by claiming that certain vehicles, with analog-only equipment, could not be upgraded to digital telematics when, in fact, they knew such vehicles could be upgraded, but chose not to incur the costs associated with an upgrade.

108.    OnStar's internet website advised owners, lessees and subscribers with analog-only equipment that their systems would not function because "a decision was made [by General Motors] to support a different network in the cellular industry."

109.    When the Defendants belatedly began to inform Plaintiffs and the Class of the imminent failure of their OnStar equipment, those vehicle owners and lessees with analog/digital-ready equipment were advised that they could continue to receive OnStar service by upgrading to analog/digital dual mode equipment for a fee of $15 and entering into a service agreement for additional years.

110.    Even though analog cellular service would be available throughout the country for a period after January 1, 2008, Defendants unilaterally decided to terminate OnStar service and effectively disable the OnStar equipment in plaintiffs' vehicles and the vehicles of all Class members as of January 1, 2008.

111.    Additionally, many OnStar subscribers exercised the option offered by OnStar to prepay for a set amount of cellular phone service, or minutes, on their OnStar equipment. Class members with analog only equipment who had prepaid minutes as of December 31, 2007, when analog service was cut off, lost the value of those minutes. OnStar has refused to credit Class members who lost prepaid minutes due to the cessation of analog service.

112.    All class members are either original purchasers or lessees, or are successors and assignees of the original purchasers and lessees with respect to the rights and claims asserted herein.

113.    Plaintiffs believe that Defendants have acted in the same or similar manner with respect to all Class members.

114.    Solely as a result of Defendants' conduct, Plaintiffs and all Class members were damaged including, *inter alia*, costs and expenses to replace and/or repair the analog OnStar equipment in their vehicles to function with digital cellular service.

### Facts As To Representative Plaintiff Johnson

115.    In March 2005, Plaintiff Bruce Johnson Purchased a Buick Park Avenue sedan with manufacturer-installed OnStar telematic equipment from Liberty Buick, an authorized GM dealer in Peoria, Arizona.  At the time of purchase, Plaintiff Johnson was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.  Mr. Johnson also purchased an extended GM warranty for the vehicle.  His extended warranty was expressly extended to subsequent owners and lessees.  He has continuously subscribed to the OnStar service since acquiring this vehicle.

116.    By form letter dated February 12, 2007, GM, through its OnStar subsidiary, advised Mr. Johnson that his OnStar equipment was "analog-only,"  meaning that it was not capable of receiving or transmitting digital signals, that it would not function and  would be completely inoperable after December 31, 2007.  GM further advised that it would not repair, modify or replace his OnStar equipment.

117.    On February 12, 2007 Mr. Johnson's Buick had less than 36,000 miles and was less than three years old.

### Facts As To Representative Plaintiff Rochow

118.    On or about August 19, 2003, Mr. Rochow purchased a 2004 Buick Park Avenue with manufacturer-installed OnStar telematic equipment from a GM dealer in Connecticut.  At the time of purchase, Plaintiff Rochow was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.  He has continuously subscribed to the OnStar service since acquiring this vehicle.

119.    By form letter dated March 20, 2007, OnStar advised Mr. Rochow that his OnStar equipment was analog only, would not function after December 31, 2007 and that his service would be terminated as of that date.  He was further advised that GM would not repair, replace or upgrade his OnStar equipment.

### Facts As To Representative Plaintiff Nary

120.    On or about October 28, 2003, Ms. Nary purchased a 2003 Buick Park Avenue with manufacturer-installed OnStar telematic equipment from Spitzer Buick-Cadillac in Parma, Ohio.  At the time of purchase, Plaintiff Nary was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.  She has continuously subscribed to the OnStar service since acquiring this vehicle.

121.    By form letter dated February 12, 2007, OnStar advised Ms. Nary that her OnStar equipment was analog-only, would not function after December 31, 2007 and that her OnStar service was terminated as of January 1, 2008.  She was further advised that GM would not repair, replace or upgrade her OnStar equipment.

### Facts As To The Representative Plaintiffs Susan and Norman Nelson

122.    In July 2004, Plaintiffs Susan and Norman Nelson purchased a new 2004 Cadillac Escalade with manufacturer-installed OnStar telematic equipment from Rydell GM Auto Center in Grand Forks, North Dakota.  They also purchased an extended warranty on the vehicle at that time which is still in effect. At the time of purchase, Plaintiffs Nelson were not told: 1) the type of telematics equipment in their vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that they would have to pay to upgrade analog/digital-ready equipment.  They have continuously subscribed to the OnStar service since acquiring this vehicle.

123.    By form letter dated April 24, 2007, addressed to Plaintiff Susan Nelson, GM, through its OnStar subsidiary, advised these Plaintiffs that the hardware on their 2004 Escalade was analog and will not operate on a digital network unless it is upgraded for an additional cost of $15.00, plus a new subscription fee of $199.  Without the upgrade and additional payment, the letter stated that the OnStar equipment would cease to operate after December 31, 2007.

### Facts as to Representative Plaintiff Busch

124.    On March 9, 2004, Mr. Busch purchased a new 2004 Volkswagen Passat from Heart Chevrolet in Kingston, New York, an authorized Volkswagen dealer.  The car had OnStar telematic equipment as a manufacturer installed option, with a manufacturer sticker price of $699.  At the time of purchase, Plaintiff Busch was not told: 1) the type of telematics equipment

24

in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

125.    In 2007, by form letter, OnStar advised Mr. Busch that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Volkswagen would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiffs Gill

126.    On February 6, 2003, Mr. and Mrs. Gill leased a new 2003 Acura 3.5 RL with manufacturer installed OnStar telematic equipment from Acura of Serramonte, located in Colma, California.  At the time of purchase, Plaintiffs Gill were not told: 1) the type of telematics equipment in their vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that they would have to pay to upgrade analog/digital-ready equipment.  .

127.    In 2007, by form letter, OnStar advised Mr. and Mrs. Gill that their OnStar equipment was analog-only, would not function after December 31, 2007, and that their OnStar service was terminated as of January 1, 2008.  They were further advised that Acura would not repair, replace or upgrade their OnStar equipment.  At the time, Plaintiffs were subscribers to the OnStar service.

### Facts As To Representative Plaintiff Irvine

128.    On September 11, 2002, Mr. Irvine purchased a new 2002 Cadillac Seville with manufacturer installed OnStar telematic equipment from Wayne Stead Cadillac, located in

Walnut Creek, California. At the time of purchase, Plaintiff Irvine was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

129. In 2007, by form letter, OnStar advised Mr. Irvine that his hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional subscription fee; and that without the upgrade and additional payment, Mr. Irvine's OnStar equipment would not work after December 31, 2007 and that his OnStar service was terminated as of January 1, 2008. He was further advised that GM would not repair, replace or upgrade his OnStar equipment without charge. At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Williams

130. On October 20, 2002, Ms. Williams purchased a new 2003 GMC Envoy with manufacturer installed OnStar telematic equipment from Marina Pontiac & GMC, located in San Leandro, California. At the time of purchase, Plaintiff Williams was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

131. In 2007, by form letter, OnStar advised Ms. Williams that her hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional subscription fee; and that without the upgrade and additional payment, Ms. William's OnStar equipment would not work after December 31, 2007 and that her OnStar service was terminated as of January 1, 2008. She was further advised that GM would not repair, replace or upgrade her OnStar equipment. At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Stein

132.    In September 2004, Ms. Stein leased a new 2004 Cadillac CTS with manufacturer installed OnStar telematic equipment from Weil Cadillac, located in Libertyville, Illinois.  At the time of purchase, Plaintiff Stein was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

133.    In 2007, by form letter, OnStar advised Ms. Stein that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that GM would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Hoover

134.    On November 9, 2002, Ms. Hoover purchased a new 2002 Oldsmobile Intrigue GLS with manufacturer installed OnStar telematic equipment from Martino Motor Sales, located in Lansing, Illinois.  At the time of purchase, Plaintiff Hoover was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

135.    In 2007, by form letter, OnStar advised Ms. Hoover that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that GM would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Nicholas

136.   On October 22, 2002, Ms. Nicholas purchased a new 2003 Chevrolet Trailblazer with manufacturer installed OnStar telematic equipment from Graves Chevrolet, Baker, Louisiana.  At the time of purchase, Plaintiff Nicholas was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

137.   In 2007, by form letter, OnStar advised Ms. Nicholas that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that GM would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Schueter

138.   On November 28, 2002, Ms. Schueter purchased a new 2002 GMC Yukon XLT with manufacturer installed OnStar telematic equipment from Frank Bommarito Olds, located in Ellisville, Missouri.  At the time of purchase, Plaintiff Schueter was not told: 1) the type of telematics in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

139.   In 2007, by form letter, OnStar advised Ms. Schueter that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that GM would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiffs Tchoukaleff

140.    On November 15, 2003, Mr. and Mrs. Tchoukaleff purchased a new 2004 Cadillac Escalade with manufacturer installed OnStar telematic equipment from Jim Lynch Cadillac in Hazelwood, Missouri.

141.    At the time of purchase, Plaintiffs Tchoukaleff were not told: 1) the type of telematics equipment in their vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that they would have to pay to upgrade analog/digital-ready equipment.  By form letter, OnStar advised Mr. and Mrs. Tchoukaleff that, with respect to their 2004 Cadillac Escalade,  their hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional subscription fee; and that without the upgrade and additional payment, their OnStar equipment would not work after December 31, 2007.  At the time, Plaintiffs were subscribers to the OnStar service.

## Facts As To Representative Plaintiff Reich

142.    In 2003, Mr. Reich purchased a new 2003 Saab 9-3 with manufacturer installed OnStar telematic equipment from Mike Shaw Buick/Saab in Denver, Colorado.  At the time of purchase, Plaintiff Reich was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

143.    In 2007, by form letter, OnStar advised Mr. Reich that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was

terminated as of January 1, 2008.  He was further advised that Saab would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiff Imbierowicz

144.   In 2003, Ms. Imbierowicz purchased a new 2003 Saab 9-3 from an authorized Saab dealer with manufacturer installed OnStar telematic equipment.  At the time of purchase, Plaintiff Imbierowicz was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

145.   In 2007, by form letter, OnStar advised Ms. Imbierowicz that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that Saab would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiff Kuller

146.   On October 16, 2003, Mr. Kuller purchased a new 2004 Acura RL with manufacturer installed OnStar telematic equipment from Hinshaw's Acura, located in Fife, Washington.  At the time of purchase, Plaintiff Kuller was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

147.   In 2007, by form letter, OnStar advised Mr. Kuller that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Acura would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiff Allenson

148.    In August 2003, Mr. Allenson purchased a new 2003 Acura TL with manufacturer installed OnStar telematic equipment from Acura of Westchester, located in Larchmont, New York.  At the time of purchase, Plaintiff Allenson was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

149.    In 2007, by form letter, OnStar advised Mr. Allenson that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Acura would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiff Golish

150.    On May 15, 2005, Mr. Golish purchased a new 2005 Volkswagen Phaeton with manufacturer installed OnStar telematic equipment from Commonwealth VW in Costa Mesa, California.  At the time of purchase, Plaintiff Golish was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

151.    In 2007, by form letter, OnStar advised Mr. Golish that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Volkswagen would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Haywood

152.    On March 2, 2004, Ms. Haywood purchased a new 2004 Volkswagen Passat with manufacturer installed OnStar telematic equipment from Timmons Volkswagen in Long Beach, California.  At the time of purchase, Plaintiff Haywood was not told: 1) the type of telematics equipment in her vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that she would have to pay to upgrade analog/digital-ready equipment.

153.    In 2007, by form letter, OnStar advised Ms. Haywood that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008.  She was further advised that Volkswagen would not repair, replace or upgrade her OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representative Plaintiff Vamos

154.    On February 28, 2004, Mr. Vamos purchased a new 2004 Volkswagen Passat Wagon with manufacturer installed OnStar telematic equipment from VW of Onenta, located in Oneonta, New York.  At the time of purchase, Plaintiff Vamos was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

155.    In 2007, by form letter, OnStar advised Mr. Vamos that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Volkswagen would not repair,

replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Robert Schatz

156.    On September 30, 2003, Mr. Schatz purchased a new 2004 Audi A4 from McDonald Automotive, located in Littleton, Colorado.   The Audi had OnStar telematic equipment as a manufacturer installed option, with a manufacturer sticker price of $750.  At the time of purchase, Plaintiff Schatz was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

157.    In 2007, by form letter, OnStar advised Mr. Schatz that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Audi would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Plaintiff Borum

158.    In January 2004, Mr. Borum purchased a new 2004 Subaru Outback with manufacturer installed OnStar telematic equipment from RK Chevrolet & Subaru, located in Virginia Beach, Virginia.  At the time of purchase, Plaintiff Borum was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

159.    In 2007, by form letter, OnStar advised Mr. Borum that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was

33

terminated as of January 1, 2008.  He was further advised that Subaru would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

## Facts As To Representatives Erdenberger

160.    On September 2, 2003, Mr. and Mrs. Erdenberger purchased a new 2003 Subaru Legacy with manufacturer installed OnStar telematic equipment from Glanzmann Subaru, located in Jenkintown, Pennsylvania.  At the time of purchase, Plaintiffs Erdenberger were not told: 1) the type of telematics equipment in their vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that they would have to pay to upgrade analog/digital-ready equipment.

161.    In 2007, by form letter, OnStar advised Mr. and Mrs. Erdenberger that their OnStar equipment was analog-only, would not function after December 31, 2007, and that their OnStar service was terminated as of January 1, 2008.  They were further advised that Subaru would not repair, replace or upgrade their OnStar equipment.  At the time, Plaintiffs were subscribers to the OnStar service.

## Facts As To Representative Plaintiff Kemp

162.    On February 13, 2004, Mr. Kemp purchased a new 2004 Subaru Outback with manufacturer installed OnStar telematic equipment from Kendall Subaru, located in Eugene, Oregon.  At the time of purchase, Plaintiff Kemp was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

163.    In 2007, by form letter, OnStar advised Mr. Kemp that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was

terminated as of January 1, 2008.  He was further advised that Subaru would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Facts As To Representative Reishman

164.    In May 2004, Mr. Reishman purchased a new 2004 Audi A8 with manufacturer installed OnStar telematic equipment from Bert Wolfe Audi, located in Charlestown, West Virginia.    At the time of purchase, Plaintiff Reishman was not told: 1) the type of telematics equipment in his vehicle; 2) that the equipment would fail after December 31, 2007; 3) that the Manufacturer would not fix, repair or upgrade analog-only devices; and 4) that he would have to pay to upgrade analog/digital-ready equipment.

165.    In 2007, by form letter, OnStar advised Mr. Reishman that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008.  He was further advised that Audi would not repair, replace or upgrade his OnStar equipment.  At the time, Plaintiff was a subscriber to the OnStar service.

### Estoppel From Pleading and Tolling of Applicable Statutes of Limitation

166.    Any applicable statute of limitations that might otherwise bar Plaintiffs' and Class members' claims should be tolled because notwithstanding the exercise of due diligence, Plaintiffs and the Class could not reasonably have been expected to learn or discover the fact that Defendants had concealed material information concerning the telematic equipment.  Therefore, the claims being asserted by Plaintiffs and the Class present the archetypical scenario in which the discovery rule is applicable.

167.    Defendants are also estopped from relying on any statutes of limitation by virtue of their acts of fraudulent concealment.

168.    By reason of the FCC's proposed rule making and the Manufacturer Defendants and OnStar's participation in those rule making proceedings, Manufacturer Defendants and OnStar knew or should have known that analog OnStar equipment would not function after February 18, 2008 and that they intended to shut down OnStar service as of December 31, 2007. Notwithstanding this knowledge, Manufacturer Defendants and OnStar concealed from owners and lessees of OnStar equipped vehicles the impending failure of their OnStar equipment.

### Class Action Allegations

169.    Plaintiffs bring this action individually and on behalf of the following classes:

### GM OnStar Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a GM vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment or who paid for an upgrade on or before December 31, 2007.

### VW OnStar Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a VW vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment or who paid for an upgrade on or before December 31, 2007.

### Honda OnStar Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Honda vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment or who paid for an upgrade on or before December 31, 2007.

**Subaru OnStar Class**

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Subaru vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment or who paid for an upgrade on or before December 31, 2007.

170.    Excluded from the Classes are fleet purchasers, OnStar, GM, VW, Subaru and Honda, and any of their respective subsidiaries, affiliates, officers and directors, or entities in which any Defendant has a controlling interest.

171.    Plaintiffs reserve the right to modify the Class definitions at any time up to and including trial.

172.    Numerosity.   The Classes are so numerous that joinder of all members is impracticable.

**GM**

(a)    GM sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, GMC, Saturn and Saab model vehicles.

(b)    There are over 450,000 OnStar subscribers who own or lease GM vehicles equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who may be stranded on the highways and exposed to an increased risk of serious personal injury and harm if GM does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service.

(c)     There are approximately 1,500,000 OnStar subscribers who own or lease GM vehicles with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007.

**VW**

(d)     VW sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Audi and Volkswagen model vehicles.

(e)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease VW vehicles equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who may be stranded on the highways and exposed to an increased risk of serious personal injury and harm if VW does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service.  Indeed, an Affidavit from David DiMusto, an OnStar OEM Account Manager, states that Audi sold 22,300 vehicle with analog-only OnStar equipment during the relevant time period.

(f)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease VW vehicles with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007.

**Subaru**

(g)     Subaru sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Subaru motor vehicles.

(h)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Subarus equipped with analog-only equipment who have received notice of

termination, who will have stranded investments in their motor vehicles, and who will be stranded on the highways and exposed to an increased risk of serious personal injury and harm if Subaru does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service.

(i)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Subarus with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007.

**Honda**

(j)     Honda sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Honda motor vehicles.

(k)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Hondas equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who will be stranded on the highways and exposed to an increased risk of serious personal injury and harm if Honda does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service.

(l)     Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Hondas with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007.

173.     <u>Commonality</u>.  There are numerous questions of law and fact that are common to all Class members and that predominate over individual questions, if any.

(a)     Common questions of fact include but are not limited to:

(i)      All Class members purchased or leased a vehicle with analog Onstar equipment.

(ii)     OnStar equipment is a consumer product for all class members.

(iii)    All Class members' OnStar equipment was defective and not suited for use with the OnStar system.

(iv)     All Class members' OnStar equipment will not function after December 31, 2007.

(v)      Each Manufacturer Defendant and OnStar made the same or similar express and implied representations and warranties to all Class members.

(vi)     Each Manufacturer Defendant maintained the same or similar customs, policies and practices regarding service and repairs for safety components.

(vii)    Each Manufacturer Defendant and OnStar concealed and failed to disclose the same information regarding the defects in its analog OnStar equipment.

(viii)   Each Manufacturer Defendant and OnStar concealed and failed to disclose termination of analog service to their subscribers with analog OnStar equipment.

(ix)     All Class members were given the same or similar notices of termination of analog service.

(x)      Each Manufacturer Defendant refuses to provide Class members with repairs, replacements, devices or other means to receive OnStar digital service.

(xi)     All Class members have suffered the same or similar damage as a result of Defendants' conduct.

(b)      Common questions of law include but are not limited to:

(i)      Is Michigan law applicable to all Class members and all claims?

        (ii)     Did all Manufacturer Defendants and OnStar engage in unfair and deceptive trade practices under the Michigan Consumer Protection Act ("MCPA")?

        (iii)    Did each Manufacturer Defendants and OnStar fail to disclose and/or omit material facts relating to their OnStar equipment?

        (iv)    Did each Manufacturer Defendant breach its express warranties?

        (v)     Did each Manufacturer Defendant breach its implied warranties of merchantability?

        (vi)    Did all Manufacturer Defendant breach its implied warranties of fitness for particular purpose?

        (vii)   Are the Manufacturer Defendants and OnStar legally responsible for the Class' damages?

        (viii)  Alternatively, did each Manufacturer Defendant engage in unfair and deceptive trade practices under the laws of each state.

174.   <u>Typicality</u>   Plaintiffs' claims are typical of the claims of Class members. Plaintiffs are members of the Class.  Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and for all other Class members.

175.   <u>Adequate and Fair Representation</u>.  Plaintiffs will fairly and adequately represent and protect the interests of the class.  Plaintiffs have no interests that conflict with or which are adverse to the interests of other class members.  Plaintiffs have retained qualified counsel who are able and experienced in class action litigation.

176.   <u>Fairness and Efficiency</u>.  A class action is a fair and efficient method to adjudicate this controversy.

        (a)     Common questions of law and fact predominate over individual questions.

(b)     The claims of Plaintiffs and the Class are based on the same common nucleus of operative facts.  Proof of Plaintiffs' claims will effectively prove the claims of all other Class members.

(c)     Resolution of the claims of the Class will depend on the application of common principles of law.

(d)     A class action will permit a large number of relatively small claims involving similar facts and legal issues to be resolved efficiently in one proceeding based on common proof.

(e)     This case is manageable as a class action in that:

(1)     The material evidence is relatively simple and centralized.

(2)     Manufacturer Defendants and OnStar maintain computer and business records which will enable Plaintiffs to identify Class members and establish liability and damages.

(3)     Damages for Class members can be calculated in the same or similar manner.

(f)     The claims of individual Class members are not sufficiently large enough to support litigation on an individual, case-by-case basis.

(g)     A class action will result in an orderly and expeditious administration of claims and will foster economies of time, effort and expense.

(h)     A class action will contribute to uniformity of decisions concerning Defendants' conduct.

(i)     This class action is the best available method, and indeed the only realistic method, by which Plaintiffs and the Class can seek redress for the harm caused by Defendants.

**Count I**
**Plaintiffs and The Classes v. All Defendants**
**Violations Of The Michigan Consumer Protection Act**

177.    Plaintiffs incorporate all other paragraphs of the Complaint by reference.

178.    As Plaintiffs and all Class members used their Manufacturer Defendants' vehicles and OnStar equipment and service for personal, family and household purposes, the Manufacturer Defendants and OnStar engaged in trade or commerce within the meaning of the MCPA §445.902(g).

179.    Plaintiffs and all other Class members who purchased vehicles manufactured by Manufacturer Defendants are consumers and each of the Manufacturer Defendants and OnStar are sellers and therefore subject to the MCPA.

180.    Manufacturer Defendants' and OnStar's statements, representations, omissions, and practices made in connection with their sale or lease of OnStar equipment and service as alleged herein were in violation of the following sections of the MCPA § 445.903:

a.§ 445.903(c) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have or that a person has sponsorship, approval, status, affiliation, or connection, which he does not have.

b.§ 445.903(n) by causing a probability of confusion or of misunderstanding as to the legal rights, obligations or remedies of a party to a transaction.

c.§ 445.903(p) by disclaiming or limiting the implied warranty of merchantability and fitness for use, without clearly and conspicuously disclosing a disclaimer.

d.§ 445.903(s) by failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

e.§ 445.903(bb) by making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

f.§ 445.903(cc) by failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.

g.§445.903(g) by failing to advertise or represent goods and services with intent not to dispose of them as advertised and represented.

h.§445.903(y) by failing to provide promised benefits and making gross discrepancies between oral and written representations.

181.    Defendants' unilateral decision to render the Class' OnStar systems obsolete effective January 1, 2008, to wait to disclose to customers that their analog systems will be obsolete and that they will be without OnStar service, their refusal to upgrade or repair analog OnStar systems without charge, and their refusal to compensate Class members also amounts to unfair, unconscionable and/or deceptive business practices in violation of the MCPA.

182.    Defendants' violations of the MCPA proximately caused damages to Plaintiffs and Class members who purchased or leased vehicles manufactured by GM, VW, Honda and Subaru and will cause them to  suffer imminent harm and loss, including but not limited to:

a.    the amount paid for their OnStar equipment and prepaid minutes;

b.    the cost for repair, replacement or upgrade;

c.    additional fees and costs to renew service; and

d.    their inability to obtain OnStar service after December 31, 2007.

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against each Defendant, jointly and severally with OnStar, and request the following relief:

(a)    certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel;

(b)    compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees;

44

(c)     exemplary damages; and

(d)     such other relief as may be just, necessary or appropriate.

**Count II**
**Plaintiffs and the Classes v. All Defendants**
**Unfair and Deceptive Trade Practices In**
**Violation Of All States' Consumer Protection Acts**

183.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

184.    Alternatively, each Manufacturer Defendant's and OnStar's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*;

(b)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Code § 45.50.471, *et seq.*;

(c)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(d)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(e)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and the Consumers legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq.* ;

(f)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(g)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

(h)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(i)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*;

(j)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(k)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, *et seq.*;

(l)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(m)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(n)       Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

(o)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(p)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1b, *et seq.*;

(q)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(r)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

(s)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

(t)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

(u)      each Manufacturer Defendant and OnStar have has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(v)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(w)      Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

47

(x)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

(y)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(z)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

(aa)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(bb)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(cc)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(dd)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(ee)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1 *et seq.*;

(ff)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(gg)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(hh)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(ii)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.;*

(jj)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(kk)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(ll)     Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(mm)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(nn)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(oo)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1; *et seq.*;

(pp)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(qq)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(rr)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(ss)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(tt)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, ;*et seq.*

(uu)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, *et seq.*;

(vv)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101 , *et seq.*;

(ww)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*; and

(xx)   Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100,*et seq.*

185.   Defendants' violations of the state consumer protection statutes listed above proximately caused damage to Plaintiffs and members of the Class.

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against all Defendants, and request the following relief:

(a)   certification of the Plaintiff Class, the appointment of Plaintiffs as Class representatives, and the appointment of Plaintiffs' counsel as class counsel;

(b)   compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees;

(c)   exemplary damages; and

(d)   such other relief as may be just, necessary or appropriate.

**Count III**
**Plaintiffs and the Classes v. All Manufacturer Defendants**
**Breach of Express Warranty**

186.    Plaintiffs incorporate all other paragraphs of the Complaint by reference.

187.    Each Manufacturer Defendant expressly warranted to Plaintiffs and all other Class members who purchased or leased their vehicles that the OnStar equipment in their vehicle would be free of defects in workmanship and materials during the warranty period, and that the Manufacturer Defendant would repair or replace such defective equipment at no cost to Plaintiffs and all other Class members.

188.    The OnStar equipment in all of the Manufacturer Defendants' vehicles purchased or leased by plaintiff and other Class members was covered by their new motor vehicle warranties.  The OnStar equipment in many Class members' vehicles was covered by an extended warranty.

189.    At the time  that Class members were given notice that their OnStar equipment was defective, numerous Class members were within the mileage and term of their original and extended warranties.

190.    The OnStar equipment sold and delivered to Plaintiffs and all other Class members was manufactured with faulty and defective workmanship and materials, are defective, and will not function and will not perform its intended purpose during the warranty period.

191.    Contrary to their warranties, each Manufacturer Defendant has expressly or implicitly given notice to Plaintiffs and all other OnStar subscribers who purchased or leased their vehicles that it will not repair or replace their defective OnStar equipment so that it will operate on digital cellular networks, at no cost to Plaintiffs and the Class, and continue to refuse to do so.

192.     Each Manufacturer Defendant breached its express warranties to Plaintiffs and all other Class members to repair and/or replace OnStar equipment so that it is in good operational condition and repair and suitable for use in the OnStar system.

193.     The Manufacturer Defendants' breach of these express warranties proximately caused damages to Plaintiffs and members of the Class.

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against the Manufacturer Defendants, and request the following relief:

(a)     certification of the Plaintiff Class, the appointment of Plaintiffs as Class representatives, and the appointment of Plaintiffs' counsel as Class counsel;

(b)     compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees;

(c)     such other relief as may be just, necessary or appropriate.

## Count IV
## Plaintiffs and the Classes v. All Manufacturer Defendants
## Breach Of Implied Warranties

194.     Plaintiffs incorporate all other paragraphs of the Complaint by reference.

195.     At the time of contracting, each Manufacturer Defendant impliedly warranted to Plaintiffs and to all other Class members who purchased or leased their vehicles that their OnStar equipment was of merchantable quality and suitable for ordinary use.

196.     The OnStar equipment sold, leased and delivered to Plaintiffs and all other Class members was not of merchantable quality and was not suited for ordinary use.

197.     Each Manufacturer Defendant breached its implied warranty of merchantability of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles.

53

198.    Each Manufacturer Defendant breached its implied warranty of fitness for a particular purpose of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles.

199.    Each Manufacturer Defendant breached its implied warranty of fitness for a particular purpose of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles.

200.    Each Manufacturer Defendant's breach of warranties proximately caused damages to Plaintiffs and all Class members who purchased or leased their vehicles.

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against the Manufacturer Defendants, and request the following relief:

(a)     certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel;

(b)     compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees;

(c)     such other relief as may be just, necessary or appropriate.

**Count V**
**Plaintiffs and the Classes v. All Manufacturer Defendants**
**Violation of The Magnuson-Moss Warranty Act**

201.    Plaintiffs incorporate all other paragraphs of this Complaint by reference.

202.    OnStar equipment is a consumer product used for personal, family or household purposes.

203.    Each Manufacturer Defendant is a supplier and/or warrantor within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301.

204.    Each Manufacturer Defendant has failed to comply with its obligations under its written and implied promises, warranties and representations despite having a reasonable opportunity to do so.

205.    Plaintiffs and the Classes are therefore entitled to recover compensatory damages together with interest, reasonable attorney's fees and costs.

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against each Manufacturer Defendant and request the following relief:

(a)    certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel;

(b)    compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees; and

(d)    such other relief as may be just, necessary or appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial of 12.

Respectfully submitted,


   /s/ David H. Fink
David H. Fink (P28235)
E. Powell Miller (P39487)
Marc L. Newman (P51393)
The Miller Law Firm PC
Interim Lead Counsel for Plaintiffs
950 W. University Dr, Suite 300
Rochester, MI  48307
248-841-2200
dhf@millerlawpc.com
www.millerlawpc.com

Jeffrey L. Kodroff
John A. Macoretta
Spector Roseman & Kodroff PC
1818 Market St., Suite 2500
Philadelphia, PA 19103
215-496-0300
jkodroff@srk-law.com
jmacoretta@srk-law.com

C. Donald Amamgbo
Amamgbo & Assoc,
1940 Embarcadero
Oakland, CA 94606
510-434-7800
Donald@amamgbolaw.com

N. Albert Bacharach, Jr
115 NE 6th Avenue
Gainesville, FL  32601
352-378-9859
n.a.bacharach@att.net

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser LLP
227 Capitol Street
Charleston, WV  25301
jbarrett@baileyglasser.com

Mark R. Bendure
Bendure & Thomas
645 Griswold, Suite 4100
Detroit, MI  48226
313-961-1525
bendurelaw@cs.com

Larry W. Bennett
Giarmarco Mullins
101 W. Big Beaver Rd, 10th Fl.
Troy, MI  48084
248-457-7037
lbennett@gmhpc.com

Philip Bohrer
Scott Brady
Bohrer Law Firm LLC
8712 Jefferson Hgwy, Suite B
Baton Rouge, LA  70809
225-925-5297
phil@bohrerlaw.com
scott@bradylawfirmllc.com

Patrick E. Cafferty
101 N. Main Street, Suite 450
Ann Arbor, MI  48104
734-769-2144
pcafferty@caffertyfaucher.com

Marc C. Calahan
6451 Drexel Avenue
Los Angeles, CA 90048
310-717-2484
mccalahan@yahoo.com

Edward W. Cochren
20030 Marchmont Road
Shaker Heights, OH 44122
216-751-5546
edwardcochren@adelphia.net

Lanny H. Darr
Schrempf, Blaine, Kelly, Naap
307 Henry Street, Suite 415
Alton, IL 62002
618-465-2311
ldarr@sbkdlaw.com

Daniel A. Edelman
Edelman Combs Latturner
120 S. LaSalle St., Suite 1800
Chicago, IL  60603
312-739-4200
dedelman@edcombs.com
courtecl@edcombs.com
tgoodwin@edcombs.com
zjacobs@edcombs.com

Marc Edelson
45 W. Court Street
Doylestown, PA 18901
(215) 230-8043
medelson@hofedlaw.com

Frederic S Fox
Larry D. King
Donald R. Hall
Kaplan Fox & Kilsheimer LLP
850 Third Ave., 14th Floor
New York, NY  10022
212-687-1980
ffox@kaplanfox.com
lking@kaplanfox.com
dhall@kaplanfox.com

Philip Stephen Fuoco
Joseph A. Osefchen
24 Wilkins Place
Haddonfield, NJ 08033
856-354-1100
pfuoco@msn.com
josefchen@msn.com

Eric H. Gibbs
Daniel T. LeBel
Girard Gibbs LLP
601 California Street, 14th Fl.
San Francisco, CA  94108
415-981-4800
ehg@girardgibbs.com
dtl@girardgibbs.com

Steven E. Goren
Goren Goren & Harris PC
30400 Telegraph Rd, Suite 470
Bingham Farms, MI 48025
248-540-3100
sgoren@gorenlaw.com

Mary Ellen Gurewitz
1000 Farmer
Detroit, MI  48226-2899
313-965-3464
megurewitz@sachwaldman.com

Greg Hafif
Law Offices of Herbert Hafif
269 W. Bonita Avenue
Claremont, CA 91711
909-624-1671
ghafif@hafif.com

Daniel Harris
150 N. Wacker Dr., Suite 3000
Chicago, IL
312-960-1802
lawofficedh@yahoo.com

Dennis J. Johnson
Johnson & Perkinson
1690 Williston Road
S. Burlington, VT 05403
802-862-0030
djohnson@jpclasslaw.com

Franklin D. Julian, Jr
1620 S. Bend Ave.
South Bend, IN  46617
574-247-1234
fdj@theverdict.com

Roy A. Katriel, Esq.
The Katriel Law Firm
1101 30th St., NW   Suite 500
Washington, DC 20007
202-625-4342
rak@katriellaw.com

Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
One Indiana Square, Suite 1400
Indianapolis, IN  46204
317-636-6481
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
vmiller@cohenandmalad.com

Jonathan K. Levine
601 California St, Suite 1400
San Francisco, CA 94108
415-981-4800
jkl@girardgibbs.com

Peter L. Masnik
Kalikman & Masnik
30 Washington Avenue
Haddonfield, NJ 08033
856-428-5222
PMasnik@aol.com

Gary E. Mason
The Mason Law Firm PC
1225 19th St NW, Suite 500
Washington, DC  20036
202-429-2290
gmason@masonlawdc.com

Kevin L. Oufnac
Kahn Gauthier Swick
650 Poydras St., Suite 2150
New Orleans, LA 70130
504-455-1400
Kevin.oufnac@kgscounsel.com

Mario A. Pacella
Strom Law Firm LLC
2110 Beltline Blvd, Suite A
Columbia, SC  29204
803-252-4800
mpacella@stromlaw.com

Ethan Preston
Kamber Edelson LLC
53 W. Jackson Blvd, Suite 1530
Chicago, IL 60604
epreston@kamberedelson.com

Michael F. Ram
Levy Ram & Olson
639 Front St., 4th Fl
San Francisco, CA 94111
415-433-4749
mfr@lrolaw.com

Paul S. Rothstein
626 NE 1st Street
Gainesville, FL  32601
352-376-7650
psr@rothsteinforjustice.com

Peter Safirstein,
Andrew Morgani
Jennifer Czeisler
(Milberg Weiss)
1 Pennsylvania Plaza
New York, NY 10119-0165
212-594-5300
psafirstein@milbergweiss.com
amorganti@milbergweiss.com
jczeisler@milbergweiss.com

Fred W. Schultz
320 W. 8th St., Suite 100
Bloomington, IN 47401
866-685-6800
fred@greeneschultz.com

Ronald J. Smolow,
Michael H. Landis
Smolow & Landis LLC
204 Two Neshaminy Interplex
Trevose, PA 19053
215-244-0880
rsmolow@smolowlandis.com
mlandis@smolowlandis.com

Stephen M. Sohmer
Sohmer Law Firm LLC
One Passaic Avenue
Fairfield, NJ 07004
973-227-7080
counsel@sohmerlawfirm.com

Carol L. Solomon
Gergel Nickles & Solomon PA
PO Box 1866
Columbia, SC 29202
803-779-8080
csolomon@gnslaw.com

Kim D. Stephens
Beth E. Terrell
Tousley Brain
1700 Seventh Ave., Suite 2200
Seattle, WA  98101
206-682-2992
kstephens@tousley.com;
bterrell@tousley.com

J. Preston Strom, Jr.
Mario A. Pacella
2110 Beltline Blvd, Suite A
Columbia, SC  29204
803-252-4800
petestrom@stromlaw.com;
mpacella@stromlaw.com

Francis E. Sweeney Jr.
323 W Lakeside Ave, Suite 450
Cleveland, OH  44113
216-928-9288
skip900@roadrunner.com

Reginald Terrell, Esq.
Terrell Law Group
223 25th Street
Richmond, CA  94804
510-237-9700
ReggieT2@aol.com

Frank H. Tomlinson
15 N. 21st St., Suite 302
Birmingham, Al  35203
205-326-6626
htomlinson@bellsouth.net

Joe R. Whatley, Jr.
1540 Broadway, 37th Fl.
New York, NY 10036
212-447-7070
jwhatley@wdklaw.com

Brian C. Witter
Vincent DiTommaso
Peter S. Lubin
DiTommaso Lubin
17200 W 22nd St
Oakbrook Terrace, IL 60181
630-333-0004
bcw@ditommasolaw.com
vlt@ditommasolaw.com
psl@ditommasolaw.com

John P. Wolff
Christopher K. Jones
Keogh Cox & Wilson LTD
701 Main Street
Baton Rouge, LA 70802
225-383-3796
jwolff@kcwlaw.com
cjones@kcwlaw.com

Leroy H. Wulfmeier
Cox Hodgman
101 W. Big Beaver Rd, 10th Fl.
Troy, MI  48084
248-457-7077
lwulfmeier@chglaw.com

Lance Young
43311 Joy Road #244
Canton, MI   48187
734-446-6932
younglcy@hotmail.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 25, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send such notification to all ECF attorneys of record.  Pursuant to the Court's Case Management Order No. 1 dated January 25, 2008 at § XIII, service is not required on any party not registered for ECF.

   /s/ David H. Fink
David H. Fink (P28235)
E. Powell Miller (P39487)
Marc Newman (P51393)
**THE MILLER LAW FIRM, P.C.**
Interim Lead Counsel for Plaintiffs
950 W. University Drive, Suite 300
Rochester, Michigan 48307
(248) 841-2200 Phone
dhf@millerlawpc.com
www.millerlawpc.com
