UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE ONSTAR CONTRACT LITIGATION

Case No. 2:07-MDL-01867
Hon. Sean F. Cox

_____/

**VOLKSWAGEN GROUP OF AMERICA, INC.'S BRIEF IN RESPONSE TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AS TO VOLKSWAGEN**

# TABLE OF CONTENTS

MOST APPROPRIATE AUTHORITIES ................................................................................. iii

STATEMENT OF ISSUE PRESENTED ................................................................................. vii

I.    INTRODUCTION ........................................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................................. 2

    A.    OnStar On Model-Year 2002 Through 2005 Volkswagen and Audi Vehicles ............ 2

    B.    The FCC's Analog Sunset Order ................................................................................. 3

    C.    Extensive Disclosures Regarding The FCC Analog Sunset Order Were Available
        And Varied Over Time Based On Developments At The FCC .................................... 5

    D.    The Consumer Buying Decision Process Varied Significantly Among Consumers .... 8

    E.    VWGoA's Express Warranties Contain Certain Time And Mileage Limits.............. 11

    F.    Plaintiffs' Newly Proposed Class Is Materially Different Than The Definition
        Stated In Their Pleadings ........................................................................................... 11

    G.    Plaintiffs' Class Action Claims.................................................................................. 13

III.  CLASS CERTIFICATION REQUIREMENTS AND STANDARD OF REVIEW........... 15

IV.   ARGUMENT .................................................................................................................. 16

    A.    Plaintiffs' Newly Proposed Classes Cannot Be Certified Because They Have
        Never Been Identified In Any Pleading Filed With The Court .................................. 16

    B.    Plaintiffs' Proposed Classes Are Not Certifiable Under Rule 23(b)(3)...................... 18

        1.    The Court Should Not Certify A Class Under The Consumer Protection
            Acts Of The Putative Class States Because Individual Issues Predominate...... 18

            a.    West Virginia and Colorado ................................................................... 18

            b.    New York and California......................................................................... 20

            c.    Reliance And Causation Are Issues Requiring Individualized Inquiry .... 22

i

2.    Individualized Issues Predominate In Determining Whether Plaintiffs Satisfy The Elements Of Their Express Warranty Claims ................................ 25

    a.    It Is Necessary To Determine Whether A Putative Class Member Was Within The Durational Limitations Of His Or Her Express Warranty, Which Requires Individualized Inquiry .................................................... 25

    b.    Individualized Inquiry Is Required To Prove Reliance And Causation ... 25

        i.    *West Virginia and Colorado* ............................................... 26

        ii.    *New York and California* ................................................... 27

    c.    The Alleged Unconscionability Of VWGoA's Warranty Does Not Eliminate The Need For Individualized Inquiry ........................................ 30

3.    Individual Issues Predominate Because Of The Variations In The Timing And Content Of Disclosures That The Putative Class Members Were Exposed To Before Purchase ............................................................................ 31

4.    Individual Issues Predominate Regarding Damages .......................................... 33

C.    Plaintiffs Have Not Established Numerosity ............................................................. 34

D.    The *Tele Aid* Case Is Readily Distinguishable And Cuts Against Class Certification ....................................................................................................... 35

E.    Plaintiffs' Claims Are Not Manageable As Class Actions .......................................... 37

1.    Plaintiffs Do Not Propose A Viable Trial Plan ..................................................... 37

2.    The New Proposed Classes Are Not Manageable Or Ascertainable ................ 39

V.    CONCLUSION .................................................................................................................. 40

## MOST APPROPRIATE AUTHORITIES

**Cases**

*Abraham v. Volkswagen of America, Inc.*, 795 F.2d 238 (2nd Cir. 1986) .................................... 25

*Allegheny & Western Energy Corp. v. Columbia Gas Sys., Inc.*, 1986 WL 13360 (S.D. W. Va. June 30, 1986) ....................................................................................................... 26

*Allen v. DaimlerChrysler Motors Co. LLC*, 2007 WL 2774440 (Cal. App. 1 Dist. Sept. 25, 2007) .......................................................................................................... 22

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ......................................... 16

*American Software, Inc. v Ali*, 46 Cal. App. 4th 1386 (1996) ....................................... 30

*Armstrong v. McAlpin*, 699 F.2d 79 (2nd Cir. 1983) ................................................... 17

*Associates of San Lazaro v. San Lazaro Park Properties*, 864 P.2d 111 (Colo. 1993) ............... 27

*Berlowitz v. Nob Hill Masonic Mgmt., Inc.*, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996) ........... 16

*Carlson, et al. v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989) ................................ 30

*Caro v. Procter & Gamble Co.*, 18 Cal. App.4th 644 (1993) .......................................... 21

*Cartiglia v. Johnson & Johnson Co.*, No., 2002 WL 1009473 (N.J. Super. Apr. 24, 2002) ........ 33

*Cohen v. DIRECTV, Inc.*, 178 Cal. App.4th 966 (2010) ............................................. 21

*Consolidated Freightways Corp. v. Neidert Terminals, Inc.*, 612 F. Supp. 1391 (N.D. Ill. 1985) ....................................................................................................... 26

*Crosby v. Social Sec. Admin. Of U.S.*, 796 F.2d 576 (1st Cir. 1986) .................................. 40

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2nd Cir. 2003) ............................. 30

*Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824 (2006) .......................... 25

*Donald v. Shinn Fu Co. of Am.*, 2005 WL 32068351 (S.D.N.Y. Nov. 14, 2005) ................... 28

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350 (2010) ..................................... 21, 22

*Galli v. Metz*, 973 F.2d 145 (2d Cir.1992) ............................................................. 29

*Garcia v. Medved Chevrolet, Inc.*, 240 P.3d 371 (Colo. App. 2009) .............................. 19, 20

*Gartin v. S&M Nutec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007)......................................................... 21

*General Tele. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ............................................................ 15

*In re Fin Paper Litig. State of Washington*, 632 F.2d 1081 (3rd Cir. 1980)................................... 38

*In re Fosamax Products Liab. Litig.*, 248 F.R.D. 389 (S.D.N.Y. 2008).......................................... 32

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)................................... 15, 16

*In re OnStar Contract Litig.,* 600 F. Supp. 2d 861 (E.D. Mich. 2009)...................................... 25, 39

*In re Prempro Products Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005) ......................................... 32

*In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) .................................................................... 21, 22

*Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 Fed. Appx. 654 (6th Cir. 2007).......................... 17

*Keith v. Buchanan*, 173 Cal. App. 3d 13 (1985)........................................................................... 29

*Klein v. Robert's American Gourmet Food, Inc.*, 28 A.D. 3d 63 (2006)................................... 27, 28

*Levin v. Gallery 63 Antiques Corp.*, 2006 WL 2802008 (S.D.N.Y. Sept. 28, 2006)..................... 28

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)............................. 37

*Marcial v. Coronet Ins. Co.*, 122 F.R.D. 529 (N.D. Ill. 1988) ...................................................... 34

*McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2161786 (S.D.N.Y. Jul. 27, 2007) ................. 17

*Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D. N.J. 2009)................................... 35, 36

*Morrissey v. Nextell Partners, Inc.*, 72 A.D.3d 209, 895 N.Y.S.2d 580 (2010).......................... 20

*Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845 (10th Cir. 1986)................................................. 30

*Ortiz. v. Ford Motor Co.*, 909 So.2d 479 (Fla. App. 2005)........................................................... 33

*Regents of the Univ. of Colorado v. Harbert Construction Co.*, 51 P.3d 1037
    (Colo. App. 2001) .................................................................................................................. 25

*Reynolds v. The Univ. of Pennsylvania*, __ F. Supp.2d __, 2010 WL 4187935
    (E.D. Pa. Oct. 25, 2010)......................................................................................................... 39

*Riegel v. Medtronic, Inc.*, 2003 WL 25556778 (N.D.N.Y. Dec. 2, 2003).................................... 28

iv

*Rogath v. Siebenmann*, 129 F.3d 261 (2d Cir. 1997)..................................................... 29

*Rugumbwa v. Betten Motor Sales*, 200 F.R.D. 358 (W.D. Mich. 2001)......................... 15

*Safaie v. Jacuzzi Whirlpool Bath, Inc.*, 2008 WL 4868653 (Cal. App. 4th Nov. 12, 2008).......... 29

*Schwartz v. The Upper Deck Co.*, 183 F.R.D. 672 (S.D. Cal. 1999)............................. 34

*Sevidal v. Target Corp.*, 189 Cal. App. 4th 905 (2010)........................................ 20, 21

*Sosna v. Iowa*, 419 U.S. 393 (1975) ........................................................... 40

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) ................................ 15

*Strauss v. Long Island Sports, Inc.*, 401 N.Y.S.2d 233 (App. 1978)............................. 28

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ......................................... 15

*Wade v. Knoxville Utils. Bd.*, 259 F.3d 452 (6th Cir. 2001) ................................... 17

*Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213 (2010) ............................. 29

*White v. Wyeth*, __ S.E.2d __, 2010 WL 5140048 (W. Va. Dec. 17, 2010) ........................ 18

*Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135 (2008)............................ 29

*Yadlosky v. Grant Thornton, L.L.P.*, 197 F.R.D. 292 (E.D. Mich. 2000).......................... 21

**Statutes**

28 U.S.C. §1407................................................................................ 37

**Other Authorities**

7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1604
 (3d ed 2010) ................................................................................ 38

West Virginia Code § 46A-6-106(a) of the West Virginia Consumer Credit
 and Protection Act.......................................................................... 18, 19

v

**Rules**

Fed. R. Civ. P. 15 ............................................................................................. 17

Fed. R. Civ. P. 19 ............................................................................................. 38

Fed. R. Civ. P. 23 ........................................................................... 15, 33, 35, 37, 39

Fed. R. Civ. P. 26(e) ......................................................................................... 16

Fed. R. Evid. 407 ............................................................................................. 39

## STATEMENT OF ISSUE PRESENTED

Whether the Court should deny class certification pursuant to Fed. R. Civ. P. 23 where (1) Plaintiffs seek certification under a proposed class that is not defined in any of their pleadings; (2) individualized issues of fact and law regarding reliance and causation predominate over common questions on Plaintiffs' consumer fraud and express warranty claims; (3) Plaintiffs have failed to establish numerosity; and (4) Plaintiffs have failed to demonstrate that proceeding with a class action is a superior or manageable method by which to litigate their claims.

VWGoA answers, "Yes."

OnStar Answers, "Yes."

Plaintiffs Answer, "No."

## I.    INTRODUCTION

Deciding to purchase or lease an automobile, whether new or used, is a high-involvement, complex, and entirely individual process. Each consumer seeks out or is exposed to numerous sources of vehicle and feature information at various times and places. In turn, each is ultimately motivated by innumerable different factors in selecting a vehicle. Each places different values on certain vehicles and features. Each engages in specific unique discussions or negotiations with dealer sales professionals or private sellers. On every one of these points, each consumer's ultimate decision may be significantly influenced by friends and family members, each one of which brings his or her own experiences, information and agenda into play. In the used car market, the identity and nature of sellers, who can range from the most sophisticated franchise dealership to the proverbial "little old lady," is every bit as varied and individual as is the case with the prospective buyer.

In spite of these facts, Plaintiffs seek certification of their consumer fraud and breach of express warranty claims against Volkswagen Group of America, Inc. ("VWGoA") in connection with the purchases or leases of new and used Audi and Volkswagen vehicles equipped with analog-only OnStar equipment. As one might expect, the record fairly bristles with evidence of widely varying fact patterns among consumers, including all proposed class representatives, in all of these aspects of their individual purchase or lease experiences. The record also confirms that putative class members, among them the proposed class representatives, could and did have actual knowledge regarding the ostensibly concealed fact at issue in this case – the impending cessation of analog service by OnStar – from independent sources *long before* they purchased or leased their vehicles. Every aspect of each fact pattern in which these issues arise is inherently individual. These issues are not only predominant, but fundamental to the determination of

1

liability and whether any particular putative class member is entitled to any damages.  Thus, Plaintiffs' proposed classes, even "limited" to the four states under whose laws they now seek to proceed as class representatives, cannot meet Fed. R. Civ. P. 23's applicable common question, predominance, and superiority requirements.  Certification must accordingly be denied.

For the same reasons, Plaintiffs do not, because they cannot, propose any manageable plan for trying their proposed class actions, including the separate class action they propose against OnStar, particularly in light of the MDL Rules, the principles of Federal Rule of Civil Procedure 19, or Federal Rule of Evidence 407, which all present substantial triability issues.

For all of the foregoing reasons, as discussed more fully below, the Court should deny Plaintiffs' Motion for Class Certification as to Volkswagen.

## II.    STATEMENT OF FACTS

### A.    OnStar On Model-Year 2002 Through 2005 Volkswagen And Audi Vehicles

OnStar is a vehicle telematics system that has been offered by OnStar LLC since 1996. *VWGoA Ex.* ("*VW Ex.*") *A*, OnStar Summary.  For a vehicle to receive OnStar service, the vehicle must have equipment that can receive OnStar's signal.  Pursuant to a Telematic Services Agreement between OnStar and VWGoA, OnStar equipment first became available on certain model-year 2002 Audi vehicles in the United States.  *VW Ex. B*, VWGoA List of OnStar-Equipped Vehicles.  After the 2002 model year, OnStar equipment became available on additional Audi and Volkswagen models.  *Id.*  The last vehicles so equipped were 2005 model-year vehicles.

For vehicles containing OnStar equipment, the new vehicle owner or lessee could choose to receive a year's subscription to OnStar service for free.  *Defendants' Common Ex.* ("*D.C. Ex.*") *78*, DiMusto Dep., p. 67.  If the new vehicle owner or lessee chose to continue the

2

subscription beyond one year, he or she would have to pay a subscription fee to OnStar based on the level of OnStar service desired and the length of the subscription chosen.[1]  OnStar was solely responsible for providing the OnStar service to customers.  *VW Ex. D*, Telematic Services Agreement ("TSA") §2.1.  The OnStar equipment that OnStar sold to VWGoA was all analog-only.  *VW Ex. E*, Pltfs. Resp. to VWGoA Requests for Admissions ("VWGoA RFAs"), Nos. 68-71.  It could therefore receive only analog cellular signals and could not be upgraded to a system that could receive digital signals.  *D.C. Ex. 80*, Cameron Dep., p. 46.

The OnStar equipment was optional on some Volkswagen and Audi models, and standard equipment included at no extra charge on other models.  See *VW Ex. F*, VWGoA Chart Showing OnStar Optional Equipment Pricing.  For the vehicles on which OnStar equipment was optional, the price varied from $699 to $850, depending on the model.  *Id.*  VWGoA offered OnStar as feature through the 2005 model-year.  *Id.*  Throughout this time, customer demand for OnStar on Audi and Volkswagen vehicles was low.  *D.C. Ex. 80*, Cameron Dep., pp. 36-38.  Indeed, at one point, VWGoA had such a glut of OnStar equipment, it included the equipment as a "mandatory option" on certain 2004 Volkswagen Passat models at no charge so that it could clear out the equipment.  *Id.*, pp. 138-140; see e.g., *VW Ex. G*, Pltfs' Am. Resp. to VWGoA RFAs, No. 64, (OnStar identified as "Special Feature at no additional charge" on Plaintiff Vamos's Passat).  Ultimately, VWGoA decided not offer OnStar beyond the 2005 model year and ended its relationship with OnStar.  *D.C. Ex. 80,* Cameron Dep., p. 64.

**B.    The FCC's Analog Sunset Order**

As former Federal Communications Commission ("FCC") Commissioner Kathleen

---

[1] OnStar offered three service packages – "Safe and Sound," "Directions and Connections," and "Luxury and Leisure," which had different prices.  *D.C. Ex. 78,* DiMusto Dep., p. 83; *VW Ex. C*, OnStar Service Descriptions.

Abernathy, who personally served on the FCC at the relevant time period for this case, states in her expert report, in 1992 and 1995, the FCC considered removing the requirement that cellular carriers provide analog service, and it decided to continue the requirement both times. *D.C. Ex. 45*, Abernathy Rpt., p. 2. In 2001, the FCC again considered whether to eliminate or modify the requirement that carriers provide analog signals. *Id.* In its Notice of Proposed Rulemaking released on May 17, 2001, however, the FCC sought comment on the effect of the elimination of the rule. *Id.* After the comment period, on September 24, 2002, the FCC released a Report and Order ("Analog Sunset Order") stating that the rule requiring analog should eventually be eliminated. *Id.*, pp. 2-3. But because of the potential negative impact on some consumers, the FCC adopted a five-year transition period to resolve the issues. *Id.*, pp. 3-4. The FCC stated, however, that "if hearing-aid compatible devices are not available, or market conditions change," the FCC "***will not*** eliminate the rule at the conclusion of the five-year period." *Id.*, p. 4 (emphasis added). Under the Administrative Procedures Act, the Analog Sunset Order did not become effective until February 18, 2003, establishing the sunset date as February 18, 2008. *Id.*

As part of the Analog Sunset Order, the FCC required carriers to file reports on the third and fourth anniversaries of the Analog Sunset Order describing the extent to which hearing-aid-compatible devices were available and the progress made in educating consumers about the analog sunset. *Id.* The FCC noted that the "information contained in the reports will be used to determine whether or not the Commission will initiate a proceeding to extend the sunset date." *Id.* Further, in January 2003, before the Analog Sunset Order became effective, AT&T filed a petition for reconsideration seeking to substantially shorten the sunset period. *Id.* On February 4, 2004, the FCC adopted an order rejecting AT&T's petition and reaffirming the FCC's prior determination of a five-year sunset period, concluding that "at least a five-year transition period

is required to provide persons with hearing disabilities adequate access to hearing-aid compatible digital devices." *Id.*, pp. 4-5. Thus, the FCC confirmed the Analog Sunset Order's February 18, 2008 sunset. *Id.*[2]

## C.    Extensive Disclosures Regarding The FCC Analog Sunset Order Were Available And Varied Over Time Based On Developments At The FCC

VWGoA had no involvement in providing OnStar services to subscribers, and under the Telematic Services Agreement between OnStar and VWGoA, OnStar was responsible for advising consumers about issues affecting service. *VW Ex. H*, TSA, Statement of Work §20.3. Shortly after the Analog Sunset Order became effective, OnStar made the first of what became a constant stream of public disclosures regarding the FCC's Analog Sunset Order. For example, OnStar provided dealers with information to share with prospective customers about the analog-to-digital transition. *D.C. Ex. 11*, OnStar June 2003 Dealer Letter. OnStar also placed information on its website regarding the FCC discussion for public view. See e.g., *D.C. Ex. 4*, OnStar 2003 Website FAQs. OnStar also began providing each customer with information in its Terms and Conditions, effective July 2003, a document that each new customer was required to read and sign, which stated the following:

> Your vehicle manufacturer has equipped your vehicle with Hardware programmed to receive OnStar services. It must comply with Federal Communications Commission ("FCC") regulations, be compatible with your Services and your service plan, and will not interfere with our services. Your Hardware uses either analog or digital telephone signals. If the underlying wireless carriers terminate or restrict analog service, OnStar services will not be available. Effective February 16, 2008, the FCC no longer requires wireless carriers to support analog service. Thus, some wireless carriers may cease providing service to analog Hardware at that time.

*VW Ex. E*, Pltfs. Resp. to VWGoA RFAs, No. 87; see *D.C. Ex. 38*, Subscription Service Agmt.

---

[2] The only exception would be to extend the date if the wireless carriers did not submit satisfactory reports showing that digital hearing-aid compatible devices would be sufficiently available. *Id.*, p. 5.

OnStar's disclosures evolved over time as information about the FCC's decision changed, as described above. Indeed, after the FCC adopted its rejection of AT&T's petition for reconsideration, OnStar changed the language in its July 2004 Terms and Conditions to the following, although the February 2008 sunset date was still was not certain:

> Analog to Digital Transition. As a result of an FCC ruling, wireless service providers will not be required to support the analog wireless network in the United States *beginning in 2008.* Consequently, *the OnStar wireless service provider will not continue to provide analog service and will begin providing services on the digital network only. To accommodate the transition to the new digital only service, beginning January 1, 2008, the OnStar system will operate only on Equipment capable of operating on the digital network. If your Vehicle is equipped with analog only Equipment, your OnStar system including all services will no longer function as of that date.*

*VW Ex. E*, Pltfs. Resp. to VWGoA RFAs, No. 88 (emphasis added). OnStar also issued an updated disclosure letter to dealers and updated the disclosures on its website. *D.C. Ex. 13*, OnStar June 2004 Dealer Letter; *D.C. Ex. 5*, OnStar 2004 Website FAQs. In December 2004, OnStar further changed its disclosure in the Terms and Conditions. *VW Ex. E*, Pltfs. Resp. to VWGoA RFAs, No. 89.

Similarly, once the FCC decision rejecting AT&T's petition became final, and the February 2008 sunset date became official, VWGoA included disclosures regarding the sunset in brochures for its 2005 model-year vehicles, which would have gone on sale in late Summer 2004.[3] *D.C. Ex. 80*, Cameron Dep., pp. 141-143, 170. For example, VWGoA's disclosure for the 2005 Volkswagen Phaeton stated the following: "Volkswagen vehicles are equipped with a telematics system that utilizes analog telephone signals to enable Volkswagen telematics by OnStar services." See e.g., *VW Ex. I*, 2005 VW Phaeton Brochure; *D.C. Ex. 71*, Golish Dep., pp.

---

[3] Notably, former Commissioner Abernathy concluded in her report that "[i]nformation regarding the cellular analog sunset was made available by the Defendants years before the FCC required wireless carriers to provide such notice. *D.C. Ex. 45*, Abernathy Rpt., p. 7.

39-40. It further stated, "Recently, the U.S. Federal Communications Commission (FCC) ruled that wireless telephone carriers are required to fully support the analog wireless network until February 16, 2008. After that date, it is likely that the analog wireless network will be phased out, ***rendering analog devices inoperable***." *Id.*; *VW Ex. E*, Pltfs Rsp. to VWGoA RFAs Nos. 81, 83, 84 (emphasis added). This disclosure was plain and understandable. Indeed, the one named Plaintiff who purchased a 2005 Phaeton, Robert Golish, so testified:

> Q   Do you have any problem understanding what that [the VWGoA 2005 brochure disclosure] means?
>
> * * *
>
> THE WITNESS:  It says that analog devices will be inoperable.
>
> * * *
>
> BY MR. SEYFERTH:
>
> Q   After a certain date?
>
> A   After a certain date.
>
> Q   And it also says within Footnote 2 that the Volkswagen vehicle that you have has -- or utilizes, quote, analog telephone signals; correct?
>
> A   Yes.
>
> Q   Do you have any problem understanding what that means?
>
> * * *
>
> THE WITNESS:  Well, I guess I don't have a problem understanding what it means. (*D.C. Ex. 71*, Golish Dep., pp. 39-40.)[4]

---

[4] Mr. Golish testified that he reviewed a Phaeton brochure before purchasing, but that he could not recall whether he had personally seen this particular disclosure. *Id.*, p. 41. Nonetheless, he testified he could understand it. Plainly, whether a jury would find that he is chargeable with knowledge of this disclosure is a question unique to Mr. Golish and dependent on the facts of his case. Far from being "representative" of anyone, Mr. Golish's case would be a prime candidate for severance for trial in order to avoid prejudicing a jury which would have to hear any other claimant's case.

Throughout the class period, information about the analog sunset and its effect on analog cellular service was also available from numerous other sources, such as dealer personnel, the internet, media sources, and the FCC itself. See e.g., *D.C. Ex. 11*, OnStar 2003 Dealer Letter; *D.C. Ex. 42*, Martin Rpt., p. 9; *D.C. Ex. 41*, USA Today Article dated 8/7/2002 Re: Analog Sunset and Effect on OnStar; *VW Ex. J*, Telecom Digest Online Posting dated July 28, 2005; *D.C. Ex. 41*, Orlando Sentinel Article dated 5/27/04 Re: OnStar; see also FCC Docket No. 01-108. Indeed, named Plaintiff John Kuller admitted that he had learned about the analog sunset from sources other than OnStar:

> Q   Do you recall how you found out that the system was shutting down, as you say?
>
> A   No, other than from my reading and pursuit of the Internet, and car friends that may have been aware. (*D.C. Ex. 65*, Kuller Dep., p. 42.)

He also testified that this was *before* September 2004. *Id.*, pp. 61-62.

## D.     The Consumer Buying Decision Process Varied Significantly Among Consumers

There were many modes by which a consumer could obtain an OnStar-equipped Volkswagen or Audi vehicle. They could have purchased the vehicle new or used from an authorized dealership, leased new or used from an authorized dealership, purchased or leased used from an independent dealer or private party, bought the vehicle at lease end, received a new or used vehicle as a gift, or purchased the vehicle at an auction. Indeed, although the named VW/Audi Plaintiffs are all new-vehicle purchasers or lessees, examples of some of the other means of obtaining vehicles are demonstrated by named Plaintiffs alleging claims against the other Defendants in this case. See e.g., *D.C. Ex. 52*, Jacovelli Dep., p. 11 (purchased used after friend turned vehicle in dealership); *D.C. Ex. 55*, Stein Dep., p. 25 (purchased after end of lease).

The buying motivations and circumstances and the value placed on OnStar by the various Plaintiffs varied significantly, as Dr. Claude Martin has pointed out. Dr. Martin is an expert in

marketing, with particular expertise on automobile purchasing decisions who has over 35 years of experience with automotive dealers. *D.C. Ex. 42*, Martin Rpt., pp. 27-43 (Curriculum Vitae). Not surprisingly, given Dr. Martin's vast experience and conclusions regarding the important differences among putative class members' purchasing decisions and experience, Plaintiffs attempted to keep his opinions from the Court through a *Daubert* motion. But Plaintiffs failed in this attempt, as the magistrate recommended that the Court not strike Dr. Martin because he has provided relevant information for class certification. See *VW Ex. K*, Rpt. and Rec. On Pltfs. Mtn. to Exclude The Rpt., Supplemental Rebuttal Rpt., and Testimony of Claude R. Martin, Jr., PhD.[5]

Indeed, Dr. Martin summarized and analyzed many of the differences among consumers after reviewing the Plaintiffs' depositions and other record evidence. For example, Dr. Martin noted that "[t]he range of time devoted to the search prior to making a decision [by the named Plaintiffs] consists, for example, from no search (Robert Schatz); to impulsive – same day (Irene Nary); to six months (Murle Kemp); to one year (Charles Allenson)." *D.C. Ex. 42*, Martin Rpt., p. 13. The named Plaintiffs also considered different amounts and types of materials in making their purchase decisions, as Dr. Martin points out:

> For example, David Busch used printed and advertising material; Sandra Williams reports using no printed material, seeing no OnStar advertising and not having an OnStar demonstration; John Kuller looked at Kelly Blue Book material, but no OnStar materials; Larnell Gill reported reading printed brochures and having an OnStar demonstration at the dealer; Walter Rochow and John Irvine reported having no OnStar demonstration, but they did see OnStar advertising; Robert Golish used an internet search system to identify a dealer and then a specific dealer's internet salesperson for information; and Norman & Susan Nelson visited some dealers and then bought on the phone.

*Id.* Further, the named Plaintiffs differed significantly in the number and types of makes and models of vehicles they each searched for before making a purchase decision. *Id.*

---

[5] Plaintiffs did not appeal the Magistrate's Report and Recommendation, and it has now become an order. *Id.*

In addition, the Pláintiffs identified differing motivations for their vehicle purchases. *Id.,* p. 14. Some, such as David Busch, testified that OnStar was the specific reason why they bought their vehicle. *D.C. Ex. 68*, Busch Dep., pp. 205-206; see also *D.C. Ex. 42*, Martin Rpt., p. 14. Others, such as Jack Jacovelli, who bought his friend's vehicle when he traded it in, did not consider OnStar as a motivation at all. *D.C. Ex. 52*, Jacovelli Dep., p. 14. The named Plaintiffs also differed in their use of a "buying pal," in their purchase decisions. *D.C. Ex. 42*, Martin Rpt., p. 15. Dr. Martin explained that "the buying pal can frame the vehicle selection, either for the brand, model, or features," and as such, "in many instances acts as a prime influencer, including the acquisition and processing of information." *Id.* Further, the Plaintiffs vary as to whether they were the principal drivers of the vehicles at issue, which also impacts a consumer's buying process and decision making. *Id.*

Other aspects of the Plaintiffs' purchase circumstances varied as well. OnStar was a separately priced option on some of the vehicles and included as a "special feature at no charge" on other vehicles. See *VW Ex. L*, Schatz Monroney Label; *VW Ex. E*, Pltfs. Resp. to VWGoA RFA Nos. 64, 65. Further, the Plaintiffs negotiated with their sellers over the final vehicle purchase price. For example, the evidence shows that the VW/Audi Plaintiffs paid less than the sticker price for their vehicles or they negotiated a trade-in as part of the purchase. *D.C. Ex. 68*, Busch Dep, pp. 136-137; *D.C. Ex. 71*, Golish Dep., pp. 55-56; *D.C. Ex. 70*, Vamos Dep., p. 30; *D.C. Ex. 67*, Reishman Dep., p. 25; *D.C. Ex. 69*, Schatz Dep., pp. 38-40. The VW/Audi Plaintiffs also negotiated to have certain vehicle features included for free or at a discount. See e.g., *D.C. Ex. 70*, Vamos Dep., p. 31 (negotiated price of roof rack and ski rack).[6]

---

[6] Another difference is that different putative class members would have subscribed to different OnStar subscription packages. As noted above, OnStar charged different prices for these service packages. See e.g., *VW Ex. C*, OnStar Service Descriptions.

E.      **VWGoA's Express Warranties Contain Certain Time And Mileage Limits**

VWGoA's 2002-2005 model-year Audi and Volkswagen vehicles were sold with a standard 4-year/50,000 mile Limited New Vehicle Warranty. See e.g., *VW Ex. M*, VWGoA Warranty. This warranty covered "defects in materials or workmanship" in the vehicle and its components, including the OnStar equipment. *Id.* The warranty did not, however, cover OnStar service. *Id.* Also, some aspects of the vehicles were warranted for longer periods, such as the emissions system (8 years/80,000 miles) and vehicle corrosion (12 years, with no mileage limitation). *Id.* In addition to the standard New Vehicle Limited Warranty, vehicle consumers could also purchase extended warranties on their Audi and Volkswagen vehicles if they chose to do so. But none of the five named VW/Audi Plaintiffs had an extended warranty, and the evidence shows that at least three of them were offered, but chose not to purchase, extended warranties. *VW Ex. E*, Pltfs' Resp. to VWGoA's RFAs Nos. 18, 19, 22, 23, 26, 30-32, 34. "Certified Pre-Owned" warranties were also available on certain used Volkswagen and Audi vehicles. *D.C. Ex. 80*, Cameron Dep., p. 74.

The named VW/Audi Plaintiffs vary as to whether their vehicles were within the express warranty limits as of December 31, 2007. Plaintiffs Vamos, Reishman, and Golish had exceeded the mileage limitation of the warranty, but Plaintiffs Busch and Schatz[7] had not. *VW Ex. E*, Pltfs. Resp. to VWGoA RFAs, Nos. 16, 24, 28; *VW Ex. G*, Pltfs. Am. Rsp. to VWGoA's RFAs, Nos. 20, 29. Whether the express warranty had expired depends on each individual's driving habits.

F.      **Plaintiffs' Newly Proposed Class Is Materially Different Than The Definition Stated In Their Pleadings**

Plaintiffs have filed a class action lawsuit alleging that OnStar, VWGoA, and other

---

[7] The four-year time limitation of Plaintiff Schatz's warranty had expired by December 31, 2007. He purchased his vehicle in September 2003, and the time limitation of the warranty therefore ended in September 2007. *VW Ex. N*, Schatz Purchase Agreement.

vehicle manufacturers whose vehicles contained OnStar equipment misrepresented and omitted

facts regarding the availability of OnStar service after the analog sunset date.   After twice

amending their Complaint, Plaintiffs proffered the following nationwide class against VWGoA:

> All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a VW vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007.

*VW Ex. O*, Pltfs. Initial Class Stmt.   The parties proceeded with discovery regarding class

certification based on this definition.

During the class certification discovery phase, Plaintiffs' experts argued and maintained

that it was necessary to include *non-subscribers* in the class definition, as the following

testimony by Dr. Russell Lamb, Plaintiffs' economist, shows:

> Q.        [ ]  For purposes of your analysis in determining the impact and harm to people that are included in the manufacturer class, you made no distinction between those people that were in the manufacturer class that were subscribers versus those people that were not subscribers to the OnStar service; is that fair?
>
> A.        That's correct. *(D.C. Ex. 83,* Lamb Dep., p. 92)*.

The same is true for Dr. Warren Keegan, Plaintiffs' proffered marketing expert:

> Q.        I'm referring to something different.  And that is, 40 percent of people who bought the subject Subaru vehicles never subscribed, including never activating the service during the first year within which it was free.  Okay?
>
> A.        Uh-hum.
>
> Q.        Is that meaningful to your decision about whether OnStar would have been a meaningful consideration in their purchase decision?
>
> A.        No. *(D.C. Ex. 82,* Keegan Dep., p. 143)*.

Defendants' experts, Dr. Martin, Dr. Richard Semenik, and Dr. Bruce Strombom all

emphasized, however, that whether a particular consumer had been a subscriber to OnStar was a

crucial consideration as to whether the person placed value on OnStar.   See *D.C. Ex. 48*, Semenik Rpt., p. 8; *D.C. Ex. 49*, Semenik Rebuttal Rpt., pp. 4-5; *D.C. Ex. 42*, Martin Rpt., p. 19;[8] *D.C. Ex. 47*, Strombom Rebuttal Rpt., pp. 3, 13-14.  They pointed out that Plaintiffs' class definition and the analysis of Plaintiffs' experts were fundamentally flawed by including vehicle owners or lessees who were not OnStar subscribers at the sunset date.  *Id.*

Subsequently, after Defendants' experts had provided their reports and were deposed, and *616 days* after they filed their Initial Class Statement, Plaintiffs filed their class certification motion, changing their proffered class definition to one that (1) eliminates non-subscribers; (2) requires class members to have subscribed to OnStar and still have owned the vehicle on particular dates; and (3) is limited to residents of particular states:

> All individuals and entities, who are residents of either California, Colorado, New York or West Virginia, who between August 8, 2002 and December 2006, purchased or leased a Volkswagen vehicle that was equipped with an OnStar system, who subscribed to OnStar service as of December 31, 2006 and who owned or leased the vehicle as of December 31, 2007.

See Pltfs. Mtn. for Class Cert. As To VWGoA.  Indeed, Plaintiffs now seek to certify a class that is not only significantly different than the class they have pursued throughout discovery, but that is not identified in any pleading that is pending before the Court, despite having filed three prior versions of their Complaint and seeking a fourth amendment (which also did not proffer the current class definition).  See Prior Complaints, and Pltfs. Mtn. For Leave To File Third Master Amended Class Action Complaint.

## G.   Plaintiffs' Class Action Claims

In their Motion for Class Certification, the VW/Audi Plaintiffs seek certification of classes against VWGoA under the consumer protection acts of West Virginia, Colorado, New

---

[8] A copy of Dr. Martin's Rebuttal Report is also attached for Court's reference as *D.C. Ex. 43.*

York, and California ("the Putative Class States"). Plaintiffs claim that VWGoA violated these states' consumer protection acts through alleged misrepresentations, omissions, and fraud regarding the inoperability of OnStar equipment in Volkswagen and Audi vehicles due to the analog sunset. See 2MAC, ¶¶2, 82, 212; see also Pltfs. Mtn. for Class Cert., p. 22.

The VW/Audi Plaintiffs also seek certification of claims against VWGoA in the Putative Class States for alleged breaches of VWGoA's express Limited New Vehicle Warranty.[9] Specifically, Plaintiffs allege that VWGoA "warranted and represented that the OnStar equipment was free of defects and was suitable for use on the OnStar system." 2MAC, ¶93. They further allege that VWGoA "expressly and impliedly represented to Plaintiffs and the Class that their OnStar equipment would provide safety and security and would function and be available for the life of their vehicles." *Id.*, ¶84.[10]

The damages that Plaintiffs seek from VWGoA (and Honda and Subaru) relating to their non-upgradable equipment are for "that portion of the cost of their OnStar equipment which they were unable to use because it no longer functioned when analog-cellular OnStar service was discontinued." *VW Ex. P*, Lamb Rpt., p. 22. The damages that Plaintiffs with upgradable equipment seek against OnStar are the cost of the upgrade. *Id.*, p. 21. But those with non-upgradable equipment seek the same damages against OnStar that they claim against the VWGoA – i.e., "the portion of their OnStar equipment that they were unable to use." *Id.*, p. 24.

---

[9] Plaintiffs have abandoned their implied warranty and Magnusson-Moss claims. Pltfs. Mtn., p. 2, n.2.

[10] Notably, however, Plaintiffs allege only that "[a]t the time they were given notice that their OnStar equipment was defective, ***numerous*** Class members were within the mileage and term of their limited and extended warranties." 2MAC, ¶217 (emphasis added). Plaintiffs do not allege that all, most, or even a large minority of the putative class members were within their warranty terms when they received notice of the cessation of analog service by OnStar or as of December 31, 2007. *Id.* In other words, Plaintiffs' Second Master Amended Class Action Complaint itself implicitly acknowledges a significant difference among the putative class members regarding whether their vehicles were under warranty at the sunset date.

## III.    CLASS CERTIFICATION REQUIREMENTS AND STANDARD OF REVIEW

Plaintiffs seek to certify four classes pursuant to Fed. R. Civ. P. 23, which lists four

prerequisites which must be met to maintain a class action: numerosity, commonality, typicality

and adequacy of representation. *Rugumbwa v. Betten Motor Sales*, 200 F.R.D. 358, 361 (W.D.

Mich. 2001).    The party seeking certification bears the burden of establishing that *all*

requirements of Rule 23 have been satisfied," *id.*, and "[f]actual determinations necessary to

make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen*

*Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). If each of the four requirements of

Rule 23(a) is met, the party seeking certification must also show that the action falls within one

of the categories listed in Rule 23(b). Here, Plaintiffs attempt to show that the action falls within

Fed. R. Civ. P. 23(b)(3), which requires the Plaintiffs to establish by a preponderance of the

evidence that "questions of law or fact common to the members of the class predominate over

any questions affecting only individual members, and that a class action is superior to other

available methods for the fair and efficient adjudication of the controversy."

A class "may only be certified if the trial court is satisfied, *after a rigorous analysis*, that

the prerequisites" for certification have been met. *General Tele. Co. of Sw. v. Falcon*, 457 U.S.

147, 161 (1982) (emphasis added); *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 397

(6th Cir. 1998) (en banc) ("a district court may not certify any class without 'rigorous analysis'

of the requirements of Rule 23"). "The plain text of Rule 23 requires the court to 'find,' not

merely assume, the facts favoring class certification." *Unger v. Amedisys Inc.*, 401 F.3d 316,

321 (5th Cir. 2005). The need for such a "rigorous analysis" reflects the fact that the elements of

Rule 23 are not discretionary; they are mandatory, and "courts must be mindful that the Rule sets

the requirements they are bound to enforce." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

15

620 (1997). "Because the decision whether to certify a class 'requires a thorough examination of the factual and legal allegations,' the court's rigorous analysis may include a 'preliminary inquiry into the merits,' and the court may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'" *In re Hydrogen Peroxide*, 552 F.3d at 317 (internal citations omitted). The required rigorous analysis of the facts here dictates that Plaintiff's motion for class certification be denied.

## IV.   ARGUMENT[11]

**A.   Plaintiffs' Newly Proposed Classes Cannot Be Certified Because They Have Never Been Identified In Any Pleading Filed With The Court**

Plaintiffs have filed three complaints and attempted to file a fourth in this case. None of these pleadings identifies the classes that Plaintiffs now ask the Court to certify in their instant motion. See Master Class Action Complaint, First and Second Master Amended Class Action Complaints, and Proposed Third Master Amended Class Action Complaint. Moreover, Plaintiffs were required to file their Initial Class Statement on March 2, 2009, but Plaintiffs have never amended their Initial Class Statement. See *VW Ex. O*, Initial Class Stmt.; see also, Fed. R. Civ. P. 26(e). Indeed, 616 days passed between Plaintiffs' Initial Class Statement and Plaintiffs' proffer of the current class for the first time in their November 8, 2010 motion for class certification. The Court cannot properly certify a class that is not identified in any pleadings filed by Plaintiffs: "The court is bound by the class definition provided in the complaint." *Berlowitz v. Nob Hill Masonic Mgmt., Inc.*, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996).[12] "The court will not consider certification of the class beyond the definition provided in the complaint unless plaintiffs choose to amend it." *Id.*

---

[11] Although VWGoA believes its brief is comprehensive, VWGoA incorporates the arguments against class certification made in the respective briefs of the other defendants in this case.
[12] Unpublished cases are attached alphabetically as *VW Ex. T.*

Plaintiffs may attempt to argue that the Court should treat their class certification motion as yet another request to amend their complaint. But such treatment is not appropriate here based on Fed. R. Civ. P. 15. It is appropriate to deny leave to amend where a party has unduly delayed seeking amendment or where the amendment will cause undue prejudice. See *Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 Fed. Appx. 654, 660-61 (6th Cir. 2007) (upholding trial court's denial of leave to amend for undue delay and prejudice).[13] Denial is also appropriate where a party has failed to correct defects through prior amendments. *Armstrong v. McAlpin*, 699 F.2d 79, 93-94 (2nd Cir. 1983) ("Because the complaint whose allegations were being considered by the district court was plaintiffs' second amended complaint, the district court did not abuse its discretion in refusing to give plaintiffs a fourth attempt to plead."); *McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2161786 (S.D.N.Y. Jul. 27, 2007) ("There is no basis in the Federal Rules or the case law for Plaintiff's right to endless amendments of the complaint until his allegations stumble upon a viable claim.").

The changes that Plaintiffs have made to the class definition in their brief are material changes that should require yet another amendment to their complaint. Indeed, the proposed change reduced the number of potential VW/Audi class members from over 38,000 to less than 3,400. See *VW Ex. B*, List of VW/Audi OnStar Equipped vehicles and *VW Ex. Q*, OnStar Subscriber Data By State as of 12/31/06 for VW/Audi Vehicles. But Plaintiffs have unreasonably delayed in seeking to amend the class definitions, waiting more than 20 months after filing their Initial Class Statement to do so. Moreover, although Plaintiffs have filed a complaint that has been amended twice and sought leave to file a fourth complaint, which was

---

[13] "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001).

granted, in part, Plaintiffs have never corrected, or even attempted to correct, the defect in their complaints to state the class definition they now proffer. This has materially prejudiced VWGoA's ability to obtain discovery, particularly from Plaintiffs' experts, regarding the scope of the new class definition and how it affects the issues regarding class certification. Accordingly, the Court should reject this indirect attempt by Plaintiffs to amend their Complaint, and it should refuse to certify Plaintiffs' newly proffered classes against VWGoA.

**B.      Plaintiffs' Proposed Classes Are Not Certifiable Under Rule 23(b)(3)**

      **1.      The Court Should Not Certify A Class Under The Consumer Protection Acts Of The Putative Class States Because Individual Issues Predominate**

To prove that they are entitled to damages under the consumer protection laws of the Putative Class States, Plaintiffs must prove that VWGoA's alleged misrepresentations were the "but for" cause of their alleged damages. As discussed below, this is necessarily a matter of individual inquiry that precludes class certification.

      **a.      West Virginia and Colorado**

The West Virginia Supreme Court of Appeals, in a case analyzing the West Virginia Consumer Credit and Protection Act, recently held that causation is required:

> [w]here concealment, suppression or omission is alleged, and proving reliance is an impossibility, the causal connection between the deceptive act and the ascertainable loss is established by presentation of facts showing that the deceptive conduct was the proximate cause of the loss. In other words, the facts have to establish that 'but for' the deceptive conduct or practice a reasonable consumer would not have purchased the product and incurred the ascertainable loss. We find that this approach best serves the WVCCPA's dual purpose of protecting the consumer while promoting 'fair and honest competition.'

*White v. Wyeth*, ___ S.E.2d ___, 2010 WL 5140048 (W. Va. Dec. 17, 2010). Accordingly, "a private cause of action under the provisions of West Virginia Code § 46A-6-106(a) of the West Virginia Consumer Credit and Protection Act must allege: (1) unlawful conduct by a seller; (2) an ascertainable loss on the part of the consumer; and (3) ***proof of a causal connection*** between

the alleged unlawful conduct and the consumer's ascertainable loss." *Id.* (emphasis added). And "[w]here the deceptive conduct or practice alleged involves affirmative misrepresentations, *reliance* on such misrepresentations must be proven in order to satisfy the requisite causal connection." *Id.* (emphasis added).

Colorado law is substantially the same. In *Garcia v. Medved Chevrolet, Inc.*, 240 P.3d 371 (Colo. App. 2009), the Colorado Court of Appeals expressly rejected the notion of presumed reliance in consumer protection act cases and held that class members could not establish the required classwide injury in a class action under facts similar to the instant case. Specifically, the court addressed the question of "whether the allegations of materially deceptive omissions in the context of an alleged violation of the Colorado Consumer Protection Act satisfy a classwide theory of causation and injury." *Garcia*, 240 P.3d at 379. The plaintiff brought a class action on behalf of Colorado consumers against ten automobile dealerships alleging a violation of the CCPA based on a claimed failure to adequately disclose the identity and cost of dealer-added aftermarket products in connection with the sale of new automobiles. *Id.*, at 374. The plaintiff claimed that there were fraudulent omissions on window stickers and that, but for those omissions, the buyer would have paid a lower price or, perhaps, would not have purchased the automobile. *Id.*, at 376. The defendants argued that face-to-face transactions involving individual buyers preclude a classwide method of proving causation and injury. *Id.*, at 378.

The court held that there was no basis in Colorado law for proving reliance on a consumer protection act claim by circumstantial evidence. *Id.*, at 379. The court also held that there was no basis for a "presumed reliance" theory in Colorado. *Id.*, at 380-81. Indeed, the court held that it was necessary to analyze individual purchase prices and face-to-face transactions with the dealer, because some plaintiffs could have "struck a bargain in anticipation

19

of receiving the products. It is even possible that a particular price paid for a given automobile was so far below the MSRP that there was no effective charge for manufacturer-installed options, let alone dealer-added products" and "the price paid by each customer is an important and predominant component of injury." *Id.* Thus, because the trial court did not consider the affect of those individualized issues on class certification, it reversed the trial court's class certification order and remanded for further proceedings. *Id.* at 382.

### b. New York and California

New York law also requires that Plaintiffs establish causation, and causation in the consumer protection act context is a matter of individualized inquiry. Although individual reliance is not a required element of a § 349 claim, a plaintiff must still show that the material deceptive acts alleged *caused* the alleged injury. *Morrissey v. Nextell Partners, Inc.*, 72 A.D.3d 209, 895 N.Y.S.2d 580, 585, 587 (2010) ("the prosecution of plaintiffs' Gen. Bus. Law §349 claim would require extensive individualized inquiries into the conduct of defendant's sales representatives with respect to each individual purchaser which, in turn, would overwhelm any issues common to the class" because "if the terms and conditions associated with the use of 'bonus minutes' were fully disclosed to any given customer prior to his or her purchase, it could not be said that any such customer suffered an injury as a result of the alleged deceptive practice"). Accordingly, the Court must conduct individualized inquiries to determine whether the class members received any disclosures or representations from dealership salespeople.

Finally, California also requires proof of reliance and causation under the CLRA and the UCL. Regarding causation, it is well-settled that "to obtain relief under the CLRA, both the named plaintiff and unnamed class members must have suffered some damage *caused by* a practice deemed unlawful under Civil Code section 1770." *Sevidal v. Target Corp.*, 189 Cal.

20

App. 4th 905, 929 (2010) (citation omitted) (emphasis in original).  The *Sevidal* court concluded that "[b]ecause the majority of unnamed class members did not view the alleged misrepresentation, they could not satisfy this causation element of the CLRA claim."  *Id.* at 929; *see also Gartin v. S&M Nutec LLC*, 245 F.R.D. 429, 440 (C.D. Cal. 2007) ("Relief is limited to those who actually suffered damages, so causation is a requirement of relief under CLRA.").[14]

As for reliance, "actual reliance must be established for an award of damages under the CLRA."  *See Cohen v. DIRECTV, Inc.*, 178 Cal. App.4th 966, 980 (2010) (citations omitted). *Cohen* addressed class certification of CLRA and UCL claims following the California Supreme Court's decision in *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009).  The *Cohen* court explained that although *Tobacco II* addressed the standing requirements for absent class members in UCL class actions brought under California law, it did not change the courts' predominance analysis with regard to the individual factual issues raised by UCL and CLRA claims.  *Id.* at 980-81 ("the issue of 'standing' simply is not the same thing as the issue of 'commonality' [California's version of predominance]").  The *Cohen* court then affirmed the denial of plaintiff's class certification motion because the UCL and CLRA claims raised individualized questions about class members' reliance on the allegedly false representations.  *Id.*[15]

---

[14] Similarly, the *Gartin* court held that causation could not be determined on a classwide basis because, unlike some of the putative class members, the named plaintiff did not read the product's packaging and representations, and thus a determination of whether the packaging constituted a material misrepresentation would have to be determined on an individual basis for each class member.  *Gartin*, 245 F.R.D., at 440 (citing *Caro v. Procter & Gamble Co.*, 18 Cal. App.4th 644, 668 (1993) (same)); See also, *Yadlosky v. Grant Thornton, L.L.P.*, 197 F.R.D. 292, 297 (E.D. Mich. 2000)("Where numerous mini-trials are necessary to resolve individual questions of reliance and causation, the benefits of a class action disappear.")

[15] In another California case, the court also analyzed the *Tobacco II* case, noting that "[t]he parties in *Tobacco II* agreed the phrase 'as a result of' in Business and Professions Code section 17204 'indicates there must be some connection between the injury and the defendant's conduct,' but they disagreed as to the particular type of causation the plaintiff must plead and prove." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1362 (2010), quoting *Tobacco II*, 46 Cal. 4th

Therefore, to obtain class certification, a class representative must show that purported

class members suffered *actual damages* or that damages can be inferred based upon reliance

upon a material misrepresentation. Differences among the proposed class members in their *very*

*entitlement to* damages and in their *manner of incurring* damages are grounds to deny class

certification. See *Allen v. DaimlerChrysler Motors Co. LLC*, 2007 WL 2774440, at *6 (Cal.

App. 1 Dist. Sept. 25, 2007).

### c.   Reliance And Causation Are Issues Requiring Individualized Inquiry

Here, it is undisputed that whether and what kind of information about the analog sunset

was available varied over time. The testimony of some named Plaintiffs shows that consumers

could have learned about and understood the impact of the analog sunset on OnStar long before

December 31, 2006. Consumers had discussions with dealer salespeople about OnStar, and

could have discussed the analog sunset issue prior to purchase. Further, as noted above, John

Kuller testified he independently learned about the analog sunset issue from the internet and/or

friends in 2004. VWGoA's 2005 model-year brochures had disclosures about the sunset, and, as

noted above, Plaintiff Robert Golish testified that he could understand the disclosure. Plaintiff

---

at p. 325. The court further observed that the *Tobacco II* court held the "as a result of" language
"'imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action
under the UCL's fraud prong.'" *Id.*, quoting *Tobacco II*, 46 Cal 4th at p. 326. The *Durell* court
then explained "there is no doubt that reliance is the causal mechanism of fraud. Additionally,
because it is clear that the overriding purpose of Proposition 64 was to impose limits on private
enforcement actions under the UCL, we must construe the phrase 'as a result of' in light of this
intention to limit such actions." *Id.* The court rejected the argument that the phrase "as a result
of" "merely requires 'a factual nexus' between a defendant's conduct and a plaintiff's injury:
[i.e.] 'the representative plaintiff need only be one of the people from whom the defendant
obtained money or property while engaging in its unfair business practice.'" *Id.* The *Durell*
Court further noted that "'[r]eliance is proved by showing that the defendant's misrepresentation
or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct." *Id.* n. 6.
A plaintiff may establish that the defendant's misrepresentation is an "immediate cause" of the
plaintiff's conduct by showing that in its absence the plaintiff "in all reasonable probability"
would not have engaged in the injury-producing conduct.'" *Id.*

Larnell Gill also testified that he could understand OnStar's disclosure in its Terms and Conditions. *D.C. Ex. 63*, Gill Dep., pp. 107-108. Each of these persons' knowledge of, and claimed reliance on, any of these alleged disclosures or concealments, as well as their materiality in the vastly greater vehicle purchase decision of which they are, at best, a very minor part, can only be presented to and resolved by a jury individually with respect to each transaction (See discussion below of reliance and causation with respect to warranty claims).

Indeed, Plaintiffs' expert, Warren Keegan admits that consumers could have known about the sunset issue based on available disclosures:

Q.      I'll represent to you, sir, that Mr. Gill testified that upon reading the terms and conditions, that he understood them to inform him that after January 1st, 2008, the OnStar service would not be available in analog vehicles. And that he also understood that he had an analog vehicle.

Did you disregard Mr. Larnell Gill's testimony for some specific reason or would you consider him an outlier?

A.      *I'd consider him an outlier.*

Q.      He's a named class representative. You understand that, correct?

A.      Yes. Yes.

Q.      So, in your mind, Mr. Gill would not be typical of the prospective purchaser in this case?

A.      Yes. He's *untypical* in that he read it and he's *untypical* in that he understood it. (*D.C. Ex. 82*, Keegan Dep., pp. 74-75) (emphasis added).

* * *

Q.      Would you agree with me that it's at least a possibility, based on the information we've seen and that was made available to dealers, that some dealer personnel, in fact, did communicate to customers what equipment they had in their car and what effect the analog sunset date would have on that equipment?

A.      Yes. (*Id.*, p. 261).

* * *

23

Q.      All right . . . in discussing this issue of impending obsolescence, you said, quote, some people could have known, end quote.  Do you recall saying that about this pending obsolescence, based on the review of the materials that we looked at?

A.      Yes.

Q.      All right.  And the reason that some people could have known would have been because of materials provided by OnStar and/or one of the manufacturers, such as VW.  Fair?

A.      Yes.  (*Id.*, p. 271).

Dr. Keegan further testified that if someone saw and understood the disclosures and still purchased the vehicle, they cannot claim to have been suffered any injury as a result:

Q.      [ ] How is it that if, as you suggest, a better or satisfactory disclosure was made, that that would have caused all of the proposed class members to do something different that would have avoided the harm?

A.      [ ] But the big difference is, in the one case people know, they're informed.  And in the other case, they don't know.  And that's where they -- ***in the one case, they have not been harmed because they're informed.***  And they have every right to walk away, to negotiate a different price, to decline the option, you know, and all of the various permutations.  They can do whatever they do. (*Id.*, pp. 54-55).

Dr. Keegan also admits that whether a putative class member has suffered injury – a material element of any claim – is a matter of individual inquiry:

Q.      ***In figuring out the issue of whether . . . the failure to disclose has caused those used buyers to suffer some kind of damage or be impacted or for there to be causation, you'd have to look at what that used buyer knew about the sunset, right?***

A.      Yes.  (*Id.*, p. 189) (emphasis added).

And because it is essentially necessary to have "mini trials" on this issue, class certification is improper.

**2.    Individualized Issues Predominate In Determining Whether Plaintiffs Satisfy The Elements Of Their Express Warranty Claims**

**a.    It Is Necessary To Determine Whether A Putative Class Member Was Within The Durational Limitations Of His Or Her Express Warranty, Which Requires Individualized Inquiry**

To prove breach of express warranty, a plaintiff must prove that he or she was within the durational limitations of his or her express warranty at the time OnStar analog service stopped. Indeed, the Court has already ruled on this issue: "the express warranty claim in the MAC, as it currently exists, fails to state a claim for relief as to those named-Plaintiffs whose express written warranties had expired prior to the cut-off of analog service." *In re OnStar Contract Litig.,* 600 F. Supp. 2d 861, 879 (E.D. Mich. 2009).[16]

The evidence shows that three out of the five VW/Audi plaintiffs were outside of their warranty mileage term. This alone demonstrates the diversity among putative class members on this issue. But there is also no way to determine the vehicle mileage of each putative class member as of December 31, 2007 without individual inquiry. VWGoA does not have repair records for every vehicle sold or leased, and even if such records were available, they would not indicate whether a putative class member's warranty had expired due to mileage. For example, if someone had their car repaired at a VWGoA dealership in 2005 at 35,000 miles but never brought it in for repair afterwards, there is no way to know if and when they exceeded the 50,000 mile limit, except to seek individualized evidence from the putative class member.

**b.    Individualized Inquiry Is Required To Prove Reliance And Causation**

To succeed on a breach of express warranty claim in any of the Putative Class States,

---

[16] See also, *Daugherty v. American Honda Motor Co.,* 144 Cal. App. 4th 824 (2006); *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238 (2nd Cir. 1986); *Regents of the Univ. of Colorado v. Harbert Constr. Co.,* 51 P.3d 1037, 1041 (Colo. App. 2001). Therefore, whether or not a particular proposed class member is within the warranty is a crucial issue.

Plaintiffs must show that the breach of the warranty directly caused their damages, regardless of whether reliance is required. But as discussed below, whether any class member can claim that the alleged breach of warranty caused him or her damages will depend on individualized proof of whether the class member had actual notice of the analog sunset and its effect on OnStar.

### i.      *West Virginia and Colorado*

In West Virginia, courts have held that "in the context of a breach of warranty[] claim, the concepts of reliance and causation are closely related . . . . This does not mean, however, that the concepts of causation and reliance are identical." *Allegheny & Western Energy Corp. v. Columbia Gas Sys., Inc.*, 1986 WL 13360, *6, n.7 (S.D. W. Va. June 30, 1986). Plaintiffs cite *Allegheny* for the proposition that West Virginia does not require reliance in a breach of warranty claim, but they fail to inform the Court that *Allegheny* holds that a plaintiff must still prove causation. In *Allegheny*, Allegheny claimed that Columbia made misrepresentations in the course of Allegheny's acquisition of Columbia Gas and that Columbia breached warranties included in the sales agreement between the parties. *Id.* at *1. Although the court ruled that reliance is not a requirement of a breach of warranty claim in West Virginia, it held that causation is, reasoning that if it was "shown that Allegheny was aware of the April 30 filing and that Columbia did not mislead Allegheny with respect to the nature of the proceeding [in its description of the proceeding to Allegheny officials], then it may safely be said that Allegheny did not rely on Columbia's omission and that Columbia's breach of warranty did not cause Allegheny any damages." *Id.* at *6, citing *Consolidated Freightways Corp. v. Neidert Terminals, Inc.*, 612 F. Supp. 1391, 1397 (N.D. Ill. 1985) (no recovery for breach of warranty where causal link between breach and injury was not established).

Colorado law likewise requires a plaintiff to prove causation, and where a plaintiff possesses information contrary to the warranty before purchase, but buys anyway, he or she has waived any claim that the breach of warranty caused him or her damages. In *Associates of San Lazaro v. San Lazaro Park Properties*, 864 P.2d 111 (Colo. 1993), the Colorado Supreme Court held that the purchaser of a mobile home park waived its right to rely on express warranties contained in the purchase agreement. The plaintiff was informed by its own independent investigation of discrepancies about the number of mobile home pads that would be available for rent and the warranty offered by the seller. *Id.* at 114. But the plaintiff chose to purchase anyway on the chance that it could resolve the issue in the future. *Id.* at 114-115. The court ruled that, under such circumstances, "the seller's warranty does not constitute an inducement to the buyer, and enforcement of the warranty might grant the buyer an unfair advantage." *Id.*, at 115. Furthermore, the court observed that "[b]y necessity, the determination of whether a buyer clearly relied upon the buyer's independent investigation involves substantial fact finding." *Id.* In other words, it is a matter of intense individualized inquiry.

### ii.    New York and California

New York law also requires proof of reliance and causation. In *Klein v. Robert's American Gourmet Food, Inc.*, 28 A.D. 3d 63 (2006), the appellate court held that the record did not provide the basis for the Supreme Court's (the lower court) conclusion that common issues of law and fact predominate over issues affecting only individual members of the class. *Id.*, at 72. "The complaint, for instance, asserts causes of action sounding in common-law fraud, negligent misrepresentation, *breach of express warranties,* and false advertising under General Business Law § 350. *Each requires . . . proof of reliance*[.]" *Id.* (emphasis added). The court held, therefore, that questions existed that were not common to the proposed class, "such as

whether individual Class members purchased the Products in reliance upon the allegedly misrepresented fat and caloric contents [of defendant's snack food], as opposed to other considerations." *Id.*; see *Riegel v. Medtronic, Inc.*, 2003 WL 25556778, at *2 (N.D.N.Y. Dec. 2, 2003) ("In order for an express warranty to exist, there must be an affirmation of fact or promise by the seller, the natural tendency of which is to induce the buyer to purchase. Thus, for a buyer to recover for breach of express warranty, he must show that the warranty was relied on."). Absent any evidence of reliance, the breach of warranty claim cannot stand. *Id.*; see also *Strauss v. Long Island Sports, Inc.*, 401 N.Y.S.2d 233, 235 (App. 1978) ("It is elementary that in any action based upon representations in advertising whether the action sounds in fraud or in warranty the plaintiff must prove knowledge of, and reliance upon, the representations alleged.").

Plaintiffs incorrectly argue that *Levin v. Gallery 63 Antiques Corp.*, 2006 WL 2802008 (S.D.N.Y. Sept. 28, 2006) holds that reliance is not at all required to establish a breach of warranty claim. "Reliance is a part of an express warranty claim, but only in the sense that a party to a contract must rely on the inclusion of an express warranty in order to make an agreement." *Id.* at *11, citing *Donald v. Shinn Fu Co. of Am.*, 2005 WL 32068351, *5 (S.D.N.Y. Nov. 14, 2005). Accordingly, if a class member had obtained information about the analog sunset and its effect on OnStar service from VWGoA, a VWGoA dealer, or OnStar prior to the transaction and still purchased, such a person could not have reasonably relied upon any allegedly contrary express warranty. Indeed, the Second Circuit has held that "a court must evaluate both the extent and the source of the buyer's knowledge about the truth of what the seller is warranting. 'Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless

the buyer expressly preserves his rights under the warranties . . ., we think the buyer has waived the breach.'" *Rogath v. Siebenmann*, 129 F.3d 261, 264 (2d Cir. 1997), quoting, *Galli v. Metz*, 973 F.2d 145, 151 (2d Cir.1992). Of course, to determine if a purchaser had such information and chose to purchase anyway is necessarily a matter of individualized inquiry that has direct bearing on any particular class member's potential entitlement to damages.

California law is similar, as it too requires proof of causation in breach of express warranty cases. Although a breach of warranty claim in California does not require proof of prior reliance, causation remains an essential element of such a claim. See *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (2008); *Safaie v. Jacuzzi Whirlpool Bath, Inc.*, 2008 WL 4868653 (Cal. App. 4th Nov. 12, 2008)("Regardless of the extent to which the reliance element has been statutorily altered or removed from express warranty claims, the plaintiff must show injury from the breach of express warranty to obtain any recovery beyond nominal damages."). This requires individualized inquiry.[17]

---

[17] Furthermore, at least one California court has observed that even the presumption of reliance can be rebutted. See *Keith v. Buchanan*, 173 Cal. App. 3d 13, 24 (1985) ("The buyer's actual knowledge of the true condition of the goods prior to the making of the contract may make it plain that the seller's statement was not relied upon as one of the inducements for the purchase, but the burden is on the seller to demonstrate such knowledge on the part of the buyer. Where the buyer inspects the goods before purchase, he may be deemed to have waived the seller's express warranties"); but see, *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213 (2010) (distinguishing *Keith* where the disclosure sought to be used as the basis for rebuttal of reliance was made *after* purchase.) *Keith* is apposite for this analysis, however, because the basis for rebutting the presumption of reliance here is whether a particular plaintiff had actual knowledge of the analog sunset *before* purchasing or leasing their vehicle, which would remove any alleged reliance on a warranty for the life of the vehicle from the basis of the bargain. Moreover, Plaintiffs' reliance on *Weinstat* is misplaced because an individualized inquiry is still necessary to determine whether a class member received the OnStar Terms and Conditions or other literature disclosing the analog sunset at the time of vehicle delivery and whether that person understood those disclosures. Indeed, *Weinstat* holds that "affirmations and descriptions in product literature received *at the time of delivery but after payment of the purchase price are, without more, part of the basis of the bargain, period.*" *Id.* at 631 (emphasis added). Therefore, at a minimum, it is necessary to inquire as to each putative class member whether, at the time of

     c.     **The Alleged Unconscionability Of VWGoA's Warranty Does Not Eliminate The Need For Individualized Inquiry**

Unconscionability is a matter of individualized inquiry, because it is dependent on the particular facts and circumstances of the transaction in question. "[D]etermining whether isolated contractual language is 'unconscionable' requires analysis of the *particular facts and circumstances* surrounding an *individual transaction* or series of transactions . . . [E]ach case necessarily turns on variable evidence of the 'commercial setting' in which challenged disclaimers were imposed." *Carlson v. General Motors Corp.,* 883 F.2d 287, 294, n. 8 (4th Cir. 1989); *American Software, Inc. v. Ali,* 46 Cal. App. 4th 1386, 1390-91 (1996)("California courts generally require a showing of procedural and substantive unconscionability at the time the contract was made"); *Mullan v. Quickie Aircraft Corp.,* 797 F.2d 845, 850 (10th Cir. 1986) (factors to consider for unconscionability include, among other things "all the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect"); *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 787-88 (2nd Cir. 2003) (same).

Here, individual inquiry is necessary to determine if a particular plaintiff had actual knowledge of the analog sunset – such as from a conversation with the dealer or by reviewing a brochure – and still purchased, because such person is estopped from claiming unconscionability. Also, a plaintiff could have knowingly purchased a used vehicle after the express warranty had expired, and therefore had no reasonable expectation of warranty coverage for any aspect of the vehicle when he or she entered the transaction. This would be particularly true if the used vehicle had a sticker identifying the vehicle being sold "As Is," which is required by federal and states laws. See e.g. *VW Ex. R,* 16 C.F.R § 455.2. At a minimum, for such used-car purchasers,

---

purchase, they received OnStar's Terms and Conditions and how they understood those disclosures.

one must make individual inquiries as to whether they understood that they were purchasing their vehicle "As Is" and whether it had a sticker or other disclaimer to that effect.[18]

Further, the Limited New Vehicle Warranty clearly states if an aspect of the vehicle was warranted beyond the 4-year/50,000 mile term (e.g., emissions (8-years/80,000 miles) and corrosion (12 years)), and OnStar equipment is not among them. There is no statement in the warranty that the OnStar equipment was warranted for longer than four years or 50,000 miles or for the life of the vehicle. See *Ex. M*, VWGoA Warranty. Plaintiffs do not provide any factual or legal basis to support a claim that any express warranty existed outside of the terms of the written warranty, nor is there any. But even if Plaintiffs could argue that other express warranties exist such that OnStar equipment was warranted for the "useful life" of the vehicle, whether *any particular class member* received such an express warranty outside of the written warranty is a matter of individual inquiry. Indeed, one would have to determine whether, and on what basis, a particular consumer believed that the OnStar equipment was expressly warranted for the vehicle's "useful life." For example, one would have to know whether a plaintiff relied on dealer representations to that effect, as Plaintiff Pepper testified in his deposition. See *D.C. Ex. 66*, Pepper Dep., p. 23. Again, this requires individualized inquiry.

### 3. Individual Issues Predominate Because Of The Variations In The Timing And Content Of Disclosures That The Putative Class Members Were Exposed To Before Purchase

As noted above, the disclosures by OnStar and VWGoA appropriately varied in content over time. There were no disclosures by OnStar or VWGoA before the Analog Sunset Order became effective in February 2003, some disclosures after it became effective, and various different disclosures on different dates after the FCC's February 2004 order reaffirming the

---

[18] Any claim by a consumer who purchased after the stated term of the express warranty expired sounds in implied warranty, which Plaintiffs' have expressly abandoned.

February 2008 sunset date. *VW Ex. E*, Pltfs. Resp. to VWGoA RFAs, No. 81-89.   The main

issue, therefore, is what disclosures were available when a particular class member obtained his

or her vehicle.   This varied extensively.   For example, the information available to a purchaser of

a new 2003 model-year vehicle regarding OnStar was significantly different than what was

available to one who bought a new 2005 model-year vehicle.   Further, the sources and content of

disclosures available to a person who bought a used 2003 model-year vehicle – included in

Plaintiffs' proposed class – in calendar-year 2005 were indisputably different than those that

were available to a person who bought the same 2003 model-year vehicle new in 2002.[19]   Thus,

to assess any individual's claims, the Court must look at what information was available when

that individual bought or leased, whether the individual saw the disclosure, and whether the

individual understood the disclosure. See e.g., *VW Ex. S*, Disclosure Examples.

Instructive is a consumer fraud case involving changing warnings where the court held

that common issues did not predominate because the manufacturer's "promotional material,

informational literature, and advertising changed over time, [and] what and when a plaintiff saw

the advertisement will differ from plaintiff to plaintiff, directly affecting whether Wyeth violated

any consumer fraud laws." *In re Prempro Products Liab. Litig.*, 230 F.R.D. 555, 567 (E.D. Ark.

2005).   In another case where disclosures changed over time, a different court also held "[s]ome

members of each proposed class . . . will have to prove that Merck was negligent because it

failed to give any warning.   Post-June 2005 users will have to argue that the current warning is

inadequate.   No one class member's theory of negligence is typical of all other class members'

claims." *In re Fosamax Products Liab. Litig.*, 248 F.R.D. 389, 399 (S.D.N.Y. 2008).

At a minimum, the putative class would have to be split into subclasses based on when

---

[19] As noted above, new model-year vehicle typically go on sale in approximately August of the previous calendar year.

they purchased and what disclosures were available at the time:

> consumers can be divided into *at least seven* (7) different groups based on the number of times the warning status changed. . . . Whereas putative class members who initially took Propulsid when there were no warnings might not have been adequately warned, this is not to say that those who took in 2000 with the numerous additional warnings were not. The proffered class representatives do no represent these different possibilities on behalf of putative class members and their various circumstances under which they consumed Propulsid.

*Cartiglia v. Johnson & Johnson Co.*, 2002 WL 1009473 (N.J. Super. Apr. 24, 2002). Courts come to the same conclusion in the context of automotive disclosures: "A determination would have to be made whether each putative class member had seen a rollover warning and, if so, which version they saw, how they interpreted it and what impact it had on their understanding in order to determine if that member was deprived of their full purchase price." *Ortiz. v. Ford Motor Co.*, 909 So.2d 479 (Fla. App. 2005).

The above cases demonstrate that whether a particular plaintiff received an adequate disclosure varies by when the person bought or leased their vehicle, what disclosures were available, and whether they understood the disclosures they saw, if any. None of these facts can be determined without individualized inquiry. Accordingly, Plaintiffs do not satisfy the predominance requirement of Rule 23, and the Court should decline to certify any classes.

### 4.     Individual Issues Predominate Regarding Damages

VWGoA's economics expert, Bruce Strombom, addressed the issue of damages at length in his expert report. *D.C. Ex. 47*, Strombom Rebuttal Rpt. Dr. Strombom is an economist with over 17 years of experience, including economic issues regarding the value of automobiles. *Id.* In his report, Dr. Strombom concludes that the determination of damages is rife with individualized questions that must be resolved. First, Dr. Strombom concludes that damages cannot be determined without knowing how each individual valued the OnStar equipment, if at all. *Id.*, p. 3. Plaintiffs' expert, Warren Keegan, admits that this is the case here:

A.       But of and in itself, *it simply remains unknown as to what each individual's value preference was for -- for the OnStar event.*

Q.       And that would be really something that would be an *individual inquiry*? I mean, you'd have to look at each situation, and even those situations that we have of the 25 people here, to know how that ranked at all consciously in the mix. Fair?

A.       Yes. (*D.C. Ex. 82*, Keegan Dep., pp. 300-301 (emphasis added)).

Second, Dr. Strombom also concluded that it is necessary to review *how and to what extent* each person used OnStar to establish the extent to which they suffered harm based on their expectation of being able to use OnStar service. *Id.* Third, Dr. Strombom concluded that determining damages will require individualized information about new and used vehicle transaction prices for each particular vehicle to determine if the price of OnStar equipment was passed through to any particular consumer. *Id.*, pp. 3-4. Fourth, Dr. Strombom concluded that the rate of depreciation of vehicles and OnStar equipment would also require individualized determination because of the particularized factors that affect that calculation, such as accumulated mileage, geographic location, vehicle condition, and expected holding period. *Id.*, p. 5. Because individualized inquiry is necessary regarding the fact, rather than simply the amount of damages, the Court should deny class certification.

## C.   Plaintiffs Have Not Established Numerosity

Plaintiffs offer only mere speculation and conclusory statements as to the number of putative class members in any of their proffered classes against VWGoA. "A mere conclusory allegation that joinder is impractical or speculation as to the size of the class is insufficient." *Marcial v. Coronet Ins. Co.*, 122 F.R.D. 529, 530 (N.D. Ill. 1988) (denying class certification where plaintiff alleged that 400 to 600 insureds filed theft claims, but plaintiff did not indicate how many of those people were affected by the fraudulent scheme in question); see also, *Schwartz v. The Upper Deck Co.*, 183 F.R.D. 672, 682 (S.D. Cal. 1999) ("While the Court

*suspects* that there are enough potential class members to more than adequately meet the minimum required by Rule 23(a)(1), a mere hunch by the Court is insufficient grounds.") (emphasis in original). Thus, Plaintiffs have not carried their burden to establish numerosity.

Moreover, information that VWGoA has only very recently received from OnStar in light of Plaintiff's changed class definitions shows that Plaintiffs cannot establish numerosity in West Virginia. Indeed, the OnStar data shows that there were only 63 OnStar subscribers in West Virginia with Audi/VW vehicles as of December 31, 2006. *VW Ex. Q*, OnStar Subscriber Data. VWGoA does not have information about how many of those people still owned their vehicles as of December 31, 2007 – as required by Plaintiffs' current class definition – but it certainly less than 63, and perhaps substantially so, whether through vehicle sale, trade in, theft, or accident loss. Such a small number of putative class members cannot support class certification.

**D.     The *Tele Aid* Case Is Readily Distinguishable And Cuts Against Class Certification**

Plaintiffs cite to *Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D. N.J. 2009) ("*Tele Aid I*") to support their claims against VWGoA. See Pltfs' Brf. pp. 9-10. But this reliance in misplaced because *Tele Aid* is distinguishable in at least two important ways. First, the defendant in *Tele-Aid* was the vehicle manufacturer *and* the services provider, whereas VWGoA is merely the vehicle manufacturer and had nothing to do with services. See *Tele-Aid I*, 257 F.R.D., at 50. This is important because the *Tele Aid* court, in a subsequent opinion, raised the following distinction about when and how the alleged harm arose for the putative class members: "The harm at issue in this litigation, however, does not arise out of the Plaintiffs' purchase of their *vehicles*, but rather their decision to subscribe to *Tele Aid service* for those vehicles." *Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 1145 (D. N.J. 2010) ("*Tele Aid II*") (emphasis added). "Accordingly, it is not the information that the class Plaintiffs considered when making the decision to purchase their vehicles that is relevant to the Court's determination

as to which state's law applies to their respective claims, but rather the information that affected their choices to subscribe to Tele Aid and subsequent decisions to renew that subscription" *Id.* This is the opposite of the case here, where Plaintiffs seek to certify classes against VWGoA based on their decisions to purchase vehicles, as opposed to their decision to subscribe to OnStar. Thus, the *Tele Aid* decision on class certification, by its own terms, is inapposite.

Second, the claims in *Tele Aid* case were based entirely on Mercedes' failure to make *any* public disclosure until 2006, after the vehicles were purchased. *Tele Aid I*, at 52. Here, as discussed above, there is no dispute that disclosures were made by OnStar and VWGoA at various times, beginning in 2003; thus, the claims involve the adequacy of disclosures. The *Tele Aid* Court held that, because the consumer fraud claims were based on uniform alleged *omissions*, rather than individualized alleged misrepresentations (as here), the plaintiffs could establish causation by common proof by simply showing that Mercedes knew analog service not available after 2007 but did not make *any* disclosures to class members until after they had purchased vehicles that contained analog-only systems and subscribed to Tele Aid. *Id.*, at 74-75.

*Tele Aid* is also not helpful to Plaintiffs because that court excluded persons who had "actual knowledge" through disclosures on window stickers on pre-owned cars after 2006 because they could not establish that Mercedes caused them harm. *Tele Aid II*, 267 F.R.D. at 157. The same reasoning applies here, but on a broader scale, and similarly warrants denying class certification. The evidence shows that at least some consumers could have received and understood OnStar's and VWGoA's disclosures or information from other sources about the analog sunset and its effect on OnStar before purchasing. If that is the case, such consumers were not harmed by their purchase of an Audi or Volkswagen vehicle with analog-only OnStar equipment. But the only way to determine if any of the putative class members had such

36

knowledge before purchasing is through individualized inquiry.

**E.      Plaintiffs' Claims Are Not Manageable As Class Actions**

    **1.      Plaintiffs Do Not Propose A Viable Trial Plan**

Under Fed. R. Civ. P. 23(b)(3)(C) and (D), the Court must consider "the desirability or undesirability of concentrating the litigation of the particular claims in the particular forum" and "the likely difficulties in managing the class action." Plaintiffs do not offer any trial plan. They merely make the bald statement on page 2 of their brief that "[t]he Classes can be tried in the Eastern District of Michigan or in the forum states, most likely as individual Classes, rather than a class with more than one Defendant or more than one State's laws." Although it is unclear, Plaintiffs appear to propose that the Court try the class actions in this Court with OnStar or that it order separate trials in the Putative Class States with OnStar having a separate trial here. But there is simply no way to manage the cases as class actions under either scenario.

To begin, the MDL rules do not allow the Court to retain the putative class actions against VWGoA; they must be remanded to the districts from which they were transferred. 28 U.S.C. §1407 ("Each action transferred ***shall*** be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated") (emphasis added); *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34-37, 40 (1998). Thus, there is no basis upon which the putative class actions against VWGoA can be tried in this Court. Further, even if it were permissible for the Court to try the cases here, it is impossible for them to be tried together with the OnStar case because it would be necessary to apply the laws of multiple states to multiple claims for multiple plaintiffs against multiple defendants.

Additionally, the option of separate class actions against VWGoA in the Putative Class

States and a trial here against OnStar arising out of the same vehicle purchase would violate the principles of Fed. R. Civ. P. 19, which governs the required joinder of parties: "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction *must* be joined as a party if . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(ii) (emphasis added). If separate actions proceed against OnStar and VWGoA, there is potential for Plaintiffs to obtain double recovery because Plaintiffs seek the same alleged injury against OnStar and VWGoA from having non-upgradable analog-only OnStar equipment. See pp. 14-15, *supra* .

Further, there is a potential for inconsistent obligations and verdicts. For example, if a jury in a case against OnStar finds that OnStar's disclosures were adequate, it would be inconsistent for a jury in a separate case involving the same plaintiff against VWGoA to find that the plaintiff was harmed by VWGoA either not making a disclosure or having made an inadequate disclosure, because the plaintiff would already have had an adequate disclosure from OnStar and would have been fully informed about the analog sunset. This type of inconsistency is what Rule 19 is intended to avoid, and it demonstrates why separate class actions against OnStar and VWGoA are not desirable or manageable. See 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1604 (3d ed 2010) ("The [Rule 19] decision has to be made in terms of the general policies of avoiding multiple litigation, providing the parties with complete and effective relief in a single action, and protecting absent persons from the possible prejudicial effect of deciding the case without them."); see also *In re Fin Paper Litig. State of Washington*, 632 F.2d 1081, 1091 (3rd Cir. 1980)("The fact that the litigation is in the form of a

class action . . . does not impair the obligor's right to insist on joinder of all interested parties").

The existence of different disclosures at different times by OnStar and VWGoA also makes the case unmanageable. The trial of this case will necessarily include evidence that at various times during the proposed class time period, beginning in 2003, OnStar and VWGoA prepared and distributed various evolving disclosures regarding the analog sunset. But Fed. R. Evid. 407 prohibits evidence of subsequent remedial measures as evidence of liability.[20] Rule 407 considerations present difficulty for trial because the disclosures provided to early purchasers will have to be presented as evidence along with later disclosures that were changed in accordance with changing developments at the FCC. In a class-action context, this problem cannot be simply cured by a limiting instruction.

### 2.    The New Proposed Classes Are Not Manageable Or Ascertainable

Plaintiffs' new class definition is defective for many reasons, warranting denial of Plaintiffs' motion. The definition does not require that a class member have purchased or leased their vehicle in one of the Putative Class States. It merely applies to "residents" of one of those states. This is contrary to this Court's ruling that the law of the state where a person purchased or leased a vehicle must apply to their claims. *In re OnStar Contract Litig.*, 2010 WL 3516691 (E.D. Mich. 2010). Under the new class definition, people who purchased or leased their vehicles in Oklahoma, Idaho, or Texas but now live in California, for example, could potentially be class members. But since they purchased or leased in different states, the California court would violate this Court's choice-of-law ruling if it simply applied California law to all of the claims. It would have to apply up to 51 jurisdictions' laws, making it impossible to maintain class actions due to the uncommon legal issues. See Fed. R. Civ. P. 23.

---

[20] Rule 407 "applies to any case—whether filed by a single plaintiff or a class." *Reynolds v. The Univ. of Pennsylvania*, __ F. Supp.2d __, 2010 WL 4187935, at *12 (E.D. Pa. Oct. 25, 2010).

Further, it is impossible to ascertain who is and is not included in the class under Plaintiffs' class definition. This difficulty extends to Plaintiffs themselves. Named plaintiff Mark Vamos is a prime example. Mr. Vamos purchased his Volkswagen Passat in New York. But he has resided in Texas since before this case was filed. Because he is not a resident of New York (or any other Putative Class State), he does not fall within Plaintiffs' own class definition. Accordingly, he is not a class member and not an appropriate class representative. *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975) ("A litigant *must* be a member of the class which he or she seeks to represent at the time the class action is certified by the district court.") (emphasis added).

Identifying the members of Plaintiffs' proposed classes requires determining, among other things, (1) if they subscribed to OnStar as of December 31, 2006; (2) if they still owned or leased the same vehicle as of December 31, 2007; *and* (3) whether they are *currently* a resident of West Virginia, Colorado, New York, or California. There is simply no reasonable way to determine whether someone who meets the first two criteria has moved to, and currently resides in, one of the Putative Class States or has moved out of one of those states. The Court cannot certify a class where it is impossible to identify the class members who are entitled to notice. *Crosby v. Social Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986) (certification improper where "class members impossible to identify prior to individualized fact-finding and litigation").

## V.    CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification as to Volkswagen.

BUSH SEYFERTH & PAIGE PLLC

By: /s/ Patrick G. Seyferth
Patrick G. Seyferth (P47575)
Moheeb H. Murray (P63893)
3001 W. Big Beaver Rd., Ste. 600
Troy, MI 48084
(248) 822-7800;seyferth@bsplaw.com
Dated: February 16, 2011

and

Daniel V. Gsovski
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8512; dgsovski@herzfeld-rubin.com
Attorneys for Volkswagen Group of America, Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE ONSTAR CONTRACT LITIGATION

Case No. 2:07-MDL-01867

Hon. Sean F. Cox

Magistrate Paul Komives

_____/

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2011, I electronically filed **VOLKSWAGEN GROUP OF AMERICA, INC.'S BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AS TO VOLKSWAGEN** with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record. Pursuant to this Court's Case Management Order No. 1 dated January 25, 2008, service is not required on any party not registered for ECF.

By: /s/ Patrick G. Seyferth
    Patrick G. Seyferth (P47575)
    Moheeb H. Murray (P63893)
3001 W. Big Beaver Rd., Ste. 600
Troy, MI 48084
(248) 822-7800
Seyferth@bsplaw.com - email
murray@bsplaw.com – email