UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE ONSTAR CONTRACT LITIGATION | § § § § § | Case No. 2:07-MDL-1867 Hon. Sean F. Cox |
| THIS DOCUMENT RELATES TO: All Actions | § § § § | |

## ONSTAR LLC'S RESPONSE TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.     Introduction ................................................................................... 1

II.    Factual Background ..................................................................... 3

    A.    The FCC Decision ............................................................. 3

    B.    Disclosures Regarding the Analog Sunset Order .............................. 4

    C.    Information Available Prior to Purchase ........................................ 7

    D.    Experiences of the Named Plaintiffs ............................................. 12

        1.    Jack Jacovelli ........................................................ 12

        2.    Bruce Johnson ....................................................... 15

        3.    Carey Stein .......................................................... 16

        4.    Norman and Susan Nelson ....................................... 17

        5.    Bradley Reich and Merle Kemp ................................. 18

        6.    John Irvin ............................................................ 18

        7.    Janice Rhodes ....................................................... 19

        8.    Larnell Gill .......................................................... 21

        9.    Other Plaintiffs' Experiences ................................... 22

III.   Argument and Authorities ............................................................ 23

    A.    Class Certification Standards ........................................ 23

    B.    The MCPA Claim ....................................................... 24

    C.    Plaintiffs Cannot Satisfy the Commonality and
           Typicality Requirements ............................................... 25

    D.    Individual Issues Predominate Over Any
           Common Issues .......................................................... 28

        1.    Injury and Damages are Individual Questions ................... 28

        2.    Materiality and Reliance are Individual Questions ............. 30

E.      The Proposed Class is Not Reasonably Ascertainable
        Since Individual Inquiry is Required to Determine
        Membership ................................................................................. 35

F.      Adequacy of Representation ......................................................... 38

G.      Superiority Requirement is Not Met ............................................. 39

IV.   Conclusion ............................................................................................ 40

## TABLE OF APPROPRIATE AUTHORITIES

CASES

*Alston v. Advanced Brands & Importing Co.*,
  2006 U.S. Dist. LEXIS 31324 (E.D. Mich. May 19, 2006) .................................................. 30

*Castono v. American Tobacco Company*,
  4 F.3d 734 (5th Cir. 1996) ......................................................................................... 34

*Dix v. Amer. Bankers Life Ass. Co.*,
  429 Mich. 410 (1987) ............................................................................................ 31-32

*Edwards v. Cape to Cairo*,
  2010 Mich. App. LEXIS 535 (Mich. App. 2010) .............................................................. 37

*G.M. Sign, Inc. v. Brink's Mfg.*,
  2011 U.S. Dist. LEXIS 7084 (W.D. Ill. 2011) ................................................................... 36

*Gasperoni v. Metabolife Int., Inc.*
  2000 U.S. Dist. LEXIS 20879 (E.D. Mich. 2000) .......................................................... 31-32

*German Free State of Bavania v. Toyota Co.*,
  480 F. Supp. 2d 958 (W.D. Mich. 2007) ........................................................................ 36

*Harahan v. Fairmarket Life Settlements Corp.*,
  2006 U.S. Dist. LEXIS 82248 (E.D. Mich. 2006) ............................................................. 37

*Herbrandson v. ALC Home Inspection Services, Inc.*,
  2004 Mich. App. LEXIS 545 (Mich. App. 2004) .............................................................. 27

*In re American Medical System*,
  75 F.3d 1069 (6th Cir. 1996) ..................................................................................... 23

*In re Mercedes Tele Aid*,
  267 F.R.D. 113 (D.N.J. 2010) ................................................................................. 32-33

*In re Mercedes-Benz Tele Aid Contract Litigation*,
  257 F.R.D. 46 (D.N.J. 2009) ...................................................................................... 32

*In re Teflon Products Liability Litigation*,
  254 F.R.D. 354 (S.D. Iowa 2008) ................................................................................. 34

*Katz v. Lindt & Sprungli (USA), Inc.*,
  270 F.R.D. 150 (S.D. N.Y. 2010) ................................................................................. 39

*Kemp v. Metabolife Int'l.*,
  2002 U.S. Dist. LEXIS 2435 (E.D. La. 2002) .................................................................. 31

*Kline v. Wolf*,
    702 F.2d 400 (2nd Cir. 1983) ......................................................................... 39

*Kussy v. Home Depot USA, Inc.*,
    2006 U.S. Dist. LEXIS 90024 (E.D. Mich. 2006) ................................. 26, 28-29, 31

*Lackowski v. Twin Lab Corp.*,
    2001 U.S. Dist. LEXIS 25634 (E.D. Mich. 2001) ............................................... 28

*Lewis v. Riddle P.C.*,
    1998 U.S. Dist. LEXIS 20465 (W.D. La. 1998) .................................................. 38

*Mwantembe v. T.D. Bank*,
    268 F.R.D. 548 (E.D. Pen. 2010) .................................................................... 38

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ......................................................................... 35

*Parker v. George Thompson Ford*,
    83 F.R.D. 378 (N.D. Ga. 1979) ...................................................................... 38

*Perrone v. General Motors Acceptance Corp.*,
    232 F.3d 433 (5th Cir. 2000) ......................................................................... 34

*Peters v. Cars-to-Go*,
    184 F.R.D. 270 (W.D. Mich. 1998) ................................................................. 28

*Reeb v. The Ohio Dept. of Rehab. and Corr.*,
    435 F.3d 639 – 45 (6th Cir. 2006) .................................................................. 24

*Robertson v. State Farm Fire & Cas. Co.*,
    890 F. Supp. 671 (E.D. Mich. 1995) ............................................................... 36

*Romberio v. Unum Provident Corp.*,
    2009 U.S. App. LEXIS 695 (6th Cir. 2009) ........................................... 24, 35, 38

*Sautner v. Fleetwood Enterprise, Inc.*,
    2007 U.S. Dist. LEXIS 33564 (E.D. Mich. 2007) ........................................ 36-37

*Serrano v. Cintas Corp.*,
    2009 U.S. Dist. LEXIS 26606 (E.D. Mich. 2009) ................................... 23, 25-26

*Sprague v. GMC*,
    133 F.3d 388 (6th Cir. 1998) .................................................................. 24-25, 34

*Van Vels v. Prem. Ath. Cen. of Plainfield*,
    182 F.R.D. 500 (W.D. Mich. 1998) ................................................................. 28

*Vandernal v. Harvey Automotive, Inc.*,
  2005 Mich. App. LEXIS 1493 (Mich. App. 2005) .............................................. 30

*Webb v. Carter's, Inc.*,
  2011 U.S. Dist. LEXIS 12597 (C.D. Ca. 2011) ................................................. 33

**STATUTES**

MCL 445.902(g) ............................................................................................... 36

MCL § 445.903(3)(c)(g)(n)(p)(s)(y)(bb) and (cc) ............................................. 24

MCL § 445.911(3) ............................................................................................ 28

**OTHER AUTHORITIES**

67 Fed. Reg. 77175 (December 17, 2002) ......................................................... 3

Fed. R. Civ. P. 19 ............................................................................................ 40

Fed. R. Civ. P. 23 ..................................................................................... *Passim*

## **FORWARD**

The Defendants are submitting common exhibits in a joint appendix.  OnStar will cite to the common exhibits as "DC Ex. _____."   To the extent a common exhibit is a deposition that has exhibits attached, it will be cited as "DC Ex.___, p. _____ DX_____"  to reference the deposition and relevant deposition exhibit.

# I.  INTRODUCTION

Plaintiffs seek to certify a nationwide class against OnStar for alleged violation of the Michigan Consumer Protection Act ("MCPA").[1]  Based on a Federal Communication Commission ("FCC") order (the "Analog Sunset Order") issued in late 2002 that allowed, but did not require, wireless carriers to cease supporting analog wireless coverage, Plaintiffs assert that "OnStar knew it was selling analog equipment and that it would stop working at a certain point" and "made the decision not to warn . . . customers."  Motion, p. 1.  Both of these assertions, which are linchpins of Plaintiffs' MCPA claim, are wrong.

First, contrary to the statements in Plaintiffs' Motion, OnStar in conjunction with the vehicle manufacturers made disclosures in various media regarding the Analog Sunset Order and its effect on the future ability to utilize OnStar's services.  While the disclosures changed over time based on the understanding of the effect of the rule change, beginning in June 2003 information regarding the Analog Sunset Order was available, for example, (1) on OnStar's website, (2) in the OnStar Owner's Guide, (3) in the OnStar Terms and Conditions, (4) in OnStar brochures and vehicle brochures, (5) on stickers placed on General Motors ("GM") vehicles, (6) in letters and OnStar sales guides provided to dealerships, and (7) in the OnStar magazine sent to dealers and subscribers. That these materials were available to putative class members is established by, among

---

[1] OnStar intends to file shortly a Motion for Reconsideration of Choice of Law Ruling ("Reconsideration Motion"), contending that the MCPA's restriction of class actions to persons who were injured or reside in Michigan should be enforced.  Since the Court's choice of law determination, several courts have applied the Supreme Courts' ruling in *Shady Grove v. Allstate Insurance Company* and enforced similar class action restrictions in other state's consumer protection acts.  Obviously, if the MCPA does not apply to non-Michigan residents, Plaintiffs' certification motion fails.  Nevertheless, even if the MCPA could be applied in a nationwide class action, for the reasons set forth herein, Plaintiffs' proposed class should not be certified.

other things, the fact that many named Plaintiffs produced the materials in discovery, and in many instances had the materials prior to purchasing or leasing their vehicles. Further, the two GM dealers who were deposed both testified that their sales people were provided information regarding the Analog Sunset Order and its effect on OnStar service, and were instructed to provide the information to potential vehicle purchasers.

Second, OnStar did not sell any equipment, analog or otherwise, to consumers. Rather, the equipment was purchased by various vehicle manufacturers from third-party suppliers and installed in the manufacturers' vehicles. The new vehicles were then sold by independent dealers and used vehicles were sold by a variety of persons and entities. In short, OnStar did not manufacture or sell the vehicles or any of the equipment installed in vehicles, and it was not a party to any vehicle sale transaction. In fact, OnStar is strictly a service provider which, after a vehicle has been purchased or leased, provides a variety of services to its subscribers through the OnStar equipment installed in the vehicles.[2] This distinction is important since Plaintiffs' complaint relates to the purchase or lease of vehicles with analog OnStar equipment, not the services provided by OnStar.

With this backdrop, Plaintiffs' assertion that OnStar and the vehicle manufacturers uniformly failed to provide information, or uniformly provided inaccurate information, to vehicle purchasers is simply not supported by the record. To the contrary, the record establishes that in order to determine liability under the MCPA, each putative class member's vehicle purchase or lease transaction would have to be analyzed to determine

---

[2] Importantly, not all persons who own vehicles with OnStar equipment subscribe to OnStar, and many only subscribed for a short period of time.

whether information regarding the Analog Sunset Order and its effect on OnStar equipment was provided to the putative class member by dealers' salespersons, or was otherwise obtained by the putative class member from vehicle or OnStar brochures, stickers on the vehicles, the OnStar Terms & Conditions, OnStar Owner's Guides, the OnStar website, or other publicly available sources.

Plaintiffs cannot satisfy the requirements of Rule 23 for the simple reason that there was no uniform omission or misrepresentation, and therefore typicality and commonality are lacking and individual issues necessarily predominate.  In addition to this inherently individual issue, Plaintiffs' proposed class is not ascertainable since, in order for the MCPA to even apply, each individual class member must establish that their vehicle was purchased or leased for personal, as opposed to business, use.

## II.  FACTUAL BACKGROUND

### A.    The FCC Decision.

On August 8, 2002, the FCC issued a press release stating it was going to change its rules to allow, but not require, cellular providers to shut down their analog networks in 2008.  The actual Analog Sunset Order was not released until later and was published in the Federal Register on December 17, 2002.  *See* 67 Fed. Reg. 77175 (December 17, 2002).  The FCC determined that the Analog Sunset Order would not become effective until sixty days after publication in the Federal Register, *i.e.,* on February 18, 2003.  (DC Ex. 45)[3]  Publication of the Analog Sunset Order in the Federal Register also triggered

---

[3] Kathleen Abernathy, who was a commissioner at the FCC from May 2001 through December 2005, provides a detailed analysis of the FCC's actions relating to the Analog Sunset Order in her expert report.  (DC Ex. 45)

the period for seeking reconsideration from the FCC or appellate review. *Id.* One of the wireless carriers, AT&T, filed a petition for reconsideration which requested that the five year transition period be shortened. *Id.* On February 4, 2004, the FCC upheld its decision, stating that "at least a five year transition period is required to provide persons with hearing disabilities adequate access to hearing aid compatible devices." *Id.*

On November 30, 2005, a public notice was issued to cellular licensees reminding them of the requirement under the Analog Sunset Order to file reports detailing the progress made toward the availability of hearing aids compatible with digital services. *Id.* The notice specifically stated that if the issue was not adequately addressed, "the commission may decide to extend the [analog] sunset." *Id.* The wireless carriers submitted reports around February 21, 2006, and indicated that the vast majority of carriers appeared ready for the currently scheduled analog sunset. *Id.* However, on February 21, 2006, the Alarm Industry Communications Committee filed a request for the FCC to extend the analog sunset beyond February 18, 2008, and on November 30, 2006, filed a petition for rule making to extend the analog sunset by two years. *Id.* On May 25, 2007, the FCC denied the petition. *Id.*

### B. Disclosures Regarding the Analog Sunset Order.

After publication of the Analog Sunset Order, OnStar in conjunction with vehicle manufacturers developed a plan to communicate the issue to subscribers and vehicle purchasers, the objective of which was to provide information regarding the Analog Sunset Order in multiple media in June of 2003. (DC Ex. 77, pp. 35, 51-52). OnStar met with vehicle manufacturers in February and March of 2003 to outline a communication

plan.  (DC Ex. 78, pp. 29, 38-44; Ex. 77, DX 4)  OnStar also met with GM dealers through the Dealer Advisory Board and a specific analog to digital ("ADT") sub-committee, to obtain input from GM dealers.  (DC Ex. 77, pp. 42-45, DX 3, 8, 9)  Ultimately, beginning in June 2003 OnStar, in conjunction with the vehicle manufacturers, began a public rollout of the communication plan.  (DC Ex. 77)  Specifically, the Analog Sunset Order and ADT issues were communicated to subscribers and potential vehicle owners through the following means:

- Information regarding the FCC ruling was posted on the OnStar website on June 2, 2003, in the form of frequently asked questions ("FAQ").  The website information was then updated periodically until the time of the analog shutdown. (DC Ex. 4 and 5)

- On June 2, 2003, OnStar Call Center employees were provided information to answer questions from subscribers or potential customers regarding the Analog Sunset Order.  (DC Ex. 6)

- On June 27, 2003, a letter was sent to all General Motors dealers providing information regarding the Analog Sunset Order.  The letter directed dealers to OnStar's website for the latest information.  With the letter was a communication piece that explained the FCC ruling and possible future impact on OnStar service.  Dealers were instructed to make copies of the communications piece "available to all prospective customers" and to keep a copy on file for reference.  An updated letter and information piece was sent to dealers in Summer of 2004.  (DC Ex. 11, 13, 14, and 15)

- The summer 2003 issue of the OnStar Magazine, which was sent to all subscribers as well as dealers who sell vehicles with OnStar equipment, contained a communication piece regarding the Analog Sunset Order.  This communication piece also noted that OnStar's website, OnStar.com, would have the very latest information regarding the impact of the Analog Sunset Order.  Subsequent OnStar Magazines also contained information regarding ADT issues.  (DC Ex. 9 and 10)

- Beginning in the summer of 2003, a factory-applied OnStar window label was affixed to each GM 2004 and later model year vehicles.  The

window label identified the vehicle as having one of three different OnStar systems: "analog," "analog/digital," or "analog/digital-ready." The window label also explained the effect of the Analog Sunset Order and noted OnStar.com would have additional information.  The window sticker was modified for 2005 model year vehicles.  (DC Ex. 7)

- Prior to the introduction of the 2004 model year vehicles in the fall of 2003, dealers were provided with OnStar Dealer Pocket Guides which gave details on how to determine which OnStar equipment was installed in any vehicle, as well as information regarding the Analog Sunset Order and ADT issues.  The Pocket Guides were provided to dealers on an ongoing basis for each model year, sometimes with mid-year updates.  (DC Ex. 12, 16, 17, 18, 19, 20, and 21)

- The OnStar Terms & Conditions ("T&C") effective June 2003 included, in paragraph 3, information regarding the Analog Sunset Order and its potential effect on OnStar service.  Later T&C all contained disclosures which changed over time.  The July 2004 T&C were included as part of the OnStar Magazine sent to subscribers, and the December 2004 T&C were mailed or e-mailed to all subscribers.  (DC Ex. 1-3, 10, and 35)

- The OnStar Owner's Guide for 2004 and later model years, which was in the glove box of all new vehicles with OnStar equipment, set out the type of OnStar equipment in the vehicle and information regarding the Analog Sunset Order.  The Owner's Guide also stated that the OnStar website had further details regarding the Analog Sunset Order.  (DC Ex. 8)

- OnStar Brochures, available at dealerships which sold vehicles equipped with OnStar, included a disclosure regarding the Analog Sunset Order, and directing customers to the OnStar.com for additional information.  (DC Ex. 27-30)

- Vehicle brochures for GM 2004 and later model years, also available at the dealerships, included a disclosure regarding the Analog Sunset Order, and also directed customers to OnStar.com for additional information.  (DC Ex. 31-33)

- Beginning in the fall of 2004, OnStar included ADT disclosures in letters and e-mails sent to subscribers, for example in renewal reminders and/or renewal thank you correspondence.  (DC Ex. 36-37)

- In March of 2005, GM provided information to its dealers regarding a program to upgrade certain analog vehicles to digital if the vehicle

> owner committed to a 3 year OnStar subscription.   (DC Ex. 22-25)
> Thousands of vehicles were upgraded pursuant to this program.  (DC
> Ex. 77, pp. 151-152)

In short, OnStar and the vehicle manufacturers disclosed in multiple media and in numerous ways information regarding the potential effect of the Analog Sunset Order. And, as more information became known, the disclosures changed over time.

### C.      <u>Information Available Prior to Purchase.</u>

Plaintiffs stress, as they must since their claim depends on it, the information available to Plaintiffs and putative class members at the time a vehicle was purchased or leased.[4]  Given this, it is important to focus on the point of sale information specifically, and the process of purchasing a vehicle generally.   In this regard, Claude Martin ("Martin"), a long-time marketing professor at the University of Michigan in Ann Arbor provides valuable background.[5]  (DC Ex. 42)  As reflected in Martin's report, purchasing an automobile is a unique experience, unlike purchasing a product "off the shelf" like vitamins or toothpaste.[6]  (*Id.* at 8-11)  In particular, independent dealers and salespersons play a pivotal role in the vehicle purchase decision, since dealer personnel often provide information to consumers and guide them in their automotive purchase decisions.   (*Id.*) Martin notes that the automobile salesman must "tailor the selling effort" to address each

---

[4] For example, all the Plaintiffs' declaration state "at no time prior to purchase" was information regarding the Analog Sunset or ADT issues provided.  As discussed later herein, these statements, as well as other statements in the declarations, are in many instances demonstrably false.

[5] As reflected in the report, Martin has been a faculty member at the University of Michigan in Ann Arbor since 1965, and has specific research and consulting experience in the automotive sales areas.  (DC Ex. 42)

[6] Richard Semenik, another marketing expert for OnStar, provides additional analysis on why "high involvement" products, like automobiles which are higher cost, more complex, and have multiple features, create variation among consumers on the information processed and reasons for purchasing the product.  (DC Ex. 48-49)

individual customer and that, based on his experience in the field, "there are not only differences among sales personnel, but differences in how a single sales person would approach different customers." (*Id.* at 10)

As noted above, information regarding the FCC decision and its impact on OnStar service was made available to dealers beginning in 2003, and dealers were instructed to convey this information to prospective vehicle purchasers. Based on this and the other disclosures, Martin concludes:

> During the proposed class period, there was a wide variety of information available to consumers regarding OnStar generally as well as the FCC's decision and impact on OnStar service from the transition from analog to digital. This information varied over time and it came from various different sources in media. Determining whether any particular purchaser or lessor saw or heard this information; how they understood it, if at all; or the impact it had on their decision to purchase or lease a vehicle, would require a transaction-by-transaction analysis.

(*Id.* at 20-21) Among other things supporting Martin's opinions and analysis are (1) testimony from actual dealers and (2) the opinions of Plaintiffs' own expert.

Plaintiffs' marketing expert, Warren Keegan ("Keegan"), agrees that dealers have the most direct contact with new vehicle purchasers, and that manufacturers use independent dealers to communicate information about vehicles to purchasers. (DC Ex. 82, p. 223) Keegan acknowledges that dealers were provided information regarding the analog sunset and were instructed to provide such information to vehicle purchasers. Indeed, Keegan testified:

> Q:    Would you agree with me that it is at least a possibility, based on the information you've seen and that was made available to dealers, that some dealer personnel, in fact, did communicate to customers what equipment

they had in their car and what effect the analog sunset would have on that equipment?

A:     Yes.

(*Id.* at 261)  Keegan agrees that if dealers provided the information that OnStar requested be provided to customers, then adequate disclosure would have been made.  (*Id.* at 235-242, DX 8)  Further, Keegan also agreed that if prospective purchasers reviewed the OnStar window sticker that was placed on vehicles by GM, they would have had adequate disclosure regarding the Analog Sunset.  (*Id.* at 242-245, DX 9)  Specifically, Keegan testified:

Q.     Well, if you're at the dealership looking at new vehicles the stickers on the car, and you say oh, I'm interested in this car, and you see the sticker.  Would that be sufficient disclosure?

A.     Well, yes.  If you were – if you were purchasing a car with this – if you saw the car with this sticker on it and you looked at this sticker and read it before you made your purchase decision, this – you know, if you read it, read it right through to the end, you would know.

(*Id.* at 245-246, DX 9)  Finally, Keegan also agrees dealers were provided sufficient information to allow them to explain to prospective customers what type of OnStar equipment was installed in a vehicle and what effect the Analog Sunset Order would have on that equipment.  (*Id.* at 247, 251, DX 10)[7]

Further confirming Martin's opinions and underscoring the unique nature of the automotive purchasing experience is the testimony of the only two dealers who have been deposed, Mr. Keery and Mr. Lamping.  Both dealers testified that (1) OnStar provided

---

[7] Interestingly, Keegan testified he did not recall reviewing the dealers' depositions and had not reviewed much of the information sent to dealers prior to his deposition.  (*Id.* at 235, 246-247)

information to the dealers regarding the analog sunset, the type of equipment in each vehicle, and the effect on the equipment of the analog sunset, and (2) the dealers instructed their sales personnel to provide such information to prospective customers. (DC Ex. 50 and 51) Both dealers also testified that each sales transaction was "unique" since the purchasing motivation differed, and specifically that customers' interest in OnStar differed.  For example, Mr. Lamping testified that purchasers are interested in particular vehicles for a variety of reasons, some being most interested in color, the type of engine, or vehicle styling.  (DC Ex. 51, p. 75)  With respect to OnStar, Mr. Lamping testified that while some people were interested in the OnStar service, for others it was simply something that happened to be in the car they wanted to buy.  (*Id.*)  Similarly, Mr. Keery testified that the reason a person purchases a vehicle varies, and that the most important feature for one person is not the most important feature for another.  (DC Ex. 50, p. 107)  With respect to OnStar, Mr. Keery testified that while some people were interested in OnStar, others only used OnStar because it came with the vehicle they wanted to purchase.  (*Id.*)  Both dealers also confirmed that individual salesmen will approach customers in different ways, some going over each aspect and feature (like OnStar) of the vehicle in detail, and others providing a more general description.  (DC Ex. 51, 81; DC Ex. 50, 85-86)

Of course, OnStar and the manufacturers did not rely solely on dealers to communicate this information.  As set out above, information regarding the analog sunset, the type of equipment installed in vehicles, and the effect the analog sunset would have on that equipment was provided in various other written disclosures.  For example,

GM placed window stickers on new vehicles.  (DC Ex. 7)  Mr. Lamping confirmed that the OnStar Magazine was sent to dealers, and at his dealership were available to prospective vehicle purchasers.  (DC Ex. 51, p. 67)  Other materials at the dealerships and/or in the vehicles contained disclosures, such as vehicle brochures, OnStar brochures, OnStar T&C, and OnStar Owner's Guides, all of which directed that additional information could be obtained at OnStar's website or by calling OnStar.   Indeed, in essentially all of its communications OnStar directed customers and potential customers to its website, which contained specific information regarding the analog sunset.  (DC Ex. 5)

Finally, information regarding the Analog Sunset Order was available from sources other than OnStar and the vehicle manufacturers.  For example, in August 2002, USA Today published an article regarding the Analog Sunset Order, and the article specifically stated that "some emergency-button car cell phone systems, such as OnStar, are analog" and therefore would not work if analog wireless service was unavailable. (DC Ex. 41)  On May 27, 2004, The Orlando Sentinel published an article on OnStar that specifically stated that some OnStar equipment uses only analog wireless and would not function after 2007, and directed readers to the OnStar web site for more information. (*Id.*)   Moreover, both Plaintiffs and Defendants' marketing experts agree that vehicle purchasers often obtain information from friends, relatives, or third-party evaluators, such as Consumer Reports, regarding vehicles they are interested in purchasing.  Given the widespread dissemination of information by OnStar and the vehicle manufacturers about the Analog Sunset Order and ADT issues, it is likely that some class members obtained

the information from such sources. For example, one of the named Plaintiffs, John Kuller, knew before June 12, 2005, that the OnStar equipment in his 2003 Acura was analog-only and would not work after January 1, 2008. (DC Ex. 65, pp. 62-64, 69, DX 9)[8] He believes he obtained the information "from my reading and pursuit of the internet, and car friends that may have been aware." (*Id.*, p. 42)

### D.    Experiences of the Named Plaintiffs.

Plaintiffs assert that the cookie cutter declarations of the named Plaintiffs submitted with the Motion establish the common experiences of the named Plaintiffs and the putative class. However, in many instances the declarations are simply contrary to the Plaintiff's sworn deposition testimony and other documentary evidence. Indeed, the testimony and evidence provided by just the named Plaintiffs completely undercuts their argument that uniform misrepresentations or omissions were made even to them, much less with respect to all putative class members. As the Court is aware, there are 27 named Plaintiffs, and space constraints therefore do not allow an analysis of the circumstances of each one. Nevertheless, even a few examples amply illustrate the problems with the declarations, and Plaintiffs' theories as a whole.[9]

### 1.    Jack Jacovelli.

Jack Jacovelli ("Jacovelli") purchased a used 2005 Cadillac in May of 2006 from DeSimone Cadillac in Mount Laurel, New Jersey. (DC Ex. 52) At the time of the

---

[8] Mr. Kuller also testified that reviewing OnStar's website would have been "a logical part of his research" before purchasing his vehicle, and he did at some point print out ADT information from the OnStar website (*Id.*, p. 41-42).

[9] OnStar is including in the Appendix deposition testimony of all the named Plaintiffs.

purchase, Jacovelli already owned a 2002 Cadillac with OnStar.  (*Id.* at 10)  It was Jacovelli's practice to purchase used Cadillacs owned by his friend, Vito Fruggiero, who only kept his vehicles for two years.  (*Id.* at 10-13)  In this regard, Mr. Fruggiero would trade in his Cadillac to DeSimone Cadillac, and Jacovelli would then purchase the vehicle from DeSimone for $500.00 over the trade-in value.  (*Id.*)  With respect to the 2002 Cadillac, Jacovelli testified that he would have purchased the car regardless of whether it had OnStar because it was a "cream puff."  (*Id.* at 14)  Jacovelli traded in the 2002 vehicle in September of 2007, and therefore that vehicle is not the subject of the proposed class action.

With respect to the 2005 vehicle, at the time it was purchased he signed a GM Customer Incentive and OnStar Acknowledgment form which stated "I acknowledge that I have received the Terms and Conditions under which the OnStar service in my vehicle is provided (copies are available in the vehicle glove box, from the dealer, at www.OnStar.com or by contacting OnStar as described below.)"[10]  (*Id.* at 21-22, DX 1) In addition, a representative of the dealership certified on the same form that "The OnStar Terms and Conditions have been provided to the purchaser."  (*Id.*)  From the time he purchased the vehicle Jacovelli had a copy of the T&C in his possession, which were effective as of December 2004, and stated in paragraph 12:

> CAUTIONS ABOUT A CHANGE IN OnStar SERVICE IN 2008.  The OnStar equipment in some 2004 or later cars uses both digital and analog wireless technology.  Other OnStar equipment uses only analog wireless technology.  The Federal Communications Commission has decided that,

---

[10] Effective 11/01/2005, this form was used by dealers, as opposed to the OnStar Service Subscription Agreement, to show acknowledgment of receipt of the T&C.  (DC Ex. 23)

> after 2007, wireless service providers (including the ones who work with
> us) don't have to provide service for the analog wireless network.  As a
> result, our wireless service providers won't continue to provide analog
> service after 2007.  This means that beginning on January 1, 2008, OnStar
> won't provide service to analog-only OnStar equipment.  IF YOU DON'T
> HAVE DIGITAL ONSTAR EQUIPMENT, YOUR ONSTAR SERVICE
> WON'T WORK AFTER THAT DATE.

(*Id.* at 26, DX 2)  Jacovelli admitted after having read the T&C that he understood OnStar

hardware would be affected by the FCC decision and would need an upgrade.  (*Id.* at 53-

54)  In addition, Jacovelli was also provided at the time of purchase a Warranty and

Owner Assistance Manual by GM which stated, "Notice: This warranty excludes any

communication device that becomes unusable or unable to function as intended due to

changes in technology or wireless service."  (*Id.* at 27-28)  Once Jacovelli read this

provision, he understood that the warranty book excluded from coverage the exact thing

he was complaining about in the lawsuit, that he had to pay $15.00 to upgrade his OnStar

equipment to work after 2007.  (*Id.*)  Jacovelli does not assert that anything was

misrepresented to him at the time he purchased the vehicle by anyone at the dealership,

OnStar, or General Motors.  (*Id.* at 37-38)  Moreover, regarding who he believes should

have informed him about the OnStar equipment, Jacovelli testified:

> Q.:   Do you think OnStar should have told you about the equipment in
> the vehicle or General Motors should have told you about the
> equipment in the vehicle or the dealer that you were dealing with,
> DeSimone, should have told you about the equipment in the vehicle?
>
> A.:   DeSimone.

(*Id.* at 55-56)  Of course, as set out above, OnStar supplied information to dealerships

which allowed them to provide exactly that information to Jacovelli.

2.    Bruce Johnson.

Bruce Johnson purchased a used 2005 Buick Park Avenue from Liberty Buick in Peoria, Arizona on March 3, 2006.  (DC Ex. 58)  At the time he purchased the vehicle, Johnson was already aware of the analog to digital transition, and was looking for a vehicle that could be upgraded.  (*Id.* at 15-17, 23)[11]  Johnson does not claim that OnStar ever represented to him prior to his purchase that the vehicle could be upgraded.  (*Id.* at 26)  However, Johnson testified that prior to purchase he asked the dealer if the 2005 Park Avenue could be upgraded, and was told that it could be upgraded.  (*Id.* at 23)  In fact, as reflected in the letters that went directly to Buick dealerships in 2003 and 2004, the 2005 Park Avenue could not be upgraded.  (DC Ex. 11-15)  Johnson's complaint is not that he didn't know about the analog to digital transition or that his vehicle would have to be upgraded, but rather that he wanted a vehicle that could be upgraded and the dealer told him he was purchasing such a vehicle.  Johnson did not sue the dealer because "he didn't have anything in writing about what the dealer told him" and he signed a document at the dealership which stated that "spoken promises are difficult to enforce, ask the dealer to put all promises in writing."  (*Id.* at 39-40, 81-83, DX3)  Johnson admits that no representations were made to him by OnStar about the equipment in the vehicle or its ability to be upgraded, and that no representations by OnStar led him to purchase the vehicle.  (*Id.* at 26-28)

---

[11] Indeed, Johnson already knew the information regarding ADT set out in the T&C prior to purchasing the vehicle. (*Id.* at 102-105, DX 9)

**3.**   <u>Carey Stein.</u>

Carey Stein ("Stein") leased a 2004 Cadillac on November 1, 2003.  (DC Ex. 55, pp. 7-8)  Stein subsequently purchased the vehicle on August 29, 2007, shortly before the end of the lease term.  (*Id.* at 17-18)  Prior to the time he purchased the vehicle, Stein received a letter from OnStar dated May 24, 2007,[12] stating that his vehicle was equipped with analog hardware that for $15.00 could be upgraded to work on the digital network.  (*Id.*)  Stein agrees that at that time he purchased the vehicle he had been informed by OnStar that the equipment in the vehicle would need to be upgraded in order to work on the digital network.  (*Id.* at 17-18, 25-26)  Further, although Stein stated in his declaration that the user manual he was provided did not inform him of the type of equipment in the vehicle, the OnStar Owner's Guide he was provided specifically states:

> This vehicle is equipped with analog/digital ready hardware.  The OnStar system in the vehicle has been prepared for conversion to digital hardware when it becomes available.  FCC Ruling 02-229 eliminates the requirement that wireless carriers support the analog network after February 16, 2008.  As a result of this ruling, if the carriers for OnStar elect to provide only digital service commencing on 2-16-08, the system in the vehicle will not operate.  Visit OnStar.com for further details.

(*Id.* at 14-15, DX 1)  Accordingly, contrary to his declaration, both at the time he leased the vehicle, and at the time he purchased the vehicle in August of 2007, Stein was provided information regarding the type of OnStar equipment in his vehicle, and what effect the analog to digital transition would have on that equipment.

Stein also states in his declaration that his vehicle could not be upgraded to work on the digital network, which is false.  The letter from OnStar he attaches to his

---

[12] Indeed, he attaches a copy of the letter to his declaration filed herein.

declaration and the OnStar Owner's Guide he was provided both clearly state the 2004 Cadillac he leased and ultimately purchased was upgradeable.  In fact, Stein elected not to upgrade the vehicle because at the time he purchased the vehicle in 2007, he was the primary driver of the vehicle (prior to that time, his wife was the primary driver) and he did not use or want OnStar.  (*Id.* at 26-27)  Accordingly, Stein made no effort to determine what he would need to do in order to upgrade the vehicle since he did not want to upgrade it.  (*Id.*)

        **4.**    <u>Norman and Susan Nelson.</u>

       Norman and Susan Nelson (the "Nelsons") purchased a 2004 Cadillac Escalade in July 2004.  Although the Nelsons both state in their declaration that they were not informed about the type of equipment in the vehicle, they produced various documents they received at the time they purchased the vehicle that provided information regarding the equipment.  Specifically, the Nelsons were provided, and produced in the lawsuit, (1) an OnStar window sticker which stated that the equipment was "analog/digital ready," (2) an OnStar Owner's Guide which set out the type of equipment in the vehicle and stated "if the carriers of OnStar elect to provide only digital service commencing on 2/16/2008, the system in the vehicle will not operate.  Visit OnStar.com for further details," and (3) a copy of the OnStar T&C which provided a disclosure regarding the analog to digital transition which stated "beginning January 1, 2008 OnStar won't provide service for analog only OnStar equipment." (DC pp. 38-43, DX 6)  Further, although the Nelsons also stated in their declarations that the 2004 Escalade could not be upgraded, the letter attached to the declaration specifically states that the vehicle "is eligible for an equipment

upgrade that will enable it to operate on the digital network."  In fact, the Nelsons did upgrade the vehicle.  (*Id.* at 32)[13]

**5.**   <u>Bradley Reich and Merle Kemp.</u>

Bradley Reich ("Reich") purchased a 2003 Saab on June 28, 2003.  Although Reich states in his declaration that he is "ready and willing to represent the class in this case," he is not even a member of the class.  In this regard, Reich traded in the 2003 Saab for a Honda in 2007, prior to the end of the year.  (DC Ex. 51, pp. 36-28)  Since the proposed class definition only includes persons who owned the affected vehicles on December 31, 2007, the date of the analog shutdown, Reich is not a class member.  Similarly, Merle Kemp ("Kemp") purchased a 2004 Subaru on February 13, 2004.  Although Kemp also states in his declaration that he is "ready and willing to represent the class in this case," he is also not a member of the class since he traded in his Subaru vehicle in August 2007, and therefore did not own the vehicle on December 31, 2007.[14] (DC Ex. 73, pp. 11-12)

**6.**   <u>John Irvin.</u>

John Irvin ("Irvin") purchased a model year 2002 Cadillac Seville in September 2002.  (DC Ex. 62A, p. 15)  After purchasing the vehicle, Irvin recalls receiving OnStar magazines and recalls the picture on the summer of 2003 OnStar magazine.  (*Id.* at 71-73, DX 6)   Although he did not read the disclosure in the magazine at the time, he

---

[13] The Nelsons real complaint is that GM did not cover the upgrade under warranty, not that OnStar misrepresented or failed to provide information.  (*Id.* at 34)

[14] In any case, Kemp admits that he was aware of and had visited the OnStar website prior to purchase, and that the OnStar guide informed him that the website had information regarding system limitations.

acknowledged that it is at the very front of the magazine, and that the disclosure is not vague or confusing.  (*Id.* at 74-75)  Irvin also printed out in June of 2005 a copy of the information contained on the OnStar website regarding the analog to digital transition which set out the type of equipment in the vehicles, how to determine what equipment was in his vehicle, and what effect the analog shutdown would have on the equipment. (*Id.* at 92-94, DX 11)

Although Irvin states in his declaration that the equipment in his vehicle was analog-only and could not be upgraded, in fact the equipment was upgradable and Irvin did upgrade the equipment.  (*Id.* at 18-19)  Importantly, Irvin upgraded his OnStar equipment in August 2006, under the upgrade program that started in the summer of 2005 that allowed a free upgrade if the vehicle owner committed to a three year OnStar subscription.  (*Id.* DX 15; DC 24-25)  Of course, this upgrade occurred prior to the time Plaintiffs contend class members were even informed that vehicles would need to be upgraded.  Further, Plaintiffs' own expert opined that a person who received a free upgrade for a three year subscription commitment had not suffered any damages.  (DC 83, pp. 204-205)  Nevertheless, Irvin states in his declaration that "OnStar and the manufacturer would not repair, upgrade, or replace my OnStar system with one that would work after 2008," even though as of the date of his deposition on September 29, 2009, he still drove the 2002 Cadillac which had been upgraded at no cost to him.

**7.**    Janice Rhodes.

Janice Rhodes ("Rhodes") leased a 2004 Chevrolet Avalanche on March 29, 2004, from Cool Chevrolet in Grand Rapids, Michigan.  (DC Ex. 56, p. 15)  At the time of the

lease, Rhodes already owned a 2002 Avalanche equipped with OnStar, and she is not complaining about that vehicle in the lawsuit.  (*Id.* at 12)  Rhodes recalls receiving OnStar magazines after she purchased the 2002 Avalanche with OnStar; however, she does not recall reading the magazine.  (*Id.* at 24)  Although Rhodes states in her declaration that the User Manual that came with her car did not disclose the type of OnStar equipment in the vehicle, the OnStar Manual for her vehicle states that the vehicle is equipped with analog-digital ready hardware, meaning it had been prepared for upgrade to the digital network, but that the system in the vehicle would not operate if analog service was not available.  (*Id.* at 28-29, DX 4)  It also instructs Rhodes to visit OnStar.com for further information.

At the time she leased the vehicle, Rhodes also obtained from the dealership a GM brochure that, in the section dealing with OnStar, had the following disclosure:

> The U.S. Federal Communication Commission ("FCC") ruled that wireless carriers will no longer be required to support the analog wireless network after February 16, 2008.  After that time, if carriers for OnStar elect only to provide digital service, OnStar service will only be available for dual mode hardware, which may require the purchase of a system upgrade.  Call 1-800-4OnStar, see your OnStar's Owner's Guide, or visit www.OnStar.com for system information and details.

(*Id.* at 22, DX 2)  Rhodes also obtained an OnStar brochure at the time she leased the vehicle which had the following disclosure:

> The U.S. Federal Communication Commission ("FCC") ruled that wireless carriers will no longer be required to support the analog wireless network after February 16, 2008.  After that time, if the carriers for OnStar elect only to provide digital service, OnStar service will only be available through dual-mode (analog/digital) hardware.  OnStar equipped vehicles have one of two types of wireless hardware:  analog or digital-ready.  Most 2004 model year vehicles have analog/digital-ready hardware.  These

vehicles have been prepared for conversion to analog-digital (dual-mode) hardware when it becomes available. Select 2004 and future OnStar-equipped vehicles feature dual-mode (analog/digital) hardware, which will be unaffected by the FCC ruling.

(*Id.* at 21, DX 1) Rhodes purchased the vehicle in December 2006, prior to the end of the three year lease term. (*Id.* at 35) Accordingly, at the time she purchased the vehicle, Rhodes had information that the equipment in her vehicle would need to be upgraded. In fact, Rhodes upgraded the equipment in the vehicle in 2007. (*Id.* at 26)

**8.**   Larnell Gill.

Larnell Gill ("Gill") leased a 2003 Acura on February 6, 2003. Gill ultimately purchased the vehicle in early 2006, at the end of the three year lease term. Gill admits that prior to the time he purchased the vehicle in 2006, he received in the mail from OnStar a copy of the OnStar T&C. (DC 63, p. 75, Ex. 13) The letter was actually addressed to his wife, Marhjory Gill, who died on October 6, 2008. She was the person that reviewed information from OnStar, since she was the principal driver of the vehicle at the time. (*Id.* at 75-77) The OnStar T&C Gill received in the mail provides in paragraph 12:

> CAUTIONS ABOUT CHANGE IN ONSTAR SERVICE IN 2008. The OnStar equipment in some 2004 or later cars uses both digital and analog wireless technology. Other OnStar equipment uses only analog wireless technology. The Federal Communications Commission has decided that, after 2007, wireless service providers (including the ones who work with us), don't have to provide service for the analog wireless network. As a result, our wireless service providers won't continue to provide analog service after 2007. This means that beginning January 1, 2008, OnStar won't provide service for analog-only OnStar equipment. IF YOU DON'T HAVE DIGITAL ONSTAR EQUIPMENT, YOUR ONSTAR SERVICE WON'T WORK AFTER THAT DATE.

(*Id.* DX 13)  Gill admits after reading this paragraph he understood that his 2003 Acura did not have digital equipment, and that OnStar service would not be available in analog vehicles.  (*Id.* at 97-98)  Indeed, Gill believes that an average person reading paragraph 12 of the T&C would understand that analog OnStar service would not be available after January 1, 2008.  (*Id.*)  Accordingly, despite assertions in his declaration to the contrary, prior to the time he purchased the vehicle in 2006, Gill had information available to him, some of which was mailed to him directly by OnStar, which would have apprised him of the equipment in his vehicle and the effect of the analog to digital transition.

**9.**    Other Plaintiffs' Experiences.

As set forth in detail in the report of Claude Martin, the other named Plaintiffs had similarly disparate experiences, knowledge, and expectations regarding OnStar.  Martin notes that the Plaintiffs' pre-purchase search for information, buying motivation with respect to OnStar, and expectations regarding OnStar all differed.  With respect to disclosure of information, after having reviewed the depositions and exhibits of all the Plaintiffs, Martin concluded that "(1) there was a considerable selection of sources and amount of information coming from the manufacturers and OnStar regarding service termination or upgrading for specific vehicles commencing in 2003;  and (2) there was no uniformity among named plaintiffs as to the timing, kind and source of information received with widespread practice of selective exposure, perception and/or retention of

that information among the named plaintiffs." (DC Ex. 42, p. 18)[15]  In short, the different

experiences of even the named Plaintiffs swamp any common factual issues.

## III.  ARGUMENT AND AUTHORITIES

### A.    Class Certification Standards.

Class certification is governed by Rule 23, which provides that a party seeking

class certification must establish numerosity, common questions of law or fact, the

typicality of the representative parties, and the adequacy of the representative parties.

*See* Fed. R. Civ. P. 23(a).[16]  In addition to the requirements of Rule 23(a), one of the sub-

sections of Rule 23(b) must also be satisfied.  Here, Plaintiffs seek to certify a damage

class, and therefore must satisfy the requirements of Rule 23(b)(3), which provides that

the court must find common questions of law or fact predominate over any individual

questions, and that a class action is the superior method to efficiently adjudicate the

controversy.   Importantly, the party seeking class certification bears the burden of

establishing that all the requirements of Rule 23 are satisfied.  *In re American Medical*

*System,* 75 F.3d 1069, 1079 (6th Cir. 1996); *Serrano v. Cintas Corp.,* 2009 U.S. Dist.

LEXIS 26606, *12 (E.D. Mich. 2009).

In considering the motion for class certification, the district court must conduct a

"rigorous analysis" into whether the requirements of Rule 23 have been satisfied.

*Romberio v. Unum Provident Corp.,* 2009 U.S. App. LEXIS 695, *14 (6th Cir. 2009);

---

[15] Martin noted that selective exposure, perception and retention is a well documented phenomena in the marketing literature, and relates to consumers tendency to ignore, misunderstand, or fail to retain information about a product or service.  (*Id.*, p. 18)

[16] OnStar does not dispute numerosity.

*Sprague v. GMC,* 133 F.3d 388, 397 (6th Cir. 1998). As part of its rigorous analysis, the court must examine the precise nature of the Plaintiffs' claim as well as the proof required to establish the claim. *See Reeb v. The Ohio Dept. of Rehab. and Corr.,* 435 F.3d 639, 644–45 (6th Cir. 2006) (rigorous analysis requires information regarding the Plaintiffs' claims); *Sprague,* 133 F.3d at 397–98 (holding that the district court was required to examine what the plaintiffs would have to prove to establish their individual claims). In analyzing the claim and the proof required to establish the claim, the court must consider whether, if a named Plaintiff proves his own claim, the claims of other class members would necessarily also be proven. *Romberio,* 209 U.S. App. LEXIS at *24. As noted by the Sixth Circuit, certification is appropriate only if the following is true: "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399. Accordingly, a class cannot encompass individuals who have no claim at all to the relief requested, or persons against whom the defendant has unique defenses. *Id.* Here, Plaintiffs cannot satisfy the requirements of Rule 23 and the motion for class certification should be denied.

### B.   The MCPA Claim.

The sole claim on which Plaintiffs seek certification for this nationwide class is under the MCPA. Plaintiffs assert that they are suing under MCL § 445.903(3)(c)(g)(n)(p)(s)(y)(bb) and (cc). Plaintiffs make little or no effort to specify how OnStar's alleged conduct violates many of these provisions. For example, with respect to subsection (p) Plaintiffs no where discuss OnStar disclaiming or limiting any implied warranty. This is not surprising since OnStar did not sell the vehicle or the

equipment, and therefore no implied warranty arises as to OnStar.  Similarly, it is entirely unclear how Plaintiffs allege OnStar violated subsection (n) by causing confusion as to the legal rights, obligations or remedies of a party to a transaction or subsection (y) relating to discrepancies between oral representations of a seller and the written agreement.   The only transaction entered into between OnStar and putative class members was governed by the T&C, and Plaintiffs do not contend OnStar caused confusion regarding the legal rights, obligations or remedies under the T&C.  In any case, Plaintiffs spend the bulk of the Motion discussing alleged omissions or misrepresentations in connection with class members' purchase of vehicles with OnStar equipment.  For the reasons set forth below, Plaintiffs misrepresentation and omission claims under the MCPA are not appropriate for class certification.

## C.   Plaintiffs Cannot Satisfy the Commonality and Typicality Requirements.

Plaintiffs have the burden of establishing that "questions of law and fact common to the class" are sufficient to support class certification, and that "the claims and defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(2) and (3).  With respect to commonality, "it is not every common question that will suffice," rather it must be "a common issue the resolution of which will advance the litigation."  *Sprague*, 113 F.3d at 397.  Further, as this Court noted in *Serrano*, typicality requires, at the most basic level, that proof or disproof of the named Plaintiffs' claim will necessarily prove or disprove the claims of other class members.  *Serrano*,

2009 U.S. Dist. LEXIS 26606, *24.  Here, both commonality and typicality are lacking as exemplified by the facts surrounding the named Plaintiffs.

Some class members, such as Stein and Gill, at the time of purchase had full information regarding the OnStar equipment and the effect the analog shut-down would have on that equipment, and therefore have no claim.  *See Kussy v. Home Depot USA, Inc.*, 2006 U.S. Dist. LEXIS 90024, *17-19 (E.D. Mich. 2006) (because plaintiff knew the true facts, his MCPA claim failed).  Others, such as Johnson, simply received false information from a dealer despite the fact that OnStar had supplied accurate information to dealers to convey to consumers.  Others, such as Jacovelli, do not contend that anything was misrepresented by OnStar, and to the extent information regarding the OnStar equipment was not provided, blame the dealer, not OnStar.  Others, such as Irvin, suffered no damages even under Plaintiffs' expert's theory.  Combined with the evidence that disclosures regarding the equipment in the vehicles and the analog shut-down (1) changed over time and (2) was available through various media, including individual interactions with dealers, the record establishes that there are no relevant common issues since the claims of class members by definition will vary.

In addition to the above, Plaintiffs apparently assume, since they do not address the issue, that used car purchasers are in the same position as new car purchasers. However, used car purchasers present a whole host of unique issues.  As discussed by Bruce Strombom ("Strombom") in his expert report, used car transactions present significant differences in, among other things, the channels of distribution (*i.e.,* private transaction or purchase from a dealership), the amount and quality of information

available to buyers, the condition of the vehicles at the time of purchase, and the prices paid for the vehicles. (DC Ex. 44) For example, OnStar and vehicle manufacturers have little or no input or control over the sale of a used vehicle in a private transaction. This is important since, as evidenced by Plaintiff Kuller, original owners of the vehicle may have known of the analog shut down and the type of equipment in their vehicle, and then sold their vehicle in a private transaction in which they may or may not have disclosed that information to the purchaser.

Used car transactions also raise legal issues under the MCPA since OnStar played no role in a private vehicle sale transaction. *See Zine,* 36 Mich. App. at 280-281 ("a 'transaction' is the business conducted between the parties" and therefore failure to reveal information material to a transaction "can be reasonably understood only as referring to information withheld during the negotiations and up to the time of the transaction."); *see also, Herbrandson v. ALC Home Inspection Services, Inc.,* 2004 Mich. App. LEXIS 545 (Mich. App. 2004). Since OnStar plays no role in most used car transactions, an analysis of each transaction would be necessary to determine if OnStar could have any liability in such "transaction."

Accordingly, for all these reasons the commonality and typicality requirements cannot be satisfied. In any case, as discussed below, any common issues are swamped by individual issues.

**D.   Individual Issues Predominate Over Any Common Issues.**

**1.   Injury and Damages are Individual Questions.**

With respect to class actions, the MCPA provides that "a person who <u>suffers loss</u> as a result of a violation of this Act may bring a class action on behalf of persons residing or injured in this state for the <u>actual damages</u> caused" by the prohibited act or practice. MCL § 445.911(3) (emphasis added).  It is clear that in order to recover under the MCPA a class member must have been injured, *i.e.*, suffered a loss.  *See Kussy*, 2006 U.S. Dist. LEXIS 90024, *17-18 (because the plaintiff "had the means to determine, and did determine, that the representation as to price was not true…his claim under the MCPA is untenable.").  Moreover, because of the individual inquiry needed to establish a class member's actual damages, at least three district courts have held that certification of a damage class is not appropriate under the MCPA.  *See Peters v. Cars-to-Go*, 184 F.R.D. 270, 278 (W.D. Mich. 1998) (plaintiffs' MCPA claim cannot be certified because the MCPA limits damages in class actions to actual damages."); *Van Vels v. Prem. Ath. Cen. of Plainfield*, 182 F.R.D. 500, 509 (W.D. Mich. 1998) ("The MCPA claims cannot be certified for the purpose of monetary damages."); *Lackowski v. Twin Lab Corp.*, 2001 U.S. Dist. LEXIS 25634, *24-25 (E.D. Mich. 2001) (certifying plaintiffs' MCPA claim for purposes of injunctive or declaratory relief only).  Here, determining injury and damage is an inherently individual inquiry.

The record establishes that information regarding the Analog Sunset Order and its effect on OnStar equipment was available to putative class members from a variety of sources.  For example, Plaintiffs' own expert agrees that dealers were provided such

information and may have provided the information to prospective purchasers at the time of sale.  Further, several of the named Plaintiffs had disclosure information in their possession at the time they purchased their vehicles.  It is axiomatic that class members who were provided adequate disclosures and purchased the vehicle anyway have not been injured.  *See Kussy*, 206 U.S. Dist. LEXIS 90024, at *17-19.[17]  Yet, these putative class members cannot be identified without obtaining discovery from all.

Moreover, many class members may not have valued the OnStar service, and therefore the loss of the service caused them no "actual damages."  As noted by Strombom in his expert report, by choosing not to upgrade their vehicles, many class members revealed that their "net valuation of OnStar service is zero," and that "to determine whether these proposed class members did not upgrade because they placed no value on OnStar or for some other reason will require individual inquiry."  (DC Ex. 44, p. 28)  One of the named plaintiffs offers a perfect example.  Stein testified that he did not upgrade his vehicle because at the time the upgrade was necessary, he was the principal driver of the vehicle and he did not use, want, or need OnStar.  So, despite the fact that his vehicle could have been upgraded, he chose not to upgrade because OnStar service had no value to him.  Accordingly, determining (1) whether a putative class member has suffered any injury, and (2) if injury was suffered, the amount of "actual damages" incurred, are both individual questions that cannot be established by common proof.  (DC Ex. 44)

---

[17] As noted earlier, Plaintiff Irvin and the thousands of people like him also suffered no injury since their vehicles were upgraded at no cost.

**2.**     Materiality and Reliance are Individual Questions.

Plaintiffs assert that some sections of the MCPA do not require a showing of reliance in order to recover.  However, as noted above, several of the sections under which Plaintiffs seek to recover appear to have no applicability.  When Plaintiffs' allegations are measured against the potentially applicable provisions of the MCPA, it is clear that reliance is a required element.  In particular, those sections of the MCPA which involve a material misrepresentation or failure to reveal a material fact necessarily include, either explicitly or implicitly, a reliance element in order to recover.

The provisions of the MCPA are construed with reference to the common law tort of fraud.  *See Alston v. Advanced Brands & Importing Co.*, 2006 U.S. Dist. LEXIS 31324, *17 (E.D. Mich. May 19, 2006).  Accordingly, Michigan courts have determined that reliance on a seller's alleged representations is an implicit element of the MCPA. *Vandernal v. Harvey Automotive, Inc.*, 2005 Mich. App. LEXIS 1493, *4 (Mich. App. 2005).  Similarly, under subsection (s) relating to omissions, "the issue is not whether the omission is misleading to a reasonable consumer but whether the consumer could reasonably be expected to discover the omission at issue." *Zine*, 600 N.S.2d at 398.  This creates individual reliance questions since if a consumer reasonably could have discovered the omission, he could not rely on it under the MCPA.  Moreover, in order for a fact or omission to be "material" for purposes of the MCPA, it must be one "that is important to the transaction or affects the consumer's decision to enter into the transaction." *Zine,* 600 N.W.2d at 398.  Materiality, therefore, is also a required element.  For example, in *Kussy* the court held that a plaintiff could not recover under the MCPA

since he could not show that he relied on the alleged misrepresentation when he purchased the product. *Kussy*, 2006 U.S. Dist. LEXIS 90024, *18.

Here, it is clear that in order to recover under the MCPA putative class members would have to establish that any alleged misrepresentation or omission was material to them and that they relied on the alleged omission or misrepresentation in entering into the vehicle purchase or lease transaction. Recognizing that their true claims under the MCPA will require such a showing, Plaintiffs suggest that reliance and materiality need not be individually proven, but can be established by showing that a reasonable consumer would have relied on the representation or omission. In support of this proposition, Plaintiffs primarily rely on *Dix v. Amer. Bankers Life Ass. Co.*, 429 Mich. 410 (1987) and *Gasperoni v. Metabolife Int., Inc.* 2000 U.S. Dist. LEXIS 20879 (E.D. Mich. 2000). However, the facts of *Dix* and *Gasperoni* do not fit the facts of this case.[18]

The court in *Dix* noted that all of the alleged misrepresentations at issue were "substantially similar" and that they all stemmed "from the same pattern of misrepresentation." *Dix* at 418. Similarly, in *Gasperoni* the sole issue certified was "whether the label on [Metabolife 356] is materially misleading when viewed as a whole." *Gasperoni* at *5. Since by definition each class member was exposed to the label, a common misrepresentation or omission was at issue.[19] In other words, a necessary factual predicate to the holdings in *Dix* and *Gasperoni* is that a common

---

[18] It should also be noted that *Dix* considered certification under Michigan's old class action rule which differed significantly from Rule 23, particularly since there was no predominance requirement. *Dix* at 413.

[19] At least one count explicitly distinguished *Gasperoni* based on the limited question certified. *See Kemp v. Metabolife Int'l.*, 2002 U.S. Dist. LEXIS 2435, *16-17 (E.D. La. 2002).

representation or omission exists.  Another case relied on by Plaintiffs, *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), also falls into this pattern.  Specifically, the underpinning of certification in that case was the Court's finding that:

> Mercedes did not publicly acknowledge the FCC rule change and the impending obsolescence of analog-only Tele Aid systems until November 2006, when it posted information regarding those documents on its website.

(*Id.* at 52)  Moreover, the Court found that the class could not include persons who purchased after Mercedes disclosed the Analog Sunset Order by placing stickers on used cars in December 2006.  *In re Mercedes Tele Aid*, 267 F.R.D. 113, 156-157 (D.N.J. 2010) (the court specifically found that "individuals who had actual knowledge of the impending obsolescence of analog Tele Aid could not have been harmed by that failure").

Here, Plaintiffs cannot show that any misrepresentations or omissions were "substantially similar," let alone the same, among the members of the putative class which encompassed vehicle purchases over a 4½ year period.  To the contrary, the record establishes that putative class members purchased their new or used vehicles from other persons or independent dealerships, had individual interactions with sales persons, were provided different documents with different forms of disclosure, and in many instances performed their own individual investigations prior to the purchase or lease of the vehicles.  Further compounding the issue, the disclosure information changed over the 4½ year class period.  In short, Plaintiffs cannot point to a single common

misrepresentation that was made to every class member.[20]  Nor can Plaintiffs point to any common omitted fact, unlike in *Mercedes Tele Aid*, that was not provided to every class member.  Indeed, the amount and variety of information disseminated by OnStar and the vehicle manufacturers establishes that there is no common omission.  Under these circumstances, it would be impossible to apply a "reasonable consumer" standard since there is no common representation or omission to measure.  In short, where the record establishes that no common representation or omission exists and that materiality and reliance, required elements under the MCPA, would vary from consumer to consumer, the use of a reasonable consumer standard is not even possible.

This reasoning was applied by the court in *Webb v. Carter's, Inc.*, 2011 U.S. Dist. LEXIS 12597 (C.D. Ca. 2011).  Although some courts in California presume reliance in appropriate consumer class actions, the court in *Webb* refused to apply a reasonable consumer standard, holding: "in light of persuasive evidence that materiality and reliance would vary from consumer to consumer, the court concludes that those elements are not subject to common proof under the reasonable consumer standard and that individual issues predominate."  *Id.*  Similarly, in *Teflon Products Liab. Litig.*, 254 F.R.D. 354, 365-66 (S.D. Iowa 2008), the court denied certification while acknowledging that some states' consumer protection acts did not require individualized proof of reliance, but explained that even in those jurisdictions an individualized inquiry would be required to identify the

---

[20] Indeed, many of the named Plaintiffs, for example Jacovelli, testified no misrepresentations were made by OnStar.

representations at issue since the representations varied.  The reasoning of these cases is persuasive and should be applied here.

Numerous courts have held that if proof of individual reliance is necessary for recovery, a class action cannot be certified.  *See, e.g., Sprague*, 133 F.3d at 398 (reversing certification of claim requiring proof of justifiable reliance where "there must have been variations in the [plaintiffs'] subjective understandings of the representations and in their reliance on them"); *Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433, 440 (5th Cir. 2000); *Castono v. Amer. Tobacco Co.*, 4 F.3d 734, 745 (5th Cir. 1996) (holding that a claim "cannot be certified when individual reliance would be an issue"). Here, the record amply demonstrates that both reliance and materiality can only be proven individually.  With respect to materiality, OnStar was sold almost exclusively as standard equipment in vehicles.  That is, purchasers of the vehicles did not have the option whether or not to include the OnStar equipment in the vehicle they purchased. Since consumers purchase automobiles for a variety of reasons, which may or may not include whether the vehicle has OnStar, whether a consumer would consider OnStar to be a "material" part of the vehicle purchase transaction will necessarily vary.  (DC Ex. 42 and 48)  Further, even if a consumer specifically sought a vehicle with OnStar, the record establishes that accurate and truthful information regarding the type of OnStar equipment in the vehicles and the effect of the analog shut-down on the equipment was available to consumers.  As noted by Martin in his report, "determining whether any particular purchasers or lessor saw or heard this information; how they understood it, if at all; or the impact it had on their decision to purchase or lease a vehicle, would require a transaction-

by-transaction analysis." (DC Ex. 42)   Accordingly, individual issues of materiality and reliance predominate over common questions, if any.

> **E.     The Proposed Class is Not Reasonably Ascertainable Since Individual Inquiry is Required to Determine Membership.**

Rule 23 contains an implicit requirement that the proposed class be "precise, objective and presently ascertainable."  Newberg on Class Actions § 2:4 (4th Ed. 2002). *See also Roberio*, 2009 U.S. Dist. LEXIS at *22 (individualized fact finding needed to determine class membership made class definition unworkable); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).   Accordingly, Plaintiffs are required to demonstrate that the class they are seeking to certify is reasonably ascertainable, *i.e.,* members can be identified without undue individual inquiry.  *See Romberio,* 2009 U.S. App. LEXIS at *22.  Here, Plaintiffs propose the following class:

> All persons or entities residing in the United States who between August 8, 2002 and December 2006, purchased or leased a vehicle equipped with an analog OnStar system and were subscribers as of December 31, 2006 and who owned the vehicle as of December 31, 2007, (1) for whom no upgrade to digital service was offered, or (2) who paid for or were required to pay for an upgrade to digital OnStar service.  Excluded from the class are persons or entities who purchased their vehicles primarily for business or commercial purposes…

Motion, p. 1 (emphasis added).[21]  Plaintiffs simplistically contend that class members are easily identifiable since "OnStar maintains a database of all subscribers."  Motion, p. 14-15.  However, the class definition does not include all subscribers.

---

[21] The class definition proposed in the Motion is different than the class definition in Plaintiffs' live complaint, which creates an immediate impediment to certification.  *See G.M. Sign, Inc. v. Brink's Mfg.*, 2011 U.S. Dist. LEXIS 7084, *11 (W.D. Ill. 2011) (district courts typically hold a plaintiff to class definition in complaint, not motion).

In order maintain an action under the MCPA the product purchased must be "primarily for personal, family, or household purposes," rather than business or commercial use. MCL 445.902(g); *See Zine,* 600 N.W.2d at 392-94; *Sautner v. Fleetwood Enterprise, Inc.,* 2007 U.S. Dist. LEXIS 33564, at *17-21 (E.D. Mich. 2007). Plaintiffs attempt to address this issue by excluding business or commercial purchasers from the proposed class definition. However, Plaintiffs never discuss how the Court is to determine whether a "person or entity" purchased the vehicle primarily for personal use.[22] This is a glaring deficiency since, under Michigan law, such a determination would require a fact-intensive inquiry into every single consumer's actual use of their vehicle. *See Zine,* 600 N.W.2d at 394; *Sautner*, 2007 U.S. Dist. LEXIS at *20.

Under the MCPA, the relevant inquiry is not the type of good purchased, but how the plaintiff puts the good to use. *Sautner*, 2007 U.S. Dist. LEXIS at *20. The *Sautner* Court stated:

> A truck, like a motor home, can be purchased for business or personal use. Therefore, it is the primary way in which [plaintiff] utilizes the motor home that determines whether the MCPA applies; not whether the motor home, itself, is a consumer good—as [plaintiff] argues.

*Id.* Indeed, Michigan courts hold that the "applicability of the MCPA is to be decided on a case-by-case basis." *Edwards v. Cape to Cairo,* 2010 Mich. App. LEXIS 535, *8 (Mich. App. 2010); *see also Harahan v. Fairmarket Life Settlements Corp.,* 2006 U.S. Dist. LEXIS 82248, *21 (E.D. Mich. 2006) (when determining whether MCPA applies,

---

[22] OnStar notes it is unlikely that any "entity" not a natural person purchased a vehicle "primarily for personal, family, or household purposes." *See Robertson v. State Farm Fire & Cas. Co.,* 890 F. Supp. 671, 679 (E.D. Mich. 1995) (noting "it would be rare indeed (if even possible) for a corporation to purchase goods for personal, family or household purposes"); *see also German Free State of Bavania v. Toyota Co.,* 480 F. Supp. 2d 958, 968 (W.D. Mich. 2007).

"courts consider the particular transaction at issue").  Here, such a case-by-case inquiry would be needed to even determine whether a "person or entity" is even a member of the proposed class.

For example, in *Zine* the Court concluded that the truck at issue was purchased primarily for business use since it was used by the plaintiff in his work as a self-employed sales representative.  *Id.* at 394.  In reaching this result, the Court considered the plaintiff's deposition testimony, including that the truck was described as a business asset, a cargo box had been installed for storing equipment samples, his company name was on the side of the truck, he claimed a business deduction for depreciation of the truck, and the percentage of overall miles attributable to business driving was greater.  *Id.* In *Sautner*, the court held that whether the vehicle at issue was purchased for personal or business purposes was a question for the jury, since "reasonable minds could differ" on the answer.  *Sautner* at *20-21.

The Sixth Circuit recently held that, if "the only way to distinguish between the two sets of individuals is to engage in individualized fact-finding . . . the need for such individualized fact-finding makes the district court's class definition unsatisfactory." *Romberio,* 2009 U.S. App. LEXIS at *22 (citations omitted).  Indeed, several courts have determined that a fact-intensive inquiry regarding personal versus business use is exactly the type of individualized fact issue which prevents class certification.  *See Mwantembe v. T.D. Bank,* 268 F.R.D. 548, 561 (E.D. Pen. 2010) (determining membership in class required individualized inquiry into, among other things, the personal versus business use of bank card); *Lewis v. Riddle P.C.,* 1998 U.S. Dist. LEXIS 20465, at *11-14 (W.D. La.

1998) (personal use versus business use was not ascertainable through readily available documents, thus requiring individualized inquiry into each transaction); *Parker v. George Thompson Ford,* 83 F.R.D. 378 (N.D. Ga. 1979) (determining personal versus business use would require a factual finding for each alleged class member).  Here, the problem is particularly acute since numerous individuals purchase vehicles for business purposes, for example realtors, small business owners, construction workers, farmers, and distributors, even disregarding the reasons an "entity" may have purchased a vehicle.

Plaintiffs offer no suggestion in the Motion how this issue could be resolved, and indeed no resolution is possible.  There are no documents in the possession of OnStar, or any other data base for that matter, which would identify which proposed class members acquired and used vehicles for personal use as opposed to business use.  Instead, such information could only be obtained from each individual class member by written discovery and deposition, since OnStar has the right to challenge the standing of persons seeking to recover against it.  According, Plaintiffs proposed class fails even the most basic requirement, *i.e.,* a reasonably ascertainable class.

### F.     Adequacy of Representation.

In the Motion, Plaintiffs argue adequacy of counsel primarily based on the experience of The Miller Law Firm.  Since the Motion was filed, however, David Fink, the individual at The Miller Law Firm who was responsible for the lawsuit, has left to start his own firm, Fink & Associates.  It is unclear what role The Miller Law Firm is to have in this case, if any, and whether Fink & Associates can provide adequate representation since there has been no briefing on this issue.

In addition, the Plaintiffs' declarations filed in support of the Motion raise serious questions regarding the adequacy of both counsel and the named Plaintiffs.  As noted above, two of the named Plaintiffs are not even members of the proposed class, yet counsel filed declarations on their behalf as if they could move forward as class representatives.   In addition, OnStar has identified several instances in which the declarations are flatly inconsistent with the sworn testimony of the named Plaintiff. Given the cookie cutter nature of the declarations, which were obviously drafted by class counsel, and the fact that the declarations in many instances raise credibility questions with respect to the named Plaintiffs, adequacy of counsel and the named Plaintiffs is questionable.  *See Katz v. Lindt & Sprungli (USA), Inc.,* 270 F.R.D. 150 (S.D. N.Y. 2010) (incorrect information in plaintiffs' interrogatory responses, which were drafted by counsel, evidenced that neither plaintiff nor counsel was an adequate representative); *see also, Kline v. Wolf,* 702 F.2d 400 (2nd Cir. 1983).  Given these issues, and the fact that it is unclear what law firm is even requesting to be designated as lead counsel, OnStar submits that the adequacy requirement has not been established for either counsel or Plaintiffs.

### G.    Superiority Requirement is Not Met.

For all the reasons stated herein, a class action is not a superior method to adjudicate the issues raised in this case.  In addition, the way Plaintiffs have structured the case against the various Defendants raises other superiority concerns.  In this regard, Plaintiffs seek to certify against the manufacturing Defendants separate single state classes covering vehicle owners in a few states.  With respect to OnStar, Plaintiffs seek to

certify a nationwide class under the MCPA.  This creates overlap between class members of the proposed state classes and the nationwide class against OnStar, and raises issues regarding how the cases could be tried.  It appears Plaintiffs propose separate trials as to OnStar and each vehicle manufacturer.  However, the persons suing the manufacturers are also in the proposed nationwide OnStar class and are seeking exactly the same recovery against OnStar (DC Ex. 83, p. 92), thus leading to the possibility of double recovery.  Moreover, as currently postured, the claims against OnStar are governed by a different state's law than the claims against the manufacturer Defendants, thus raising the possibility of inconsistent results with respect to the same class members.  Given these considerations, and consistent with the principles of Rule 19, OnStar believes that the only appropriate approach is to try all of the cases together.  However, this raises issues regarding manageability given the variation in legal standards that would be applicable to the different Defendants.  Accordingly, for this reason as well, the class action is not a superior method of dealing with this controversy.

## IV.  CONCLUSION

For all the foregoing reasons, OnStar requests that Plaintiffs' Motion for Class Certification be denied.

Dated:  February 16, 2011.

By: /s/ Timothy A. Daniels
    Timothy A. Daniels
    A. Erin Dwyer
    Don Colleluori

FIGARI & DAVENPORT, LLP
3400 Bank of America Plaza
901 Main Street
Suite 3400
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 FAX

and

Michael P. Cooney
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, MI  48243
(313) 568-6955

ATTORNEYS FOR ONSTAR LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February, 2011, a true and correct copy of the foregoing document was forwarded to all counsel of record through the Court's ECF system.

/s/ Timothy A. Daniels
Timothy A. Daniels