**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: ONSTAR CONTRACT LITIGATION, | : |
| | : |
| | : |
| | : MDL 07 -md -1867 |
| | : |
| THIS DOCUMENT RELATES TO: | : |
| ALL CASES | : Hon. Sean F. Cox |
| | : |
| | : |
| | : |

**DEFENDANT SUBARU OF AMERICA, INC.'S BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

NEAL D. WALTERS
MARIAH E. MURPHY
BALLARD SPAHR LLP
A Pennsylvania Limited Liability Partnership
210 Lake Drive East
Suite 200
Cherry Hill, New Jersey 08002
Tel: (856) 761-3400
Fax: (856) 761-1021

Attorneys for Defendant Subaru of America, Inc.

## QUESTIONS PRESENTED

1.      Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging consumer fraud and breach of express warranty under the laws of New York, Pennsylvania, Oregon, and Washington where plaintiffs' proposed class is defined arbitrarily and is, in any event, over-inclusive?

        Suggested Answer:  No.

2.      Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging consumer fraud under the laws of New York, Pennsylvania, Oregon and Washington where the determination of whether each putative class member can establish the requisite elements of reliance and/or causation will require a detailed individualized inquiry into the particular facts surrounding his or her purchase decision including, without limitation, the details of each putative class member's vehicle search and purchase transaction and the degree of importance of the OnStar feature.

        Suggested Answer:  No.

3.      Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging consumer fraud under the laws of New York, Pennsylvania, Oregon and Washington where many putative class members may have had actual knowledge of the analog sunset and its potential impact on OnStar service prior to their purchase of OnStar-equipped Subaru vehicles, and where a detailed individual inquiry into each putative class member's pre-sale knowledge, including without limitation whether each putative class member read, understood and acted upon any of the disclosures or other sources of information will predominate this litigation?

        Suggested Answer:  No.

4.      Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging consumer fraud under the law of Oregon where many putative class members' claims against Subaru may be barred by the applicable statute of limitations, and where determining whether a particular claim is, or is not, so barred necessitates an individualized inquiry into the timing of the putative class members' knowledge of the analog sunset and its potential impact on OnStar service, which individualized inquiry will predominate this litigation?

        Suggested Answer:  No.

5.     Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging breach of express warranty under the laws of New York, Pennsylvania, Oregon, and Washington where the Court must determine whether each and every individual class member was within the durational and mileage limits of his or her express warranty at the time of the alleged breach in February 2008, which determination presents an individualized issue that will predominate this litigation?

Suggested Answer:  No.

6.     Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging breach of express warranty under the law of Washington where the basic 3 year/36,000 mile warranty of the proposed class representatives, Melvin and Betty Rubertt, expired before the alleged breach occurred in February 2008 and, as a result, the Rubertts cannot maintain a claim for breach of express warranty against Subaru, rendering them inadequate class representatives?

Suggested Answer:  No.

7.     Should the Court certify a class comprised of certain owners and lessees of OnStar-equipped Subaru vehicles alleging breach of express warranty under the laws of New York, Pennsylvania, Oregon, and Washington where plaintiffs allege that the durational and mileage limits of Subaru's basic 3 year/36,000 mile warranty should be invalidated under the doctrine of unconscionability, which argument cannot be resolved absent an individualized inquiry into the particular facts surrounding each putative class member's purchase transaction?

Suggested Answer:  No.

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abraham v. Volkswagen,*
    795 F. 2d 238 (2d Cir. 1986).................................................................34

*Alkire v. Irving,*
    330 F.3d 802 (6th Cir. 2003) ...............................................................18

*Allegro Corp. v. Only New Age Music, Inc.,*
    2002 U.S. Dist. LEXIS 27449 (D. Or. Oct. 4, 2002)..........................29

*Amchem Prod. v. Windsor,*
    521 U.S. 591 (1997).......................................................................18, 35

*Beattie v. CenturyTel, Inc.,*
    511 F.3d 554 (6th Cir. 2008) ...............................................................18

*Blades v. Monsanto Corp.,*
    400 F.3d 562 (8th Cir. 2005) ...............................................................18

*Boca Raton Cmty Hosp. v. Tenet Healthcare,*
    238 F.R.D. 679 (S.D. Fla. 2006) ..........................................................20

*Clarke v. Baptist Mem'l Healthcare Corp.,*
    264 F.R.D. 375 (W.D. Tenn. 2009) ......................................................20

*Clemens v. DaimlerChrysler,*
    534 F.3d 1017 (9th Cir. 2008) .............................................................34

*Costelo v. Chertoff,*
    258 F.R.D. 600 (C.D. Cal. 2009) .........................................................20

*Daigle v. Shell Oil,*
    133 F.R.D. 600 (D. Colo. 1990) ..........................................................20

*Dallas Aerospace v. CIS Air,*
    352 F.3d 775 (2d Cir. 2003)......................................................37, 38, 39

*Drennan v. PNC Bank, NA,*
    622 F.3d 275 (3d. Cir. 2010)................................................................31

*Duquesne Light Co. v. Westinghouse Elec. Co.,*
    66 F. 3d 604 (3d Cir. 1995)............................................................33, 34

*Gieseke v. First Horizon Home Loan Corp.,*
    2007 U.S. Dist. LEXIS 9219 (D. Kan. Feb. 6, 2007) ..........................37

*Graybeal v. Am. S&L Ass'n,*
 59 F.R.D. 7 (D.D.C. 1973) .................................................................................37

*Heastie v. Cmty. Bank of Greater Peoria,*
 125 F.R.D. 669 ..........................................................................................................20

*Hopkins v. New Day Financial, Inc.,*
 643 F. Supp. 2d 704 (E.D. Pa. 2009) ....................................................................38

*Huang v. Wash. Mut. Bank,*
 2008 U.S. Dist. LEXIS 108020 (W.D. Wa. Aug. 25, 2008)...................................37

*Hunt v. United States Tobacco Co.,*
 538 F.3d 217 (3d Cir. 2008)....................................................................22, 24, 25

*Huong Le v. Gentle Dent.,*
 2010 U.S. Dist. LEXIS 88521 (D. Or. Jul. 29, 2010) ..........................................38

*In Re Am. Med. Sys.,*
 75 F.3d 1069 (6th Cir. 1996) .................................................................................18

*In re Ford Motor Company Speed Control Deactivation Switch Products Liability Litig.,*
 2007 U.S. Dist. LEXIS 62483 (E.D. Mi. Aug. 24, 2007)......................................33

*In Re Hydrogen Peroxide Antitrust Litig.,*
 552 F.3d 305 (3d Cir. 2008)..............................................................................18, 19

*In Re IPO Sec. Litig.,*
 471 F.3d 24 (2d Cir. 2006)..................................................................................18, 19

*In Re Jackson Nat'l Life Ins. Co. Premium Litig.,*
 209 F.R.D. 134 (W.D. Mich. 2002) ......................................................................19

*In re Mercedes-Benz Tele Aid Contract Litig.,*
 257 F.R.D. 46 (D.N.J. 2009), *clarified by* 267 F.R.D. 113 (D.N.J. 2009)................9

*In re Philips/Magnavox TV Litig.,*
 2010 U.S. Dist. LEXIS 91343 (D.N.J. Sept. 1, 2010) ..........................................36

*In Re Qwest Sav. & Invest. Plan ERISA Litig.,*
 2004 U.S. Dist. LEXIS 24693 (D. Co. Sept. 27, 2004) ........................................20

*In re Sunset of Cellular Radiotelephone Service Analog Service Requirement,*
 22 FCC Rcd. 11243 (F.C.C. June 15, 2007) (Exhibit F) ........................................3

*In Re Wal-Mart Wage and Hour Employment Prac. Litig.,*
 2008 U.S. Dist. LEXIS 50928 (D. Nev. June 20, 2008)........................................19

*Johnston v. HBO Film Management, Inc.*,
   265 F.3d 178 (3d Cir.2001)............................................................................25

*Kelley v. Microsoft Corp.*,
   2009 WL 973368 (W.D. Wash. Apr. 10, 2009).......................................................26

*Kennedy v. United Healthcare of Ohio, Inc.*,
   206 F.R.D. 191 (S.D. Ohio 2002) ....................................................................19

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
   171 F.3d 818 (3d Cir. 1999)..........................................................................33

*Luna v. Household Fin.*,
   236 F. Supp. 2d 1166 (W.D. Wa. 2002) .............................................................37

*Mann v. TD Bank*,
   2010 U.S. Dist. LEXIS 112085 (D.N.J. Oct. 20, 2010)...........................................20

*Millennium Enterp., Inc. v. Millennium Music, LP*,
   33 F. Supp. 2d 907 (D. Or. 1999) ...................................................................27

*Morris v. ADT Security Systems, Inc.*,
   No. 07-80950, slip op. (S.D. Fl. Sept. 11, 2009) ............................................9, 30

*Mwantembe v. TD Bank*,
   268 F.R.D. 548 (E.D. Pa. 2010)......................................................................29

*Newman v. RCN Telecom Serv., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ......................................................................28

*O'Neil v. Appel*,
   165 F.R.D. 479 (W.D. Mi. 1995)......................................................................34

*Oshana v. Coca-Cola Co.*,
   225 F.R.D. 575 (N.D. Ill. 2005)....................................................................29

*Ostroff v. Alterra Healthcare Corp.*,
   433 F. Supp. 2d 538 (E.D. Pa. 2006) ...............................................................38

*Owen v. GMC*,
   533 F.3d 913 (8th Cir. 2008) .......................................................................39

*PC Com, Inc. v. Proteon, Inc.*,
   946 F. Supp. 1125 (S.D.N.Y. 1996)..................................................................39

*Pierce v. NovaStar Mortgage*,
   238 F.R.D. 624 (W.D. Wash. 2006) ..................................................................26

*Pierce v. NovaStar Mortgage, Inc.*,
    2006 U.S. Dist. LEXIS 62875 (W.D. Wash. 2006) ..................................................29

*Powers v. Lycoming Engines*,
    328 Fed. Appx. 121 (3d Cir. 2009) ......................................................................32

*Quick v. Shell Oil Co.*,
    241 F.R.D. 435 (S.D.N.Y. 2007) ........................................................................19

*Roneker v. Kenworth Truck Co.*,
    944 F. Supp. 179 (W.D.N.Y. 1996) ....................................................................37

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000)..........................................................................20

*Smith v. Ford Motor Co.*,
    2010 U.S. Dist. LEXIS 95122 (N.D.Cal. Sept. 13, 2010) ....................................36

*Smith v. John Hancock Ins. Co.*,
    2008 WL 4145709 (E.D. Pa. Sept. 3, 2008) ........................................................25

*Sprague v. GMC*,
    133 F.3d 388 (6th Cir. 1998) ..............................................................................35

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) ..............................................................................18

*Vaszlavik v. Storage Tech.*,
    175 F.R.D. 672 (D. Co.1997)..............................................................................20

*Webb v. Carters, Inc.*,
    2011 U.S. Dist. LEXIS 12597 (C.D. Cal. Feb. 3, 2011)........................................24

*Yost v. General Motors Corp.*, 651 F. Supp. 656 (D.N.J. 1986)........................................36

*Zimmer v. CooperNeff Adv.*,
    523 F.3d 224 (3d Cir. 2008)................................................................................38

STATE CASES

*Antz v. GAF Materials Corp.*,
    719 A.2d 758 (Pa. Super. Ct. 1998)....................................................................38

*Aronson v. Greenmountain.com*,
    809 A.2d 399 (Pa. Super. Ct. 2002)....................................................................25

*Best v. U.S. Nat'l Bank of Ore.*,
    714 P.2d 1049 (Or. Ct. App. 1986)....................................................................39

*Caldwell v. Pop's Homes, Inc.*,
    634 P.2d 471 (Or. Ct. App. 1981)......................................................................27

*Daugherty v. American Honda Motor Co., Inc.*,
    144 Cal. App. 4th 824 (Cal. Ct. App. 2006) .....................................................33

*Debbs v. Chrysler Corp.*,
    810 A.2d 137 (Pa. Super. Ct. 2002)..............................................................24, 25

*Feitler v. The Animation Celection, Inc.*,
    13 P.3d 1044 (Or. Ct. App. 2000)....................................................................27

*Gale v. IBM Corp.*,
    781 N.Y.S.2d 45 (App. Div. 2004) ...................................................................28

*Gemignani v. Pete*,
    71 P.3d 87 (Or. Ct. App. 2003)........................................................................27

*Hangman Ridge Training Stables v. Safeco Title Ins. Co.*,
    719 P.2d 531 (Wash. 1986)...............................................................................22

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*,
    170 P.3d 10 (Wash. 2007).................................................................................26

*Jaquith v. Ferris*,
    669 P.2d 334 (Or. Ct. App. 1983) ....................................................................31

*M.A. Mortenson Co., Inc. v. Timberline Software Corp.*,
    998 P.2d 305 (Wash. 2000)...............................................................................37

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, NA*,
    647 N.E.2d 741 (N.Y. 1995).........................................................................22, 29

*Perkins v. Daimler Chrysler*,
    383 N.J. Super. 99 (App. Div. 2006) ................................................................33

*Pickett v. Holland Am. Line-Westours, Inc.*,
    6 P.3d 63 (Wash. Ct. App. 2000), *rev'd on other grounds*, 35 P.3d 351 (Wash. 2001)..........26

*Robinson v. Avis Rent-A-Car System, Inc.*,
    22 P.3d 818 (Wash. Ct. App. 2001) ..................................................................26

*Schnall v. AT&T Wireless Servs., Inc.*,
    225 P.3d 929 (Wash. 2010)..........................................................................22, 26

*Solomon v. Bell Atl. Corp.*,
    777 N.Y.S.2d 50 (App. Div. 2004) ...................................................................29

*Sprague v. Qual. Rests.*,
    162 P.3d 331 (Or. Ct. App. 2007)........................................................38

*Terry v. Holden-Dhein Enterp., Ltd.*,
    618 P.2d 7 (Or. Ct. App. 1980)..........................................................27

*Toy v. Metro. Life Ins. Co.*,
    928 A.2d 186 (Pa. 2007)....................................................................22

*U.S. Nat'l Bank v. Boge*,
    814 P.2d 1082 (Or. 1991) ...................................................................39

*Vasquez-Lopez v. Beneficial Oregon, Inc.*,
    152 P.3d 940 (Or. Ct. App. 2007)......................................................38

*Weinberg v. Sun Co.*,
    777 A.2d 442 (Pa. 2001) ....................................................................24

**STATE STATUTES**

N.Y. G.B.L. § 349........................................................................................22, 28

O.R.S. 646.608..................................................................................................22

O.R.S. 646.638(6)..............................................................................................31

O.R.S. 646.639(1)..............................................................................................22

O.R.S. § 71.2030................................................................................................39

O.R.S. § 72.3020................................................................................................39

O.R.S. § 72.7130................................................................................................39

O.R.S. § 72.7190................................................................................................39

UCC § 1-203......................................................................................................39

UCC § 2-713......................................................................................................39

UCC § 2-719......................................................................................................39

**RULES**

FED. R. CIV. P. 23............................................................................................*passim*

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Rules**

FED. R. CIV. P. 23(b)(3)

**Cases**

*Morris v. ADT Security Servs., Inc.*, No. 07-80950-CIV (S.D. Fla. Sept. 11, 2009)

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10 (Wash. 2007)

*Newman v. RCN Telecom Serv., Inc.*, 238 F.R.D. 57 (S.D.N.Y. 2006)

*Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50 (App. Div. 2004)

*Debbs v. Chrysler Corp.*, 810 A.2d 137 (Pa. Super. Ct. 2002)

*Duquesne Light Co. v. Westinghouse Elec. Co*., 66 F. 3d 604 (3d Cir. 1995)

*Abraham v. Volkswagen*, 795 F. 2d 238 (2d Cir. 1986)

*Terry v. Holden-Dhein Enterp., Ltd.*, 618 P.2d 7 (Or. Ct. App. 1980)

*In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)

*In Re IPO Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 2

   A.  Many Subaru Customers Were Not Interested In The OnStar Feature ................. 2

   B.  Subaru Sells Vehicles – It Does Not Provide Telematic Services ......................... 2

   C.  Subaru's Lack of Knowledge of the FCC Proposed Rule Change ......................... 3

   D.  The Claims Against Subaru And Plaintiffs' Evolving Class Definition ............... 4

   E.  There Is No Way To Determine Which Class Members Knew About The Analog Sunset Without An Individualized Inquiry ................................................. 5

   F.  The Adequacy Of A Given Disclosure Is Dependent On The Particular Consumer And, Thus, Is Highly Individualized ......................................... 9

   G.  Many Class Members May Have Purchased OnStar-Equipped Subaru Vehicles Regardless Of The Sunset Or Even The Presence of OnStar In The Vehicle ........................................................................................... 11

   H.  The Experiences Of The Named Subaru Plaintiffs ................................................ 14

      1.  Gordon and Ann Erdenberger (Pennsylvania) .......................................... 14

      2.  Murle Kemp (Oregon) ............................................................................... 14

      3.  Jason Smith (New York) ........................................................................... 16

      4.  Melvin and Betty Rubertt (Washington) ................................................... 16

III.  STANDARD ON A MOTION FOR CLASS CERTIFICATION .................................. 18

IV.  LEGAL ARGUMENT ........................................................................................ 19

   A.  Plaintiffs' Latest Iteration Of The Class Definition Is Arbitrary And Over-Inclusive ........................................................................................... 20

   B.  Plaintiffs Have Failed To Demonstrate That Their Consumer Fraud Claims Can Be Adjudicated On A Classwide Basis ............................................. 22

      1.  OnStar May Have Been Material To Some, But Not All, Putative Class Members ............................................................................... 23

2.      Variations In The Importance Of OnStar Preclude Plaintiffs From Proving Causation Using Common Proof ................................................. 24

3.      Some Putative Class Members Knew About The Sunset Date And Some Did Not ........................................................................................ 29

4.      There Are Individual Issues As To The Oregon UTPA Claim's Timeliness ............................................................................................... 31

C.    Plaintiffs' Tenuous Breach of Express Warranty Claims Cannot Be Adjudicated On A Classwide Basis ......................................................................... 32

1.      Plaintiffs' Express Warranty Claims Require Individualized Inquiry Into The Mileage And Durational Limits of Their Warranties, And This Inquiry Demonstrates A Lack of Adequate Representation ........................................................................................ 33

2.      Plaintiffs' Unconscionability Defense Further Demonstrates That Their Warranty Claims Cannot Be Adjudicated On A Classwide Basis ......................................................................................................... 36

3.      Plaintiffs' Arbitrary Class Definition Requires Individualized Inquiry Into When Each Purchaser Terminated His OnStar Subscription ................................................................................................ 39

V.    CONCLUSION ...................................................................................................... 40

## I.    INTRODUCTION

Plaintiffs cannot sustain their burden of proof to certify four putative state-wide classes of purchasers of Subaru vehicles residing in Pennsylvania, Washington, Oregon and New York.  A confusing mix of individualized differences stem from class counsel's tenuous causes of action and unworkable class definition.  At its core, this matter involves the interruption of analog wireless service provided by cellular carriers and precipitated by the FCC.  Plaintiffs' burden on this Motion for Class Certification is to establish that, assuming the disclosures that were actually made did not sufficiently state what the FCC and cellular carriers might do four or five years later, all people who bought Subaru vehicles would not have bought those vehicles if they had been provided with additional information about the analog sunset.  To accomplish this, plaintiffs must show that no one had pre-existing knowledge about the sunset.  In addition, since disclosures were actually made throughout the class period, plaintiffs must show that no one understood the disclosures that were provided, or would not have at least inquired further based on the disclosures.  Finally, and most importantly, plaintiffs must show that even if "perfect" disclosures (still unarticulated by class counsel) were made about this new vehicle feature, it would have caused everyone to change their purchase decisions.  In other words, plaintiffs must show that the presence of OnStar mattered so much to all purchasers that if they knew and understood that OnStar service may or may not be available in five to six years, they would not have purchased their Subaru vehicles.

Plaintiffs cannot sustain this burden.  The record and common sense show that some people knew about the sunset before their vehicle purchase.  Others understood the disclosures that were provided.  And most importantly, many people bought their vehicles for reasons having nothing to do with OnStar.  Even plaintiffs' expert agrees that consumers begin their vehicle searches for different reasons, undertake different search processes, ultimately buy vehicles for

different reasons, had differing levels of interest in OnStar, and understood and reacted to the OnStar disclosures differently.  In sum, the wide variation among class members with respect to these issues precludes class certification.

## II.   FACTUAL BACKGROUND

### A.   Many Subaru Customers Were Not Interested In The OnStar Feature

Subaru began selling OnStar-equipped vehicles in late 2002.  Vespertino Dep. 60:6-11(Exhibit A).  OnStar was standard equipment in the 2003 and 2004 Outback models in which it was included and, therefore, a customer interested in buying an Outback model during those years got OnStar whether they wanted it or not.  Vespertino Dep. 67:5-68:11 (Exhibit A); Sinclair Dep. 12:24-13:1, 21:9-16, 24:6-12 (Exhibit B).  The total number of Subaru vehicles equipped with OnStar was 20,088.  Vespertino Affidavit ¶ 3 (Exhibit C).  In contrast, the total number of Subaru owners and lessees in Pennsylvania, New York, Washington, and Oregon, who actually subscribed to OnStar as of December 2006 (which, as explained below, constitutes the class that plaintiffs now seek to certify) is only 1,811. (Exhibit D).  Despite OnStar service being offered for free for the first year after purchase, only 60% of Subaru vehicle purchasers activated the service as of May 31, 2003.  Sinclair Dep. 24:22-25:6 (Exhibit B); (Exhibit DD).  The lack of customer interest led Subaru to stop equipping its vehicles with OnStar after the 2004 model year.  Sinclair Dep. 24:22-25:6 (Exhibit B).

### B.   Subaru Sells Vehicles – It Does Not Provide Telematic Services

Subaru had no involvement with providing OnStar's telematic services.  Subaru sells vehicles, it is not a telematics company, nor did Subaru have any experience with telematics before being introduced to telematics by OnStar.  OnStar was exclusively responsible for activating subscriptions, maintaining subscriber lists and communicating with consumers and the FCC.  DiMusto Dep. 275:22-276:4, 214:22-215:4 (Exhibit G); Sinclair Dep. 112:13-24; 113:11-

23 (Exhibit B).  OnStar also prepared the subscriber agreements, Blue Box kit, OnStar welcome

letters, OnStar renewal letters, OnStar invoices, and OnStar termination letters.  OnStar made all

decisions with respect to OnStar service, including plans, prices, timing and content of all

information provided, and when to schedule the termination date.

### C.    Subaru's Lack of Knowledge of the FCC Proposed Rule Change

Subaru's lack of involvement with the provision of OnStar service, and its customers'

disinterest in the feature, are consistent with the fact that Subaru was not even aware of the FCC

rulemaking and its potential impact on OnStar service until OnStar made a presentation to

Subaru in May 2003.  DiMusto Dep. 290:22-291:4 (Exhibit G); Sinclair Dep.15:25-16:14, 37:17-

38:3 (Exhibit B).[1]  At that time, most of the subject 2003 Subaru vehicles had been sold, and this

was only a month before the 2004 vehicles were to go on sale.  Sinclair Dep. 21:9-16, 39:25-40:8

(Exhibit B).  More importantly, unlike the other defendants, Subaru did not participate in the rule

making proceedings before the FCC.  Plaintiffs allege that the other defendants' statements to the

FCC evidence their pre-sale knowledge of the analog sunset.  However, no such argument can be

made against Subaru.  SAC ¶  58, 59.  Accordingly, because Subaru cannot possibly be charged

with knowledge prior to 2003, a significant number of Model Year 2003 purchasers stand in a

position different from those who purchased after May 2003, because pre-2003 purchasers are

---

[1]      In August 2002, the FCC announced that, as of February 18, 2008, wireless carriers could either
continue or cease to operate analog communications systems.  2nd Master Am. Compl. ("SAC") ¶ 77.
The FCC initially anticipated that analog service would continue, stating in September 2002 that "[w]e do
not anticipate that, as a general matter, carriers will immediately discontinue [analog communications]
services as it is reasonable to conclude that analog service will continue to be available as long as
consumers demand it."  Sept. 2002 FCC Report (Exhibit E).  It was not until June 2007 – long after
Subaru stopped selling OnStar-equipped vehicles – that the FCC finally publicized the fact that "AT&T,
Verizon and Alltel recently advised the [FCC] that they intend to discontinue analog service shortly after
the sunset date."*In re Sunset of Cellular Radiotelephone Service Analog Service Requirement*, 22 FCC
Rcd. 11243 (F.C.C. June 15, 2007) (Exhibit F).  Nonetheless, the FCC reiterated at that time that wireless
carriers were permitted to continue operating analog communications systems after the sunset date.  *Id.*

unable to argue preexisting knowledge on Subaru's part. This is yet another issue as to which the proposed class is fragmented.

### D.     The Claims Against Subaru And Plaintiffs' Evolving Class Definition

Plaintiffs claim Subaru is liable for consumer fraud and breach of express warranty under the laws of Pennsylvania, New York, Oregon, and Washington. The crux of these claims is plaintiffs' spurious contention that Subaru knew about the possible analog sunset, but failed to adequately disclose this possibility to class members prior to their purchase of OnStar-equipped vehicles in 2002 to 2004. Plaintiffs contend that, if additional or different information was provided, all class members would have changed their purchase decisions.

From the inception of this litigation, plaintiffs sought to certify a national class of all owners and lessees of OnStar equipped Subaru vehicles, regardless of whether they ever activated the OnStar equipment or subscribed to OnStar. SAC¶ 193; (Exhibit H); Lamb Report, p. 4 ¶ 8 (Exhibit I). All discovery, including expert discovery, was conducted based on a definition that focused on vehicle purchase and did not require actual subscription.

In their Motion for Class Certification as to Subaru, plaintiffs have done an "about-face," now seeking certification of the following proposed class:

> All individuals and entities who are residents of Washington, Pennsylvania, New York or Oregon, who between August 8, 2002 and December 2006, purchased or leased a Subaru vehicle that was equipped with an OnStar system, who subscribed to OnStar service as of December 31, 2006, and who owned or leased the vehicle as of December 31, 2007.

Plaintiffs' Motion for Class Certification, p.1. Thus, plaintiffs went from a nationwide class comprised of all purchasers and lessees of OnStar-equipped Subaru vehicles (including those who did not subscribe to OnStar), to a four-state class comprised of purchasers and lessees of OnStar-equipped Subaru vehicles, who actually subscribed, but only until the end of 2006.

4

Plaintiffs offer no explanation for this radical, eleventh hour departure from the original proposed class definition.

> **E.      There Is No Way To Determine Which Class Members Knew About The Analog Sunset Without An Individualized Inquiry**

As noted above, the crux of plaintiffs' claims is that Subaru and the other defendants allegedly failed to adequately disclose the possible analog sunset and its potential effect on OnStar.  But even plaintiffs' consumer behavior expert, Dr. Warren Keegan, admits that a car buyer lacks a reasonable expectation that analog OnStar service would last the life of the vehicle if he knew about the analog sunset prior to purchase.  Keegan Dep. 203:9-13 (Exhibit J).  Notably, such information was, in fact, disclosed throughout the relevant timeframe.  OnStar provided numerous disclosures through its website and pre-sale materials, though, as explained below, this raises numerous individual issues that will predominate this case.

Beginning in the summer of 2003, OnStar posted on its website a document entitled Analog to Digital Transition Q&A ("Transition Q&A").  (Exhibit K, p. 1); DiSalle Dep. 206:2-7 (Exhibit L).  The Transition Q&A explains the FCC Ruling, stating in relevant part:

> The FCC ruling states that wireless carriers are required to support the analog wireless network only until February 16, 2008.  **After that, if the carriers for OnStar elect to provide only digital service, OnStar will only be available through dual-mode (analog/digital) hardware.**

(Exhibit K) (emphasis added).  The Transition Q&A further explains how to determine if a particular vehicle is equipped with analog equipment.  *Id.* p. 2.

In addition, OnStar supplied a set of Terms & Conditions with its standard literature package that would have been included in an owner's kit, or "Blue Box," in the glove compartment of each vehicle prior to purchase.  Vespertino Dep. 88:5-16, 117:8-20, 124:15-18 (Exhibit A).  The July 2003 version of the Terms & Conditions provides as follows:

> 3.  Hardware.  Your vehicle manufacturer has equipped your Vehicle with Hardware programmed to receive OnStar Services.  It must comply with Federal Communications Commissions ("FCC") regulations, be compatible with our Services and your service plan and will not interfere with our services.  Your Hardware uses either analog or digital telephone signals.  **If the underlying wireless carriers terminate or restrict analog or digital service, OnStar services will not be available.  Effective February 16, 2008, the FCC no longer requires wireless carriers to support analog service.  Thus, some wireless carriers may cease providing services to analog Hardware at that time.**

2003 OnStar Terms & Conditions, p. 2 ¶ 3 (Exhibit M) (emphasis added).

Furthermore, consumers interested in purchasing 2003 and 2004 model year Subaru vehicles equipped with OnStar were informed in the Subaru Owner's Manual to access the OnStar website for information about OnStar, including limitations upon the OnStar service, and were further informed that "OnStar services require … wireless service to be available and operating for features to function properly."  (Exhibit N, p. 16-13 to 16-19); (Exhibit O, p. 6-13 to 16-18); Keegan Dep. 80:4-8 (Exhibit J).

It is irrefutable that some members of the putative class would have seen and understood these disclosures before buying their vehicles.  Plaintiffs' expert, Dr. Keegan, acknowledged class members' presale knowledge of the analog sunset when he admitted that "**[t]here have to be people out there who knew**."  Keegan Dep. 66:23-67:4 (Exhibit J) (emphasis added).  Dr. Keegan later reiterated this testimony, agreeing that some class members could have known about the impact of the analog sunset on OnStar service by, among other things, reviewing the various materials supplied by OnStar and the vehicle manufacturers.  Keegan 271:2-17 ( Exhibit J); *see also* Martin Report, p. 18 (Exhibit P)("[T]here was a considerable selection of sources and amount of information coming from the manufacturers and OnStar regarding service termination or upgrading for specific vehicles commencing in 2003.").

6

In this regard, plaintiffs' expert, Dr. Keegan, testified that some class members likely visited the OnStar website, and read and understood the Transition Q&A, prior to making their purchase decision.  Keegan Dep. 106:3-20 (Exhibit J); *see also id.* 91:13-20 (attempting to characterize Subaru plaintiff Murle Kemp as an "outlier" because he accessed the OnStar website in or around 2003 prior to purchasing an OnStar-equipped Subaru).  Dr. Keegan also acknowledged that some class members may have read and understood the OnStar Terms & Conditions at the time of sale and, thus, were informed of the analog sunset.  Keegan Dep. 72:23-73:20; *see also id.* 74:25-75:25 (attempting to distinguish Honda plaintiff Larnell Gil as an atypical "outlier" because he understood based on the OnStar Terms & Conditions that OnStar service would not be available after January 1, 2008).

Furthermore, there is no dispute that direct sellers may have informed class members about the analog sunset at or prior to sale.  *See* Keegan Dep. 329:12-22 (Exhibit J); *see also* Martin Report, p. 14 (Exhibit P)(opining that dealers were "fertile grounds" of information about the analog sunset).  However, determining whether or not a dealer conveyed such information requires a customer-specific inquiry, particularly in light of what defendants' automotive market expert, Dr. Claude R. Martin, characterized as the "unique" dealership experience of each consumer.  Martin Report, p. 10-11 (Exhibit P).  In this regard, Dr. Martin opined that "each consumer bring[s] different experiences, capabilities, and need assessment to the [purchasing] process." *Id.*, p. 10.  In turn, dealership salespeople tailor their sales approach, including the type and amount of information they provide, to each individual consumer, as some may be more informed, for example, by internet research, than others.  *Id.*  Plaintiffs' expert does not refute these fundamental facts, and indeed, as Dr. Keegan admitted, vehicle manufacturers do not, and

cannot, control the information provided by the direct seller – whether private or dealership – at the point of sale.  Keegan Dep. 116:13-22 (Exhibit J).

Moreover, there is no dispute that the timing of each individual new or used car sale likely impacted the purchasers' potential knowledge about the analog sunset.  As plaintiffs' expert, Dr. Keegan, admitted, information about the analog sunset evolved over time and, as a result, some class members would have been "fully apprised of the impending cessation of OnStar service."  Keegan Dep. 291:7-22 (Exhibit J).  This is particularly true with respect to used car purchasers because they were subjected to "a very different array of purchase information, often conveyed by a private seller, and therefore cannot be considered to have acted in the same manner as original retail purchasers."  Semenik Rebuttal Report, p. 7 (Exhibit Q).  In addition, a used car buyer making his or her purchase toward the end of the class period may have had access to more fully developed information about the analog sunset, as compared to someone who bought earlier.  *Id.*  Plaintiffs, through Dr. Keegan, agreed with this too, conceding that a used car purchaser could have been informed of the analog sunset by the original owner or used car dealership, or, for used buyers who owned another OnStar-equipped vehicle, through disclosures provided as to that vehicle.  Keegan Dep. 187:16-24, 330:19-331:3 (Exhibit J).

Finally, as defendants' consumer behavior expert, Dr. Richard J. Semenik explained, "there is no way to know, without asking members of the named class individually, what other information they might have encountered regarding the functioning of analog equipment."  Semenik Rebuttal Report, p. 6 (Exhibit Q); *see* Keegan Dep. 290:10-19 (Exhibit J) (acknowledging that there was a substantial amount of information available to consumers about the pending cessation of analog OnStar service); *see also* Bruce Johnson Dep. 15:2-13 (Exhibit R) (acknowledging having learned about the analog sunset prior to purchasing OnStar-equipped

vehicle, by reading a newspaper article).  As Dr. Keegan testified, consumers could have learned about the analog sunset on their own through, for example, internet research or word of mouth. Keegan Dep. 338:14-340:4 (Exhibit J); *see also* Martin Report, p. 14 (Exhibit P) (discussing prevalence of internet research in automobile purchasing, and noting that vehicle manufacturers, OnStar, dealers, and the FCC published information about the analog sunset online).

### F.    The Adequacy Of A Given Disclosure Is Dependent On The Particular Consumer And, Thus, Is Highly Individualized

There is no question that because it owned the telematics responsibilities, OnStar made disclosures on behalf of Subaru, and it disingenuous for plaintiffs to argue that Subaru did not make disclosures.[2]  Moreover, as explained above, the uncertain nature of the sunset was at all times accurately conveyed, making plaintiffs' hindsight quarterbacking many years later improper.  Ironically, **plaintiffs still have not explained what information they believe should have been conveyed**.  Regardless, the adequacy of a given disclosure is a function of the unique way each consumer processes information, which presents highly individualized issues.

In general, there are three aspects to consumer information processing: (1) the consumer must receive the information, (2) the consumer must comprehend the information, and (3) the consumer must find the information meaningful and, therefore, act on it (i.e., they must be

---

[2]      In contrast, *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009), *clarified by* 267 F.R.D. 113 (D.N.J. 2009), cited by plaintiffs, involved a scenario in which the telematics company made absolutely no disclosures whatsoever during the several years while this FCC issue was pending. 257 F.R.D. at 52.  The court in *Mercedes*, accordingly, excluded from the class it certified all purchasers who bought their telematics-equipped vehicles after December 2006, which is when Mercedes first made disclosures regarding the analog sunset.  267 F.R.D. at 163.  Notably, while plaintiffs seek to rely on the *Mercedes* decision, they glaringly omit any mention of the *ADT* case wherein the court denied certification of a class based upon the impact of the same FCC rule upon the cessation of analog signals on home security equipment.  Like the *Mercedes* court, a controlling factor for the *ADT* court in denying certification was that some customers knew about the analog sunset date and factual issues as to each customer's knowledge predominated and precluded class certification.  *See Morris v. ADT Security Systems, Inc.*, No. 07-80950, slip op. at 21-22 (S.D. Fl. Sept. 11, 2009).

interested in the subject).  *See generally* Semenik Report (Exhibit S); Semenik Rebuttal Report (Exhibit Q).  Each aspect implicates an individualized inquiry.

For example, the receipt of a disclosure will vary from consumer to consumer because there are a "wide variety of print and electronic media … available to transmit messages," such as television, radio, magazines, brochures, websites, emails, and, in this case, dealership sales people.  Semenik Report, p. 4 (Exhibit S).  There often is also "noise" that interferes with the receipt of information, such as a consumer's decision to ignore a television or radio ad, or to discard a brochure without reading it.  Semenik Report, p. 5 (Exhibit S).  Thus, some consumers obviously receive disclosures that other consumers do not receive.  *Id.*, p. 4.

Once a consumer receives a disclosure, whether or not he understands it is highly individualized.  Semenik Rebuttal Report, p. 6 (Exhibit Q); *see also* Semenik Dep. 20:11-21:8 (Exhibit T).  In the case of a disclosure about a technical automotive feature, whether a consumer understands the information is a function of his personal characteristics, such as his interest in or experience with that type of technology, as well as his general sophistication.  Semenik Rebuttal Report , p. 3 (Exhibit Q).

Finally, whether a consumer finds the disclosure in question relevant, and whether and how he acts on it, varies from person to person.  Semenik Rebuttal Report, p. 6 (Exhibit Q); Semenik Dep. 12:23-13:10, 19:5-7, 20:11-21:8, 21:9-16, 22:3-6, 37:19-38:3 (Exhibit T).  As explained in greater detail below, this is also a highly individualized question because people buy vehicles for very different reasons.  *See* Semenik Report, p. 6 (Exhibit S) (there is significant "individuality and variability of consumer decision making" with respect to automobile purchases).

G.   **Many Class Members May Have Purchased OnStar-Equipped Subaru Vehicles Regardless Of The Sunset Or Even The Presence of OnStar In The Vehicle**

The final aspect of consumer decision making – acting on the information in question – best exemplifies why plaintiffs' tenuous claims against Subaru cannot be adjudicated on a classwide basis.  Simply put, consumers purchase automobiles for a number of different reasons, many of which have nothing to do with OnStar, and, as a result, it is impossible to determine using common proof which putative class members, if given additional or different information about the analog sunset, would have altered their purchase decisions.

As Dr. Semenik explained, an automobile is a "high involvement product," meaning it is a "higher cost, more complex, [and] multi-feature product[]."  Semenik Report, p. 6 (Exhibit S). The complexity of an automobile's feature set increases the number of factors that influence how and why a given consumer decides to purchase a particular vehicle.  *Id.*  In other words, consumers do not base their vehicle purchase decisions on the presence or absence of a single feature, such as OnStar.  Semenik Dep. 68:4-17 (Exhibit T).  Plaintiffs' expert, Dr. Keegan, acknowledged this.  Keegan Dep. 145:7-17 (Exhibit J).  Nor is there any one feature that universally forms the basis for all automobile consumers' purchase decisions.  Semenik Dep. 111:22-112:1 (Exhibit T); *see also* Martin Report, p. 12 (Exhibit P) (opining that there is "no universal sense of importance, or unimportance, for OnStar in individual vehicle ownership").

Instead, in the words of plaintiffs' expert, Dr. Keegan, "there are many, many factors that are involved in the purchase decision … literally hundreds of factors.  People don't buy a car for a single factor.  It's a whole mix of things.  And this is one element of the mix, OnStar is." Keegan Dep. 145:12-17; *see also* Keegan Dep. 207:8-22 (Exhibit J).  Other factors that typically affect the purchase decision include things like brand or dealer loyalty, brand or dealer reputation, input from other prospective drivers in the household, family/friend

11

recommendations, independent, third-party reviews by consumer groups, family circumstances, such as having small children, vehicle styling, operation costs, cargo space, comfort, amenities, prestige, crash test ratings, and/or all-wheel drive systems, to name a few.  Semenik Rebuttal Report, pp. 2-3 (Exhibit Q); *accord* Keegan Dep. 186:14-19, 209:7-210:15 (Exhibit J) (acknowledging that consumers purchase automobiles for a variety of reasons, including styling, performance capabilities, reliability, and prior experience with certain features).

Moreover, some consumers weigh each factor equally, while other consumers weigh some factors more heavily than others.  Semenik Dep. 86:20-87:14 (Exhibit T); Keegan Dep. 208:23-209:6, 211:5-6, 298:5-299:11 (Exhibit J).  Consequently, there are buyers who based their purchase decisions, and the price they were willing to pay, "on a wide range of different factors that have nothing to do with the availability of OnStar equipment."  Semenik Rebuttal Report, p. 1 (Exhibit Q).  As plaintiffs' expert, Dr. Keegan, admitted, it is necessary to conduct individual inquiries to determine whether and to what extent each putative class member valued the presence of OnStar in the purchase decision.  Keegan Dep. 300:10-301:4 (Exhibit J).

Ultimately, consumers base their purchase decisions only on the factors that are important to them.  Semenik Rebuttal Report, p. 4 (Exhibit Q).  Since certain features, like OnStar, come standard in a vehicle (as in the case of Subaru), consumers have no choice but to accept them, even if they play little or no part in the purchase decision.  *Id.*  Thus, as plaintiffs' expert, Dr. Keegan, agreed, some consumers purchased OnStar-equipped vehicles for reasons other than OnStar.  Keegan Dep. 131:14-19, 162:17-163:5 (Exhibit J).  Moreover, according to Dr. Keegan, a consumer for whom OnStar played no role in the purchase decision is "not going to have anything in common" with someone who sought out OnStar.  *Id.* 205:20-206:10.

It necessarily follows that a consumer whose purchase decision is <u>not</u> influenced by OnStar is unlikely to attach relevance to, or act upon, the disclosure of information related to that feature. Semenik Report, p. 4-5 (Exhibit S); Semenik Rebuttal Report, p. 6 (Exhibit Q); Semenik Dep. 12:8-13:10, 18:9- 22:6, 37:19-38:3, 41:5-9 (Exhibit T). The mere existence of a disclosure about a feature will not motivate all consumers to act. Semenik Dep. 23:1-8 (Exhibit T). Instead, consumers act only on disclosures related to features that are relevant to their purchase decision, which necessarily implicates an individualized analysis. Semenik Report, p. 4-5 (Exhibit S); Semenik Rebuttal Report, p. 6 (Exhibit Q); Semenik Dep. 12:8-13:10, 18:9- 22:6, 37:19-38:3, 41:5-9 (Exhibit T). Thus, as even Dr. Keegan admits, some putative class members "would have bought their vehicles anyway and would have proceeded in exactly the same fashion," irrespective of what disclosures they actually received, because they bought their cars for reasons that have nothing to do with OnStar. Keegan Dep. 130:24-131:19 (Exhibit J).

Finally, the timing and type of a particular transaction is significant in this analysis. A consumer who purchased a vehicle in 2002 (when the sunset was still five years away) would be less likely to act upon information regarding the sunset than someone purchasing in 2005 (when the sunset was only two years away). Semenik Rebuttal at 7 (Exhibit Q). Thus, plaintiffs have failed to elicit common proofs showing, for example, that people who bought their vehicles in 2003 would have changed their purchase decision if they were given additional or different information about the possible analog sunset nearly five years later.[3]

---

[3]    This distinction is especially noteworthy with respect to vehicle lessees. As Dr. Keegan testified, for example, a lessee who entered into a three-year lease agreement in December 2002 would not have acted upon actual knowledge of the February 18, 2008 analog sunset, unless he or she had already determined to extend the lease, or to purchase off the lease, at the time of the original transaction. Keegan Dep. 140:10-141:14 (Exhibit J).

13

### H.      The Experiences Of The Named Subaru Plaintiffs

The deposition testimony of the named Subaru plaintiffs reflects the substantial variations among class members regarding many aspects of the purchase process, including, for example, desired features, reasons for purchasing a Subaru, and dealership experience.

### 1.      Gordon and Ann Erdenberger (Pennsylvania)

Gordon Erdenberger purchased a 2003 Subaru Outback in September 2003.  Erdenberger Dep. 15:18-20, 32:11-20 (Exhibit U).  He became interested in buying a Subaru after seeing a newspaper ad.  *Id.* 33:16-21.  In fact, he visited the dealer, and largely completed his purchase, the same day he saw this ad.  *Id.* 33:22-34:5, 34:13-17, 35:1-36:6.  He based his purchase decision on the fact that the Subaru had all-wheel-drive, which he described as "the attraction," because his previous car did not handle well in wet weather.  *Id.* 36:15-37:4.  He also liked that his daughter owned a Subaru and was happy with her vehicle.  *Id.* 33:13:15, 36:11-15.

While Mr. Erdenberger thought it was "pretty neat" that the Subaru came with OnStar, he did not even know OnStar was available in a Subaru vehicle until the dealer told him about the feature, which was after he had responded to the newspaper ad.  *Id.* 41:12-42:10, 43:4-9, 44:2-6.  Mr. Erdenberger then reviewed a brochure that included a section about OnStar.  *Id.* 43:10-25, 45:14-18.  Thus, prior to visiting the Subaru dealership, Mr. Erdenberger did not consider that OnStar would be a feature in the vehicle he already intended to purchase, nor did he visit any other dealers selling OnStar-equipped vehicles.  *Id.* 46:11-18, 46:25-47:5.  Mr. Erdenberger did not negotiate over OnStar because that feature came standard with the car.  *Id.* 45:1-9, 55:6-8.  He also purchased a 6 year/60,000 mile service contract.  *Id.* 55:15-21, 56:25-57:7.

### 2.      Murle Kemp (Oregon)

Murle Kemp purchased a 2004 Subaru Outback on February 13, 2004.  Kemp Dep. 22:14-18 (Exhibit X).  Mr. Kemp became interested in purchasing his Subaru in or about August

2003 because he did not like his then-current vehicle.  *Id.* 21:4-13, 22:19-22, 23:2-8.  However, Mr. Kemp was not necessarily looking to buy a car equipped with OnStar.  *Id.* 83:13-16. Instead, his "primary concern" was that his new vehicle come with all-wheel-drive.  *Id.* 23:9-13, 83:22-23.  Mr. Kemp therefore focused his search for a new car on Subaru because he knew Subaru offered all-wheel-drive vehicles. *Id.* 24:19-23, 51:2-4, 83:24-84:6.

Mr. Kemp test drove the Subaru, and "thought it handled very well," and that it was a "very good car."  *Id.* 26:10-27:20.  Then, over the course of three to four months, Mr. Kemp visited the dealership several times to consider his purchase options.  *Id.* 27:16-28:13.  During this period, Mr. Kemp independently researched OnStar by reviewing advertisements and internet-based consumer reviews.  *Id.* 34:14-35:3, 86:2-6.  He also spoke to salespeople at the Eugene dealership regarding OnStar and its features and, notably, visited the OnStar website in late 2003 or early 2004, during the time when the Transition Q&A was posted on the website to provide information about the FCC rule, the analog sunset date, and its impact on OnStar service.[4]  *Id.* 34:14-35:3, 80:2-23, 84:24-85:4, 86:2-6.  When he purchased his vehicle, Mr. Kemp also purchased an added security contract.  *Id.* 18:13-16, 20:13-21:1.

In August 2007, Mr. Kemp traded in his Subaru vehicle for a 2007 Honda Ridgeline.  *Id.* 11:11-14, 87:8-11.  The Ridgeline does not have OnStar or any other kind of telematics equipment, but, like the Subaru, does feature all-wheel-drive.  *Id.* 104:15-105:10.  Mr. Kemp

---

[4]      Although Mr. Kemp claims to have not seen the Transition Q&A while visiting OnStar's website, he admitted that it clearly described the FCC ruling and its potential impact on the availability of analog OnStar service.  *Id.* 41:4-43:22, 84:24-85:20.  In fact, Mr. Kemp testified that, if he had seen this information on the OnStar website, he would have inquired further, and may not have purchased an OnStar-equipped vehicle. *Id.* 44:3-15.      In contrast, other named plaintiffs admitted they would not have inquired about a possible sunset date four years in the future.  *See* Jacovelli Dep. 21:11-22:22 along with deposition exhibit 1 (Exhibit V); Larnell Gil Dep. 97:13-99:20 along with deposition exhibit 13 (Exhibit W).  Thus, whether each class member would have understood the disclosed information and would have inquired further also requires an individual inquiry.

explained that he replaced his Subaru with a Honda Ridgeline because he was not "real, real crazy" about his Subaru, and simply wanted a pickup truck. *Id.* 101:23-102:8, 122:1-6. Apparently, OnStar digital telematics, which was available in several brands at the time Mr. Kemp traded in his Subaru vehicle, was not particularly important to Mr. Kemp.

### 3.   Jason Smith (New York)

Jason Smith purchased a Subaru Outback on July 14, 2003. Smith Dep. 58:6-9 (Exhibit Y). Mr. Smith and his wife began looking for a new car in 2001 or 2002 because of concerns over the build quality and fuel efficiency of their prior vehicle, a Ford Expedition. *Id.* 15:19-16:3. Mr. Smith wanted a smaller, more fuel efficient, vehicle, and he "keyed in on" Subaru "from the beginning" because of the company's "track record." *Id.* 15:25-16:3, 16:11-14. That is, Mr. Smith wanted a Subaru largely because he "knew it would last." *Id.* 20:23-25.

While Mr. Smith originally intended to buy a Subaru Forester (which model did not come with OnStar), he eventually decided to purchase the Outback because it was roomier. *Id.* 16:17-17:4. Mr. Smith also liked the Outback's leather interior and other "bells and whistles," as well as its safety features. *Id.* 17:6-11, 18:6-10. He also liked the positive recommendation of his aunt, who spoke "very highly" of the Subaru she owned. *Id.* 17:12-16.

Mr. Smith visited two Subaru dealerships, but the salesmen with whom he spoke did not know much about OnStar. *Id.* 17:17-18-2, 64:14-65:4. Thus, he learned about OnStar through ads and from a friend. *Id.* 18:11-18. He also reviewed OnStar promotional brochures. *Id.* 70:9-71:6. Mr. Smith purchased a service contract. *Id.* 26:15-23. He still owned his Subaru as of August 2009, but has since sold or traded it. *Id.* 29:6-8.

### 4.   Melvin and Betty Rubertt (Washington)

Melvin and Betty Rubertt purchased their 2004 Subaru Outback in March 2004. M. Rubertt Dep. 13:10-12 (Exhibit Z). Mr. Rubertt originally wanted to purchase an AMG

16

Hummer, but that vehicle was too big for his wife, so he decided to purchase a Subaru, which he believed was better made than comparable cars. *Id.* 45:17-46:5. In addition to size and quality, Mr. Rubertt also liked the Subaru's safety features and "everything [the vehicle] had in it," such as leather interior. *Id.* 16:17-20, 26:13-15. For Mrs. Rubertt's part, she wanted to purchase a Subaru because she liked one her father had owned. B. Rubertt Dep. 15:20-16:9 (Exhibit AA).

Mr. Rubertt testified that he first learned about OnStar in January or February 2004 at a car show. M. Rubertt Dep. 19:15-21, 20:20-22,21:20-25:8. While there, he spoke with a salesman from Appleway Subaru, who explained the Subaru vehicle's features, including OnStar. *Id.* 16:16-17, 19:24-20:3, 25:9-16. Mr. Rubertt also looked at an OnStar-equipped Subaru at the show, **but did not review any written materials about OnStar**. *Id.* 23:10-15.

Mr. Rubertt testified that he decided to purchase the Subaru after the auto show, based on the information he obtained from the Appleway Subaru salesman, and **not based on any written promotional materials**.[5] *Id.* 23:16-24:8, 28:1-14. After checking stock and prices at other dealers, Mr. Rubertt visited the Appleway dealership, took a test drive, and agreed to purchase the vehicle. *Id.* 25:5-27:17, 33:17-21. He then negotiated over certain features (but not OnStar) and price. *Id.* 14:7-15:2, 33:7-21, 37:2-6. The Rubertts did not purchase a service contract, *see* Purchase Agreement (attached as Exhibit BB), meaning they had a standard 3 year/36,000 mile basic warranty. Subaru 2004 Warranty Bk., p.6 (Exhibit CC).

---

[5]     It is therefore apparent that no written disclosures would have influenced the Rubertts in any way, no matter what plaintiffs contend should have been said or included in the materials, because they did not read anything prior to making their purchase decision.

## III.   STANDARD ON A MOTION FOR CLASS CERTIFICATION

Plaintiffs' Motion should be denied since they do not meet the requirements that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2008).  Plaintiffs also fail to satisfy the requirement "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods" for resolving this case.  Fed. R. Civ. P. 23(b)(3).

"A class is not maintainable as a class action by virtue of its designation as such in the pleadings."  *In Re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008); *In Re IPO Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).  Certification necessitates "a rigorous analysis," satisfying the court that the Rule 23 requirements are met.  *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003).

Moreover, where, as here, the plaintiff contends that common issues of law and fact predominate, he or she must prove that the "proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prod. v. Windsor*, 521 U.S. 591, 623 (1997).  Thus, the court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."  *Hydrogen Peroxide*, 552 F.3d at 311. "**If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable**."  *Id.* (emphasis added).

18

Finally, contrary to plaintiffs' assertion, courts may examine a claim's merits insofar as doing so is necessary to determine whether the requirements for class certification are met. *See id.* at 316-17; *IPO*, 471 F.3d at 41; *Blades v. Monsanto Corp.*, 400 F.3d 562, 575 (8th Cir. 2005); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).[6]

## IV.   LEGAL ARGUMENT

Plaintiffs' Motion for Class Certification, like their ultimate theory of the case, is utterly without merit and should be denied.  Even a cursory review of the pleadings, legal theories, and evidence shows that plaintiffs' radically redefined proposed class definition is arbitrary and over-inclusive.  Plaintiffs' Motion also must be denied because individual issues unquestionably will predominate this litigation.  Plaintiffs cannot establish consumer fraud claims on a classwide basis for several reasons, including their inability to prove causation classwide.  Also, each class member's knowledge of the analog sunset is an individualized fact that precludes certification.

Plaintiffs' breach of warranty claim is just as unsuitable for a class action.  Plaintiffs cannot, using common proofs, demonstrate that all class members are within the time/mileage limits of their warranties.  And while plaintiffs claim they can defeat these limits under the doctrine of unconscionability, this necessarily requires a detailed review of each transaction in question to determine whether the factors for unconscionability are present.

---

[6]     While the Sixth Circuit has not yet addressed this issue, the decisions of several district courts within this circuit similarly recognize that preliminary merits inquiries are often required in order to resolve disputed class certification issues.  *See, e.g, Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191, 200 (S.D. Ohio 2002); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 209 F.R.D. 134, 138 (W.D. Mich. 2002).  In any event, in this multi-district litigation, the transferor circuit's interpretations of Rule 23 govern, insofar as they differ from the law of the Sixth Circuit.  *See Quick v. Shell Oil Co.*, 241 F.R.D. 435, 439-441 (S.D.N.Y. 2007); *In Re Wal-Mart Wage and Hour Employment Prac. Litig.*, 2008 U.S. Dist. LEXIS 50928, at *23-*24 (D. Nev. June 20, 2008).  Thus, the Smith action is governed by the Second Circuit's holding in *IPO*, *supra*, and the Erdenberger and Kemp actions are governed by the Third Circuit's decision in *Hydrogen Peroxide*, *supra*, both of which expressly held that preliminary merits inquiries are appropriate insofar as required to resolve disputed issues related to class certification.

### A.   Plaintiffs' Latest Iteration Of The Class Definition Is Arbitrary And Over-Inclusive

Three years into this litigation, plaintiffs have now proposed a gerrymandered class definition based upon an arbitrary subscription date of December 31, 2006.  As noted above, despite initially pleading a national class of all vehicle purchasers, plaintiffs now confine the class to a much smaller group of OnStar subscribers disbursed across New York, Pennsylvania, Oregon, and Washington.  *See supra* pp. 4-5.  Even if plaintiffs are permitted to advance this radically redefined proposed class,[7] it is both arbitrary and over-inclusive.

It is axiomatic that the scope of a plaintiff's proposed class definition is critical to the determination of whether the class may be certified.  "The class must be sufficiently identifiable without being overly broad."  *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 445 (E.D. Pa. 2000).  Courts refuse to certify classes that are arbitrarily defined without legal or factual basis.  *See, e.g.*, *Boca Raton Cmty Hosp. v. Tenet Healthcare*, 238 F.R.D. 679, 689 (S.D. Fla. 2006); *Daigle v. Shell Oil*, 133 F.R.D. 600, 602-03 (D. Colo. 1990).  Moreover, a class definition must not be over-inclusive.  *See Mann v. TD Bank*, 2010 U.S. Dist. LEXIS 112085, at *39-*41 (D.N.J. Oct. 20, 2010); *In Re Qwest Sav. & Invest. Plan ERISA Litig.*, 2004 U.S. Dist. LEXIS 24693, at *8-*10 (D. Co. Sept. 27, 2004); *Vaszlavik v. Storage Tech.*, 175 F.R.D. 672, 684 (D. Co.1997).

Plaintiffs' use of December 31, 2006 as a subscription cut-off date is arbitrary.  That date is neither legally nor factually significant, since OnStar service was available for an additional year until December 2007, and plaintiffs cite no basis for this date.

---

[7]     It is well-established that a plaintiff seeking class certification is held to the definition proposed in his or her class action complaint.  *See Clarke v. Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn. 2009); *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 672 n.3, 680 n.10 (N.D. Ill. 1989).

Moreover, plaintiffs' proposed definition is over-inclusive in several ways.  For example, it includes individuals who activated OnStar long after they purchased their vehicles.  Notably, most of the subject Subaru vehicles were sold in or around 2003, and there is no requirement in the class definition that a class member subscribed to OnStar at the time he or she purchased the vehicle.  There is, therefore, a substantial disconnect between the importance of OnStar to the purchase decision (in 2003) and the eventual activation of OnStar, possibly as much as three years later, and possibly based on information obtained **_after_** the purchase date.

Similarly, the proposed class definition does not require class members to have continued subscribing to OnStar until the analog sunset in early 2008, meaning it would include individuals who cancelled their subscriptions before that time.  Given that the central premise of plaintiffs' claims is that each class member valued OnStar so much that they would not have purchased their Subaru but for the allegedly inadequate disclosures, plaintiffs cannot legitimately argue that the class should include people who did not value OnStar enough to remain subscribers through the sunset date.  Such a class definition makes no sense.

The proposed definition is also over-inclusive because it encompasses individuals who, at the time they purchased their vehicles, actually knew about the analog sunset and its potential impact on OnStar.  *See* Keegan Dep. 271:2-17 (Exhibit J) (agreeing that some class members could have known about the impact of the analog sunset on OnStar service by, among other things, reviewing the various materials supplied by OnStar and the vehicle manufacturers); *Id.* 72:23-73:20, 106:3-20 (agreeing that some class members likely read and understood the 2003 Transition Q&A posted on OnStar's website and/or the OnStar Terms and Conditions, prior to sale); *Id.* 338:14-340:4 (acknowledging that consumers could have learned about the analog

21

sunset through independent internet research).  In sum, the proposed class definition lacks any factual or legal basis, and is over-inclusive.  Certification therefore should be denied.

### B.    Plaintiffs Have Failed To Demonstrate That Their Consumer Fraud Claims Can Be Adjudicated On A Classwide Basis

As set forth below, a plaintiff requesting certification of a consumer fraud claim based upon the purchase of a product faces a very difficult burden.  As one would expect, the record reflects that the putative class members did not act in the same way regarding their purchase decisions.  Under the substantive laws of each relevant state,[8] individual issues predominate over common ones under Rule 23(b)(3) including, most prominently, the elements of causation and/or reliance.  The crux of plaintiffs' claim is that the sunset disclosures were inadequate.  Plaintiffs assert that if unspecified, enhanced disclosures were provided at the time of sale, then none of the prospective buyers would have purchased their vehicles.  This implicates an individualized inquiry that precludes class certification since the importance of OnStar (and, therefore, the

---

[8]       The elements of a cause of action under the consumer protection laws of Pennsylvania, Oregon, New York and Washington are as follows:  The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") "'creates a private right of action in persons upon whom unfair methods of competition and unfair or deceptive acts or practices are employed and who[,] as a result, sustain an ascertainable loss.'"  *Hunt v. United States Tobacco Co.*, 538 F.3d 217, 221 (3d Cir. 2008) (quoting *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 190 n.4 (Pa. 2007)).

The Oregon Unlawful Trade Practices Act ("OUTPA") creates a private right of action in "any person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by O.R.S. 646.608."  O.R.S. 646.639(1).

A cause of action under New York's General Business Law § 349 ("Section 349") requires the plaintiff to prove:  (1) that the conduct complained of is "consumer-oriented"; (2) that the conduct is "deceptive or misleading in a material way"; and (3) "that plaintiff has been injured by reason thereof."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, NA*, 647 N.E.2d 741, 744 (N.Y. 1995).  Thus, a plaintiff suing under Section 349 "must show that the defendant engaged in a material deceptive act or practice that caused actual…harm."  *Id.*

The Washington Consumer Protection Act ("WCPA") requires the plaintiff to prove the following:  (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) affecting the public interest; and (4 and 5) causing injury to the plaintiff's business or property.  *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 535-39 (Wash. 1986).  Thus, a plaintiff alleging a WCPA violation must "establish a causal link between the unfair or deceptive act complaint of and the injury suffered."  *Schnall v. AT&T Wireless Servs., Inc.*, 225 P.3d 929, 939 (Wash. 2010).

impact of any additional disclosures) varied from person to person.  Additionally, some class

members had pre-sale knowledge of the analog sunset, which would preclude plaintiffs' ability

to prove consumer fraud on a classwide basis.

### 1.    OnStar May Have Been Material To Some, But Not All, Putative Class Members

One of the many flaws in plaintiffs' consumer fraud theory is that people buy cars for a

variety of reasons and thus many class members likely would <u>not</u> have changed their purchase

decisions, even if they had actual knowledge about the analog sunset prior to buying their Subaru

vehicles.  As both plaintiffs' and defendants' experts agree, consumers do not base their vehicle

purchase decisions on a single feature, such as OnStar.  Semenik Report, p. 6 (Exhibit S);

Semenik Dep. 68:4-17 (Exhibit T); Keegan Dep. 145:7-17 (Exhibit J).  Instead, people purchase

vehicles for a variety of reasons including brand/dealer loyalty, brand/dealer reputation, input

from other drivers in the household, family/friend recommendations, independent third-party

reviews, family circumstances, styling, operation costs, cargo space, comfort, amenities, prestige,

and/or crash test ratings, to name a few.  Semenik Rebuttal Report, pp. 2-3 (Exhibit Q); *accord*

Keegan Dep. 186:14-19, 209:7-210:15 (Exhibit J).  Assuming that a given factor is considered at

all, different consumers will weigh these and other factors differently.  Semenik Dep. 86:20-87-

14 (Exhibit T); Keegan Dep. 208:23-209:6, 211:5-6, 298:5-299:11 (Exhibit J).

Thus, there are undoubtedly class members who based their purchase decisions, and the

price they were willing to pay, "on a wide range of different factors that have nothing to do with

the availability of OnStar equipment."  Semenik Rebuttal Report, p. 1(Exhibit Q); *accord*

Keegan Dep. 131:14-19, 162:17-163:5 (Exhibit J).  The experts in this case all agree that such

individuals would likely have purchased their Subaru vehicles irrespective of any disclosure they

may have received relating to the analog sunset and OnStar.  Semenik Report, p. 4-5 (Exhibit S);

Semenik Rebuttal Report, p. 6 (Exhibit Q); Semenik Dep. 12:8-13:10, 18:9-19:7, 20:11-21:8, 21:9-16, 22:3-6, 23:1-8, 37:19-38:3, 41:5-9 (Exhibit T); Keegan Dep. 130:24-131:19 (Exhibit J). Plaintiffs' expert, Dr. Keegan, said it best when he testified that some putative class members "would have bought their vehicles anyway and would have proceeded in exactly the same fashion," irrespective of what disclosures they received.  Keegan Dep. 130:24-131:19 (Exhibit J).

Since the consideration given OnStar, if any at all, in the purchase decision necessarily was person-specific and varies considerably among class members, plaintiffs simply cannot prove the causation element of their consumer fraud claims on a classwide basis.  *See Webb v. Carters, Inc.*, 2011 U.S. Dist. LEXIS 12597, at *36 (C.D. Cal. Feb. 3, 2011) ("If the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action.").

### 2.    Variations In The Importance Of OnStar Preclude Plaintiffs From Proving Causation Using Common Proof

Whether analyzing Pennsylvania, Washington, Oregon or New York law, plaintiffs cannot establish on a classwide basis that they would not have purchased their OnStar-equipped Subaru vehicles but for the allegedly inadequate disclosures provided by defendants.

Contrary to plaintiffs' contention, court after court has determined that plaintiffs seeking to recover under Pennsylvania's UTPCPL must prove common law causation and reliance, irrespective of whether their claim is predicated on an alleged omission or a misrepresentation. *See Debbs v. Chrysler Corp.*, 810 A.2d 137, 157-58 (Pa. Super. Ct. 2002).[9]  In *Debbs*, the plaintiffs sought class certification of their UTPCPL claim against an auto manufacturer that

---

[9]    *See also Hunt*, F.3d at 224 (holding that a plaintiff alleging deceptive conduct under the UTPCPL must establish justifiable reliance); *Weinberg v. Sun Co.*, 777 A.2d 442, 816 (Pa. 2001) ("Nothing in the [UTPCPL's] legislative history suggests that the legislature ever intended statutory language directed at consumer fraud to do away with the traditional common law elements of reliance and causation.").

allegedly failed to disclose information about injuries related to airbag deployment. The

appellate court reversed the trial judge's decision granting certification, reasoning that the

plaintiffs could not prove reliance on a classwide basis:

> **[C]onsumers could have had a wide range of reactions to the undisclosed information, depending on a number of factors** including: (1) their personal degree of risk-aversion; and (2) their assessment of the other advantages and disadvantages of buying a Chrysler automobile. Some consumers may not have bought a Chrysler at all; others may have bought the car but replaced the air bag; and others may have bought the car but not replaced the air bag. **Reasonable consumers could come to different conclusions about the materiality of the withheld information.**

*Id.* at 158 (emphasis added). *See also Aronson v. Greenmountain.com*, 809 A.2d 399, 405 (Pa.

Super. Ct. 2002) (denying class certification of UTPCPL claim where individual questions

related to class members' reliance on allegedly false advertisements would predominate).[10]

---

[10]     Plaintiffs cite the Eastern District of Pennsylvania's opinion in *Smith v. John Hancock Ins. Co.*, 2008 WL 4145709, at *3 (E.D. Pa. Sept. 3, 2008), for the proposition that justifiable reliance may be presumed in cases involving alleged omissions. Plaintiffs' argument misses the mark for two reasons. First, the *Smith* court's determination that the UTPCPL's reliance requirement could be satisfied by a presumption was based on the Third Circuit's decision in *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178 (3d Cir.2001). *Johnston* was a securities fraud case that had nothing to do with the UTPCPL. In *Hunt*, the Third Circuit specifically rejected the notion that the presumption of reliance sometimes employed in securities fraud litigation was applicable to a UTPCPL claim. *See Hunt*, 538 F.3d at 228.

   Second, even if the *Smith* court was correct in its conclusion that reliance, in the context of a UTPCPL claim, could be satisfied by presumption, the disposition in that case shows exactly why such a presumption would be inappropriate here. As the court explained, the presumption of reliance employed in securities fraud cases applies only to actions premised on alleged omissions. *Smith*, 2008 U.S. Dist. LEXIS 67250, at *10. Such a presumption does not apply in cases primarily involving misrepresentations, even if there are allegations of material omissions as well. *See id.* at *10-*11 (plaintiff not entitled to presumption of reliance with respect to alleged failure to where allegedly omitted information was meaningless in the absence of an affirmative misrepresentation to the contrary).

   This is significant because, contrary to plaintiffs' argument, this case is not strictly about alleged omissions. Instead, the central premise of this action is that defendants allegedly misrepresented to the class members that OnStar would continue to function for the life of the subject vehicles. *See* SAC ¶ 84. Assuming an alleged omission related to the analog sunset is actionable at all (which Subaru vigorously disputes), it would be so only because of this supposed misrepresentation. Moreover, plaintiffs do not (and cannot) dispute the fact that defendants did, in fact, disclose information related to the analog sunset time and time again. Plaintiffs' claim therefore is not that there was an omission of material fact, but instead that the disclosure of that fact somehow was inadequate. Consequently, this is not an omissions case that could give rise to a presumption of reliance, even if such a presumption was recognized in UTPCPL cases (which it is not).

The *Debbs* case is directly analogous to the Pennsylvania class the Erdenbergers seek to certify. Like the plaintiffs in *Debbs*, the Erdenbergers cannot demonstrate that the information provided, or that they contend should have been provided, would have uniformly changed the purchase decisions of the class members they purport to represent. Some people would have bought their Subaru vehicles anyway, and some may not have. The degree to which each class member relied upon the disclosures and the resultant impact on his purchase decision is an individualized inquiry that precludes certification of their UTPCPL claim. *See supra* pp. 22-24.

Applying Washington law,[11] determining whether information provided or allegedly omitted about the analog sunset affected putative class members' purchase decisions requires an individualized inquiry.[12] Notably, since the Washington class representatives (the Rubertts) did

---

[11]    In order to prove causation under the WCPA, the plaintiff must show that the "injury complaint of…would not have happened if not for defendant's violative acts." *Schnall*, 225 P.3d at 939; *see Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007) ("A plaintiff [under the WCPA] must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury."); *Pickett v. Holland Am. Line-Westours, Inc.*, 6 P.3d 63, 70 (Wash. Ct. App. 2000), *rev'd on other grounds*, 35 P.3d 351 (Wash. 2001) ("The causation requirement is met where the defendant 'induced' the plaintiff to act or refrain from acting."); *see also Robinson v. Avis Rent-A-Car System, Inc.*, 22 P.3d 818, 824-25 (Wash. Ct. App. 2001) (affirming summary judgment for the defendant on plaintiff's WCPA claim because there was no evidence that the defendant's alleged failure to disclose a separately charged "concession fee" when giving price quotes for rental cars was the proximate cause of the plaintiff's injury).

[12]    Plaintiffs again argue that they somehow are excused from proving causation, this time with respect to their WCPA claim, because of a supposed presumption of reliance. Plaintiffs' Mem. at 21. However, plaintiffs fail to cite any authority actually supporting their argument, which is not surprising because, as the district court in *Kelley v. Microsoft Corp.*, 2009 WL 973368 (W.D. Wash. Apr. 10, 2009) recognized, the Washington Supreme Court has "never formally adopted a presumption of reliance" in WCPA cases. *Id.* at *7.

    Instead, plaintiffs rely on dicta from the *Kelley* case in which the court assumed, for the purpose of argument, that a presumption of reliance would be recognized, but ultimately found it inapplicable because the plaintiff alleged primarily misrepresentations, not omissions. *Id.* at *8-*9. As explained in footnote 10, *supra*, the same is true in this case.

    Furthermore, contrary to plaintiffs' insinuation, the court in *Pierce v. NovaStar Mortgage*, 238 F.R.D. 624 (W.D. Wash. 2006) did not dispense with the WCPA's causation requirement. Rather, it merely acknowledged a plaintiff was not necessarily obligated to prove common law reliance in order to satisfy that element. *Id.* at 629-30.

not read any information about OnStar prior to their purchase, no disclosure could have influenced their purchase decision, meaning they are inadequate representatives of the class they seek to represent.  Even if they were adequate class representatives, the variations among class members in the materiality of OnStar to the purchase decision precludes plaintiffs' ability to establish causation using common proofs as to the WCPA claim.  *See supra* pp. 22-24.

Under Oregon law, each putative class member's interpretation of, and action resulting from, the information disclosed or allegedly omitted can only be determined on an individual basis and this inquiry prevents certification of an OUTPA claim.  In applying OUTPA's causation element, courts essentially require the plaintiff to demonstrate that their alleged ascertainable loss would not have occurred but for the actions or inactions of the defendant.  *See Terry v. Holden-Dhein Enterp., Ltd.*, 618 P.2d 7, 11 (Or. Ct. App. 1980) (under OUTPA, the plaintiff "must suffer loss 'as a result of willful use or employment of another' of an unlawful trade practice")[13] (emphasis added).  The *Terry* case demonstrates the futility of plaintiffs' causation argument under the OUTPA.  There, the court held that the plaintiff could not recover under OUTPA for the defendant's alleged failure to disclose that he was a denturist, and not a licensed dentist, as that alleged omission "had no effect on plaintiff since, had the disclosure been made, she would not have realized there was any difference between 'dentist' and 'denturist.'"  618 P.2d at 11.[14]

---

[13]    *See also Feitler v. The Animation Celection, Inc.*, 13 P.3d 1044, 1047 (Or. Ct. App. 2000) (proof of causal link between alleged unlawful conduct and alleged ascertainable loss is required); *Millennium Enterp., Inc. v. Millennium Music, LP*, 33 F. Supp. 2d 907, 912 (D. Or. 1999) (holding that an individual action under the OUTPA may be maintained only "if the plaintiff suffers an 'ascertainable loss' *as a result* of the [alleged] violation") (emphasis added).

[14]    *Accord Gemignani v. Pete*, 71 P.3d 87, 91 (Or. Ct. App. 2003) (no causal link between misrepresentation that property was clear of liens and loss of home to foreclosure because even if prior lien was disclosed, plaintiffs' home still would have been foreclosed upon); *Caldwell v. Pop's Homes, Inc.*, 634 P.2d 471, 475 (Or. Ct. App. 1981) (holding that plaintiff could not recover under OUTPA for alleged

(continued...)

Whether the information disclosed, or that plaintiffs allege should have been disclosed, would have had any meaning to Mr. Kemp and the Oregon class he seeks to represent is an individualized determination. As defense expert Dr. Semenik testified, consumers interpret and process information provided in a variety of ways and based upon their own experiences and needs. Semenik Rebuttal Report, p. 6 (Exhibit Q); *see also* Semenik Dep. 20:11-21:8 (Exhibit T). In the case of a disclosure relating to a technical automotive feature, whether a particular consumer understands a disclosure is necessarily a unique function of that consumer's personal characteristics, such as her particular interest in or experience with that type of technology, as well as her general sophistication. Semenik Rebuttal Report , p. 3 (Exhibit Q); *see* Semenik Report, p. 6 (Exhibit S) (there is significant "individuality and variability of consumer decision making" with respect to automobile purchases). Moreover, there is no way to determine whether the Oregon class members would have changed their purchase decisions if additional or different information was provided, absent an individualized inquiry. *See supra* pp. 22-24.

Finally, applying New York law, plaintiffs cannot establish the required causation by classwide proofs and their class asserting a Section 349 claim cannot be certified. In *Newman v. RCN Telecom Serv., Inc.*, 238 F.R.D. 57 (S.D.N.Y. 2006), the court denied class certification of a Section 349 claim on causation grounds where the claim was that the defendant misrepresented the speed of its internet service, but the plaintiff admitted that he signed up for the defendant's internet service because of its price, not its represented speed. *Id.* at 64. *See also Gale v. IBM Corp.*, 781 N.Y.S.2d 45, 46-47 (App. Div. 2004) (dismissing Section 349 claim where plaintiff failed to allege he saw or heard misleading advertisements before deciding to buy product).

---

(...continued)
misrepresentation of a mobile home's age because there was no evidence that the misrepresentation played any role in plaintiff's decision to buy the home).

Like the plaintiff in *Newman*, Mr. Smith purchased his Subaru Outback for a variety of reasons, including the "bells and whistles" of the L.L. Bean edition, the recommendation of a family member, and the better fuel economy.  Consequently, he cannot establish the OnStar feature alone caused him to purchase the Outback, making him an inadequate class representative for a Section 349 claim.  Even aside from this, the causation element of Section 349 cannot be proven on a classwide basis because the importance of OnStar varied considerably among putative class members.  *See supra* pp. 22-24.

### 3.    Some Putative Class Members Knew About The Sunset Date And Some Did Not

Class members cannot recover under any of the relevant consumer fraud statutes if they knew about the analog sunset and its potential impact on OnStar prior to purchase.  In *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50 (App. Div. 2004), the court denied certification to a class of people who subscribed to the defendant's DSL internet service as a result of misrepresentations about the quality of that service because "questions as to whether each individual was reasonably misled by [the defendant's advertisements] predominate, given the alternative sources of information about DSL service that each may have had."[15]  *Id.* at 56.  Likewise, in *Mwantembe v. TD Bank*, 268 F.R.D. 548 (E.D. Pa. 2010), the court denied certification of an UTPCPL claim premised on the defendant's alleged failure to disclose a dormancy fee charged on gift cards, reasoning that individual issues would predominate regarding whether class members knew the gift cards' purchase date, which triggered the dormancy fee.  *Id.* at 560-61.[16]

---

[15]    *See also Oswego*, 647 N.E.2d at 745 (reversing summary judgment for defendant because the record was unclear as to whether plaintiff could have reasonably obtained the information he claimed defendant concealed from an alternate source).

[16]    *Accord Pierce v. NovaStar Mortgage, Inc.*, 2006 U.S. Dist. LEXIS 62875, at *23-*24 (W.D. Wash. 2006) (denying certification of a CPA claim premised on nondisclosure of fees charged to mortgagors

(continued...)

The same individual knowledge issues predominate plaintiffs' consumer fraud claims in this case.  As previously explained, there was a substantial amount of information about the analog sunset and its potential impact on OnStar.  This included information provided by defendants, as well as information in the public domain.  The experts in this case agree that many class members likely saw and understood this information prior to making their purchase decisions.  To quote plaintiffs' expert, Dr. Keegan, "**[t]here have to be people out there who knew**."  Keegan Dep. 66:23-67:4 (Exhibit J) (emphasis added).  Moreover, each class member's knowledge of the sunset date is an inherently individualized issue that predominates and precludes class certification.  *See ADT, supra*, slip op. at 9 (denying certification of class where plaintiffs could not show on a classwide basis that "each proposed class member was never informed about the analog sunset date") (Exhibit EE).

This would also be true as to used car purchasers who bought from independent sellers toward the end of the class period.  As Dr. Keegan testified, information about the analog sunset evolved over time and, as a result, some class members would have been "fully apprised of the impending cessation of OnStar service."  Keegan Dep. 291:7-22 (Exhibit J).  Moreover, used car buyers were subjected to "a very different array of purchase information, often conveyed by a private seller…."  Semenik Rebuttal Report, p. 7 (Exhibit Q); *see* Keegan Dep. 187:16-24, 330:19-331:3 (Exhibit J) (testifying that a used car purchaser could have been informed of the

---

(...continued)

because of predominant individual issues regarding extent of class members' independent knowledge of the fees); *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 580-81 (N.D. Ill. 2005) (finding plaintiff's proposed class definition of individuals who purchased Diet Coke during a five-year period over-inclusive and unmanageable because it would include people who knew that the drink contained a particular additive, the existence of which plaintiffs claim was concealed); *Allegro Corp. v. Only New Age Music, Inc.*, 2002 U.S. Dist. LEXIS 27449, at *41 (D. Or. Oct. 4, 2002) (dismissing counterclaimant's Oregon UTPA claim because she knew the actual facts that allegedly were misrepresented and, as a result, could not "sustain a claim that she was a 'deceived consumer' or a 'defrauded member of the public'").

analog sunset by the original owner or used vehicle dealership).  Thus, just as in *ADT*, "the purported class members who acquired their equipment from third parties would have to put forth different proof that ADT's omission was likely to mislead them than those purported class members who acquired their equipment directly through ADT," which precludes class certification.  *ADT, supra*, slip op. at 25.

### 4.  There Are Individual Issues As To The Oregon UTPA Claim's Timeliness

An action brought under the OUTPA "shall be commenced within one year from the discovery of the unlawful method, act or practice."  O.R.S. 646.638(6); *see Jaquith v. Ferris*, 669 P.2d 334, 336 (Or. Ct. App. 1983) (cause of action under the OUTPA accrues when the plaintiff learns the fact that he or she claims was concealed or misrepresented).  Here, the Oregon class's complaint was filed August 4, 2007, meaning any Oregon class member who knew or should have known about the analog sunset prior to August 4, 2006, is time barred.

Determining each class member's date of knowledge is obviously highly individualized because it turns on information unique to each person.  It is not reasonably subject to debate that there was a substantial amount of information in the public domain about the analog sunset, from which many buyers would have been apprised of the sunset and the ability to bring a claim.  It must be remembered that defendants made disclosures as early as Summer 2003 including, without limitation, the Transition Q&A and the OnStar Terms and Conditions.  As plaintiffs' expert, Dr. Keegan, testified, some class members could have learned about the analog sunset by, among other things, reviewing the various materials supplied by OnStar and the vehicle manufacturers.  Keegan Dep. 271:2-17 (Exhibit J).  There also was substantial information about the sunset in the public domain, especially toward the end of the class period.  *See* Keegan Dep.

290:10-19; 291:7-22, 338:14-340:4 (Exhibit J).  Thus, to quote Dr. Keegan, "**[t]here have to be people out there who knew**."  *Id.* (emphasis added).

Moreover, "there is no way to know, without asking members of the named class individually, what other information they might have encountered regarding the functioning of analog equipment."  Semenik Rebuttal Report, p. 6 (Exhibit Q).  Consequently, individual issues relating to the timeliness of each class member's OUTPA claim predominate.  *See Drennan v. PNC Bank, NA*, 622 F.3d 275, 294 (3d. Cir. 2010) (recognizing that a statute of limitations defense may prevent a class from satisfying the predominance requirement of Rule 23(b)(3)).[17]

### C.    Plaintiffs' Tenuous Breach of Express Warranty Claims Cannot Be Adjudicated On A Classwide Basis

Plaintiffs' alleged breach of warranty claim requires a highly individualized analysis in several respects.  The overwhelming majority of Subaru vehicle purchasers, who purchased their vehicles between 2003 and 2004 received the industry standard, 3 year/36,000 mile limited express warranty.[18]  Under plaintiffs' tenuous claim, the event that would constitute a "breach" of the warranty could have only occurred upon the cessation of analog signals at the sunset date in 2008.  Accordingly, for the majority of purchasers, the terms of their express warranty expired

---

[17]    In addition, the numerous laws applicable to plaintiffs' claims raises significant manageability concerns.  Specifically, plaintiffs seek certification as to claims against Subaru asserted under the laws of New York, Pennsylvania, Oregon, and Washington.  Plaintiffs further indicate that they "may seek class certification under the laws of additional states" as to Subaru.  Plaintiffs' Mem. at 1 n.1.  Moreover, in each action filed against Subaru, plaintiffs have also asserted claims against OnStar based on the laws of Michigan.  Thus, when this multi-district litigation is eventually transferred back to the various forum courts, the trial courts will have to apply the laws of at least five, and possibly many more, states.  Such a task is unmanageable, and further militates against certification.  *See Powers v. Lycoming Engines*, 328 Fed. Appx. 121, 127 (3d Cir. 2009) ("Attempting to apply the law of a multiplicity of jurisdictions can present problems of manageability for class certification under Rule 23(b)(3)").

[18]    Of course, the OnStar equipment was not defective in the first place, rather the wireless carries decided not to maintain the analog communications signals.

well before the alleged breach.  Plaintiffs seek to overcome this obvious obstacle in two unsuccessful ways that highlight, yet again, why the putative classes cannot be certified.

First, plaintiffs argue that some class representatives purchased extended warranties.  The mere fact that purchasers have differing mileage, durational and other terms highlights that the plaintiffs cannot establish a breach of warranty claim by common proofs.  Moreover, it is critical to note that the added security coverage testified to by the Erdenbergers, for example, is merely an additional service contract and not an extension of the limited express warranty.  Service contracts are subject to the specific terms agreed upon and negotiated by the seller and each plaintiff who purchased a service contract.  *See, e.g., Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823 (3d Cir. 1999) (discussing distinction between warranties and service contracts).  Plaintiffs have not explained how the specific and discrete terms of the service contract have been breached at all, let alone on a classwide basis, nor have they even asserted a claim for breach of this separate contract.

Second plaintiffs argue that the durational limitations of the express warranty should be invalidated and should not preclude their warranty claims because the terms are unconscionable.  As set forth below, however, this defense requires a fact intensive inquiry into the details of each putative class member's vehicle purchase transaction.

Lastly, plaintiffs' arbitrary class definition precludes classwide treatment of their breach of warranty claim, because it includes class members who terminated their OnStar subscription before the alleged breach, the cessation of analog signals, occurred.

### 1.     Plaintiffs' Express Warranty Claims Require Individualized Inquiry Into The Mileage And Durational Limits of Their Warranties, And This Inquiry Demonstrates A Lack of Adequate Representation

"[A]n express warranty does not cover repairs [or an alleged breach] made after the applicable time has elapsed." *Duquesne Light Co. v. Westinghouse Elec. Co.*, 66 F. 3d 604, 614

33

(3d Cir. 1995).[19]  This is true even where the manufacturer allegedly knew about, but supposedly failed to disclose, the alleged defect or effective life of a component part at the time of sale.  *See Abraham v. Volkswagen*, 795 F. 2d 238, 250 (2d Cir. 1986) ("Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time.  A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage.").[20]

In this case, many people, such as the Rubertts, had only basic warranty coverage for 3 years or 36,000 miles, while others like the Erdenbergers and Smiths, purchased a service contract.  This distinction is significant because most of the subject Subaru vehicles were purchased during 2003 and 2004.  However, the alleged defect – the cessation of analog signals – did not occur until 2008.  Thus, purchasers who had only basic warranties cannot assert warranty claims against Subaru because the alleged defect arose after their warranties expired.

For those who purchased a service contract, whether they can maintain a claim depends on the specific terms of that contract.  Determining which class members' claims are not barred by either the time or mileage limits is individualized since it turns on the details of each person's purchase and their vehicle's mileage at the sunset date.

---

[19]      *See also In re Ford Motor Company Speed Control Deactivation Switch Products Liability Litig.*, 2007 U.S. Dist. LEXIS 62483, *19 (E.D. Mi. Aug. 24, 2007) (dismissing warranty claim first asserted after warranty expired); *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006) ("The general rule is that an express warranty does not cover repairs made after the applicable time or mileage periods have elapsed."); *Perkins v. Daimler Chrysler*, 383 N.J. Super. 99, 105 (App. Div. 2006) ("Plaintiff failed to state a legally cognizable claim because the allegedly substandard part fully performed during the warranty period and beyond.").

[20]      *See also Clemens v. DaimlerChrysler*, 534 F.3d 1017, 1022-23 (9th Cir. 2008) (dismissing breach of express warranty claims where alleged "latent defect," about which manufacturer allegedly knew at time of sale, revealed itself after the expiration of the warranty); *Duquesne Light Co.*, 66 F.3d at 616 & n.12 (same).

This not only precludes plaintiffs from establishing predominance, but also shows the inadequacy of some class representatives.  The Rubertts, for example, who seek to represent a Washington class, had only a basic warranty.  The Rubertts bought their vehicle in March 2004 and their warranty expired in March 2007.  Therefore, they cannot state a claim and would be inadequate to protect the interests of absent class members who, as a result of a service contract, might not be subject to a durational problem.  *See O'Neil v. Appel*, 165 F.R.D. 479, 492 (W.D. Mi. 1995) ("[A] plaintiff subject to unique defenses can be rendered atypical and not representative of the class…because such a defense can distract the named plaintiff to such an extent that his or her representation of the interests of the rest of the class will suffer.").[21]

Likewise, some class representatives are atypical of the absent class members they seek to represent.  For example, the Erdenbergers, who bought their car in September 2003, and purchased a service contract for 6 years/60,000 miles, are atypical of class members whose contract expired before the sunset date.  Erdenberger Dep. 55:15-57:7 (Exhibit U).

Even the Erdenbergers, although they do not assert a contract claim, may be precluded from asserting one anyway, because, while they were within the 6 year time limit of their contract at the sunset date in 2008, their contract may have, nonetheless, expired before the sunset date, due to the mileage limitations.  Thus, they may face a representation impediment as do the Rubertts.

Simply put, even if a separate contract claim were asserted, whether class members' claims are barred by the durational or mileage limitations of a warranty or the specific and

---

[21]     *See also Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) ("A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."); *Sprague v. GMC*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.").

discrete terms of a service contract requires an individualized inquiry into the terms of the

warranty or applicable contract, the date of purchase and the mileage at the time of the sunset

date.  These variables preclude classwide adjudication of the warranty claims and highlight the

lack of adequate representation.

### 2.   Plaintiffs' Unconscionability Defense Further Demonstrates That Their Warranty Claims Cannot Be Adjudicated On A Classwide Basis

Plaintiffs concede that many class members are undoubtedly outside the durational limits

on their warranties.[22]  *See* Plaintiffs' Mem. at 34.  In a desperate attempt to resuscitate these

claims, plaintiffs argue that the durational limitations are unconscionable, and, therefore that the

terms of the express warranty should not limit the duration of the implied warranty of

merchantability.[23]  However, under the applicable states' laws, this argument will require a

---

[22]   Plaintiffs' attempt to challenge the 3 year/36,000 mile warranty as unconscionable fails, since court after court has held that a 3 year/36,000 mile is standard in the automobile industry.  *See Smith v. Ford Motor Co.*, 2010 U.S. Dist. LEXIS 95122, at *31-*36 (N.D.Cal. Sept. 13, 2010) (holding defendant's 3 year/36,000 mile industry standard warranty was not unconscionable despite plaintiff's claims of concealment of known defect); *see also In re Philips/Magnavox TV Litig.*, 2010 U.S. Dist. LEXIS 91343, at *16 (D.N.J. Sept. 1, 2010) (holding that plaintiff failed to make out a claim for unconscionability where there were no allegations that defendant's warranty was unfair compared to other warranties in the industry).

[23]   In their Motion, plaintiffs understandably abandoned Count IV of the SAC, a claim for breach of the implied warranty of merchantability as it cannot be a basis on which to certify the class, since even if plaintiffs could show that a uniform unconscionability excused buyers from the 3 year limitation imposed by the express warranty (which they cannot), plaintiffs cannot state a claim that the subject vehicles are not merchantable.  The fact that telematics in a given vehicle may not "work," as alleged by the plaintiffs, would not render the vehicle unmerchantable.  Merchantability as it relates to a motor vehicle is satisfied merely by the vehicle transporting its occupants from one point to another in a safe and reliable manner.  *See, e.g., Yost v. General Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J. 1986) (dismissing claim for breach of implied warranty of merchantability on automobile engine where plaintiff failed to allege any actual mechanical difficulties with his car).  Most vehicles do not even have telematics, thus the absence of a telematics feature could not render a vehicle unmerchantable.  Moreover, even if merchantability could be at issue, plaintiffs have not presented any evidence as to a uniform standard for how long telematics should have been available.  As set forth at pp. 9-11 above, the experts have confirmed that consumers have differing expectations about vehicle features and their importance, including how long a particular feature might be available.  As Dr. Semenik explained, "since people are aware that manufacturers' warranties have an expiration date on them, then they are attuned to the fact that not every

(continued...)

36

highly individualized inquiry relating to each transaction, making it inappropriate for classwide adjudication.  Further, in determining whether a contract or warranty is unconscionable, courts engage in a fact intensive inquiry involving the circumstances of each putative class member's transaction and, for this reason, courts have held that unconscionability cannot be determined on a classwide basis.  *See Gieseke v. First Horizon Home Loan Corp.*, 2007 U.S. Dist. LEXIS 9219, at *4 (D. Kan. Feb. 6, 2007) (analysis of plaintiffs' unconscionability claim "is an individualized one"); *Graybeal v. Am. S&L Ass'n*, 59 F.R.D. 7, 15 (D.D.C. 1973) (individual issues predominated as to contract claim that would require analysis of each loan transaction to determine if the loans were unconscionable).

The fact intensive nature of this inquiry is confirmed by reviewing the law of each putative class state.  In Washington, unconscionability requires an analysis of "the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether any material terms were hidden in a maze of fine print." *Luna v. Household Fin.*, 236 F. Supp. 2d 1166, 1174-1175 (W.D. Wa. 2002).[24]  Under New York law,[25] unconscionability examines the circumstances of contract formation and courts generally assess the following factors:

---

(...continued)

aspect of every vehicle can last forever."  Semenik Dep. 52:5-9 (Exhibit T).  Even continuing to accept the fiction that the cessation of a separate analog signal could constitute a breach of warranty, some class members certainly would find 3 years as the limit of their expectation regarding the life of OnStar equipment.  Others, with separate service contracts, might have different expectations.

[24]      Washington courts also consider the level of sophistication of the party claiming unconscionability, and whether the party seeking to enforce the contract exerted "undue pressure" on the other party.  *See Huang v. Wash. Mut. Bank*, 2008 U.S. Dist. LEXIS 108020, at *13-*14 (W.D. Wa. Aug. 25, 2008) (no unconscionability where defendant did not place undue pressure on plaintiff); *M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 998 P.2d 305, 315 (Wash. 2000) (no unconscionability where plaintiff was experienced retail consumer and had chance to read and understand agreement).

[25]      New York courts also consider whether the contract in question was agreed to in "an atmosphere
(continued...)

> (1) the size and commercial setting of the transaction; (2) whether there was a lack of meaningful choice by the party claiming unconscionability; (3) the experience and education of the party claiming unconscionability; and (4) whether there was disparity in bargaining power.

*Dallas Aerospace v. CIS Air*, 352 F.3d 775, 787 (2d Cir. 2003). In Oregon, unconscionability turns on the "unique facts" of each transaction, *Sprague v. Qual. Rests.*, 162 P.3d 331, 334 (Or. Ct. App. 2007), including, for example, whether there was a chance to review the contract. *See Huong Le v. Gentle Dent.*, 2010 U.S. Dist. LEXIS 88521, at *9 (D. Or. Jul. 29, 2010).[26] In Pennsylvania, "[p]rocedural unconscionability refers specifically to the process by which an agreement is reached …, including the use therein of fine print and convoluted or unclear language." *Zimmer v. CooperNeff Adv.*, 523 F.3d 224, 228 (3d Cir. 2008).[27]

Thus, in order to determine whether the Subaru warranty is unconscionable – a problematic contention to begin with – the Court must examine each transaction at issue,

---

(...continued)
of haste and pressure" and whether there has been a "lack of understanding by one of the parties." *Roneker v. Kenworth Truck Co.*, 944 F. Supp. 179, 186 (W.D.N.Y. 1996) (no unconscionability in a vehicle manufacturer's limitation on warranty remedies where buyer was independent truck driver, had purchased several trucks in the past, and acknowledged that he understood the limited warranty's terms); *see Dallas Aerospace*, 352 F.3d at 787 (rejecting plaintiff's unconscionability argument where the parties had a meaningful choice in deciding to enter into the transaction and had experience in negotiating such transactions).

[26]    *See also Vasquez-Lopez v. Beneficial Oregon, Inc.*, 152 P.3d 940, 949 (Or. Ct. App. 2007) (contract provision unconscionable where contract was offered on take-it-or-leave-it basis and defendant lied to plaintiff regarding the meaning of the provision's terms); *Creighton v. Blockbuster*, Inc., 2007 U.S. Dist. LEXIS 39265, at *6-*7 (D. Or. May 25, 2007) (no unconscionability where contract terms were not hidden and where plaintiff had opportunity to read contract and ask questions).

[27]    In determining whether a party has established procedural unconscionability, Pennsylvania courts consider the following factors: (1) whether the party had a meaningful choice about entering into the contract; (2) whether he or she was forced or pressured to sign the contract; (3) whether he or she was given an opportunity to review the contract with an attorney; (4) the party's level of education and sophistication; and (5) the conspicuousness of the challenged contractual provision. *See Zimmer*, 523 F.3d at 228-29; *Hopkins v. New Day Financial, Inc.*, 643 F. Supp. 2d 704, 717-18 (E.D. Pa. 2009); *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 544, 547 (E.D. Pa. 2006); *Antz v. GAF Materials Corp.*, 719 A.2d 758, 762 (Pa. Super. Ct. 1998).

including: the setting and characteristics of the transaction; whether the transaction involved

overreaching or high-pressure tactics; the experience, education, and sophistication level of each

purchaser; whether each purchaser had an opportunity to read and understand the warranty;

whether each purchaser had an opportunity to ask questions about the warranty; whether each

purchaser had a meaningful choice to enter into the transaction; and whether each purchaser had

an opportunity to negotiate regarding the transaction.  These factors cannot be assessed using

common proof because they implicate the unique facts of each class member's purchase

experience, which certainly vary from person to person.[28]

### 3.   Plaintiffs' Arbitrary Class Definition Requires Individualized Inquiry Into When Each Purchaser Terminated His OnStar Subscription

Plaintiffs' over-inclusive class definition highlights the individualized nature of their

warranty claims.  Under plaintiffs' tenuous theory, a breach occurred upon the analog sunset in

---

[28]   Plaintiffs' other professed defenses to the durational and mileage limits, namely "bad faith," "concealment," and "contract of adhesion," fair no better.  As an initial matter, plaintiffs' "adhesion" defense is unsupported and nonsensical.  While adhesion may be relevant to unconscionability (which, as explained above, is highly individualized), it is not a standalone defense to a written warranty's limitations.

Furthermore, many of the authorities that plaintiffs cite have nothing whatsoever to do with either bad faith or concealment, to which they allegedly pertain.  *See* NY CLS UCC § 2-713 (setting forth buyer's damages for non-conforming goods); O.R.S. § 72.7130 (same); NY CLS UCC § 2-719 (setting forth circumstances when UCC contract may limit remedies); O.R.S. § 72.7190 (same); O.R.S. § 72.3020 (stating that court may refuse to enforce contract that is found to be unconscionable).  Moreover, in the few instances where plaintiffs actually cite a case or statute addressing bad faith or concealment in some fashion, such authorities do not, as plaintiffs suggest, stand for the proposition that these doctrines are defenses to a written warranty's durational or mileage limits.  *See* NY CLS UCC § 1-203 (generally setting forth an implied covenant of good faith in sales contracts); O.R.S. § 71.2030 (same); *PC Com, Inc. v. Proteon, Inc.*, 946 F. Supp. 1125, 1138-40 (S.D.N.Y. 1996) (analyzing whether party who breaches contract in bad faith may avail itself of a contractual limitation on damages); *U.S. Nat'l Bank v. Boge*, 814 P.2d 1082, 1085-90 (Ore. 1991) (analyzing whether UCC displaced common law definition of good faith); *Dallas Aerospace*, 352 F.3d at 784-86 (holding that buyer did not justifiably rely on misrepresentation concerning jet engine's airworthiness because contract expressly disclaimed such representations); *Owen v. GMC*, 533 F.3d 913, 920-21 (8th Cir. 2008) (no claim for fraudulent concealment where auto maker allegedly did not disclose that windshield wiper motor guaranteed for three years might fail sometime after warranty expired); *Best v. U.S. Nat'l Bank of Ore.*, 714 P.2d 1049, 1056 (Or. Ct. App. 1986) (in non-sales, non-warranty case, discussing claim for breach of common law covenant of good faith).

2008, yet plaintiffs' proposed class definition focuses on and includes car owners who may have voluntarily terminated their subscriptions before the sunset date. These purchasers, however, did not experience a breach, since they voluntarily terminated their service before the sunset. Thus, plaintiffs' breach of warranty claim requires an individualized inquiry into when each putative class member terminated his OnStar subscription.

In sum, plaintiffs' claims are not subject to class treatment as a result of the inherently individualized facts surrounding the terms of the warranties, and where applicable, an added security contract, the date of purchase, the vehicle mileage at the sunset date, the specific facts surrounding each class member's purchase transaction, and the date each class member terminated his OnStar service.

## V.    CONCLUSION

For the foregoing reasons, Subaru respectfully submits that the Court deny the Plaintiffs' Motion for Class Certification.

<div style="margin-left:50%">

_/s/ Mariah Murphy_____
Neal D. Walters, Esquire
Mariah E. Murphy, Esquire
Ballard Spahr LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
Tel: 856-761-3400
Fax: 856-761-1020
*Attorneys for Defendant Subaru of America, Inc.*

</div>

Dated:  February 16, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2011, I electronically filed the foregoing Opposition to Plaintiffs' Motion for Class Certification of Defendant**,** Subaru of America, Inc. and supporting exhibits with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record with an electronic mail address registered with the Court.

<div style="margin-left:50%">

/s/ Mariah Murphy                              
NEAL WALTERS
MARIAH MURPHY
Ballard Spahr LLP
(a Pennsylvania Limited Liability Partnership)
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
Tel:  856-761-3400
Fax:  856-761-9021
waltersn@ballardspahr.com
murphym@ballardspahr.com
Attorneys for Defendant,
Subaru of America, Inc.

</div>

February 16, 2011

41