# EXHIBIT 'P'

EXPERT REPORT OF CLAUDE R. MARTIN, JR., Ph.D.
OnStar Contract Litigation MDL No. 01867
United States District Court
Eastern District of Michigan
Southern Division

## INTRODUCTION

My name is Claude R. Martin, Jr., Ph.D. On November 4, 2009 I was retained by the firm of Figari & Davenport, Dallas, Texas in the matter of OnStar Contract Litigation, Case No. MDL-01867 in the United States District Court for the Eastern District of Michigan, Southern Division.

BACKGROUND INFORMATION

I am currently the Isadore and Leon Winkelman Professor Emeritus of Retail Marketing and Professor Emeritus of Marketing at the School of Business, University of Michigan in Ann Arbor, Michigan. I joined the Michigan faculty in 1965 then progressing from my initial appointment as a Lecturer to full Professor in 1978. In 1980 I was named a chaired Professor. In 2002 I was granted emeritus status by the Regents of the University of Michigan. I received my Bachelor of Science degree in Business Administration in 1954 and my M.B.A. in 1963, both from the University of Scranton. In 1969 I was granted a Ph.D. from Columbia University (New York).

Since 1978 I have been the co-editor of the *Journal of Current Issues and Research in Advertising* and I currently serve on the editorial review boards of the *Journal of Advertising*, the *European Journal of Innovation Management,* and the *International Quarterly Journal of Marketing*. In addition I serve as an ad hoc reviewer for the *Journal of Marketing, Journal of Marketing Research, International Journal of Service Industry Management, Journal of Business and Industrial Marketing, Journal of Retailing and Consumer Behavior,* and *Journal of Business Research*. I have served as a reviewer for numerous academic conferences including those of the American Marketing Association, Academy of Marketing Science, American Psychological Association, American Academy of Advertising, European Academy of Marketing and the American Collegiate Retailing Association. I was a member of the scientific committee for the 1995, 1997, 1999, 2001, 2003 and 2005 International Seminars on Marketing Communications and Consumer Behavior.

In 1989 I received the AJCU Business Deans' Award in conjunction with the 200th anniversary of Jesuit education in the United States, having been nominated by my alma mater, the University of Scranton. In 2002 I was named a Distinguished Fellow of the American Academy of Advertising. I have also served on the services steering committee of the Marketing Science Institute. From 1989-1993 I was a board member of the National Advertising Review Board having been nominated by the National Council of Better Business Bureaus; from 1996-2002 I was a member of the Board of Trustees of the University of Scranton; from 1970-1971 I was a member of the Board of Trustees of the American Cancer Society of Michigan; from 1982 to 1988 I was a member of the research committee of the American Academy of Advertising, serving as chairman of that committee from 1987-1988.

RESEARCH AND PUBLICATIONS

I have authored more than 65 articles that report my research in peer reviewed publications along with five monographs and books. In addition I have directed a number of major research projects at the University of Michigan since 1968 including the following:

1968-1973  Director of Research Group B. This was a group of department stores in eight mid-western and southwestern states who supported through the University of Michigan a program of basic research into consumer behavior.

1974-1975  Directed preparation of an economic, cultural and educational impact study for the State of West Virginia on the development of Blenerhasset Island. The study formed the foundation for a projected multi-million dollar development of the island as an historic tourist attraction.

1979-1980  Served as a member of a research group that examined household and business mailstreams in a major national study commissioned by the U.S. Postal Service. This study was coordinated through the Institute for Social Research, University of Michigan.

1968-1979  Directed a program of graduate student development of marketing plans for major organizations. Among the organizations participating in this program were: Ford Motor Company, Wolverine WorldWide Inc., Detroit Coca-Cola Bottling Company, Federal Reserve System, Michigan Bell Telephone Company, American Cancer Society, Warner Vineyards Inc., A.T. & T., and U.S. Plywood/Champion Paper Inc.

1972-1993  Directing a study into telecommunications technology and the effect on the buying and selling of goods and services, including financial services. This research originated as a result of participation in a task force on new services taxonomy and assessment funded by the National Science Foundation as a part of an inter-disciplinary study of tele-communications and public policy.

1978-1979  Principal researcher for the Federal Reserve System on the potential for the Susan B. Anthony dollar prior to its 1979 introduction. This was a comprehensive study among consumers, retailers, and financial service institution providers. The study correctly predicted the failure of this new coin.

3

| | |
|---|---|
| 1978-1979 | Co-principal on a project formulating a model for service demand at the Survey Research Center, University of Michigan. This national study was funded by a grant from American Express. |
| 1983 | Directed a study into demand for the U.S. Olympic Coin offering. This project addressed the basic positioning of the coin and the advertising strategy for it. The project was funded by the office of the Treasurer of the United States. |
| 1980-1986 | Principal investigator and director of research for a project commissioned by the Federal Reserve Board of Governors to examine public attitudes and usage of U.S. currency. This project was coordinated with the Bureau of Printing and Engraving and U.S. Secret Service. The objective was to assess the public reaction to alternative forms of U.S. paper currency, proposed as a deterrent to a counterfeiting threat based on copy machine technology. |
| 1990-1998 | Examining the viability of mall intercepts as a method for the assessment of new product concepts and for advertising testing. (Funding from Kraft Inc.) |
| CURRENT | Member of the Tobacco Research Network at the University of Michigan – scholars examining tobacco related issues, including consumer behavior. |

## AUTOMOTIVE RESEARCH AND CONSULTING

For the past 30 years I have served as a primary judge for the National Automobile Dealers' Association's Outstanding Auto/Truck Dealer Award, sponsored by Time, Inc. and Goodyear. This has included the review and evaluation of the intimate financial, operating and performance records for more than 1,200 auto dealers in the United States in conjunction with this award.

I have also served as a consultant to the following automotive and automotive related firms:

General Motors Corporation
Toyota Motors Sales, U.S.A., Inc
Nissan Motor Company (USA)
Subaru of America
Ford Motor Company
Volkswagen & Volkswagen of America
Cleveland Automobile Dealer's Association
The Colonel's Inc.
Automobile Club of Michigan
AMOCO Oil Corporation
American Honda, Inc.

> EDS Truck & Bus Division
> Safelite Glass Corporation
> Chrysler Corporation
> Cooper Tire Company

In conjunction with my assignment in the litigation involving The Colonel's Inc., I devised and monitored focus groups throughout the U.S. researching the automotive aftermarket. The participants included auto dealers, automotive parts department managers, and managers of auto body repair shops. This research focused on the repair process and on decision making by consumers and providers of auto aftermarket products and services.

In addition I have conducted executive education seminars for the senior management of the following automotive related firms:

> Daewoo Corporation
> General Motors Corporation
> EDS (bus & truck division)
> STP Corporation
> Automotive Warehouse Distributors Association
> MAACO

OTHER LITIGATION/CONSULTING EXPERIENCE

I have been retained by more than 70 different organizations over the past 40 years to offer consulting concerning marketing, survey research, advertising and consumer behavior research issues in litigation matters. These include United Healthcare/AARP; Metropolitan Life Insurance Company; Insurance Commissioner – State of Michigan; Continental-Illinois Bank Corporation; Hallmark Cards Inc. (2 cases); Toymax, Inc. (2 cases); Amers, Inc.; Stroh Brewing Company, Inc.; Franklin Credit Management Corporation; Office Max, Inc.; Pinkerton's Inc.; Review Directories, Inc.; Cow Creek Band of the Umpqua Indian Tribe (Indian brand motorcycles); General Mills/Pillsbury; Absopure, Inc.; R.J. Reynolds, Inc.; Liggett, Inc.; Lorillard, Inc.; Philip Morris Corporation; Outboard Marine Corporation; Weber Marking Systems, Inc.; Booth Publications, Inc.; American Educational Subscription Services, Inc.; City of Adrian, Michigan; Avon Products, Inc.; Automobile Club of Michigan; Toyota Motor Sales, U.S.A., Inc. (7 cases); Ohio Mattress Company (Sealy and Stearns & Foster Inc.); Dunlop Tire and Rubber Company; PepsiCo, Inc.; Nissan Motor Company (USA) (2 cases); General Aviation Corporation; Subaru of America; Burger King Corporation; Teledyne, Inc.; Coburn Optical Industries, Inc.; U.S. West, Inc.; AMOCO Oil Corporation; Abbott Laboratories; American Dental Laser Corporation; Schering Plough Corporation; Farm Fresh Supermarkets, Inc.; Grauel Enterprises, Inc.; The Colonel's,Inc.; Anheuser-Busch,Inc.; King County (State of Washington); Southwestern Oakland County Cable Commission (Michigan); City of Brunswick, Ohio; Nutro Products, Inc.; American Honda, Inc.; OPI Products, Inc.; U.S. District

Court – Southern District of California; Publisher's Clearing House, Inc.; City of Healdsburg, California; Furniture Row BC, Inc.; General Motors Corporation; Cooper Tire Company; AT&T/Lucent Technologies; Atlantic City, New Jersey; City of San Jose, California; KMART Corporation (Sears Holdings, Inc.); R.L. Polk, Inc.; Brach's, Inc.; Toyobo, Inc.; and Raytheon, Inc.

In addition I have provided executive seminars concerning marketing, advertising and consumer research & behavior to many organizations including: Acer, Inc. (Taiwan), Management Institute, Michigan Bell Telephone Company, Time Inc. (FORTUNE), Beecham Laboratories, Charles H. Strand Inc., Hershey Foods Corporation, Red Lobster Inns of America (General Mills),STP Corporation, Unisys Corporation, Rexham Corporation, Lincoln National Life Insurance Company, Diversey Wyandotte Corporation, Southland Corporation, Southern New England Telephone Company, Bethlehem Steel Corporation, MAACO, Bell Communications Research (BELLCORE), Catho Progresso Profissional, Comercial LTDA (Brasil, Argentina, Chile), Automotive Warehouse Distributors Association, Allen-Bradley Inc., Chemical Bank of New York, General Motors Corporation, Consumers Power Company, Southwestern Bell Telephone Company, EDS, BellSouth, Inc., National Bank of Kuwait (Kuwait), University of Michigan Medical Center, University of Michigan Libraries, Sprint Corporation, and Sanford Corporation.

My *curriculum vitae,* (Appendix C), more fully reflects my academic qualifications and research activities, including my more detailed publication, teaching, and consulting record. I have also attached a statement of my fees (Appendix A) and a statement of my deposition and trial testimony in the past five years (Appendix B).

## EXAMINATION OF CLASS ACTION COMPLAINT

I have been retained in this case to examine the complaint of plaintiffs in a proposed class action against America Honda Motor Co., Inc. (Honda); Subaru of America, Inc. (Subaru); Volkswagen Group of America, Inc. (VW); and OnStar LLC (OnStar).

## DOCUMENT AND EXHIBIT REVIEW

As part of my retention for these purposes I have examined a series of documents and other exhibits . These include:

  Second Master Amended Class Action Complaint
  Defendant OnStar LLC's Responses and Objections to Plaintiff's Interrogatories
  OnStar Vehicle Upgrade Summary (11/19/07)
  Dealer Deposition Transcripts and Exhibits:
    Thomas Keery (Frost Motors – Newton, MA)
    Richard Lamping (Lockhart Cadillac – Indianapolis, IN)

Defendant Witness Depositions and Exhibits:
  Dan Appa
  Robert Cameron
  Anthony DiSalle
  Karen Snow
  James Sinclair
  David A. DiMusto
Plaintiff Deposition Transcripts and Exhibits:
  David Busch              2004 Passat (VW)
  Robert Reishman          2004 Audi A8 (VW)
  Robert Schatz            2004 Audi A4 (VW)
  Sandra Williams          2003 GMC Envoy (GM)
  John Kuller              2004 Acura RL (Honda)
  Cheryl Nicholas          2003 Chevrolet Trailblazer (GM)
  Larnell Gill             2003 Acura (Honda)
  Walter Rochow            2004 Buick Park Avenue (GM)
  John Irvine              2002 Cadillac DeVille (GM)
  Janice Rhodes            2004 Chevrolet Avalanche (GM)
  Robert Golish            2005 VW Phaeton (VW)
  Bruce Johnson            2005 Buick Park Avenue (GM)
  Irene Nary               2003 Buick Park Avenue
  Norman & Susan Nelson    2004 Cadillac Escalade (GM)
  Wanda Hoover             2002 Oldsmobile (GM)
  Murie Kemp               2004 Subaru Outback
  Charles Allenson         2003 Acura (Honda)
  Jack Jacovelli           2002 Cadillac DTS (GM)
  Angela Imbierowicz       2003 Saab (GM)
  Carey Stein              2004 Cadillac DTS (GM)
  Gordon Erdenburger       2003 Subaru Outback
  Jason Smith              2002 Subaru Outback
  Melvin & Betty Rubertt   2004 Subaru Outback LL Bean
  Bradley Reich            2003 Saab (GM)
  Mark Vamos               2004 VW Passat (VW)
Other Case Documents (listed by Bates number or Exhibit number):
  GMADT 57, 191-207, 1350-1361, 1386-1389, 1396-1400, 1403-
      1407, 1479-1507, 1538, 1542, 1551, 4150-4151, 4190-
      4191
  ONSTARADT 4358-4367, 4476-4478,4939-4941
  SUGE 174-175
  Johnson 9-16
  GMJR 44-45, 88-103
  Keery Ex. 4 & 5
  HONDA 1614
  SOA 1898-1899

7

OTHER RELIANCE

I have conferred with Professor Richard Semenik (Dean, College of Business, Montana State University) who has prepared an expert report addressing other aspects and issues in this case.

## OVERVIEW: AUTOMOTIVE BUYING & SELLING

To better understand the analysis I will present in this report, I am offering a brief overview of the automotive buying system from the perspective of both the retail dealer and from the consumer. Hopefully this will enable a better comprehension of the complexity of the purchasing process and the analysis I have undertaken.

THE AUTOMOTIVE RETAIL ENVIRONMENT

Based on my observations and experiences, I conclude that the retail automotive sales business has been undergoing an evolution, and the outcome is still unfolding. During the case time period there was an emergence in the retail environment of many dealers employing fewer, but more highly trained, sales staff selling more vehicles per dealership. In addition, new formats emerged such as superstores offering a wider selection and a variety of makes and models. Dealers moved toward a "super-coddle" mode by doing much more in the area of relationship marketing[1]. This required constant contact with consumers, often through the provision of extra services, long after the sale of the vehicle occurred. Some dealers turned their sales people into customer advocates responsible for maintaining computer files on everything related to customer purchases and subsequent service visits. While dealers did not uniformly change, any way you look at it, the old, high-pressure system of selling vehicles began to die and there was a dramatic restructuring of the auto/truck distribution and sales system that had not changed much since the 1950s. The change, which continues today, was because the system was both costly and inefficient and is the weakest part of the auto sector's value chain.

Automotive Retailing Today (ART), a coalition of all major automobile manufacturers and dealer organizations[2], in 2006, presented a study that found: *unlike economic and market turmoil in other industries where the customer has unwillingly suffered, auto dealers appear to have cushioned the customer from the effects of a shifting marketplace and that dealers were meeting consumer demands and maintaining high levels of customer satisfaction.* This research, commissioned by ART and conducted by Harris Interactive between July and August 2006, surveyed 932 new car buyers, 108 shoppers, 694 non-shoppers

---

[1] Leonard Berry, *Relationship Marketing,* 1983, Chicago: American Marketing Association

[2] http://www.autoretailing.org or http://www.autocareerstoday.org

8

and 101 professionals involved in automotive media.[3]

## THE ROLE OF THE DEALER SALESPERSON

The dealer salesperson has always been an integral part of the sales system. The changes I describe above do not negate that, but rather describe an enhancement of the salesperson's role. Despite the structural dynamics of the retail selling process, there has been one main constant: the importance of the role of the retail salesperson at the "moment of truth."[4]

A "moment of truth" occurs when the dealer sales person and customer have contact. When this occurs what happens is no longer directly influenced by the manufacturer, or even the dealer. It is the skill, motivation, and tools employed by the dealer's representative and the behavior and expectations of the customer that together result in customer satisfaction or dissatisfaction. The idea has been borrowed from bullfighters who used the term to describe the moment when the bullfighter faces the bull in the ring. In spite of all his training and preparation, a wrong move by the bullfighter or an unanticipated move by the bull can result in a disaster. Similarly, when employees and customers interact, a careless mistake by the dealer's salesperson or an unanticipated request by the prospective customer can result in a dissatisfied customer. All or much of the investment in facilities, infrastructure and product/service can go to waste if the interaction between the customer and the dealer salesperson is not managed effectively. Any mistake at the time of "moment of truth," when the dealer salesperson meets the customer, can be disastrous for business. Conversely, the effective management of that "moment of truth" can mean success for the dealership, the manufacturer and the customer.

## THE ROLE OF THE CUSTOMER

In effectively managing the "moment of truth," the dealer salesperson must understand and respond to the complexity of decision making among different consumers. Consumer decision-making is influenced by a significant number of factors, as illustrated by various models of the decision-making process, and the manner in which individuals process information[5]. It is my understanding from

---

[3] These surveys were conducted by telephone within the United States by Harris Interactive on behalf of Automotive Retailing Today (ART) between July 7 and August 24, 2006 among new car buyers who purchased or leased a new car in the past 18 months (N=932), adults who shopped for but did not purchase a lease a new car in the past 18 months (N=108), adults who did not shop for a new car in the past 18 months (N=694) and automotive media (N=101) (aged 18 and over). Figures for race/ethnicity, and region were weighted in the consumer surveys where necessary to bring them into line with their actual proportions in the population. With pure probability samples of 932, 108, 694 and 101 one could say with a ninety-five percent probability that the overall results would have a sampling error of +/- 3, +/- 9, +/- 4 and +/- 10 percentage points, respectively. Sampling error for data based on sub-samples would be higher and would vary. However, that does not take other sources of error into account. These telephone surveys are not based on a probability sample and therefore no theoretical sampling error can be calculated.

[4] Jan Carlzon, *Moment of Truth*, 1989, New York: Harper & Row

[5] Philip Kotler, *Marketing Management, Millennium Edition*, 2000, Upper Saddle River, NJ: Prentice-Hall, Inc., Ch. 6

Professor Semenik he will address overall the processing of information in more detail in his report. In speaking with Professor Semenik he opines that consumers are influenced by a broad variety of factors in making purchase decisions. Dovetailing with his opinion, I also conclude that consumer decision-making is highly individualistic, with each consumer bringing different experiences, capabilities and need assessment to the process. With respect to automotive buying behavior, consumers ultimately select and use those vehicles and brands that fit their needs as shaped by numerous influences on their decision process.

Among the numerous influences from those selling vehicles & service there are four key factors: price; place; communications; and the product including its various features, such as OnStar, that prospective consumers use to make a decision[6]. However, these consumers have limitations brought on by the decision-making process itself and the way they process information. In this regard, what the manufacturers, dealers, and OnStar communicate to the prospective buyer is only a part of what is used by them in selecting a motor vehicle and its features. Those communications and the other elements of price, place and product are conditioned by the buying environment and experience of the consumer in their buying decisions[7].

This is a complex process that consumers go through and each of the stages has its own complexity. Illustrative of this is found in the contact between a prospective buyer and the dealer's salesperson.  The relative amount and influence of the dealer's information varies with the buyer's own characteristics and, in some cases, other information is brought into the process (e.g., internet searches, advertising,  or personal recommendations of friends and/or family members,). It is important to understand that not every consumer engages in the same amount or type of search. The key point is that the role of the salesperson is to evaluate and make judgments as to the needs, attitudes, predispositions, knowledge and experience of the prospective buyer and to tailor the selling effort to address those with each individual customer. Richard Lamping (Lockhart Cadillac) acknowledges this by affirming that how one salesperson approaches a sale can be different than how another salesperson approaches a sale (Lamping deposition, p. 81). Building on that, my experience is that there are not only differences among sales personnel, but differences in how a single salesperson would approach different customers.

Indicative of the need of the salesperson to tailor their effort to changes in the prospective buyers is found in the research from ART cited above. That study debunks the myth about gender differences in the auto-buying experience. It is a misperception that most women bring their spouses or partners to showrooms out of apprehension or lack of confidence. Rather, women bring their spouses or

---

[6]  Philip Kotler, *Marketing Management, Millennium Edition*, 2000, Upper Saddle River, NJ: Prentice-Hall, Inc., Ch. 1

[7]  George Belch and Michael Belch, *Advertising and Promotion: An Integrated Marketing Communications Perspective*, 2003, New York: McGraw Hill

partners to shop with them because it is a family investment requiring serious deliberation.

However, not all women bring the same criteria to the "moment of truth." The most-cited reasons why the women who brought a man with them did so focused on lifestyle:

* Man was their spouse/significant other (39 percent);
* Man was more knowledgeable (15 percent);
* We share the decision-making (13 percent);
* We shop/do things together (8 percent).

Less than 1-in-10 women who brought a man with them said they did so out of discomfort with the dealership process.

The dealer salesperson must understand and relate to this overall change in women in the buying process, but also design their selling strategy around individual needs, behaviors and attitudes. Complicating this are the differing and complimentary factors to be considered between the man and the woman at the "moment of truth."

## ANALYSIS

### INTRODUCTION

The focus of my analysis has been on reviewing the deposition testimony of the named plaintiffs. In light of the allegations found in the complaint[8], I wanted to determine if they and the vehicle owners and subscribers that they purport to represent, acted in a common way, or in several different ways with respect to their vehicle purchase decisions and, particularly, the acquisition of OnStar service and equipment.

I have been asked to elaborate upon the specific factors that may influence an automobile purchaser's decision, including the processing of information and the interaction with automobile dealers.

### COLLECTIVITY VS. INDIVIDUALITY OF NAMED PLAINTIFFS[9]

As I have already stated consumer decision-making is highly individualistic and consumers ultimately select and use those products and brands that fit their needs as shaped by the numerous influences on their decision process. This is buttressed by my experience with automotive dealers over the last 35 years. It is also supported by Thomas Keery of Frost Motors, a veteran dealer (since 1978) who observes that each sale is unique and that the motivation for purchase, "the reason for," varies[10].

I evaluated each of the named plaintiff's deposition transcripts and found uniqueness among them on numerous dimensions. Simply put, the named plaintiffs are discretely different on many dimensions.

---

[8]  Second Master Amended Class Action Complaint

[9]  The number of named plaintiffs for the remainder of this report will count the Nelsons and the Rubretts as single named plaintiffs each.. Therefore, there are 25 named plaintiffs to be considered.

[10] Deposition of Thomas Keery, p. 107

*Ownership 2009*

Only six of the 25 vehicles in contention were sold or traded by 2009, the remainder were still owned by named plaintiffs. This certainly addresses the issue of the importance of OnStar as a component of their vehicle:

| Plaintiff | Action | Replacement Vehicle |
|---|---|---|
| Robert Schatz | Sold 2004 Audi– not upgradeable | Audi A5 – No On-Star |
| Cheryl Nicholas | Traded 2003 Trailblazer Did Not Upgrade | GM Acadia – Has OnStar |
| Murle Kemp | Traded 2004 Subaru – not upgradeable | 2007 Honda – No OnStar |
| Jack Jacovelli | Traded 2002 Cadillac - Upgraded | 2007 Cadillac – Has OnStar |
| Gordon Erdenburger | Traded 2003 Subaru – not upgradeable | 2008 Cadillac – Has OnStar |
| Bradley Reich | Traded 2003 SAAB – not upgradeable | 2007 Honda – No OnStar |

This table of six named plaintiffs shows three persons with vehicles that could not be upgraded electing to acquire new vehicles that did not have OnStar; one elected not to upgrade her vehicle, but then acquired a vehicle with OnStar; another had a vehicle that could not be upgraded and elected to acquire one that had OnStar; and the final named plaintiff upgraded his vehicle and then traded it for another newer model that also had OnStar. The best description of this behavior is diversity. This is combined with those who retained the vehicle under contention (upgradeable and did, upgradeable and did not, and non-upgradeable) and there is a valid conclusion of no commonality of behavior among named plaintiffs.

*Vehicles Owned During 2000-2009*

Reinforcing this analysis is the inventory among named plaintiffs of non-OnStar equipped vehicles they owned or leased during the 2000-2009 period. 20 of the 25 named plaintiffs had a non-OnStar equipped vehicle other than the one in contention in this case. The total number of such vehicles exceeds 72, with one plaintiff unable to quantify beyond "several cars." Two of the plaintiffs can be categorized as "collectors" (David Busch with 10 vehicles and Norman & Susan Nelson with 28).

During this same time period there were only 7 named plaintiffs that owned a vehicle equipped with OnStar, other than the one under contention.

The conclusion is that there is a wide variety of experience during this time period with non-OnStar equipped vehicles and no universal sense of importance, or unimportance, for OnStar in individual vehicle ownership.

12

***Plaintiffs' Background***

There is a diversity of backgrounds for the named plaintiffs, which has the ability to affect their acquisition and processing of information and their buying behavior. Importantly it is necessary to recognize that there is no one background that is better or worse than another in this aspect, but rather there are differences. Such an individual difference means information will be processed differently and used differently in the decision process. For example we have Mark Varnos [business editor] and his wife [a reporter and Wall Street Journal executive] who would bring a different set of processing skills than would Wanda Hoover [professional bus driver]; or John Kuller [financial manager]; or Jason Smith [sawmill operator]. This means that different named plaintiffs bring different skills and experiences to the ways and types of information they process to make a buying decision.

***Pre-Purchase Search***

Coincident with the discussion above I focused on four different dimensions in the pre-purchase search undertaken by the named plaintiffs: length of search, sources of information, vehicle make comparisons used, and whether there was any internet search.  Once again, there is wide lack of uniformity on all these.

*Length of Search.*  The range of time devoted to the search prior to making a decision consists, for example, from no search (Robert Schatz); to  impulsive – same day (Irene Nary); to   six months (Murle Kemp); to one year (Charles Allenson).

*Sources of Information.*  There are considerable differences in the type and amount of source material used prior to the purchase by the named plaintiffs. For example, David Busch used printed and advertising material; Sandra Williams reports using no printed material, seeing no OnStar advertising and not having an OnStar demonstration; John Kuller looked at Kelly Bluebook material, but no OnStar materials; Larnell Gill reported reading printed brochures and having an OnStar demonstration at the dealer; Walter Rochow and John Irvine reported having no OnStar demonstration, but they did see OnStar advertising; Robert Golish used an internet search system to identify a dealer  and then a specific dealer's internet salesperson for information; and Norman & Susan Nelson visited some dealers and then bought on the phone. These are only examples of the differences in the use of sources, there is simply no commonality across any of 25 named plaintiffs.

*Vehicle Pre-Purchase Comparisons.*  There is a wide spectrum of vehicles that were used for comparison (both OnStar and non-OnStar equipped). Some of the named plaintiffs exhibited a loyalty to one brand (e.g., Robert Reishman, Robert Schatz, Cheryl Nicholas, Walter Rochow, Janice Rhodes, Irene Nary), while others looked at numerous and diverse brands ( e.g., David Busch, Larnell Gill, Robert Golish), and others did no comparison (e.g., Gordon Erdenburger, Jack Jacovelli).

*Internet Search.* There were only 8 of the named plaintiffs who reported using the internet to source information prior to their buying decision. This is in sharp contrast to my own observations of the growth of the internet for information acquisition in vehicle purchasing. Also the worldwide automotive consulting organization Capgemini has issued a research report on "Understanding Consumer Buying Behavior in a Volatile Market,[11]" that addresses the issue of internet information search in the vehicle buying process:

> *Usage of the web as a key information source during the vehicle buying process has become pervasive across most markets. Almost 90% of consumers today use the internet to research vehicles, up from 61% in 2005. A clear online usage pattern has emerged, with consumers turning initially to search engines...then to manufacturer and dealer sites for factual information about vehicles, prices and availability; and finally to consumer-to-consumer tools like discussion sites for qualitative information and opinions.*

The findings from the named plaintiff depositions clearly run counter to this trend, even using the 61% figure for 2005. This may be a reflection of the older sample of consumers among the named plaintiffs (median age of 59 years, and only two named plaintiffs under 40 years - younger consumers tend to be more familiar with and use the internet more frequently for sourcing buying information). Certainly it means that the 8 named plaintiffs who report using the internet in the pre-purchase process stand very different from the others on this dimension. They had fertile grounds for information coming from manufacturers, OnStar, evaluation agencies, dealers, and the FCC itself.

*Summary.* Reviewing all 25 named plaintiffs shows that they have a definite lack of uniformity that they bring to the "moment of truth" at the dealer. They are individualistically different on what collective information they use  and how and where they obtained it.

### Buying Motivation

Concerning their motives for buying, the named plaintiffs in their own testimony demonstrate their individualism. For example, they range from Wanda Hoover who clearly says OnStar was the primary buying motive to Jack Jacovelli who did not consider OnStar as a motive, but rather concentrated on the availability of a specific used vehicle that had been traded by a friend. So, while some of the named plaintiffs focused on the availability of OnStar as a buying motive, not all did so. Some said OnStar was just one of several motives and others did not have OnStar as a buying motive at all.  There is a wide array of other motives that some of the named plaintiffs cited including: price; trade-in; all wheel drive capability; luxury, power, and/or automated features; the braking system; bright headlights; good crash/safety record, fuel economy, and speed. While this is not intended as an exhaustive list of motives identified, it does illustrate the wide variety of motives stated.

---

[11] http://www.capgemini.com

### *Buying Pal*

The participation of a "buying pal"[12] is a well known and understood phenomenon in the purchasing process, especially for automotive products. My experience is that the buying pal can frame the vehicle selection, either for the brand, model or features. In this case there are wide differences of participation in the purchases. These range from limited participation by a spouse (e.g., David Busch, Walter Rochow and Robert Reishman), to the named plaintiff buying solely (e.g., Jason Smith, Robert Schatz, Angela Imbierowicz and Robert Golish), and named plaintiff with child (e.g., Janice Rhodes and Bradley Reich). For those who had participation in the buying process, the buying pal in many instances acts as a prime influencer, including the acquisition and processing of information.

### *Principal Driver*

Similar to the concept of the "buying pal" is the difference in attitude, motivation and behavior based on who will be the principal driver of the vehicle. Some of the vehicles were purchased by the person who would be the sole principal driver, while other purchases were for someone else (spouse or child) to be the principal driver, and yet others were bought to have two shared principal drivers. The buying process and decision-making thus varies with the named plaintiff either being categorized as a user versus being a buyer-influencer for the purchase. There is no uniformity among the named plaintiffs here.

### *Post Purchase Behavior*

Once the buying decision had been made, there was a lack of uniformity as to post-purchase behavior among the named plaintiffs. The focus of my analysis is not on any one dimension individually, but rather on six dimensions collectively.

*OnStar Activation Process.* There is considerable difference in the OnStar activation process. In some cases the activation was undertaken by the dealer salesperson prior to vehicle delivery (e.g., David Busch), in other cases the activation was jointly by the dealer salesperson in cooperation with the customer (e.g., Robert Reishman), and in other cases the activation was undertaken by the customer themselves (e.g., Robert Schatz).

*OnStar Renewal Behavior.* Some of the named plaintiffs renewed their contract with OnStar using the system in their vehicle, some renewed using the OnStar web site, others renewed with OnStar using a telephone, and some had their renewal done automatically by OnStar using a registered credit card. The renewal timing also varied from yearly to monthly. Those who used the phone feature of OnStar also tended to use the system to "add minutes" to their account.

*OnStar Usage.* Some of the named plaintiffs used the service on a limited basis (e.g., Angela Imbierowicz), some did not use the service at all (e.g., Carey

---

[12] Michael Levy and Barton Weitz, *Retailing Management,* 2009, New York: McGraw-Hill

Stein), some were heavy users of the phone function (e.g., Jason Smith and Mark Vamos), and some were heavy users of the navigation system (e.g., Melvin Rubertt and Bradley Reich).

*OnStar Attitude – Longevity*. There is considerable difference across the named plaintiff base as to their attitude concerning the longevity of OnStar service. Among the attitudes cited were: OnStar is upgradeable for a lifetime; ten years is appropriate; longevity is tied to the vehicle extended warranty; upgrading should be free and it is likened to product recalls; it is not a special option, it is a gadget or just an "extra" amenity; it does not come under the vehicle warranty; or OnStar is part of the vehicle and should be "fixable." There are others who had no stated opinion about longevity. Others did not specifically address longevity but reported the dealer salesperson knew the system could not be upgraded and "cheated" them or lied to them, implying some form of longevity. And there were others who simply decried that the $15 upgrade cost was unreasonable.

*When Informed about Termination/Upgrade*. The majority of the named plaintiffs claim they first heard of either termination of their system or the need to upgrade via a letter or postcard at various time periods in 2007. Conflicting with this "first notification" in 2007 are others, e.g., Murle Kemp reported a May, 2004 letter from OnStar and seeing web site information; Gordon Erdenburger got a renewal letter from OnStar in September, 2004 that contained discontinuance information; Larnell Gill received a statement of "terms & conditions" in December, 2004 that contained information about discontinuance of the service; John Kuller reported a 9/04 letter from OnStar and information in June, 2005 from the OnStar web site, but also recalled at his deposition that he learned, on his own, about the FCC action and the impact on his OnStar service sometime between October 2003, when he purchased his 2004 Acura RL, and the September 2004 letter; John Irvine got an information letter about upgrading in 2005 and this triggered an early upgrade in 2006; and Mark Vamos obtained, prior to his purchase, a brochure from OnStar that says, "Anything Can Happen on the Road" and contains information about the termination of OnStar service because of the FCC ruling.

*Reaction to Termination/Upgrade*. The reaction to learning about termination or need to upgrade varied across the 25 named plaintiffs and ranged from: triggering an upgrade ; to an intense reaction including letters and/or phone calls to manufacturers, OnStar, or dealers; to looking at the OnStar web page; to trading in the vehicle; to merely contacting the dealer; to early discontinuance of service; to letting the OnStar subscription expire; to no reaction at all.

*Summary*. As can be seen across the post-purchase behaviors outlined above there were widespread differences among the named plaintiffs. Inspection on just the post-purchase dimension demonstrates there was no uniformity among them.

16

### Information Available Concerning FCC Action

There were a variety of sources about the FCC decision to discontinue the analog requirement and some which specifically addressed the impact on the OnStar system, including but not limited to:

*Dealer Disclosures Pre-June, 2003*
*2002  FCC Press Release*
*News Stories*
*Terms & Conditions –Starting June, 2003*
*OS Magazine -  2003 FCC Decision Notice*
*OS Magazine July, 2004 – Terms & Conditions*
*May, 2003 "bulletin" to the OnStar call center with FAQs for use with customers*
*2003 - Dealer OnStar Consumer Guides – 2004 model year*
*2003 – Letter to GM Dealers with customer "handout"*
*2004 - Letter to GM Dealers with customer "handout"*
*Terms & Conditions -  2004  Glove Box*
*2004 – GM Vehicle Brochure (all brands)*
*2003 - OS Owners Guide 2004 Model*
*OS Web Site after June, 2003*
*2004 & Forward  Renewal Letters*
*OS Magazine after 2004*
*December/2004 – Terms & Conditions  Mailed or Emailed*
*OS Sticker – 2004 and 2005  Model Years*
*Summer 2004 – VW Dealer Brochures  2005 Model Year*
*Model Year 2005 VW magazine, "Drivers Gear" sent to owners & dealers*
*OS Brochure "Anything Can Happen on the Road" – 2004 model year*
*June, 2005 American Honda Owner Link Web Site*
*September, 2005 American Honda Motors – "Certified Used Car Website"*
*2005 - American Honda Motors' Monroney label on OnStar analog-equipped*
   *Certified Used Cars*

Some of the named plaintiffs acknowledged receiving communications and ignoring them through selective perception, selective exposure or selective retention[13]. This can be a common practice when consumers default on using the communication process. There is a well known tendency of consumers to not retain such information. In other cases named plaintiffs acknowledge they "could have" received communications, particularly from OnStar, but regarded it as "junk" mail that was immediately discarded upon receipt, thus practicing selective exposure. Others of the named plaintiffs acknowledge that there were communications about the FCC decision and the effect on OnStar because of the

---

[13] D. Zillmann, & J. Bryant, (Eds.). "Selective Exposure To Communication," 1985 Hillsdale, NJ: Lawrence Erlbaum Associates , pp. 533-567; A. Hastorf and H. Cantil, "They Saw A Game: A Case Study," 1954, *Journal of Abnormal and Social Psychology*, 49, pp. 129-134; Jonathon Baron, *Thinking and Deciding*  (3rd ed.), 2000, New York: Cambridge University Press;  Cordelia Fine,  *A Mind Of Its Own: How Your Brain Distorts And Deceives*, 2006, Cambridge, UK: Icon books.

documents they submitted at their depositions. Examples include, Jason Smith submitted a statement of terms and conditions from June, 2003 that contained such information; Janice Rhodes submitted the 2004 GM Vehicle Brochure (all brands) and the OnStar brochure for the 2004 model year; Jack Jacovelli produced a written acknowledgement of having received a copy of the 2004 statement of terms & conditions; Angela Imbierowicz supplied a copy of the statement of terms and conditions mailed to her in December, 2004 and a 2006 email concerning her renewal that disclosed termination of service in 2007; John Irvine submitted a letter from 2005, a statement of Q & A. from June, 2005, a mailed copy of terms and conditions from December, 2004, and a renewal email in August, 2006 all containing information about the FCC decision and the need for upgrading; Bruce Johnson  submitted a copy of terms and conditions dated 2004, a 2006 letter containing information about the FCC decision and his eventual termination of service in conjunction with his 2006 purchase of a used Buick, and a copy of material from the OnStar web site dated June, 2005; Gordon Erdenburger submitted a September 3, 2004 letter and an August, 2005 email both of which have service termination information; Carey Stein submitted a 2004 Cadillac owners guide with upgrade information; Larnell Gill submitted a statement of terms and conditions for his 2004 Acura that disclosed termination of service information; John Kuller submitted a September, 2004 letter from OnStar and information in June, 2005 from the OnStar web site; and Mark Vamos submitted a brochure he obtained prior to his purchase from OnStar that says, "Anything Can Happen on the Road" and it contains information about the termination of OnStar service because of the FCC ruling.

This leads to several conclusions: (1) there was a considerable selection of sources and amount of information coming from the manufacturers and OnStar regarding service termination or upgrading for specific vehicles commencing in 2003; and (2) there is no uniformity among named plaintiffs as to timing, kind and source  of information received with widespread practice of selective exposure, perception and/or retention of that information among the named plaintiffs.

### Summary

On the basis of the dimensions that frame a consideration of collectivity versus individuality of the named plaintiffs clearly the analysis shows no uniformity in their pre-purchase behavior, attitudes, post-purchase behavior, and processing of information. Clearly they and the vehicle owners and subscribers that they purport to represent did not act in a common way with respect to their vehicle purchase decisions and, particularly, the acquisition of OnStar service and equipment.


CLASSIFICATION OF NAMED PLAINTIFFS

In addition to the analysis above, there is an issue raised as to the representative nature of the named plaintiffs and whether they reflect a valid and

2:07-md-01867-SFC-PJK   Doc # 289-17   Filed 02/16/11   Pg 20 of 44   Pg ID 12029

reliable sample for the vehicle owners and subscribers they purport to represent. In other words, there are behavioral and demographic characteristics that raise concerns whether they are representative of those who purchased or leased OnStar equipped vehicles during the case time period.

An initial concern is that included in the named plaintiff base were only those who were either to be terminated at the end of 2007 or needed to upgrade the service by the end of 2007. Missing are those who purchased vehicles from the four different manufacturers and elected either to not subscribe to OnStar or voluntarily terminated OnStar shortly after their vehicle purchase. There is also a concern that those who leased a vehicle and then turned in the vehicle are not found among the named plaintiffs. Only lessees who subsequently purchased the vehicle are found. This means those who immediately or at end-of-lease time gave up OnStar are not found among the named plaintiffs.

The next of my concerns are the ages of the named plaintiffs. There are 27 individuals (counting Norman & Sue Nelson and Melvin & Betty Rubrett individually). The sampling of these named plaintiffs is heavily skewed toward older consumers with the median age being 59 years, a sparse representation of those under 40 (only two named plaintiffs of 36 and 38 years). Considering that there are vehicles coming from four different manufacturers, this does not appear to be representative of all the purchasers. Missing are younger consumers (those under 35) and, in addition there are none of the named plaintiffs who did not have previous automotive buying experience. In other words, the inexperienced prospective buyer is ignored. Consumer buying by those inexperienced are labeled as "extensive problem solvers" in the marketing literature[14], while the very experienced older buyers are much more "limited problem solvers." This means the amount and type of information and the processing of that information by prospective buyers would be different. In simpler terminology they would each bring something "different to the plate."

Also of concern is that the named plaintiff sample is skewed 2 to 1 in favor of those with systems that could not be upgraded, despite the fact that there were 11 GM models in model year 2002 that were upgradeable and all but four that were not upgradeable by model year 2003. In addition there are only 25% of the named plaintiffs who had systems that could be and were upgraded.

Finally there is a bias in the named plaintiff sample in representation by attorneys. Five of the plaintiffs are identified as lawyers and in another instance the attorney spouse was an active participant in the buying decision. To make this representative it would mean that 1 in 5 of all vehicle buying consumers would be lawyers.

All of these leads to my analytical concern with the viability of the named plaintiff sample to be representative of those who acquired OnStar or could have

---

[14] John A. Howard and Jagdish Sheth, *The Theory of Buyer Behavior*, 1967, Homewood, IL, 1967; John A. Howard, *Marketing Management, Revised Ed.*, 1963, Homewood, IL, 1963

acquired OnStar during the case time period. In marketing and statistical terms it raise an important issue about reliability and validity[15] of those selected.

## CONCLUSION

I have reached several conclusions with a reasonable degree of certainty based on my experience, education and sound marketing principles.

First, I conclude that even the named plaintiffs identified by deposition transcript are so different along the multiple dimensions discussed that no uniformity can be identified. This lack of uniformity covers their demonstrated attitude toward choosing OnStar equipped vehicles versus those without OnStar; their knowledge and experience in dealing with information and the processing of it; the type and nature of the pre-purchase search they undertook; the buying motivation they brought to the purchase, including the importance of OnStar in that motivational pool; the use they made of a buying "pal" and the influence of who would be the principal driver and potential user of the OnStar service; and their post purchase behavior concerning OnStar. Using all these critical dimensions, there is simply no uniformity among consumers. As dealers recognize, and my own experience indicates, this is a complex process that uses one-on-one marketing techniques and communications. That effort is principally centered on the salesperson at the "moment of truth" who tailors the offering to the needs, wants, attitudes, behavior and experience of the car or truck potential buyer.

Second, I conclude that they cannot be treated in some aggregate way. To determine the basis for the valuation of OnStar as part of the product offering it is necessary to look at each individual and discrete transaction, as a dealer salesperson would. It is only that way a determination can be made of what was the effect of what the individual customer, the manufacturer, OnStar, and the dealer brought to the "moment of truth."

Third, I conclude that major elements of motor vehicle consumers who would acquire OnStar during the case period have been ignored in the selection of named plaintiffs. First, the plaintiff sample of 25 is heavily skewed toward older persons and those under 35 years of age are simply not represented. Second, there is an absence of first time automotive buyers in favor of those with considerable experience in buying cars and trucks. Simply put, the older consumer is more familiar with the process and benefits from having learned to buy.

Fourth, I conclude those who bought OnStar equipped vehicles, but elected to either not subscribe to the service or canceled soon after purchase are not included. Also missing are those who leased a vehicle and returned it, along with their OnStar service, at the end of the lease. In that sense the sample is biased.

Finally, I conclude that in any case you would have to look at each individual sales transaction to determine the motivation for the purchase and the

---

[15] Thomas C. Kinnear and James R. Taylor, *Marketing Research, An Applied Approach, Third Ed.*, 1987, New York: McGraw-Hill, pp. 301-302.

contribution, if any, OnStar made to the sale. For example, during the proposed class period, there was a wide variety of information available to consumers regarding OnStar generally as well as both the FCC decision and the impact on OnStar service from the transition from analog to digital. This information varied over time and it came from various different sources and media. Determining whether any particular purchaser or leaser saw or heard this information; how they understood it, if at all; or the impact it had on their decision to purchase or lease a vehicle, would require a transaction-by-transaction analysis.

As stated, these conclusions have a reasonable degree of certainty based on my experience, education and sound marketing principles.

Claude R. Martin, Jr., Ph.D.
January 15, 2010

21

**APPENDIX
A**

## FEE STRUCTURE

Consultation (Ann Arbor, phone, internet)...............................$450.00 hour
Consultation (outside Ann Arbor) ......(minimum of 8 hour day) $4000.00 day
Deposition and other trial testimony...(minimum of 8 hour day) $6000.00 day
          With $675 for each added hour
All fees are plus expenses as charged

**APPENDIX
B**

## PREVIOUS TESTIMONY – PAST FIVE YEARS

In the past five years I have testified, either in court or in depositions, in the following cases:

| DATE | CASE | JURISDICTION | ACTIVITY |
|------|------|--------------|----------|
| 9/24/04 | Cunningham v. Mattel, Inc. | Madison County Illinois | Deposition |
| 11/03/05 | KMART v. Capital One Bank | Oakland County Michigan | Deposition |
| 6/1/06 | Diamond Triumph v. Safelite Glass Corporation | Federal Middle District Pennsylvania | Testimony – Daubert Hearing |
| 9/6/06 | Greeting Card Association v. United States Postal Service | Federal Postal Rate Commisssion Washington, D.C. | Direct Testimony |

**APPENDIX
C**

# CLAUDE R. MARTIN JR., Ph.D.

## January, 2010

**Isadore and Leon Winkelman Professor Emeritus of Retail Marketing and Professor Emeritus of Marketing
University of Michigan**

**Contact:**  Voice or Fax:  (734) 971-1897
Cell:  (734) 417-4975
e-mail :  claudemartinjr@hotmail.com

**Residence:**  1116 Aberdeen Drive
Ann Arbor, Michigan  48104

**Office:**  School of Business Administration
University of Michigan
Ann Arbor, Michigan  48109-1234

**Personal Information:**  Born May 11, 1932
United States citizen
Widowed
Six children, ten grandchildren & one great grandson

**Current Position:**  Isadore & Leon Winkelman Professor Emeritus of
Marketing and Professor Emeritus of Marketing
University of Michigan

**Previous Positions:**

| | |
|---|---|
| 1952-1955 | Radio & Television Newsman - Northeastern Pennsylvania |
| 1955-1957 | Night Operations Supervisor - Armed Forces Radio &  TV Service, Los Angeles |
| 1957-1961 | News Director - WNEP-TV, NE Pennsylvania |
| 1961-1963 | Director of Systems - Blue Cross/Blue Shield, NE Pennsylvania |
| 1963-1965 | Research Assistant - Columbia University, New York |
| 1964-1965 | Lecturer in Marketing - St. Francis College, New York |
| 1965-1969 | Lecturer in Marketing - University of Michigan |
| 1969-1972 | Assistant Professor of Marketing - University of Michigan |
| 1973-1977 | Associate Professor of Marketing - University of Michigan |
| 1978-1980 | Professor of Marketing - University of Michigan |
| 1976-1984 | Board of Directors,  Comerica Bank -Ann Arbor. |
| 1983-1989 | Board of Directors, Perry Drug Stores Inc. (NYSE) |
| 1986-1989 | Chairman, Marketing Faculty - University of Michigan |

| | |
|---|---|
| 1991 | Visiting Professor, Institut d'Administration des Entreprises, Universite de Droit, dEconomie et des Sciences d'Aix-Marseille, @ Aix-en -Provence, France |
| 1980-2002 | Isadore & Leon Winkelman Professor of Retail Marketing · University of Michigan |
| 2002-Present | Isadore & Leon Winkelman Professor Emeritus of Retail Marketing and Professor Emeritus of Marketing - University of Michigan |
| 1978-Present | Co-Editor, *Journal of Current Issues and Research in Advertising* |

**National Biographical Listings:**

Who's Who in the World
Who's Who in America
Who's Who in the Midwest
Who's Who in Germany
Dictionary of International Biography
Men of Achievement

**Scholarly Honors and Awards:**

Alpha Sigma Nu (International Honors Fraternity)
AJCU Business Deans' Award
   (200th Anniversary of Jesuit Education in U.S.,
1989)
O'Hara Award for Distinguished Service in Education
   (University of Scranton, 1994)
Team Kania Award (Kania School of Management - 2000)
Fellow, American Academy of Advertising (2002)

**Academic Background:**

Bachelor of Science in Business Administration (1954)
Master of Business Administration (1963)
   University of Scranton
Ph.D. in Business Administration (1969)
   Columbia University

**Community Service:**

Board of Trustees
   University of Scranton (1996-2002)
Services Steering Committee
   Marketing Science Institute, (1990-2004)
Board Member
   National Advertising Review Board (1989-
   1993)

University Council (1989 - 1996)
University of Scranton
Board of Directors (1970-1971)
American Cancer Society (Michigan)
Board of Trustees (1979-1987) and Treasurer (1980-1987)
Catholic Social Services
Committee on Real Estate (1983-1989)
Diocese of Lansing

**Organizations:**

American Marketing Association
Association for Consumer Research
American Collegiate Retailing Association
Academy of Marketing Science
Adcraft Club of Detroit
Southwest Marketing Association
European Academy of Marketing
American Academy of Advertising
Member, Research Committee, 1982-88
Chairman, Research Committee, 1987-88

**Editorial Review Boards:**

Journal of Advertising
European Journal of Innovation Management
International Quarterly Journal of Marketing

**Ad hoc reviewer:**

Journal of Marketing
Journal of Marketing Research
International Journal of Service Industry Management
Journal of Business and Industrial Marketing
Journal of Retailing and Consumer Services
Journal of Business Research

**Reviewer for Academic Conferences (1970-2009):**

American Marketing Association
Academy of Marketing Science
American Psychological Association
American Academy of Advertising
European Academy of Marketing
American Collegiate Retailing Association

29

Member of the scientific committee for the 1995, 1997, 1999, 2001, 2003 and 2005 International Research Seminars on Marketing Communications and Consumer Behavior (France).

**Research Experience:**

Dr. Martin has authored more than 70 articles appearing in national and international journals. The author of five books and monographs, he also has served since 1978 as co-editor of the **Journal of Current Issues and Research in Advertising.**

1968-1973   Director of Research Group B. This was a group of department stores in eight midwestern and southwestern states who supported through the University of Michigan a program of basic research into consumer behavior.

1974-1975   Directed preparation of an economic, cultural and educational impact study for the State of West Virginia on the development of Blenerhasset Island. The study formed the foundation for a projected multi-million dollar development of the island as an historic tourist attraction.

1979-1980   Served as a member of a research group that examined household and business mailstreams in a major national study commissioned by the U.S. Postal Service. This study was coordinated through the Institute for Social Research, University of Michigan.

1968-1979   Directed a program of graduate student development of marketing plans for major organizations. Among the organizations participating in this program were: Ford Motor Company, Wolverine WorldWide Inc., Detroit Coca-Cola Bottling Company, Federal Reserve System, Michigan Bell Telephone Company, American Cancer Society, Warner Vineyards Inc., A.T. & T., and U.S. Plywood/Champion Paper Inc.

1978-1979 Principal researcher for the Federal Reserve System on the potential for the Susan B. Anthony dollar prior to its 1979 introduction. This was a comprehensive study among consumers, retailers, and financial service institution providers. The study correctly predicted the failure of this new coin.

1978-1979 Co-principal on a project formulating a model for service demand at the Survey Research Center, University of Michigan. This national study was funded by a grant from American Express.

1983      Directed a study into demand for the U.S. Olympic Coin offering. This project addressed the basic positioning of the coin and the advertising strategy for it. The project was funded by the office of the Treasurer of the United States.

1980-1986 Principal investigator and director of research for a project commissioned by the Federal Reserve Board of Governors to examine public attitudes and usage of U.S. currency. This project was coordinated with the Bureau of Printing and Engraving and U.S. Secret Service. The objective was to assess the public reaction to alternative forms of U.S. paper currency, proposed as a deterrent to a counterfeiting threat based on copy machine technology.

1994-1997 Study into the public policy implications and ethical issues associated with advertising research. Includes analysis of Center for Disease Control study on adolescent behavior. (Funding from RJR, Inc.)

1990-1998 Examining the viability of mall intercepts as a method for the assessment of new product concepts and for advertising testing. (Funding from Kraft Inc.)

1972-1993 Directed a study into telecommunications technology and the effect on the buying and selling of goods and services, including financial services. This research originated as a result of participation in a task force on new services taxonomy and assessment funded by the National Science Foundation as a part of an inter-disciplinary study of telecommunications and public policy.

Current   Member of Tobacco Research Network at the University of Michigan — scholars examining tobacco related issues.

**Consulting Experience - Litigation:**

Outboard Marine Corporation
Weber Marking Systems Inc.
Booth Publications Inc.
Metropolitan Life Insurance Company
American Educational Subscription Services Inc.
City of Adrian, Michigan
Avon Products Inc.
Automobile Club of Michigan
Toyota Motor Sales, U.S.A. Inc. (7 cases)
Continental-Illinois Bank Corporation
Ohio Mattress Company (Sealy and Stearns & Foster Inc.)
Dunlop Tire and Rubber Company
PepsiCo Inc.
Nissan Motor Company (USA) (2 cases)
General Aviation Corporation
Hallmark Cards Inc. (2 cases)
Subaru of America
Burger King Corporation
Teledyne, Inc.
Toymax, Inc. (2 cases)
Coburn Optical Industries Inc.
U.S. West Inc.
AMOCO Oil Corporation
Abbott Laboratories
Absopure, Inc.
American Dental Laser Corporation
Schering Plough Corporation
Farm Fresh Supermarkets, Inc.

**Consulting Experience - Litigation (continued):**

Amers, Inc.
Grauel Enterprises, Inc.
The Colonel's, Inc.
Anheuser-Busch, Inc.
King County (State of Washington)
Southwestern Oakland County Cable Commission (Michigan)
City of Brunswick, Ohio
Nutro Products, Inc.
American Honda, Inc.
Stroh Brewing Company, Inc.
Franklin Credit Management Corporation
Office Max, Inc.
EDS
OPI Products, Inc.
Pinkerton's Inc.
Insurance Commissioner – State of Michigan
U.S. District Court – Southern District of California
Cleveland Automobile Dealer's Association
Review Directories, Inc.
Cow Creek Band of the Umpqua Indian Tribe
Publisher's Clearing House, Inc.
City of Healdsburg, California
Furniture Row BC, Inc.
General Motors Corporation
Cooper Tire Company
General Mills/Pillsbury
United Healthcare/AARP
AT&T/Lucent Technologies
Raytheon, Inc.
City of San Jose, California
Atlantic City, New Jersey
Safelite Glass Corporation
Toyobo, Inc
Brachs, Inc.
KMART Corporation
R.L. Polk & Company
Greeting Card Association of America
Chrysler Corporation

**Consulting Experience - Litigation (continued):**

Consultant to law firms representing Philip Morris, Lorillard and Liggett from 1986-1988 concerning advertising and consumer behavior for tobacco litigation (Cippolone v. Philip Morris, et al.). Legal firms involved were:

Arnold & Porter (Washington)
Shook, Hardy & Bacon (Kansas City)
Chadbourne & Park (New York)
Webster & Sheffield (New York)

Consultant to Jones, Day, Reavis & Pogue (Cleveland/Washington/ Atlanta/Pittsburgh/ LosAngeles/Dallas); Womble, Carlyle, Sandridge, and Rice (Winston Salem); and to Collier, Shannon, Rill & Scott (Washington, D.C.) concerning advertising and consumer behavior for tobacco litigation from 1996 to present. This involved cases in the state courts of Alabama, Oklahoma, Mississippi, Florida Texas, California, Massachusetts, Vermont, Maryland, District of Columbia, Iowa, Pennsylvania, Iowa, West Virginia and Washington. It also involved litigation before the Federal Trade Commission.

Additional expert witness testimony in administrative law hearings for 35 financial institutions, including banks and saving & loan associations, involving establishment of new offices or de novo institutions.

**Executive Education Seminars:**

Acer, Inc. (Taiwan)
Management Institute
Michigan Bell Telephone Company
Time Inc. (FORTUNE)
Beecham Laboratories
Charles H. Strand Inc.
Hershey Foods Corporation
Burroughs Corporation (UNISYS)
Red Lobster Inns of America (General Mills)
STP Corporation
Unisys Corporation
Rexham Corporation
Lincoln National Life Insurance Company
Diversey Wyandotte Corporation
Southland Corporation
Southern New England Telephone Company

**Executive Education Seminars (continued):**

Bethlehem Steel Corporation
MAACO
Bell Communications Research (BELLCORE)
Catho Progresso Profissional, Comercial LTDA (Brasil, Argentina, Chile)
Automotive Warehouse Distributors Association
Allen-Bradley Inc.
Chemical Bank of New York
General Motors Corporation
Consumers Power Company
Southwestern Bell Telephone Company
EDS
BellSouth, Inc.
National Bank of Kuwait (Kuwait)
University of Michigan Medical Center
University of Michigan Libraries
Sprint Corporation
Sanford Corporation

Also has served as a core faculty member for the Executive Education Division of the Ross School of Business Administration, University of Michigan in the following programs:

Managing Services For Competitive Advantage (Dubai)*
Strategic Marketing for Managerial Decision Making (Dubai)*
Banking and Financial Services Executive Program
Marketing for Non-Marketing Managers*
New Product Development
Daewoo Executive Education Program
New Products & Services for High Technology Firms
Excellence in Service Management*
Sports Management Insitute
International Marketing for Non-Marketing Managers (Hong Kong and Beijing)*
(*faculty director)

**Other Consultation (includes strategic planning):**

Old Kent Financial Corporation
Michigan National Corporation
United Michigan Corporation
National Bank of Detroit
Dow-Corning Inc.
Dayton-Hudson Inc.

35

Bil-Mar Foods Inc.
General Motors Corporation
Rexham Corporation
Realtron, Inc.
National Decorating Products Association
Burroughs Corporation (UNISYS)
Michigan Bell Telephone Company (AMERITECH)
University of Michigan - Office of Continuing Medical Education
Witmark Catalog Showrooms
University of Michigan Student Dining & Housing

For the past 27 years has served as a primary judge for the National Automobile Dealers' Association's Outstanding Auto/Truck Dealer Award, sponsored by Time, Inc. and Goodyear. This has included the review and evaluation of the intimate financial, operating and performance data for more than 1,000 auto dealers in the United States in conjunction with this award.

**Selected Publications**

### Articles

"Support for Women's Lib: Management Performance," **Southern Journal of Business,** (University of Georgia), Vol. 7 No. 1, February, 1972.

"What Consumers of Fashion Want to Know," **Journal of Retailing,** Vol.47 No.4, Winter 1977.

"The Contribution of the Professional Buyer to the Success or Failure of a Store," **Journal of Retailing,** Vol. 49 No. 2, Summer 1973.

"Survey Implemented Market Segmentation, a Modification of AID," **Proceedings of the American Institute for Decision Sciences,** April 1973.

"Double Jeopardy," **Journal of the Academy of Marketing Science,** Fall 1973. Also in: **Marketing Update,** Harold Berkman, et.al., eds. Greenvale, N.Y.: Academy of Marketing Science, 1977.

"Profit Oriented Data Analysis for Market Segmentation: An Alternative to Aid," **Journal of Marketing Research,** August 1974.

"Teleshopping and EFTS," in **Project Cable Faculty Seminars,** Anil Telang and Kan Chen, eds. Publication C-20, University of Michigan Program in Telecommunications Research, June 1975.

"Teleshopping and Electronic Funds Transfer," in **Policy Research in Cable Communications, Report to the National Science Foundation,** Kan Chen, ed., June 1975.

"The Future for an Electronic Business Society," **Business Horizons,** Vol. 18, October 1975.

""The Consumer and Electronic Funds Transfer Systems," in **Eliminating Constraints on Banking,** Philip C. Mayer, ed., Golembe and Associates, December 1975.

"The Elderly Consumer: One Segment or Many," **Advances in Consumer Research, Volume III,** Association for Consumer Research, 1975. Also in: The **Elderly Consumer,** Fred Waddell, ed., The Human Ecology Center, 1976; **Lifestyles in Consumer Behavior of Older Americans,** Howard G. Schultz and Glen R. Hawkes, eds., Prager Publishing Company, 1978.

"Transgenerational Comparison: The Elderly Fashion Consumer," **Advances in Consumer Behavior, Volume III,** Association for Consumer Research, 1975. Also in: **The Elderly Consumer,** Fred Waddell, ed., The Human Ecology Center, 1976.

"EFTS: The Need for Marketing Planning and Analysis," in **Marketing EFTS to Consumers,** Payment Systems Research Program, 1976.

"Teleshopping: An Assessment," in **The Retail Revolution of 1976,** National Retail Merchants Association, January 1976.

"SIMS II: Profit Oriented Market Segmentation for Decision Time Implementation," **Journal of the Marketing Research Society,** July 1976.

"Profit Oriented and Decision Time Segmentation," **Journal of the Academy of Marketing Science,** Spring 1977.

"Consumer Demand for Electronic Banking," **Proceedings of the 1977 Southwestern Marketing Association,** March 1977.

"The Situation Confronting Introduction of the Anthony Dollar," in **Government Marketing,** Steven Permut and Michael Mowka, eds., Prager Press Inc., 1981.

"The New Susan B. Anthony Dollar: Hypotheses Regarding Consumer and Retailer Reactions," **Developments In Marketing Science, Volume III,** Academy of Marketing Science, 1980.

"Temporal Incongruency in Consumer Behavior," **Advances in Consumer Research, Volume VIII,** Association for Consumer Research, October 1980.

"Normative Models for Department Store Buying," **Proceedings of the Southern Marketing Association,** 1980.

"The Non-Checking Account Customer and EFTS," in **Marketing of Services,** James H. Donnelly and William R. George, eds., American Marketing Association, 1981.

"An Improved Model for Media Audience Evaluation," **Proceedings of the European Academy for Advanced Research in Marketing,** March 1981.

"A Review of Situational Influence Paradigms and Research," in **Review in Marketing 1981,** Ben M. Enis and Kenneth J. Roering, eds., American Marketing Association, 1981.

"Evaluating Classifications of Shoppers: Temporal and Enjoyment Dimensions of Patronage," **Proceedings of the Patronage Theory Conference,** William Darden, ed., American Marketing Association, May 1981.

"Conceptualizing Elderly Buyer Behavior," **Developments in Marketing Science, Volume IV,** American Academy of Marketing Science, May 1981.

"Voice Analysis in Advertising: Two Additional Concerns," **Proceedings of the American Academy of Advertising,** April 1981.

"On Using Voice Analysis in Marketing Research," **Journal of Marketing Research,** August 1981.

38

"The Attitudinal Implications of a New Brand Name," **Advances in Consumer Research, Volume IX,** Association for Consumer Research, October 1981.

"Collective Behavior in Consumer Behavior," in **Marketing Theory: Philosophy of Science Perspectives,** Ronald F. Bush and Shelby D. Hunt, eds., American Marketing Association, February 1982.

"Message Characteristics and Audience Characteristics: Predictors of Advertising Response," **Advances in Consumer Research, Volume X,** Association for Consumer Research, October 1982.

"Two Copy Testing Techniques: The Cloze Procedure and Cognitive Complexity," **Journal of Business Research,** Summer 1983.

"Demand Potential for Electronic Funds Transfer at the Retail Point of Sale," in **The Economics of Distribution,** Franco Angeli, ed., Centro de Studi sul Commericio, University L. Bocconi, (Milan, Italy), 1983.

"The Cloze Procedure: A Clue to Advertising Likeability and Message Recall," **Journal of Advertising Research,** June/July 1983.

"On Building a Transition-Based Paradigm for Examining the Changing Household," in **The Changing Household, Its Nature and Consequences,** Ballinger Publishing Company, 1984.

"New Service Development: International Research Report," **Creativity in Services Marketing** , American Marketing Association, September 1985.

"Domanda Potenziale Per Il Trasferimento Elettronico Di Fondi Al Punto Di Vendita Al Dettaglio," **Commercio, Revista Di Economia E Politica Commerciale,** Aldo Spranzi, ed., Milan: CESCOM, 1985.

"Burroughs Corporation: Why A New Corporate Identity Program," in **Crosscurrents in Corporate Communications No. 15,** New York: Time Inc., 1986

"Electronic Funds Transfer at the Point of Sale: The Issue of Productivity," in **Distributive Trades: An International Perspective**, L. Pelligrini & S.K. Reddy, eds., Milan: Franco Angeli Libri S.R.L., 1986 (pp. 209-229)

"Le Management Du Nouveau Service Aux U.S.A. Et En France," in **Contribution A L'Etude Du Nouveau Service: Concepts Et Pratique Manageriales**, Eric Langeard, et.al. eds., Aux En Provence: Rapport de Recherche remis au Ministere de la Rechere et de l'Enseignement Superieur, December, 1986 (pp.101-111)

"Item Non-Response in a Telephone Survey: Effects of Question Form and Respondent Characteristics," **Journal of Marketing Research**, Volume XXIV, November 1987 (pp. 418-424)

"The Impact of New Brand Names on the Process of Inferential Belief Formation," **Journal of Business Research**, Volume 15 No. 2, April 1987 (pp. 157-172)

"New Services Development Among Successful Firms," **Les Apports Marketing, Production Et Ressources Humaines Au Management Des Services - 1st Seminaire International De Rechere En Management Des Activites De Service**, June, 1990, Aix-En-Provence, France: institut d'administration des entreprises; pp. 160-181

"Communications in Europe: Global, Local or 'Glocal'?" **Proceedings of the XVIIth International Research Seminar in Marketing**, La Londe les Maures (France), May, 1991

"Restructuring Toward A Service Orientation," **International Journal of Service Industry Management**, Volume 3, No. 1, 1992 (pp.25-38)

"New Services Development: Consumer vs. Organizational Firms," **Les Apports Marketing, Production Et Ressources Humaines Au Management Des Services - 2nd Seminaire International De Rechere En Management Des Activites De Service**, June, 1992, Aix-En-Provence, France: institut d'administration des entreprises, pp. 150-172

"Service Innovation: Successful vs. Unsuccessful Firms," **International Journal of Service Industry Management,** Volume 4, No. 1, 1993 (pp. 49-65)

"Research Validity and Resulting Public Policy: The Case of the DiFranza 'Old Joe' Cigarette Study," **Proceedings of the American Association of Public Opinion Research,** May 1993

"The Efficacy of Statistically-Based Research: The Case of 'Old Joe'," **Proceedings of the American Statistical Association,** August 1993

"Developing New Retail Services: A Research Report," **Proceedings of the 7th International Conference on Research in the Distributive Trades,** University of Sterling, Sterling, Scotland, September 1993 (pp. 154-171)

"Consumer Research Standards & Public Policy Formulation: The Case of Mickey Mouse & Old Joe," **Advances in Consumer Research,** Vol. XXI - 1994 (pp. 380-386)

"Pollay's Pertinent and Impertinent Opinions: 'Good' versus 'Bad' Research," **Journal of Advertising,** Vol. 23, No. 1 - 1994 (pp. 117-122)

"Checking the References: Adolescent Smoking Research Used in Public Policy Formulation," **Proceedings of the Marketing and Public Policy Conference,** Vol. 4 - 1994 (p. 2)

"The Congruence of New Product and New Service Development, "**Le Management des Services:Apports Multidisciplinaires"- Seminaire International De Rechere En Management Des Activites De Service,** May, 1994, Aix-En-Provence, France: institut d'administration des entreprises (pp. 526-545)

"Ethical Advertising Research Standards: Three Case Studies," **Journal of Advertising,** Volume 23, No 3 - 1994 (pp. 17-30)

"The FTC v. *Joe Camel:* Research Standards and Public Policy," **Proceedings of the 1994 Conference of the Society for Consumer Psychology,** 1995 (pp. 1-8)

"Advertising Effectivness: Stimuli Setting Differences," **Proceedings of the International Research Seminar on Marketing Communications and Consumer Behavior,** La Londe les Maures, France: 1995 (pp. 384-396)

"Retail Service Breakdowns and Recovery," **Proceedings of the 8th International Conference on Research in the Distributive Trades; September, 1995;** Milan, Italy, pp. B5.15-5.22

"Review of Retailing by Dunne, et al" in **Journal of Retailing and Consumer Services,** Vol. 3 No. 1, 1996, pp.58-59

"Level of Success Inputs for Service Innovations in the Same Firm," **International Journal of Service Industry Management,** Volume 6 No. 4, 1995, pp. 40-57

"The Role of Advertising in a Service-Driven Strategy," in **Marketing Intangibles in Business Marketing, A Report from the Institute for the Study of Business Markets, The Pennsylvania State University and from The Center for Business and Industrial Marketing, Georgia State University,** Bob Donath, ed., 1996, pp. 18-21

"The Advertising Creative Theme: Service Constructs as a Foundation," **"Les Apports Marketing, Production, Economie, Stratégie et Resources Humaines au Management des Services - Séminaire International de rechere en management des activités de service,** Aix-En-Provence, France: institut d'administration des entreprises d'aix-marseille III France, 1996, pp. 490-509

"Retail Service Innovations: Inputs for Success," **Journal of Retailing and Consumer Services,** Vol. 3 No. 2, pp. 63-71, 1996

"Advertising in the New Service Economy: How It is Meeting the Challenge of Communicating the Intangibles," **Development in Marketing Science,** Volume XX, Elizabeth J. Wilson and Joseph F. Hair Jr., eds., 1997, p. 161

"Effects of Plain Packaging on the Cigarette Consumption Process," in **Plain Packaging and the Marketing of Cigarettes,** J.C. Luik, ed., London: NTC Publications, Ltd., Chapter 7, 1998

42

"The Business to Business Customer in the Service Innovation Process," **European Journal of Innovation Management,** Vol. 2 No. 2, 1999

"The Effect of Advertising on Adolescent Smoking Behaviour," in **The Current State of Business Disciplines Vol 6,** S.B. Dahiya, ed.,. Rohtak, India: Spellbound Publications, March, 2000. pp. 2959-2983

"A Perspective On Client Productivity In Business-To-Business Consulting Services," International Journal of Service Industry Management, Vol. 12, No. 2, 2001, pp. 137-157

"Rencontre De Service: Et Productivite Des Clients," **Marketing Management,** No. 4, Revue Trimestrielle, 2001, pp. 91-100

Books, Journals, and Monographs

**Journal of Current Issues and Research In Advertising, (32 volumes),** 1978-2010 (co-editor).

**An Introduction to Electronic Funds Transfer Systems,** American Management Association, 1978.

**EFTS: Electronic Funds Transfer Systems,** Stichting Contact Centrum Levensmiddelenhandel, (Amsterdam), 1977.

**Research Study into Market Acceptance of the New One Dollar Coin,** Federal Reserve Bank of Chicago, 1979.

**Telecommunications and Electronic Funds Transfer Systems,** Publication TC-5, University of Michigan Program in Telecommunications Research, June 1975.

"Conceptual Development of the Situation and Setting in Marketing Exchange: Toward a Molar Perspective of Marketing," **Research In Marketing ,Volume 8,** JAI Press, March 1986.