# EXHIBIT 'Q'

Rebuttal to Dr. Warren J. Keegan Expert Report

In Re: General Motors OnStar Litigation
Master File No. 07-1867

By Richard J. Semenik, Ph.D.

March 17, 2010

I have been asked to respond to the opinions set forth in the expert report and deposition testimony of Dr. Warren J. Keegan relative to the OnStar analog telecommunications system provided in various models of General Motors (GM), Honda, Subaru and Volkswagen vehicles. I will not try to address every single point that he makes but will focus on his main opinions regarding consumer expectations and the nature of disclosure information. I am available for deposition testimony to answer any questions regarding this report.

**Introduction**

There are numerous aspects of Dr. Keegan's expert report and testimony with which I disagree. First, I will explain that he provides no basis for arguing or knowing what the particular expectation would have been for each and every buyer or lessee (henceforth referred to as buyers, purchasers or owners) of said vehicles with respect to the OnStar system. Next, I will explain that he does not provide a basis for arguing or knowing the possible reaction of each and every buyer to disclosure information that was or could have been provided. Finally, I will explain that he provides no basis to defend his position that disclosure, as he warrants it should have occurred, would have been received, attended to, understood or had an impact on either a purchase decision or the price consumers were willing to pay for a vehicle.

I disagree with Dr. Keegan's allegations regarding consumer expectations and the adequacy of disclosure, because different buyers of said vehicles would base their vehicle purchase decision and price they would be willing to pay on a wide range of different factors and features that have nothing to do with the availability of OnStar equipment.

Support for this position, as opposed to Dr. Keegan's allegations, comes from the accepted principles of consumer information processing and consumer decision making, from the realities of actual subscription, non-subscription, and lapsed subscription behavior of members of the named class, and the documents and testimony in this case.

## Consumer Expectations

Dr. Keegan argues that OnStar uses "mass market advertising" (Keegan expert report, p. 4) and "dealer materials available at the point of purchase" (Keegan expert report, p.5) to "create awareness and interest in OnStar among consumers." (Keegan expert report, p.5) He further asserts that "the aim of OnStar's marketing communications is to communicate the message that OnStar is a system that dramatically increases the safety for the vehicle occupants and therefore adds additional value to the vehicle in which it is installed" (Keegan expert report, p.5). All of which in his opinion would affect the decision to purchase a vehicle.

I disagree with his logic and conclusion above. The central problem with Dr. Keegan's arguments is that he uses the *mere existence* of these marketing materials to assert that such communications would have actually impacted buyers' purchase decisions. There is faulty and inadequate reasoning in Dr. Keegan's conclusion. Specifically, Dr. Keegan fails to provide a basis for arguing that consumers:

- ever received the marketing information,
- ever attended to the marketing information
- interpreted the OnStar information as intended (his own language uses the terms "aim of" (Keegan expert report, p.5))
- were influenced by OnStar, and fails to acknowledge the influence of other safety features impacting any given purchaser's decision, including for example:
    - Air bags
    - Crash test ratings
    - Braking systems (disc brakes, ABS braking systems)
    - Suspension
    - Steering
    - Non-slip or all wheel drive systems
    - Driver visibility

2

- were influenced by OnStar, and fails to acknowledge the influence of other non-safety features of a vehicle impacting any given purchaser's decision including for example:
    - Styling
    - Operating costs
    - Acceleration
    - Cargo space
    - Heating/cooling systems
    - Model (2 door, 4 door, sport coupe, station wagon, etc.)
    - Comfort
    - Status or prestige
    - Amenities (e.g., cup holders, satellite radio)
- were not affected by multiple other relevant and influential factors in their vehicle purchase decision including for example:
    - Loyalty to a vehicle brand
    - Reputation of a vehicle brand
    - Loyalty to a vehicle dealer
    - Reputation of a vehicle dealer
    - Loyalty to a vehicle salesperson
    - History of resale value of a vehicle brand
    - Recommendations of friends or family members
    - Assessments of a vehicle brand by third parties (e.g., Consumer Reports, Car and Driver, or comments by dealers of competing brands)
    - Family circumstances (e.g., children, multiple drivers)
    - Personal use or purchase for another member of the household
- would expect OnStar equipment to continue working for an indefinite period of time. Depending on the sophistication of an individual consumer, some consumers who were more interested in or experienced with technology, state of the art devices may have been aware that such devices go through evolutionary changes in short time frames (e.g. computers, cell phones, video recording devices, etc.). Those same individuals would interpret information about the technology in a much different manner than others. In addition, it is not clear that there were consistent views among consumers regarding the expected life of the vehicle itself, or whether having the OnStar equipment last for the life of the vehicle was a factor for consumers in the decision to purchase the vehicle or the price they paid.

The accepted research on and principles of consumer information processing and consumer decision making (which I provide in detail in my January 15, 2010 report in this case) warrant that consumers will individually consider specific features that are important to them from a broad range of features. In addition, each consumer will be

3

subject to a broad range of different influences in making a purchase decision. Dr. Keegan fails to demonstrate that all consumers would behave similarly in these regards. In language from his own expert report, Dr. Keegan claims that "To *many*..." (Keegan expert report, p.7) consumers, "*many* consumers...." (Keegan expert report, p.17), and "*numerous* OnStar customers......" (Keegan expert report, p.17) (emphasis added). Language that relies on the phrases like "to many" or "numerous" indicates that not all consumers would have reacted or behaved in the manner in which he asserts. In order to accurately understand the role (if any) OnStar equipment played, it is necessary to consider each individual consumer's particular emphasis on specific vehicle features in the purchase decision---a point with which Dr. Keegan himself agrees (Keegan deposition, pgs. 300-301.) In this regard, although Dr. Keegan claims that all members of the proposed class had the same expectation about alleged importance of OnStar to buyers' purchase decisions, there is no such single expectation. For example, Dr. Keegan relies upon a marketing textbook that he authored in an attempt to support this opinion, however, that same marketing textbook recognizes the same model of individualized consumer information processing that contradicts his opinions. (Marketing, Keegan, Moriarty and Duncan, Prentice-Hall, 1995, attached).

Further, I disagree with Dr. Keegan's suggestions that the entire "feature set" of a high involvement product necessarily impacts every buyer's purchase decision, and that the class members in this case were somehow subconsciously caused by the marketing to pick OnStar vehicles. By definition, high involvement products motivate consumers to consider those specific features which are relevant to them in the product, and in standard make products like automobiles, they often have no choice but to accept the many other features in which they have no interest. Dr. Keegan's testimony about heated seats is a perfect example.

**Subscription Behavior**

I disagree with Dr. Keegan's assertions that consumer expectations related to OnStar safety features "was something they specifically sought out upon shopping for a new car" (Keegan expert report, p.8) and that it was the overriding factor in the purchase decision.

4

Dr. Keegan fails to acknowledge the fact that an appreciable number of buyers of vehicles equipped with OnStar equipment **never activated the service** even though it would have been provided to them at no additional charge for a year. In addition, even among those buyers who did activate the service at no additional charge for a year, a large percentage of those over time chose not to continue subscribing. If as Dr. Keegan asserts, the safety and security provided by OnStar was something buyers specifically sought out and based their purchase decision upon, then surely one would not expect the large number of buyers who never activated the service even when it was at no additional charge, and one wouldn't expect the significant number of buyers who failed to maintain subscriptions throughout ownership of the vehicles. Dr. Keegan's response to this challenge is that buyers who did not subscribe upon purchase simply didn't "understand that you had to activate it." (Keegan deposition pgs. 172). Dr. Keegan points to no evidence to suggest this was the case, and this is simply speculation on his part. Surely if the OnStar feature was so essential to the vehicle purchase as Dr. Keegan asserts, buyers would learn and understand how to activate it. Further, if consumers were so influenced by marketing communications of manufacturers to seek out OnStar in the first place, as Dr. Keegan asserts, then manufacturer information on activation (glove box kit, dealer information, the subscription agreement, the device itself) would certainly be effective in creating an "understanding" of how to activate the service. Consumers would go to whatever effort was necessary to avail themselves of this "essential feature" (not to mention that there was, in fact, minimal effort actually necessary to achieve activation for no additional charge). Moreover, if we were to assume that the people who never subscribed did so because they did not have the resourcefulness or aptitude, one would have to similarly assume that those same people would not have been impacted by the marketing as alleged by Dr. Keegan, nor could those same people be helped in any way by more complete disclosure. The reality is more likely that people who did not subscribe lacked an interest in using the service and did not consider OnStar to be a basis for the decision to purchase the vehicle.

5

## Adequacy and Timing of Disclosure

I disagree with Dr. Keegan's conclusions regarding the adequacy and timing of disclosure. Dr. Keegan opines that the **disclosure information** provided about the sunset date of OnStar analog equipment was inadequate. First, from mid-2003 forward, a wide range of disclosure information was, in fact, provided to consumers from the vehicle manufacturers/OnStar. In addition, there is no way to know, without asking members of the named class individually, what other information they might have encountered regarding the functioning of analog equipment. Second, there is also no way of knowing if consumers would have changed their expectations about the value of the OnStar equipment and its reliability based on such information. Dr. Keegan's assertion again fails to recognize accepted principles of consumer information processing and consumer decision making. An analysis based on these accepted principles as explained earlier, would lead to the conclusion that there is **no certainty** in the proposition that buyers would have changed their expectations or that they would have indeed acted on such disclosure information because:

- such information would have had to have been received by consumers
- such information would have had to have been understood by consumers
- such information would have to be relied on to the exclusion of other information about vehicle safety features related to vehicle choice
- such information would have to be relied on to the exclusion of other information about broad based vehicle features related to vehicle choice
- such information would have to be relied on to the exclusion of other broad based influencing factors related to vehicle choice
- even if received and understood, there is no way to know with certainty that such disclosure information would have impacted the purchase decision of a vehicle or the willingness to pay a particular price for a vehicle.

Dr. Keegan goes on to opine that but for the **timing** of the disclosure information, consumers would have either changed their expectations or acted differently with regard to making a purchase decision.

6

Dr. Keegan does not provide support for the allegation that vehicle manufacturers "knew in August of 2002 that analog service would be discontinued in early 2008" (Keegan expert report, p. 8) and he fails to take into consideration opinions of the former Commissioner of the FCC, Kathleen Abernathy. Ms. Abernathy recounted at length in her expert report in this case the numerous intervening circumstances that would have made any disclosure about the future availability of analog service uncertain during the time period described by Dr. Keegan. An incorrect message would have been confusing to consumers. And, in fact, Dr. Keegan admits that the disclosures were truthful.

Dr. Keegan does not establish a methodology nor provide support for his conclusion that all consumers would not have understood disclosures available to them. Indeed, his conclusion is contradicted by the testimony of named plaintiffs who said they understood disclosures when they read those disclosures at their depositions.

Another problem with Dr. Keegan's methodology is that he admittedly has not addressed the differences that would have existed among consumers purchasing at markedly different time periods. First, and quite obviously, used vehicle purchaser class members would have been subject to a very different array of purchase information, often conveyed by a private seller, and therefore cannot be considered to have acted in the same manner as original retail purchasers. In addition, it is substantially more likely that a class member making a used vehicle purchase decision in 2007, for example, would have actually known about the sunset, either by way of being informed directly by the seller, through access to extensive media coverage of the transition, or otherwise. Second, even among original retail purchasers, a purchaser who buys, for example, in 2002 would be faced with the decision as to whether a sunset that is 5 years away would matter; whereas, a purchaser who buys in 2005 might (depending on their interest) care more about the service concluding within 3 years. In this regard, Dr. Keegan fails to address the impact that the duration of the manufacturers' warranties would have had upon some consumers' expectations.

7

## Conclusion

As I have explained, Dr. Keegan fails, in making his assertions and drawing conclusions, to recognize and acknowledge either the accepted principles of consumer information processing and decision making or the realities of circumstances surrounding the purchase behavior with respect to vehicles in question. I have reached my opinions with a reasonable degree of certainty based on fundamental and accepted consumer behavior principles, as well as my training, background and experience.

*[signature]*
Richard J. Semenik, Ph.D.

8

2:07-md-01867-SFC-PJK   Doc # 289-18   Filed 02/16/11   Pg 10 of 10   Pg ID 12063

firm's letterhead, signs, and trucks to its receptionists and even its shopping bags. We begin this chapter with an overview of marketing communication, including a discussion of the concept of *integrated marketing communication*. In the second half of the chapter, we focus on one of the most visible tools of marketing communications—*advertising*.

# MARKETING AND COMMUNICATION

**Marketing communication**, the focus of the first chapter objective, encompasses all the elements in the marketing mix that establish meaning and communicate value to customers and other stakeholders of an organization. The marketing communication section of a marketing plan focuses on such primary components of the marketing communication mix as advertising, public relations, sales promotion, packaging, direct marketing, and personal selling. Advertising is discussed in this chapter, the other topics in Chapters 19–21. To gain a better appreciation of the complexity of marketing communication, let's first look at the theory behind the messages.

**marketing communication**
All the elements in the marketing mix that establish meaning and communicate value to customers and stakeholders.

## THE MARKETING COMMUNICATION MODEL

The traditional *communication model* provides the basis for all marketing communication. In Figure 18-1 we have translated this model into a marketing context. As you read the following descriptions of the model's components—the topic of chapter objective two—you'll see that they are actually steps in the communication process:

◇ *Sender:* The source of the message—that is, the marketer (a company or an organization).

*Figure 18-1*
*The Marketing Communication Model*

