UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re: OnStar Contract Litigation                    Case No. 2:07-MDL-01867

                                                     Honorable Sean F. Cox

_____/

## OPINION & ORDER
## DENYING PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

Buyers and lessees of automobiles equipped with OnStar telematics equipment filed

prospective class action complaints against four automobile manufacturers (General Motors

Corporation ("GM"), American Honda Motor Company ("Honda"), Subaru of America

("Subaru"), and Volkswagen of America ("VW")), and OnStar Corporation ("OnStar"), asserting

consumer protection act and warranty claims.  Those actions were consolidated for pretrial

proceedings by the Judicial Panel on Multidistrict Litigation.  The complaints have since been

combined in a Second Master Amended Complaint that seeks certification of nationwide classes.

This matter is currently before the Court on Plaintiffs' Motions for Class Certification as

to Defendant OnStar and three manufacturer Defendants:  Honda, Subaru, and VW.  Plaintiffs

ask the Court to certify a nationwide class as to their Michigan Consumer Protection Act claims

against OnStar.  Plaintiffs also seek class certification of their consumer fraud and express

warranty claims against: 1) Honda under the laws of Washington, California, New York, and

Florida; 2) Subaru under the laws of Washington, Pennsylvania, New York, and Oregon; and 3)

VW under the laws of California, Colorado, New York, and West Virginia.

The parties have conducted extensive class-certification discovery and have fully briefed the issues.  A hearing on the motions was held on November 10, 2011.  As explained below, because the consumer protection and warranty laws of several states govern Plaintiffs' claims, and because factual variations among the claims abound, Plaintiffs have not met FED. R. CIV. P. 23(b)(3)'s predominance requirement.  Accordingly, the Court shall DENY Plaintiffs' Motion for Class Certification.

## BACKGROUND

### A.    Procedural Background

Case Management Order No. 1, which was submitted and agreed to by the parties, was entered in this action on January 25, 2008.  (D.E. No. 44). That order provided that Plaintiffs would file a Master Amended Complaint ("MAC") and that Defendants may file motions to dismiss the MAC.  It also required Plaintiffs to file their Initial Class Statement within 10 days of the Court's ruling on Motions to Dismiss and provided that the statement to be filed by Plaintiffs "shall define the putative class(es) (including any subclasses for which Plaintiffs will seek class treatment.)"  (D.E. No. 44 at 7).   It further provides that class certification discovery would commence upon the filing of that Initial Class Statement.  (*Id*.).

Plaintiffs filed their MAC on February 25, 2008.  (D.E. No. 46).  Thereafter, Defendants filed Motions to Dismiss.  This Court issued its Opinion & Order on the Motions to Dismiss on February 19, 2009.  (D.E. No. 100).  Notably, at the time that the Court ruled on the Motions to Dismiss, the Court had not made any rulings regarding choice of law.  The Court made rulings concerning several of the grounds presented in the motions to dismiss based on generally applicable law and declined to make rulings on other grounds that required a choice-of-law

2

determination before they could be addressed.

Among other things, this Court ruled that the MAC, as it existed at that time, failed to state an express warranty claim as to any Plaintiff whose express written warranty had expired prior to the cut-off of analog service. The Court did not rule whether or not a Plaintiff whose express written warranty had expired, but who alleged unconscionability, stated a breach of warranty claim.

**Plaintiffs' Initial Class Statement**

On March 2, 2009, Plaintiffs filed their Initial Class Statement, wherein Plaintiffs stated that they intended to seek certification of the following nationwide classes as to the Manufacturer Defendants:

Honda Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Honda vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007.

Subaru Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Subaru vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007.

VW Class

All individuals and entities in the United States who, as of December 31,

2007, either owned or leased a VW vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007.

GM

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a GM vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007.

(D.E. No. 101 at 1-2).

**Plaintiffs' SMAC**

On April 30, 2009, Plaintiffs filed their Second Master Amended Complaint ("SMAC"). (D.E. No. 113).

The following five counts of the SMAC are asserted against Honda, Subaru, VW, and GM: Count I, asserting claims under the Michigan Consumer Protection Act; Count II, alleging "Unfair and Deceptive Trade Practices In Violation Of All States' Consumer Protection Acts"; Count III, alleging "Breach of Express Warranty" claims; Count IV, alleging breach of implied warranty claims; and Count V, alleging violations of the Magnuson-Moss Warranty Act. The SMAC states that Plaintiffs seek to bring this action on behalf of the same nationwide classes that were identified in Plaintiffs' Initial Class Statement. (*See* SMAC at ¶ 193). The Breach of Express Warranty Count in the SMAC differs from the MAC in that it alleges that the durational limitations in the Manufacturer Defendants' warranties with respect to analog OnStar equipment were "unreasonable," "unconscionable, invalid and unenforceable." (SMAC at ¶¶ 220-21).

4

Only Counts I and II of the SMAC, the consumer protection act claims, are asserted against OnStar.

**Claims Against GM Are Stayed**

On June 1, 2009, GM filed a voluntary petition seeking bankruptcy protection under 11 U.S.C. § 101 *et. seq*. in the United States Bankruptcy Court for the Southern District of New York. (D.E. No. 126). As of December 16, 2009, Counsel for GM advised the Court that the bankruptcy case was still pending and all claims against GM remain stayed. (*See* D.E. No. 199). Plaintiffs are not seeking class certification as to any claims asserted against GM. To date, the Court has not received any notice from Plaintiffs indicating that the stay has been lifted, that the claims against GM have been discharged, or that Plaintiffs wish to dismiss the claims against GM.

**Choice-Of-Law Rulings**

On August 25, 2010, after conducting a choice-of-law analysis as to the consumer protection act and warranty claims asserted against Honda, Subaru and VW, this Court ruled that the law of each Plaintiff's home state (i.e., the law of the state where each Plaintiff resides) shall govern his or her claims. (D.E. No. 250).[1] The Court ruled that Michigan law applies to Plaintiffs' consumer protection act claims against OnStar.

**Pending Motions For Class Certification**

From the outset, Plaintiffs have sought to certify *nationwide* classes in this action, taking

---

[1]No choice-of-law ruling was made as to the claims asserted against GM due to the bankruptcy stay.

the position that Michigan law should be applied to all claims against all Defendants. Thus, the SMAC includes Count I: "Plaintiffs and The Classes v. All Defendants Violations Of The Michigan Consumer Protection Act." It also contains, as an alternative count, Count II: "Plaintiffs and the Classes v. All Defendants Unfair and Deceptive Trade Practices In Violation Of All States' Consumer Protection Acts," which then asserts claims under the consumer protection acts of the remaining 49 states and the District of Columbia. The SMAC, however, only includes named plaintiffs from Michigan and eight other states.

Plaintiffs have filed separate motions asking this Court to certify class actions as to OnStar, Honda, Subaru, and VW. Both the SMAC – the operative complaint in this action – and Plaintiffs' Initial Class Statement ask the Court to certify OnStar, Honda, Subaru, and VW classes that are different than the classes that Plaintiffs now ask this Court to certify in their motions.

**OnStar**

Plaintiffs are still asking the Court to certify a nationwide class as to Defendant OnStar, but they have changed the proposed OnStar Class. The OnStar Class that Plaintiffs now ask the Court to certify is as follows:

> All persons or entities residing in the United States who between August 8, 2002 and December 2006, purchased or leased a vehicle equipped with an analog OnStar system and were subscribers as of December 31, 2006 and who owned the vehicle as of December 31, 2007, (1) for whom no upgrade to digital service was offered, or (2) who paid for or were required to pay to upgrade to digital OnStar service.
> Excluded from the Class are any persons or entities who purchased their vehicles primarily for commercial or business purposes. General Motors Corporation, General Motors Company, American Honda Motor Company, Volkswagen of

America, Subaru of America and OnStar, and any of their respective subsidiaries, affiliates, officers and directors, or entities in which these companies have a controlling interest.

(Pls.' OnStar Motion at ¶ 1). As Plaintiffs acknowledge, the "proposed OnStar Class differs from the class proposed in the operative complaint in that it excludes commercial purchasers and it requires Class Members to have been subscribers to the OnStar service on December 30, 2006." (Pls.' OnStar Cert. Br. at 5).

**Honda, Subaru, and VW**

As to Honda, Subaru, and VW, Plaintiffs appear to take a piecemeal approach towards nationwide certification. Plaintiffs seek certification of classes comprising residents of eight different states: California, Colorado, Florida, New York, Oregon, Pennsylvania, Washington, and West Virginia. Plaintiffs could not seek certification as to classes comprising residents of other states because the SMAC does not include any Honda, Subaru, or VW plaintiffs who reside in other states. Yet Plaintiffs seem to take the position that they will seek to certify such additional classes, once they find class representatives from those states:

> In Plaintiffs' Motion for Class Certification as to Honda, Plaintiffs state they "reserve the right to seek class certification under the laws of additional states, if adequate class representatives step forward." (D.E. No. 260 at 1 n.1).

> In Plaintiffs' Motion for Class Certification as to Subaru, Plaintiffs state that they "may seek class certification under the laws of additional states." (D.E. No. 261 at 1 n.1).

> In Plaintiffs' Motion for Class Certification as to VW, Plaintiffs state they "reserve the right to seek certification under the laws of additional states if adequate representatives step forward." (D.E. No. 263 at 1 n.1).

In addition, like the proposed OnStar Class, the proposed Honda, Subaru and VW Classes differ

7

from the proposed classes in the SMAC and Plaintiffs' Initial Class Statement in that they

exclude commercial purchasers and require class members to have been subscribers to OnStar

service on December 30, 2006.

### Honda

Plaintiffs filed the instant Motion for Class Certification as to Honda, asking this Court to

certify classes as to Plaintiffs' claims against Honda consisting of:

> All individuals and entities, who are residents of Washington, California, New
> York or Florida, who between August 8, 2002 and December 2006, purchased or
> leased a Honda vehicle that was equipped with an OnStar system, who subscribed
> to OnStar service as of December 31, 2006, and who owned or leased the vehicle
> as of December 31, 2007.
>
> Excluded from the Class are General Motors Corporation, General Motors
> Company, American Honda Motor Company, Volkswagen of America, Subaru of
> America and OnStar, and any of their respective subsidiaries, affiliates, officers
> and directors; or entities in which those companies have a controlling interest.

(Pls.' Honda Motion at ¶ 1).  There are five named Plaintiffs who assert claims against Honda: 1)

Marhrjory Gill; 2) Larnell Gill; 3) Charlie Allenson; 4) Armand Pepper; and 5) John Kuller.

Marhrjory Gill has since passed away.  Mr. Gill seeks to represent California residents; Allenson

seeks to represent New York residents; Pepper seeks to represent Florida residents; and Kuller

seeks to represent Washington residents.

### Subaru

Plaintiffs filed the instant Motion for Class Certification as to Subaru, asking this Court

to certify "separate class actions to Plaintiffs' claims against Subaru, on behalf of the following

four classes:"

> All individuals and entities, who are residents of Washington, Pennsylvania, New

York or Oregon, who between August 8, 2002 and December 2006, purchased or leased a Subaru vehicle that was equipped with an OnStar system, who subscribed to OnStar service as of December 31, 2006, and who owned or leased the vehicle as of December 31, 2007.

Excluded from the Class are General Motors Corporation, General Motors Company, American Honda Motor Company, Volkswagen of America, Subaru of America and OnStar, and any of their respective subsidiaries, affiliates, officers and directors; or entities in which those companies have a controlling interest.

(Pls.' Subaru Motion at ¶ 1). There are six named Plaintiffs who assert claims against Subaru: 1) Gordon Erdenberger; 2) Ann Erdenberger; 3) Murle Kemp; 4) Jason Smith; 5) Melvin Rubertt; and 6) Betty Reubertt. The Erdenbergers seek to represent Pennsylvania residents; the Rubertts seek to represent Washington residents; Smith seeks to represent New York residents; and Kemp seeks to represent Oregon residents.

### VW

Plaintiffs filed the instant Motion for Class Certification as to VW, asking this Court to certify class actions as to Plaintiffs' consumer protection act and express warranty claims on behalf of the following classes:

All individuals and entities, who are residents of California, Colorado, New York or West Virginia, who between August 8, 2002 and December 2006, purchased or leased a Volkswagen vehicle that was equipped with an OnStar system, who subscribed to OnStar service as of December 31, 2006, and who owned or leased the vehicle as of December 31, 2007.

Excluded from the Class are General Motors Corporation, General Motors Company, American Honda Motor Company, Volkswagen of America, Subaru of America and OnStar, and any of their respective subsidiaries, affiliates, officers and directors; or entities in which those companies have a controlling interest.

(Pls.' VW Motion at ¶ 1). There are five named Plaintiffs who assert claims against VW: 1)

9

David Busch; 2) Robert Golish; 3) Robert Reishman; 4) Robert Schatz; and 5) Mark Vamos. Busch and Vamos seek to represent New York residents; Golish seeks to represent California residents; Schatz seeks to represent Colorado residents; and Reishman seeks to represent West Virginia residents.

**Supplement To SMAC**

On June 23, 2011, Plaintiffs filed a "Supplement to Second Master Amended Complaint" (D.E. No. 323), wherein Plaintiffs supplemented the SMAC to include allegations regarding two additional named Plaintiffs, Jason Smith and Armand Pepper. Plaintiffs' Counsel had neglected to include Smith or Pepper in the SMAC, although the parties took discovery as to those individuals. (*See* D.E. No. 279).

Including Smith and Pepper, there are a total of 29 named Plaintiffs who assert claims against OnStar and the Manufacturing Defendants. Each named Plaintiff who asserts claims against Honda, Subaru or VW also asserts claims against OnStar. For example, Plaintiff John Kuller asserts consumer protection act and warranty claims against Honda under the laws of Washington and also asserts consumer protection act claims against OnStar under Michigan law.

**Overview Of The Counts At Issue In The Class Certification Motions**

In the pending motions, Plaintiffs seek class certification as to Honda, Subaru, and VW as to Counts II (violation of all states' consumer protection acts) and III (breach of express warranty) of the SMAC. Plaintiffs also seek class certification as to OnStar as to Count I (violation of MCPA) of the SMAC.

Plaintiffs allege that each of the Defendants "knew by August 2002 that their analog-based OnStar equipment would stop working on February 18, 2008. Despite the knowledge that

their equipment would stop working in 2008, Defendants continued to sell analog equipment to customers without notifying those customers that the equipment would cease to function. Defendants intentionally concealed from consumers the material fact that their equipment would stop working on February 18, 2008." (SMAC at ¶ 5).

Count I of the SMAC asserts claims against OnStar under the MCPA and alleges that OnStar's statements, representations, omissions, and practices made in connection with their sale or lease of OnStar equipment and service as alleged herein were in violation of the following sections of the MCPA § 445.903:

> a.  § 445.903(c) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have or that a person has sponsorship, approval, status, affiliation, or connection, which he does not have.
> b.  § 445.903(n) by causing a probability of confusion or of misunderstanding as to the legal rights, obligations or remedies of a party to a transaction.
> c.§ 445.903(p) by disclaiming or limiting the implied warranty of merchantability and fitness for use, without clearly and conspicuously disclosing a disclaimer.
> d. § 445.903(s) by failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.
> e. § 445.903(bb) by making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.
> f. § 445.903(cc) by failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.
> g. § 445.903(g) by failing to advertise or represent goods and services with intent not to dispose of them as advertised and represented.
> h. § 445.903(y) by failing to provide promised benefits and making gross discrepancies between oral and written representations.

(SMAC at ¶ 204).

Count II alleges "Unfair and Deceptive Trade Practices In Violation Of All States'

Consumer Protection Acts." That Count alleges that Honda, Subaru, and VW's "actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed" in Count II. Count II then alleges that each Manufacturer Defendant has engaged in:

> (e) . . . unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and the Consumers legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq;*
> (f) . . . unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105 *et seq.*;
> . . . .
> (j) . . . unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201 *et seq.*;
> . . . .
> (ff) . . . unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;
> . . . .
> (kk) . . . unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605 *et seq.*;
> (ll) . . . unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;
> . . . .
> (uu) . . . unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010 *et seq.*;
> (vv) . . . unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101 *et seq.*

(SMAC at 54-60).

Count III asserts breach of express warranty claims against Honda, Subaru, and VW. They each offered an express warranty on the vehicles purchased or leased by Plaintiffs. Although the terms of the express warranty offered by each of them differ, each warranty is subject to time and mileage limitations: 1) Honda's warranty "begins on the date the vehicle is put into use" and covers the vehicle "for 4 years or 50,000 miles, whichever comes first."

12

(SMAC at ¶ 97); 2) Subaru's warranty is for "3 years or 36,000 miles, whichever comes first."

(SMAC at ¶ 94); and 3) VW's "New Vehicle Warranty period is 4 years or 50,000 miles,

whichever occurs first."  (SMAC at ¶ 91).  Plaintiffs allege that:

215.   Each Manufacturer Defendant expressly warranted to Plaintiffs and all other Class members who purchased or leased their vehicles that the OnStar equipment in their vehicle would be free of defects in workmanship and materials during the warranty period, and that the Manufacturer Defendant would repair or replace such defective equipment at no cost to Plaintiffs and all other Class members.

216.   The OnStar equipment in all of the Manufacturer Defendants' vehicles purchased or leased by plaintiff and other Class members was covered by their new motor vehicle warranties.  The OnStar equipment in *many Class members' vehicles was covered by an extended warranty.*

217.   At the time that Class members were given notice that their OnStar equipment was defective, *numerous Class members were within the mileage and term of their original and extended warranties.*

218.   The OnStar equipment sold and delivered to Plaintiffs and all other Class members was manufactured with faulty and defective workmanship and materials, are defective, and will not function and will not perform its intended purpose during the warranty period.

219.   The OnStar equipment would not function during the reasonable life expectancy of plaintiffs' vehicles.

220.   The durational limitations in the Manufacturer Defendants' warranties with respect to analog OnStar equipment was unreasonable.

221.   The durational limitations in the Manufacturer Defendants' warranties with respect to analog OnStar equipment was unconsionable, invalid and unenforceable.

222.   Contrary to their warranties, each Manufacturer Defendant has expressly or implicitly given notice to Plaintiffs and all other OnStar subscribers who purchased or leased their vehicles that it will not repair or replace their defective OnStar equipment so that it will operate on digital cellular networks, at no cost to Plaintiffs and the Class, and continue to refuse to do so.

223.   Each Manufacturer Defendant breached its express warranties to Plaintiffs and all other Class members to repair and/or replace OnStar equipment so that it is in good operational condition and repair and suitable for use in the OnStar system.

13

224.    The Manufacturer Defendants' breach of these express warranties proximately caused damaged to Plaintiffs and members of the Class.

(SMAC at 61-63) (emphasis added).

**B.      Factual Background**

The parties have conducted extensive class certification discovery in this matter, which reflects the following.

**The OnStar System**

OnStar is an in-vehicle telematic communications system that enables vehicles with both OnStar equipment and activated OnStar service to have access to emergency service and information, and other services, almost anywhere in the United States and portions of Canada. (SMAC at ¶ 48).  The OnStar system was developed in the 1990s.  (SMAC at ¶ 47).

OnStar provides telematics services to certain owners of vehicles manufactured by several companies, including GM, Honda, Subaru, and VW.   OnStar equipment was included as either standard or optional equipment.   Telematic equipment enables persons in vehicles to communicate with OnStar Centers through third-party cellular service providers.  (Ex. 4 to Pls.' Br. at 2).

"At various times, OnStar capable vehicles were equipped with three types of wireless cellular equipment: a) Analog-Only; b) Analog/Digital-Ready; and c) Dual-Mode (Analog/Digital)."  (MAC at ¶ 53).

In 2002, OnStar equipment used analog signal in order to provide OnStar service. (SMAC at ¶ 4).

14

**The FCC Rule Change**

The Federal Communications Commission ("FCC") rules regulating cellular telephone service were adopted when cellular service was initiated in the 1980's. (Abernathy Report, Defs.' Ex. 45 at 1; 67 Fed. Reg. 77175 (Dec. 17, 2002)). At the time the rules were adopted, the FCC required all cellular service providers to offer service in accordance with the compatibility standard for analog systems (Advanced Mobile Phones Service ("AMPS")). (*Id*.). Over time, new digital technologies emerged. "Because of the FCC's ongoing AMPS requirement, however, cellular carriers desiring to deploy advanced digital technologies had to maintain two networks – a digital network and an analog network – thus effectively dividing the spectrum between these networks." *Id*. As consumer demand for digital cellular service grew, requiring more spectrum to satisfy demand, cellular carriers urged the FCC to eliminate the AMPS requirement to free up more cellular spectrum for digital services. (Abernathy Report, Defs.' Ex. 45 at 1, at 1-2).

On May 17, 2001, the FCC proposed eliminating the requirement that wireless phone carriers operate analog-based networks, allowing carriers to provide only digital-based networks. (SMAC at ¶ 59) (citing Notice of Proposed Rule Making, 16 FCC Rcd. 11169 (May 17, 2001)). The FCC sought comment on the effect elimination of the rule would have on rural customers and services that use analog technology, such as OnStar. (Defs.' Ex. 45 at 2).

OnStar submitted filings with the FCC opposing the proposed rule change. For example, OnStar filed written comments with the FCC opposing the elimination on July 2, 2001 and August 2, 2001. (*See,* e.g., Ex. 4 to Pls.' OnStar Br.).

Some, but not all, of the Manufacturer Defendants submitted filings with the FCC

opposing the proposed rule change.

On August 8, 2002, the FCC issued a press release stating that it was going to change the rules to allow, but not require, cellular providers to shut down their analog networks in 2008. Plaintiffs' proposed classes begin "with vehicles purchased on or after August 8, 2002, when the FCC publicly announced that it was allowing wireless telephone companies to cease providing analog wireless networks in five years (the 'Rule Change')." (Pls.' OnStar Br. at 4).

The actual Analog Sunset Order was published in the Federal Register on December 17, 2002. 67 Fed. Reg. 77175 (Dec. 17, 2002). The FCC decided to eliminate the analog requirement but, because "eliminating the rule immediately without a reasonable transition period would be extremely disruptive to certain customers," the FCC modified its rules requiring the analog standard to "include a sunset period of five years." (*Id*.).

The FCC rule change was significant as it relates to OnStar and the Manufacturer Defendants because "at various times, OnStar capable vehicles were equipped with three types of wireless cellular equipment: a) Analog-Only; b) Analog/Digital-Ready; and c) Dual-Mode (Analog/Digital)." (MAC at ¶ 53).

In 2002, OnStar equipment used analog signal in order to provide OnStar service. (SMAC at ¶ 4). Vehicles with analog-only equipment were manufactured to operate only on analog wireless networks. (SMAC at ¶ 56). The OnStar equipment in those vehicles cannot be upgraded to work on a digital system. OnStar service to vehicles with analog-only equipment ceased on January 1, 2008. (SMAC at ¶ 56).

Vehicles with analog/digital ready equipment can be upgraded so that their OnStar equipment operates on a digital wireless network. (SMAC at ¶ 57). Vehicles with Dual-Mode

16

hardware can use existing OnStar equipment with digital signals and do not require any upgrade.

GM has manufactured vehicles with all three types of OnStar equipment.

The OnStar equipment that was in vehicles manufactured by Honda, VW, and Subaru was analog-only equipment.  Thus, it cannot be upgraded.

**OnStar's Disclosures Regarding The Analog Sunset Order**

Anthony DiSalle has been OnStar's Vice President of sales and marketing since 2002. (DiSalle Dep., Defs.' Ex. 77, at 11).  DiSalle testified that in early 2003, OnStar developed a plan to communicate information regarding the Analog Sunset Order to subscribers and vehicle purchasers, with an objective to get the messaging into multiple pieces of communications at around the same time, in June 2003.  (*Id*. at 35, 51-54).  OnStar submitted evidence that the Analog Sunset Order and analog to digital ("ADT") issues were communicated to subscribers and potential vehicle purchasers through multiple means, which include but are not limited to, the following disclosures.

OnStar's subscriber agreements with its customers include written terms and conditions ("T&C's"), which are subject to change.  (*See, e.g* Defs.' Ex. 2 at 1) ("Once your Services have been activated, you are agreeing to be bound by these Terms and Conditions as they may be updated from time to time unless you contact OnStar to decline Services.").  Since 2002, the current version of the OnStar T&C's has been posted on the OnStar website.  (Gilstorf. Decl. at ¶ 7).

Since 2003, OnStar's T&C's have contained disclosures regarding the Analog Sunset Order, and those disclosures have changed over time.  OnStar's T&C's that went into effect in June 2003 included the following information:

3.  Hardware.  Your vehicle manufacturer has equipped your Vehicle with Hardware programmed to receive OnStar Services. . . Your Hardware uses either analog or digital telephone signals.  If the underlying wireless carriers terminate or restrict analog or digital service, OnStar services will not be available.  Effective February 16, 2008, the FCC no longer requires wireless carriers to support analog service.  Thus, some wireless carriers may cease providing service to analog Hardware at that time . . .

(Defs.' Ex. 1).

Beginning in June, 2003, information regarding the FCC rule change was posted on the

OnStar website, in the form of questions and answers.  (DiSalle Dep. at 206).  Defendants'

Exhibit 4 contains the questions and answers that were posted on the OnStar website in June of

2003, which include:

Recently, the U.S. Federal Communications Commission (FCC) ruled that wireless carriers will no longer be required to support the analog wireless network after February 18, 2008.  After that, if the carriers for OnStar elect to provide only digital service, beginning Feb. 16, 2008, OnStar service will only be available through dual-mode (analog/digital) hardware.  As of June 2003, all OnStar systems utilize analog-only hardware.
. . . .

4.    What are the different types of hardware on OnStar equipped vehicles?

All OnStar-equipped vehicles will have one of three types of hardware:

Analog-only: Most 2003 model year and earlier vehicles have analog-only hardware.  Fortunately, the FCC ruling requires that U.S. wireless carriers provide reliable, nationwide analog service up until February 2008.  We do not anticipate that OnStar service will be impacted in any way during the five-year transition period.  However, if the carriers for OnStar elect to only provide digital service after that, then beginning Feb. 16, 2008, OnStar service will only be available through dual-mode (analog/digital) hardware.

Analog/Digital Ready: Select 2003 and 2004 model year GM vehicles have analog/digital ready hardware.  These vehicles have been prepared for conversion

18

to analog/digital (dual-mode) equipment when it becomes available.

Analog/Digital (Dual Mode): Select 2004 and future OnStar-equipped GM
vehicles feature dual-mode (analog/digital) hardware, which will be unaffected by
the FCC ruling.

5.      How will I know what kind of equipment is in a vehicle?

There are several ways to tell what type of hardware comes on an OnStar-
equipped vehicle:

a.  Look for the label on GM vehicles

Starting in the 2004 model year, OnStar-equipped GM vehicles will have a new
OnStar window label that indicates which of three different hardware systems is
integrated into the vehicle.  Refer to question #4 for additional information.

b. Refer to this chart, [which indicates the type of equipment based on how the
system responds to a given command.]

c.  Ask your dealer

(*Id.* at 208; Defs.' Ex. 4).   As of March 2, 2004, OnStar's website had the questions and answers

contained in Defendants' Exhibit 5, which are very similar.  (DiSalle Dep. at 212).

On June 2, 2003, OnStar Call Center employees were provided information on how to

answer questions from callers regarding the Analog Sunset Order.  (Defs.' Ex. 6).  Among other

things, the advisors were instructed as to how to advise callers how determine the type of OnStar

equipment in a new or used vehicle:

*How will a buyer know what kind of equipment is in a new vehicle?*
Beginning in the 2004 MY, most OnStar equipped vehicles will include the
OnStar label which will indicate what type of hardware is available in the vehicle.

*How will a buyer know what kind of equipment is in a previously owned vehicle?*
The easiest way to find out what equipment is available in a previously owned
OnStar equipped vehicle is to push the blue OnStar button, and ask the advisor

19

whether the equipment in the vehicle is analog or analog/digital.

(Defs.' Ex. 6) (Italics in original).

On June 27, 2003, OnStar sent all GM dealers a letter regarding the Analog Sunset Order

and OnStar's plan to communicate the information to customers:

> Here's our plan to work through the transition from analog to digital wireless service:
>
> • Attached is a communications piece that will be helpful in explaining the FCC Ruling and possible future impact on OnStar service. *Please make copies available to all prospective customers* and keep a copy on file for reference.
>
> • The summer 2003 issue of OnStar Magazine will notify existing OnStar subscribers of the FCC ruling as well as our anticipation of no change in system performance before 2008.
>
> • Beginning this summer, a new, factory-applied OnStar window label on each '04 Model Year vehicle will identify the vehicle as having one of three different OnStar systems: "Analog," "Analog/Digital," or "Analog/Digital-Ready" – which means the vehicle has been prepared for conversion to "Analog/Digital" hardware when it becomes available. See the attachment for further explanation. Also refer to the 2004 OnStar pocket guide for details on how to determine what OnStar system is integrated into the vehicle.
>
> • Well before February 2008, OnStar will be contacting active subscribers with affected hardware to explain options based on their vehicle's equipment. Keep in mind that those with Analog/Digital (Dual-Mode) OnStar systems will be unaffected by the FCC ruling.

(Defs.' Ex. 11) (emphasis added). The "attached communications piece" that OnStar attached to

that letter, and asked dealers to provide to prospective customers, stated, in pertinent part:

> Recently the U.S. Federal Communications Commission (FCC) ruled that wireless carriers will no longer be required to support the analog wireless network

after February 16, 2008.  After that time, if the carriers for OnStar elect to only provide digital service, OnStar service will only be available through dual-mode (analog/digital) hardware.

As of June 2003, all OnStar systems utilize analog-only hardware.  From the beginning, OnStar has relied on a nationwide analog wireless network to provide communication to and from OnStar-equipped vehicles.  Today, the analog network continues to provide the most extensive coverage across the U.S. and Canada.

However, the U.S. wireless carriers have begun to shift away from analog to digital networks and so will OnStar.

**WHAT YOU NEED TO KNOW ABOUT ONSTAR HARDWARE IN GM VEHICLES**

The OnStar equipped vehicle you're considering has one of three types of hardware:

- **Analog-only:**
  Most 2003 model year and earlier vehicles have analog-only hardware.  Fortunately, the FCC ruling requires that U.S. wireless carriers provide reliable, nationwide analog service up until February 2008.  We do not anticipate that OnStar service will be impacted in any way during the transition period.  However, if the carriers for OnStar elect to only provide digital service after that, then beginning Feb. 16, 2008, OnStar service will only be available through dual-mode (analog/digital) hardware.

- **Analog/Digital-Ready:**
  Select 2003 and 2004 model year vehicles have analog/digital-ready hardware.  These vehicles have been prepared for conversion to analog/digital (dual mode) hardware when it becomes available.

- **Analog/Digital (Dual-Mode):**
  Select 2004 and future OnStar-equipped vehicles feature dual-mode (analog-digital) hardware, which will be unaffected by the FCC ruling.

(*Id*.) (bolding in original).

OnStar has its own publication called OnStar Magazine, that it sends to OnStar's existing

subscribers and to dealers, so they can put them out in their waiting rooms.  (DiSalle Dep. at 60

& 68).  The Summer 2003 issue of OnStar Magazine stated, in pertinent part:

**DEAR ONSTAR SUBSCRIBER**:

We're writing to inform you of a recent decision by the U.S. Federal
Communications Commission (FCC) that may impact your OnStar service down
the road.

**Background**
Currently, OnStar relies on a nationwide analog wireless network to provide
communication to and from all OnStar-equipped vehicles.  This analog network is
made up of a number of independent wireless communication companies or
"carriers."

Several years ago, carriers also began offering digital services in limited areas.
While the U.S. telecommunications market has begun to shift from analog to
digital networks, the analog network still provides the most extensive coverage
across the U.S. and Canada at this time.

**The FCC Ruling**
Effective Feb. 18, 2008, wireless carriers will no longer be required to support the
analog wireless network.  This decision will eventually affect not only OnStar and
its subscribers, but also most U.S. wireless carriers as well as those with analog
cell phones.

**What This Means for You**
As of June 2003, all OnStar systems utilize analog-only hardware.  Fortunately,
the FCC ruling requires that U.S. wireless carriers provide reliable, nationwide
analog service up until February 2008.  This means that your OnStar service will
not be impacted in any way during the five-year transition period.
          After that time, however, if the carriers for OnStar elect to only provide
digital service commencing on Feb. 18, 2008, then OnStar services will only be
available through dual-mode (analog/digital) hardware.

(*Id*.; Defs.' Ex. 9) (bolding in original).

Beginning in 2003, factory-applied OnStar window labels were affixed to new GM 2004

and later model year vehicles, identifying the type of OnStar equipment in the vehicle and providing information about the impact of the Analog Sunset Order. (*See* e.g. Defs.' Ex. 7).

Beginning in 2003, OnStar provided dealers with OnStar Dealer Pocket Guides that contained information on how to determine the type of OnStar equipment in a given vehicle and information on the Analog Sunset Order.  (*See* Defs.' Exs. 12, 16-21).  The information in those guides changed over time.

The OnStar Owner's Guide for 2004 and later model years, which was in the glove box of all new vehicles with OnStar equipment, stated the type of the equipment in the vehicle and information on the Analog Sunset Order.  (*See* Defs.' Ex. 8) ("This vehicle is equipped with Analog/Digital Ready hardware.  FCC ruling 02-229 eliminates the requirement that wireless carriers support the analog network after February 16, 2008.  As a result of this ruling, if the carriers for OnStar elect to provide only digital service commencing on 2/16/08, the system in the vehicle will not operate.  Visit OnStar.com for further details.").

The OnStar T&C's that went into effect on July 2004 included the following information regarding the Analog Sunset Order and OnStar equipment:

> 3.  Analog to Digital Transition.  As a result of an FCC ruling, wireless service providers will not be required to support the analog wireless network in the United States beginning in 2008.  Consequently, the OnStar wireless service provider will not continue to provide analog service and will begin providing services on the digital network only.  To accommodate the transition to the new digital only service, beginning on January 1, 2008, the OnStar system will operate only on Equipment capable of operating on the digital network.  **If your Vehicle is equipped with analog only Equipment, your OnStar system including all Services will no longer function as of that date.**

(Defs.' Ex. 2) (bolding in original).  The July 2004 OnStar T&C's were mailed to existing

subscribers, as an insert to the Fall/Winter 2004 OnStar Magazine.  (Defs.' Ex. 10; Gilstorf Decl. at ¶ 7).

The December 2004 OnStar T&C's were mailed or e-mailed to all existing subscribers in the first half of 2005.  (Gilstorf. Decl. at ¶ 7).  They contained the following information:

> 12.  CAUTIONS ABOUT A CHANGE IN OnStar SERVICE IN 2008.  The OnStar Equipment in some 2004 or later Cars uses both digital and analog wireless technology.  Other OnStar Equipment uses only analog wireless technology.  The [FCC] has decided that, after 2007, wireless service providers (including the ones who work with us), don't have to provide service for the analog wireless network.  As a result, our wireless service providers won't continue to provide analog service after 2007.  This means that beginning January 1, 2008, OnStar won't provide service for analog-only OnStar Equipment.  IF YOU DON'T HAVE DIGITAL OnStar Equipment, YOUR OnStar SERVICE WON'T WORK AFTER THAT DATE.

(Defs.' Ex. 3).

In March of 2005, OnStar and GM offered a program to OnStar subscribers with ungradable OnStar equipment (i.e., analog/digital ready equipment), under which they could receive a free upgrade if the vehicle owner signed a three-year subscription plan for OnStar services.  (*See* Defs.' Exs. 23-25).  Approximately 4,600 people accepted that offer and had their OnStar equipment upgraded.  (DiSalle Dep. at 151-52).

**Information Provided By Other Sources**

Information regarding the Analog Sunset Order, and its impact on OnStar service, was also available through other sources.  For example, information was conveyed in media sources, including newspaper articles.

On August 7, 2002, *USA Today* published an article titled "Analog phones could hang it up" that stated that the "Federal Communications Commission is expected to give wireless

24

carriers permission to shut down their analog networks in five years," and noted "the move could pose problems for consumers." The article stated that "[s]ome emergency-button car cell phone systems, such as OnStar, are analog. They would have to upgrade to digital in five years." (Defs.' Ex. 41).

On May 27, 2004, the *Orlando Sentinel* published a newspaper article titled, "GM's OnStar Can Be Lifesaver, Well Worth Price." (*Id.*). That article stated, in pertinent part:

> There's also one other factor you should be aware of: OnStar's network, which uses regional carriers, is analog, not digital. The Federal Communication Commission has ruled that wireless carriers will no longer be required to support the analog wireless network after Feb. 16, 2008.
>
> All vehicles equipped with OnStar from the 2002 model year and older have only analog systems. Some 2003 OnStar-equipped vehicles have dual analog-digital systems, and most 2004 vehicles have dual systems. Those vehicles will still be able to use OnStar after Feb. 16, 2008. GM is working on some sort of transition package for older vehicles, but at the moment, it doesn't have one ready. Of course, 2008 is a ways off, but if you're buying a new vehicle with OnStar, I'd suggest you make sure it will work after '08.
>
> For more information on OnStar, log onto onstar.com.

(*Id.*).

At various times, the Manufacturer Defendants also provided certain disclosures regarding the FCC Ruling.

For example, VW's vehicle brochure for the model-year 2005 Audi A8 contained the following statement: "Recently, the U.S. Federal Communications Commission (FCC) ruled that wireless telephone carriers are required to fully support the analog wireless network until February 16, 2008. After that date, it is likely that the analog wireless network will be phased out, rendering analog devices inoperable." (VW's Ex. E, Pls.' Responses to Reqs. for Admission,

at ¶ 81).  Other VW brochures for 2005 VW models, including the 2005 Phaeton, included that

same information.  (*Id*. at ¶¶ 83 & 84).

**Class Certification Discovery From Named Plaintiffs**

The extensive class certification discovery in this matter includes discovery obtained

from the named Plaintiffs.  Discovery as to several named Plaintiffs is included below.

**Robert Golish**

Robert Golish is a resident of California.  (SMAC at ¶ 29).  On May 15, 2005, Golish

purchased a new 2005 VW Phaeton with manufacturer-installed OnStar equipment from a dealer

in California. (SMAC at ¶ 163).

Golish testified that he received a VW brochure from the dealership before he purchased

his vehicle.  (Defs.' Ex. 71 at 41).

It is undisputed that VW's brochure for the 2005 Phaeton included the following

disclosure:  "Recently, the U.S. Federal Communications Commission (FCC) ruled that wireless

telephone carriers are required to fully support the analog wireless network until February 16,

2008.  After that date, it is likely that the analog wireless network will be phased out, rendering

analog devices inoperable." (VW's Ex. E, Pls.' Responses to Reqs. for Admission, at ¶ 83).

During his deposition, Golish testified that he understands what the disclosure in the 2005

Phaeton brochure means:

> Q.    What does this next line say?
> A.    "After this date it is likely that the analog wireless network will be
>        phased out rendering analog devices inoperable."
> Q.    Do you have any problem understanding what that means?
> MR. GEORGE:     Objection.  Foundation.
> THE WITNESS:    It says that analog devices will be inoperable.

BY MR. SEYFERTH:

Q.    After a certain date?

A.    After a certain date.

Q.    And it also says within Footnote 2 that the Volkswagen vehicle that you have has – or utilizes, quote, analog telephone signals; correct?

A.    Yes.

Q.    Do you have any problem understanding what that means?

MR. GEORGE:    Objection.  Foundation.

THE WITNESS:    Well, I guess I don't have a problem understanding what it means.

(Golish Dep. at 39-40).

Golish testified that he does not know whether the Phaeton brochure he received contained that information.  (*Id*. at 41).

**John Irvine**

In September of 2002, John Irvine purchased a 2002 Cadillac Seville with manufacturer-installed OnStar equipment.  (SMAC at ¶ 141; Irvine Dep., Defs.' Ex. 62A, at 15)**.**

In August of 2006, the OnStar equipment in Irvine's vehicle was upgraded under a program offering a free upgrade if the vehicle owner signed a three-year subscription plan for OnStar services.  (Irvine Dep. at 18-19; Ex. 14 to Irvine Dep.; Defs.' Exs. 24 & 25).

Again, the OnStar class that Plaintiffs seek to certify consists of "All persons or entities residing in the United States who between August 8, 2002 and December 2006, purchased or leased a vehicle equipped with an analog OnStar system and were subscribers as of December 31, 2006 and who owned the vehicle as of December 31, 2007, (1) for whom *no upgrade to digital service was offered*, or (2) who *paid for or were required to pay to upgrade* to digital OnStar service."  (Pls.' OnStar Motion at ¶ 1) (emphasis added).  Because Irvine was offered and

27

received a free upgrade, he is not a member of the proposed class. Despite the fact that class certification revealed this to be true, Plaintiffs' Counsel included Irvine among the named Plaintiffs in the OnStar Motion for Class Certification and submitted a declaration from Irvine stating that he is "ready and willing to represent the class in this case."

Plaintiffs later acknowledged, in their Reply Brief as to the OnStar motion, that Irvine is not a member of the proposed OnStar Class. (D.E. No. 316 at 3 n.4).

**Bruce Johnson**

In 2006, Bruce Johnson purchased a used 2005 Buick Park Avenue with manufacturer-installed OnStar equipment from Liberty Buick, a dealer in Arizona. (SMAC at ¶ 126; Johnson Dep., Defs.' Ex. 58, at 15). Johnson subscribed to OnStar service after purchasing the used vehicle (SMAC at ¶ 126) but, because the equipment in his vehicle cannot be upgraded, it was inoperable after the sunset date.

During class certification discovery, Johnson testified that, at the time that he was shopping for that vehicle, he was aware that the "switchover" from analog to digital was coming in the future. (*Id.* at 15-17). Johnson and his wife told the salesperson at the dealership that they "wanted to make sure OnStar would work long term after the changeover." (*Id.* at 17). Johnson knew the OnStar equipment in the vehicle he purchased was not already set to work on a digital network. (*Id.* at 23). The salesperson, however, told Johnson and his wife that the OnStar equipment in the vehicle could be upgraded but in fact it cannot be upgraded. (*Id.* at 17 & 23, 27). Thus, Johnson testified that the salesperson at the dealer told him that the existing OnStar equipment in the vehicle could be upgraded, which was untrue, and that Johnson purchased the vehicle based on that salesperson's representation. (*Id.* at 27).

28

Johnson further testified that, at the time he purchased the vehicle, no representations about the equipment had been made to him by anyone at OnStar:

> Q.    At the time you purchased the vehicle, had anyone at OnStar made any representations about the equipment in that car, its ability to be converted, or whether it would work after the analog to digital transition?
>
> A.    No.

(*Id*. at 26).   Johnson did not speak to anyone at OnStar until after he had purchased the vehicle. (*Id*. at 25).

**Murle Kemp and Bradley Reich**

Murle Kemp, a resident of Oregon, purchased a 2004 Subaru Outback with manufacturer-installed OnStar equipment.  (SMAC at ¶¶ 35 & 175).  Kemp is the only named Plaintiff who seeks to represent a Subaru class on behalf of Oregon residents.  (*See* Pls.' Subaru Br. at 7).

Bradley Reich is a resident of Colorado who purchased a new 2003 Saab 9-3 with manufacturer-installed OnStar equipment.  (SMAC at ¶¶ 25 & 155).

Kemp and Reich are not members of the proposed classes because, as they each testified to during their depositions, they each no longer owned their vehicles on December 31, 2007, the date of the analog shutdown.  (*See, e.g.*, Defs.' Ex. 61 at 78-79).

Indeed, Plaintiffs' Counsel acknowledged that Kemp and Reich are not members of the proposed classes in Plaintiffs' OnStar Reply.  (D.E. No. 316, at 3 n.4).   Thus, *there is no named Plaintiff who could represent a Subaru class of Oregon residents.*   The Court therefore cannot certify a Subaru class of Oregon purchasers because there is no class representative for same.

29

**John Kuller**

John Kuller is a resident of Washington.  (SMAC at ¶ 27). On October 16, 2003, Kuller purchased a new 2004 Acura RL with manufacturer-installed OnStar equipment.  (SMAC at ¶ 159).  Kuller testified that he first learned of the analog system was "shutting down" after he purchased his vehicle, but sometime prior to September 3, 2004.  (Kuller Dep., Defs.' Ex. 65, at 42 & 60).  When asked if recalls how he found out that the analog system was shutting down, Kuller responded, "No, other than from my reading and pursuit of the Internet, and car friends that may have been aware."  (*Id.*).  Thus, Kuller learned of the analog shutdown from sources other than OnStar or Honda.

**Carey Stein**

Proposed class representative Carey Stein leased a 2004 Cadillac CTS from Weil Olds Cadillac Hummer in Libertyville, Illinois on November 1, 2003.  (Stein Dep., attached as Def. Ex. 55, at 5-7; Stein Decl., attached as Pls.' Ex. 25).  Stein later purchased the vehicle on August 29, 2007, shortly before his lease expired.  (Stein Dep. at 17-18).

Prior to purchasing his vehicle, on May 24, 2007, Stein received a letter from OnStar stating, in pertinent part:

. . . .

For the past 10 years, OnStar has relied on the analog cellular network to provide communications to and from OnStar-equipped vehicles.  However, based on a Federal Communications Commission (FCC) ruling, cellular carriers will not be required to support the analog cellular network beginning in early 2008.  Without the analog network, we cannot ensure the coverage that will allow us to provide you the services you expect from us.  As a result, beginning January 1, 2008, OnStar service in the United States and Canada will be available only through vehicles that are capable of operating on the digital network.

> *Your vehicle is equipped with analog hardware.* However, it is eligible for an
> equipment upgrade that will enable it to operate on the digital network. If you do
> not upgrade your vehicle's equipment, you will no longer be able to receive
> OnStar service after December 31, 2007.
> . . . .
>
> Digital equipment that is compatible with your vehicle is currently available . . .
> Your cost for the upgrade, including parts and labor, is only $15 with the purchase
> of a one-year Safe & Sound subscription at $199.

(5/24/07 Letter, attached as Ex. A to Stein Decl., D.E. No. 264-26 at 103). Thus, Stein

acknowledges that *before* he purchased the vehicle, he had "received written notice from OnStar

that the OnStar telematics system" in the vehicle "would not work after December 2007 and that

[his] OnStar service would be terminated." (Stein Decl.).

Stein testified that he ultimately chose not to upgrade the OnStar equipment in the vehicle

he purchased:

> Q.  Can you tell me why is it that you and your wife decided not to upgrade
>      the vehicle to work on the digital network for 2008 and this portion of –
> A.  She didn't decide. When the lease was up I asked her if she wanted to
>      keep that car. I was going to buy that card, which I did, and she could
>      have kept that car or got a new car and I would take that car because my
>      lease was going to be up on the Lexus, and she decided that she needed to
>      have a hybrid for whatever reason and she bought a hybrid, and my lease
>      on the Lexus was up and I just took the Cadillac.
> Q.  So in the fall, or whenever it was that you purchased the Cadillac, did you
>      begin driving that as your primary vehicle?
> A.  Either just before or just after, yeah.
> Q.  Is it fair to say that you made the decision not to upgrade?
> A.  It wasn't so much a decision as I just don't use OnStar. I got it primarily
>      because I felt it was a safety feature for my wife. . .
> Q.  So you never really thought or looked into the idea of what it would take
>      or what you would have to do in order to get the vehicle upgraded?
> A.  Yeah. Never even crossed my mind.
> . . . .
> Q.  And as we sit here today you have never actually paid the $15 to have the

31

vehicle upgraded because you personally don't utilize OnStar services to any significant degree?

A.    That's correct.

. . . .

Q.    And even if OnStar or GM or somebody gave you the upgrade for free, would you – I mean, the way I'm understanding it you wouldn't activate the OnStar system because you don't really use it.

A.    What's your question?

Q.    My question – I'm sorry if you don't understand the question.  I'll just ask you a different question so hopefully you can.

        The way I'm understanding your testimony is even if your OnStar was activated for free, you would not pay to have the service of OnStar in your vehicle?

A.    Not at the present time, No.  That's a correct statement.

(Stein Dep. at 26-27; 53, 56).

**Mark Vamos**

On February 28, 2004, Mark Vamos purchased a new 2004 Volkswagen Passat Wagon with manufacturer-installed OnStar equipment from VW of Onenta, located in New York. (SMAC at ¶ 31).  At the time of purchase, Vamos resided in New York.

At the time the SMAC was filed, however, Vamos resided in Texas and he still resides in Texas today.  (SMAC at ¶ 167; Vamos Decl.).

Because Vamos currently resides in Texas, he is not a member of the proposed VW Class, which is limited to "individuals and entities" "who are residents of California, Colorado, New York or West Virginia."  Nevertheless, Plaintiffs' Counsel submitted a declaration from Vamos stating that he is "ready and willing to represent the class."  (*Id*.).

## ANALYSIS

"Class certification is governed by Federal Rule of Civil Procedure 23."  *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2548 (June 20, 2011).  A "trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23."  *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Pilgrim v. Universal Health Card, LLC*, __ F.3d __, 2011 WL 5433770 at * 2 (6th Cir. Nov. 10, 2011).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*, 131 S.Ct. at 2551.  The Sixth Circuit has explained that "[m]ere repetition of the language of Rule 23(a) is not sufficient.  There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled.  Maintainability may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide . . . The parties should be afforded an opportunity to present evidence on the maintainability of the class action." *In re American Medical Sys., Inc.*, 75 F.3d at 1079 (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)).

The Supreme Court has recognized that sometimes it is necessary for the court to "probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if the trial court is satisfied, after a "rigorous analysis," that the prerequisites of Rule 23(a) have been satisfied.  *Wal-Mart Stores, Inc.*, 131 S.Ct at 2552.  "Frequently that 'rigorous

33

analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* Going beyond the pleadings is necessary because a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011); *Reeb v. Ohio Dept. of Rehabilitation and Correction*, 435 F.3d 639, 644-45 (6th Cir. 2006).

The party seeking class certification bears the burden of establishing that all prerequisites for class certification are satisfied. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

"Given the huge amount of judicial resources expended by class actions, particular care in their issuance is required." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, __ F.3d __, 2011 WL 3524325 at *9 (6th Cir. 2011).

Under Rule 23(a), the party seeking certification must demonstrate, first, that: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and 4) the representative parties will fairly and adequately protect the interests of the class. "Second, the proposed class must satisfy at least one of the three requirements in Rule 23(b)." *Id.*

## I.     Rule 23(a) Requirements

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc., supra*, at 2550 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). In order to warrant a departure from that

34

rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.  *Id.*  "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – 'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Id.* (citations omitted).

### A.  Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).

"To prove numerosity, [Plaintiffs] must demonstrate that the putative class is 'so numerous that joinder of all members is impracticable.'" *Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005) (quoting FED. R. CIV. P. 23(a)(1)).  There is no strict numerical test for determining impracticability of joinder and the requirement requires examination of the specific facts of each case. *Id*.  "Nevertheless, while 'the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative.'" *Id.*

As a practical matter, OnStar, Subaru and Honda do not appear to dispute that the numerosity requirement could be met here.

VW, however, does contest numerosity.  VW notes that Plaintiffs have offered only speculation as to the actual number of class members.  VW further asserts that information it "only very recently received from OnStar in light of Plaintiff's changed class definitions shows that Plaintiffs cannot establish numerosity in West Virginia:"

> Indeed the OnStar data shows that there were only 63 OnStar subscribers in West
> Virginia with Audi/VW vehicles as of December 31, 2006.  VW Ex. Q, OnStar
> Subscriber Data. [VW] does not have information about how many of those
> people still owned their vehicles as of December 31, 2007 – as required by
> Plaintiffs' current class definition – but it [is] certainly less than 63, and perhaps
> substantially so, whether through vehicle sale, trade in, theft, or accident loss.

(VW's Br. at 35).

Although the parties engaged in extensive class certification discovery, Plaintiffs do not

identify the number of individuals or entities that would be included within each of the proposed

classes.  Thus, they have not met their burden.

The Court concludes that the reason why Plaintiffs have not identified the number of

proposed class members is because, for a number of reasons, the proposed classes are not

ascertainable without individualized inquiries.

"The existence of an ascertainable class of persons to be represented by the proposed

class representative[s] is an implied prerequisite of Federal Rule of Civ Procedure 23.*" John v.*

*National Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (cited with approval in

*Romberio v. Unumprovident Corp.*, 385 Fed.Appx. 423, 431 (6th Cir. 2009)).  As such, a class

definition should be based on objective criteria so that class members may be identified without

individualized fact finding.  *Id.; Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986);

*see also* 7A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1760 (3d ed.) (The class

description must be "sufficiently definite so that it is administratively feasible for the court to

determine whether a particular individual is a member.")

In their Motions for Class Certification, Plaintiffs assert generally that the identity of class

members is ascertainable through "data maintained by OnStar."  The data maintained by OnStar,

however, will not be sufficient to determine if any given individual meets all of the requirements of a given proposed class.  Individualized inquiries will be required.

This problem is illustrated by the fact that Plaintiffs' own counsel has had difficulty in identifying which of the 29 named Plaintiffs would be members of the proposed classes.  For example, Plaintiffs' Counsel believes that Vamos is a member of the VW Class.  Vamos, however, purchased his vehicle in New York but now resides in Texas, and he is therefore not a member of the proposed VW class – which is limited to individuals "who *are* residents of California, Colorado, New York or West Virginia."  The OnStar subscriber data base does not contain information as to the *current* states of residence for its *former* subscribers and Vamos is certainly not the only individual who purchased a vehicle in one state but now resides in another state.

Plaintiffs' Counsel also believed that Reich and Kemp were in the proposed classes and submitted declarations from those individuals.  Because Reich and Kemp no longer owned their vehicles on December 31, 2007, however, Plaintiffs' Counsel acknowledged in their OnStar Reply Brief that they are not in the proposed classes.  The OnStar subscriber data base obviously does not contain information as to whether a *former* OnStar subscriber sold his or her vehicle *after they stopped subscribing* to OnStar.  The fact that Reich and Kemp had sold their vehicles only came to light when they were deposed.[2]

### B.    Commonality

Commonality is the rule requiring a plaintiff to show that "there are questions of law or

---

[2]In addition, as addressed later, there would also be individualized inquiries regarding each Plaintiff's warranty terms and whether the vehicle was purchased or leased primarily for business purposes.

fact common to the class." FED. R. CIV. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart Stores, Inc.,*131 S.Ct at 2551. In *Wal-Mart Stores, Inc.*, the Supreme Court noted examples of common questions that were raised in that case and then explained that they are not sufficient to establish commonality under Rule 23:

> For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification.

Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. *Id.* "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.*

The plaintiffs' "claims must depend upon a common contention" and that common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at *7. As the Supreme Court further explained:

> What matters to class certification . . . is not the raising of common "questions" – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what the potential to impede the generation of common answers.

*Wal-Mart Stores, Inc., supra*, at 2551 (internal citations omitted.) (emphasis in original).

Here, Plaintiffs' Motions for Class Certification were all filed before the Supreme Court issued *Wal-Mart Stores, Inc.* Thus, Plaintiffs assert that showing one common question of law or fact is sufficient to establish commonality and Plaintiffs offer the same kinds of broad questions

38

that the Court found insufficient in *Wal-Mart Stores, Inc.* (e.g., did all class members' OnStar equipment cease to function on December 31, 2007?). Because they did not have the benefit of *Wal-Mart Stores, Inc.*, Plaintiffs have not identified a common contention that is capable of classwide resolution and which the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

Even if they could do so, however, as explained later, the Court concludes that Plaintiffs cannot establish that common questions of fact or law common to class members *predominate* over individual issues.

### C.   Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The premise of typicality is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). As in *Sprague,* the Plaintiffs cannot show that here.

In *Sprague*, the Sixth Circuit found that typicality was lacking where, in pursuing their own claims, the named plaintiffs could not advance the interests of the entire class. The court explained:

> Each claim, after all, depended on each individual's particular interactions with GM – and these, as we have said, varied from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.

*Id.*

As will be discussed in more detail in the predominance section of this Opinion & Order,

due to the nature of their claims, there are individualized issues that would have to be determined as to each Plaintiff (e.g., reliance or causation).  In addition, Defendants may assert unique defenses against each class member's consumer protection act and warranty claims (e.g., expiration of warranty term or statute of limitations defense).  As this Court explained in *Serrano*, where a defendant has unique defenses against each class member's individual claim, a case is unsuitable for class action:

> "Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members, *Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir. 2006), the typicality premise is lacking, for – under those circumstances – it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members."  *Romberio v. UnumProvident* Corp., 2009 WL 87510 (6th Cir. Jan. 12, 2009) (unpublished).

*Serrano v. Cintas Corp.*, 2009 WL 910702 at * 8 (E.D. Mich. 2009).

Here, Proof or disproof of a given named plaintiff's consumer protection or warranty act claim will not necessarily prove or disprove the claims of any other class members.  For example, if OnStar is able to disprove Bruce Johnson's claims (*see* pages 56-57 of this Opinion & Order), or disprove Carey Stein's claims (*see* page 49 of this Opinion & Order), that would not prove or disprove any other Plaintiff's claims against OnStar.

### D.    Adequacy Of Representation

"Rule 23(a)(4) allows certification only if 'the representative parties will fairly and adequately protect the interests of the class.'" *In re American Medical Sys., Inc.,* 75 F.3d at 1083.  "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members."  *Id.*   The Sixth Circuit has articulated two criteria for determining

adequacy of representation: 1) the representative must have common interests with unnamed members of the class; and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Id.* "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.*

It is well established that "the party seeking the class certification bears the burden of proof" and that Rule 23(a) contains four prerequisites, including adequacy of representation, "which must *all* be met before a class can be certified." *In re American Medical Sys., Inc.*, 75 F.3d at 1079 (emphasis in original).

Plaintiffs do not have a named Plaintiff who can represent the proposed Subaru class of Oregon residents. Thus, the Court cannot certify a Subaru class of Oregon residents.

If all of the other requirements for class certification were met, this Court does not believe that adequacy of representation would pose a significant obstacle to certification - except as to the proposed Subaru class of Oregon residents. Because, as explained below, the Court concludes that Rule 23(b)'s predominance requirement is not met, the Court need not analyze this requirement further.

## II.   Rule 23(b) Requirements

If the party seeking certification demonstrates that the requirements of Rule 23(a) are met, then the Court must consider whether one of the three requirements in Rule 23(b) has been met. Here, Plaintiffs assert only[3] that the requirements of Rule 23(b)(3) have been met.

---

[3]That is, Plaintiffs do not assert that the requirements of Rule 23(b)(1) or (2) have been met.

"Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Wal-Mart Stores, Inc.,* 131 S.Ct at 2549 n.2.

"Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the *more stringent requirement* that common issues 'predominate' over individual issues." *In re American Medical Sys., Inc.,* 75 F.3d at 1084 (emphasis added).

### A.   Predominance Requirement As To Motion To Certify MCPA Claims Against OnStar

Here, Plaintiffs are asking this Court to certify a nationwide class as to Plaintiffs' MCPA claims against OnStar. Plaintiffs allege that "OnStar's statements, representations, omissions, and practices made in connection with their sale or lease of OnStar equipment and service as alleged herein were in violation of the following sections of the MCPA § 445.903(1):

> a. § 445.903(c) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have or that a person has sponsorship, approval, status, affiliation, or connection, which he does not have.
>
> b. § 445.903(n) by causing a probability of confusion or of misunderstanding as to the legal rights, obligations or remedies of a party to a transaction.
>
> c. § 445.903(p) by disclaiming or limiting the implied warranty of merchantability and fitness for use, without clearly and conspicuously disclosing a disclaimer.
>
> d. § 445.903(s) by failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.
>
> e. § 445.903(bb) by making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the

represented or suggested state of affairs to be other than it actually is.

   f. § 445.903(cc) by failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.

   g. § 445.903(g) by failing to advertise or represent goods and services with intent not to dispose of them as advertised and represented.

   h. § 445.903(y) by failing to provide promised benefits and making gross discrepancies between oral and written representations.

(SMAC at ¶ 204).

"The provisions of the MCPA are to be construed with reference to the common-law tort of fraud." *Kussy v. Home Depot U.S.A., Inc.*, 2006 WL 3447146 (E.D. Mich. 2006) (citing *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178 (1983)).[4]  To establish a claim for fraud or misrepresentation, a plaintiff must establish: 1) that the defendant made a material misrepresentation that was false; 2) the defendant knowingly made the false representation with the intent that the plaintiff would act upon it; 3) that the plaintiff acted in reliance upon it; and 4) resulting damages. *Baker v. Arbor Drugs, Inc*., 215 Mich.App. 198 (1996).

A material fact for purposes of the MCPA is "one that is important to the transaction or affects the consumer's decision to enter into the transaction." *Zine v. Chrysler Corp*., 236 Mich.App. 261, 283 (1999).  For purposes of the MCPA, a "transaction" is the business conducted between the parties. *Id*. at 280.

The Court concludes that the MCPA claims asserted by the proposed OnStar class raise numerous individualized issues that predominate over any common issues.  Below are just a few

_____

[4]In their OnStar Reply, Plaintiffs assert that there are thirty-three sections of the MCPA but only two of those sections (§§ 445.903(1)(s) and (bb)) require reliance.  Notably, Plaintiffs claim that OnStar violated *those two very sections*.  (*See* SMAC at 51).  The fact that Plaintiffs included allegations regarding other sections, some of which are hard to see how they could apply to the facts here, does not alter the fact that reliance is required as to the claims Plaintiffs allege.

examples of such individualized issues.

### 1. Individual Inquiries Regarding Reliance

OnStar contends that reliance is a required element of Plaintiffs' MCPA claims and, under the facts of this case, that element requires individualized determinations.

"Subsection 3(1)(s) [of the MCPA] prohibits making an omission that tends to mislead or deceive any consumer, but only if the omitted fact could not be reasonably known by that consumer. Thus, the issue is not whether the omission is misleading to a reasonable consumer but whether the consumer could reasonably be expected to discover the omission at issue." *Zine,* 236 Mich.App. at 398. OnStar contends that this creates individual reliance questions since if a consumer reasonably could have discovered the omission, he could not rely on it under the MCPA.

Under *Zine*, in order for a fact or omission to be "material" for purposes of the MCPA, it must be "one that is important to the transaction or affects the consumer's decision to enter into the transaction." *Zine v. Chrysler Corp.*, 236 Mich.App. 261, 283 (1999). OnStar contends that "in order to recover under the MCPA, putative class members would have to establish that any alleged misrepresentation or omission was material to them and that they relied on the alleged omission or misrepresentation in entering into the vehicle purchase or lease transaction." (OnStar's Br. at 31).

Plaintiffs assert that reliance need not be individually proven because the Plaintiffs can establish reliance on a class-wide basis using a reasonable consumer standard. Plaintiffs primarily rely on *Dix* and *Gasperoni*. *Dix v. American Bankers Life Assur. Co. of Florida*, 429 Mich. 410 (1987); *Gasperoni v. Metabolife International, Inc.,* 2000 WL 33365948 (E.D. Mich.

2000).

In *Dix*, the Michigan Supreme Court ruled that "members of a class proceeding under the [MCPA] need not individually prove reliance on the alleged misrepresentations.  It is sufficient if the class can establish that a reasonable person would have relied on the representations."  *Dix*, 429 Mich. at 418.  The court explained that while a "class action should not be allowed if practical problems would make it unmanageable, the issues of fact and law presented in the Consumer Protection Act count do not differ so much from claim to claim that a class action would not be manageable."  *Id.*  The court noted that alleged misrepresentations that formed the basis of the MCPA count in that case were "all substantially similar."

In *Gasperoni,* the plaintiffs sued the defendant manufacturer of a diet product called Metabolife 356 for failure to warn consumers that an ingredient in the product is capable of producing adverse health problems.  "The product label identifie[d] Metabolife 356 as an 'herbal formula to enhance your diet and provide energy,' and state[d] that the product is 'indendently laboratory tested for safety.' ('*Based upon multi-species clinical laboratory testing.')."  *Id.* at *1. The plaintiffs, "who purchased and ingested Metabolife 356," claimed that "Metabolife's labeling is deceptive and misleading because it fails to warn Michigan consumers of the adverse health effects of ephedrine, it fails to adequately disclose to consumers that the use of the product has not been clinically tested or FDA approved, and it fails to warn consumers that possession of a certain amount of ephedrine (the equivalent of 10 bottles of Metabolife 356) is against Michigan law and actually encourages consumers to possess such amounts by giving them a discount for purchases of 10 bottles or more."  *Id*.  The plaintiffs asserted that the defendant's product labeling constituted a fraudulent misrepresentation under the MCPA. *Id.*

45

The defendant manufacturer opposed class certification, asserting that individual issues predominated over common issues.  The defendant asserted that an individualized inquiry would be necessary for each class member in order to establish reliance. Replying on *Dix*, the district court ruled that reliance could be established in that case on a class-wide basis.  Before so concluding, however, the district court expressly noted that the "essence of plaintiffs' case is that the *bottle label* is deficient and incomplete."  *Id.* at *6 (emphasis in original).  Thus, the "only legal issue to be decided" in that case was is "whether the label, taken as a whole, is materially misleading."  Notably, "every purchaser" was exposed to the information on the label.  *Id.*

OnStar contends that, under the facts and circumstance of this case, "Plaintiffs cannot show that any misrepresentations or omissions were 'substantially similar,' let alone the same, among the members of the putative class which encompassed vehicle purchases over a 4 ½ year period.  To the contrary, the record establishes that putative class members purchased their new or used vehicles from other persons or independent dealerships, had individual interactions with sales persons, were provided different documents with different forms of disclosure, and in many instances performed their own individual investigations prior to the purchase or lease of the vehicles.  Further compounding the issue, the disclosure information changed over the 4 ½ year class period."  (OnStar's Br. at 32).  OnStar asserts that, "[u]nder these circumstances, it would be impossible to apply a 'reasonable consumer' standard since there is no common representation or omission to measure.  In short, where the record establishes that no common representation or omission exists, and that materiality and reliance, required elements under the MCPA, would vary from consumer to consumer, the use of a reasonable consumer standard is not even possible."  (OnStar's Br. at 33).

The Court agrees that, under the unique circumstances presented here, it would be impossible for this Court to apply a reasonable consumer standard as to reliance class-wide because the putative class members received different disclosures, from different sources, at different times, and the disclosures changed over time.

Moreover, there is no dispute that an individual asserting a claim under subsection (s) of the MCPA for a defendant's failure to "reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer" must establish reliance. If, in certifying a class action under FED. R. CIV. P. 23, this Court were to apply a "reasonable person" standard to determine reliance on a class-wide basis, that would prevent Defendant OnStar from asserting a statutory defense that it would be able to assert in an individual action. To do so would go against the Supreme Court's recent decision in *Wal-Mart Stores, Inc.*, wherein it stated:

> Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b); *see Ortiz*, 527 U.S., at 845, 119 S.Ct. 2295, a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims.

*Wal-Mart Stores, Inc., supra*, at * 15.

## 2.    Individual Inquiries Regarding Damages

An individual asserting a claim under the MCPA can recover "actual damages or $250.00, whichever is greater, together with reasonable attorneys' fees." M.C.L. § 445.911(2)**.** With respect to class actions, however, the damages that may be recovered by a class member are limited to the "actual damages" caused by the violation of the Act. M.C.L. § 445.911(3).

Plaintiffs' claim that OnStar's violation of the MCPA proximately caused damages to

47

Plaintiffs and Class members, including: a) the amount paid for their OnStar equipment; b) the cost for repair, replacement or upgrade; c) additional fees and costs to renew service; and d) their inability to obtain OnStar service after December 31, 2007.  (SMAC at ¶ 206).

OnStar asserts that "because of the individual inquiry needed to establish a class member's actual damages, as least three district courts have held that certification of a damage class is not appropriate under the MCPA."  (OnStar's Br. at 28).  On Star directs the Court to the following three cases:  *Peters v. Cars-to-Go*, 184 F.R.D. 270, 278 (W.D. Mich. 1998) (declining to certify damage class because determination of actual damages under MCPA would require an individual analysis); *Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.,* 182 F.R.D. 500, 509 (W.D. Mich. 1998) (declining to certify damage class because determination of class members' actual damages would require individual proofs); *Lackowski v. Twin Lab Corp.*, 2001 U.S. Dist. LEXIS 25634, at *24-25 (E.D. Mich. 2001) (same).

OnStar contends that determining whether any given member of the proposed class can establish actual damages, and what such damages would be, would require inherently individual inquiries.  The Court agrees.  Below are just two examples of such individualized damages inquiries.

> **a.** **Individual Inquiries To Determine If Class Member Had Knowledge Prior To Purchase Or Lease**

The record establishes that information regarding the Analog Sunset Order, and its effect on OnStar equipment and service, was available to putative class members from a variety of sources.  OnStar asserts that any class member who had actual knowledge of the change and its impact on the OnStar equipment in his or her vehicle and purchased or leased the vehicle anyway

cannot establish any injury under the MCPA because they cannot establish a violation of the MCPA.  The Court agrees.

Named Plaintiff Carey Stein illustrates this issue.  It is undisputed that before Stein purchased his vehicle, OnStar notified him in writing that the OnStar telematics system in the vehicle he had leased was analog only and would not work after December 2007 unless he upgraded the equipment.

Class members like Stein, who at the time of purchase had full information regarding the OnStar equipment and the effect the analog shut-down would have on that equipment and purchased their vehicle anyway, likely have no claim under the MCPA.  *See Kussy v. Home Depot USA, Inc.*, 2006 U.S. Dist. LEXIS 90024, *17-19 (E.D. Mich. 2006) (because plaintiff knew the true facts at the time of purchase, his MCPA claim failed).  Yet, such class members could not be identified without obtaining discovery.

### b.   Individual Inquiries To Determine Any Damages For The Inability To Obtain OnStar Service After December 31, 2007

The damages that the proposed class seeks to recover from OnStar include damages to compensate Plaintiffs for "their inability to obtain OnStar service after December 31, 2007." (SMAC at ¶ 206).

OnStar contends that "many members of the proposed class may not have valued the OnStar service, and therefore the loss of the service caused them no 'actual damages.'  As noted by Stombom in his expert report, by choosing not to upgrade their vehicles, many class members revealed that their 'net valuation of OnStar service is zero,' and that 'to determine whether these proposed class members did not upgrade because they placed no value on OnStar or for some

other reason will require individual inquiry.'" (OnStar's Br. at 29).

This is not a hypothetical argument. The testimony from one of the named Plaintiffs, Carey Stein, illustrates this issue.

Stein leased a 2004 Cadillac CTS in 2003. Stein testified that he purchased that vehicle on May 24, 2007, shortly before the lease expiration. Before Stein purchased the vehicle, he knew that the OnStar equipment in the vehicle would not work after December 2007 unless he paid a fee to upgrade the equipment. Stein further testified that, after purchasing the vehicle, his wife chose to purchase another vehicle and he began driving the CTS. Stein testified that it "never even crossed his mind" to upgrade the OnStar equipment in the vehicle simply because he does not use or want OnStar service. Stein's testimony reflects that Stein would not want or activate OnStar service in his vehicle even if he did not have to pay to upgrade the equipment. (Stein Dep. at 26,-27, 53, 56).

Given that testimony, Stein cannot establish that he incurred any actual damages for his "inability to obtain OnStar service after December 31, 2007." Other members of the class, however, may actually use and value OnStar service and could maintain a damage claim for their inability to obtain OnStar service after December 31, 2007. The only way to determine whether a class member could establish damages for their inability to obtain OnStar service would be to obtain discovery on the issue.

### 3.   Individual Inquiries Required To Determine If "Consumer Good"

Again, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative[s] is an implied prerequisite of Federal Rule of Civ Procedure 23." *John v. National Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). As such, a class

50

definition should be based on objective criteria so that class members may be identified without individualized fact finding.  *Id.; Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986); *see also* 7A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1760 (3d ed.) (The class description must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.")

Here, the proposed OnStar Class includes, in pertinent part, "[a]ll *persons or entities* residing in the United States who between August 8, 2002 and December 2006, purchased or leased a vehicle equipped with an analog OnStar system" and excludes from the class "*any persons or entities who purchased their vehicles primarily for commercial or business purposes*."  (Pls.' OnStar Motion at ¶ 1) (emphasis added).

The intent behind the MCPA is to protect consumers in their purchases of goods which are primarily used for personal, family or household purposes.  *Zine*, 236 Mich.App. at 271.  "[I]f an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection."  *Id.* at 273.

"*Zine* demonstrates that the relevant inquiry is how the plaintiff puts the consumer good to use."  *Sautner v. Fleetwood Enterprises, Inc.,* 2007 WL 1343806 (E.D. Mich. 1999); *see also Tang v. Putruss*, 2007 WL 2909527 at * 3 (E.D. Mich. 2007).  Motor vehicles can be purchased for commercial use, personal use, or both.  It is the primary way in which the party utilizes the vehicle that determines whether the MCPA applies.  *Sautner, supra.*

"The applicability of the MCPA is to be decided on a case-by-case basis."  *Edwards v. Cape to Cairo*, LLC, 2010 WL 986502 Mich.App. 2010 (citing *Nelson v. Ho*, 222 Mich.App. 74, 84 (1997)).  This is so because, as demonstrated by *Zine* and *Sautner*, the determination of

whether a particular good was used primarily for personal or commercial use is a fact-intensive inquiry.

In *Zine*, the plaintiff asserted a MCPA claim relating to his purchase of a truck.  The appellate court reversed the trial court's denial of the defendant's motion for summary disposition because, based on the plaintiff's deposition testimony, "reasonable minds could not differ in concluding that Zine purchased the truck primarily for business rather than personal use." *Zine, supra*, at 275.

In *Sautner*, the plaintiff asserted a MCPA claim relating to her purchase of a motor home. The defendant sought to dismiss that claim on several grounds, including that the motorhome was purchased primarily for commercial rather than personal use.  The trial court noted that there was evidence submitted by the parties indicating that the plaintiff used the motorhome for both commercial and business use and that "reasonable minds could differ" as to whether it was used primarily for business purposes.  Thus, the issue would have been determined by a jury had the court not dismissed the MCPA claim on other grounds.

OnStar contends that because persons who purchased their vehicles primarily for business use cannot assert a claim under the MCPA, the proposed OnStar class is not reasonably ascertainable because an individualized determination will be required to determine whether an individual or entity who purports to be a class member purchased their vehicle primarily for business or personal use.  OnStar states that "[t]here are no documents in the possession of OnStar, or any other data base for that matter, which would identify which proposed class members acquired and used vehicles for personal use as opposed to business use.  Instead, such information could only be obtained from each individual class member by written discovery and

deposition, since OnStar has the right to challenge the standing of persons seeking to recover against it."  (OnStar's Br. at 38).

In response, Plaintiffs assert that other courts have rejected such arguments.  Plaintiffs direct the Court to two cases: 1) *Gradisher v. Check Enforcement Unit, Inc*., 203 F.R.D. 271, 277 (W.D. Mich. 2001), a case that involved FDCPA claims, not claims under the MCPA; and 2) *Perry v. Beneficial Finance Co. of New York, Inc.*, 81 F.R.D. 490, 496 (W.D. N.Y. 1979), a case involving TILA claims, not claims under the MCPA.   Plaintiffs contend that by excluding "persons or entities who purchased their vehicles primarily for commercial or business purposes" from the class definition, they have somehow resolved this issue.  They have not.

If the proposed OnStar class were certified, this issue would require individualized determinations to be made with respect to individuals[5] purporting to be in the proposed class.

Many people purchase or lease vehicles for both personal and business uses (eg., realtors, salespersons, small business owners, construction workers, etc.).  Excluding "persons or entities who purchased their vehicles primarily for commercial or business purposes" from the proposed class will not resolve this issue.   If a person purchased a vehicle for both personal and business uses, who decides which use is *primary*?  Plaintiffs' position appears to be that the class plaintiffs would simply make that determination on their own - but that gets us nowhere.  The Plaintiffs in both *Zine* and *Sautner* believed their personal use of their vehicle was primary and

---

[5]The Court notes that the proposed class definition includes "entities" who purchased or leased vehicles with OnStar equipment.  It is very unlikely that any "entity" that is not a natural person purchased or leased a vehicle "primarily for personal, family, or household purposes." *Robertson v. State Farm Fire & Cas. Co.*, 890 F.Supp. 671, 679 (E.D. Mich. 1995); *see also German Free State of Bavania v. Toyota Co.,* 480 F.Supp.2d 958, 968 (W.D. Mich. 2007).

their commercial use secondary – that is why they filed suit under the MCPA.  But the defendant

can challenge that assertion and establish that the plaintiff's primary use was commercial,

thereby entitling it to summary judgment.[6]

Accordingly, if the proposed class were certified, this issue that would require

individualized determinations to be made with respect to individuals purporting to be in the

proposed OnStar class.

### 4.    Individual Determinations Regarding Plaintiffs Who Purchased Used Vehicles With Existing OnStar Equipment

OnStar notes that the proposed class would include persons who purchased used vehicles

that had OnStar equipment and contends that used car purchasers present a whole host of unique

issues.

OnStar contends that "used car transactions present significant differences in, among

other things, the channels of distribution (i.e., private transaction or purchase from a dealership),

the amount and quality of information available to buyers, the condition of the vehicles at the

time of purchase, and the prices paid for the vehicles."  (OnStar's Br. at 26-27).  It further states:

For example. OnStar and vehicle manufacturers have little or no input or control

---

[6]Plaintiffs appear to suggest that because their proposed class excludes those who purchased/leased their vehicles primarily for commercial reasons, that OnStar would not have the ability to challenge any purported class member's MCPA claim on the basis that his or her purchase was primarily for commercial use.  Again, the Court concludes that certifying a class on the premise that the defendant will not be entitled to litigate its defenses to individual claims would go against the Supreme Court's recent decision in *Wal-Mart Stores, Inc.*, wherein it stated: "Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b); *see Ortiz*, 527 U.S., at 845, 119 S.Ct. 2295, a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims."  *Wal-Mart Stores, Inc., supra*, at * 15.

over the sale of a used vehicle in a private transaction.  This is import since, as evidence by Plaintiff Kuller, original owners of the vehicle may have known of the analog shut down and the type of equipment in their vehicle, and then sold their vehicle in a private transaction in which they may or may not have disclosed that information to the purchaser.

(*Id.*).

OnStar also contends that used car sales raise legal issues under the MCPA because OnStar played no role in private vehicle sales transactions.

The plaintiffs in *Zine,* like the Plaintiffs here, asserted a MCPA under M.C.L. § 445.903(1)(cc) for "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  The named plaintiff in *Zine* was an individual who purchased a new truck from an automotive manufacturer.  The manufacturer provided one booklet in each new vehicle it sold that contained information relevant to the lemon laws of those states that require the manufacturer to provide such information.  The plaintiff claimed that the manufacturer violated the MCPA by voluntarily undertaking to provide information about some states' lemon laws without disclosing the existence or terms of Michigan's lemon law.  The manufacturer asserted the term transaction as used in subsection (1)(cc) refers to the sale of the vehicle and that anything that happened after the sale is irrelevant. The Court agreed, stating that "a 'transaction is the business conducted between the parties, which in this case would be the negotiations that concluded in Zine's agreement to buy the truck. Because subsection 3(1)(cc) refers to the failure to reveal information material to the transaction, it can be reasonably understood only as referring to information withheld during the negotiations and up to the time of the transaction, in this case a sale of a vehicle, is complete." *Zine*, 236 Mich.App. at 280-81

OnStar contends that because it plays no role in most used car transactions, an analysis of each transaction would be necessary to determine if OnStar could have any liability under the MCPA in such transactions.  (OnStar's Br. at 27).

Named Plaintiff Bruce Johnson's deposition testimony illustrates this issue.  In 2006, Johnson purchased a used 2005 Buick Park Avenue from Liberty Buick, a dealer in Arizona. (SMAC at ¶ 126; Johnson Dep., Defs.' Ex. 58, at 15).  Johnson subscribed to OnStar service after purchasing the used vehicle (SMAC at ¶ 126) but, because the equipment in his vehicle cannot be upgraded, it was inoperable after the sunset date.

During class certification discovery, Johnson testified that, at the time that he was shopping for that vehicle, he was aware that the "switchover" from analog to digital was coming in the future.  Johnson and his wife told the salesperson at the dealership that they "wanted to make sure OnStar would work long term after the changeover."  Johnson knew the OnStar equipment in the vehicle he purchased was not already set to work on a digital network.  The salesperson, however, told Johnson and his wife that the OnStar equipment in the vehicle could be upgraded but in fact it cannot be upgraded.  Thus, Johnson testified that the salesperson told him that the existing OnStar equipment in the vehicle he purchased could be upgraded, which was untrue, and that Johnson purchased the vehicle based on the salesperson's representation. Johnson further testified that, at the time he purchased the vehicle, no representations about the equipment had been made to him by OnStar.

Under such facts, the Court fails to see how Johnson could establish that OnStar violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  OnStar played no role in the "transaction" at

issue (ie., the sale of the used vehicle to Johnson).

The Court agrees that a case-by-case analysis would be required as to class members who purchased used vehicles containing OnStar equipment.

Accordingly, due to all of these individualized issues, the Court concludes that common issues do not predominate over individualized issues and therefore Rule 23(b)'s predominance requirement is not met as to Plaintiffs' MCPA claims against OnStar.

**B.     Predominance As To Motions To Certify Claims Against Honda, Subaru And VW**

Plaintiffs seek class certification of their consumer fraud and express warranty claims against: 1) Honda under the laws of Washington, California, New York and Florida; 2) Subaru under the laws of Washington, Pennsylvania, New York and Oregon; and 3) VW under the laws of California, Colorado, New York and West Virginia.

As explained below, the Court concludes that Rule 23(b)'s predominance requirement is not met as to Plaintiffs' consumer protection and warranty claims against Honda, Subaru or VW.

**1.     Individual Determinations As To Consumer Protection Act Claims**

Again, the court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Madison,* 637 F.3d at 555; *Reeb,* 435 F.3d at 644-45.

Here, Count II alleges "Unfair and Deceptive Trade Practices In Violation Of All States' Consumer Protection Acts." That Count alleges that "each Manufacturer Defendant's [ ] actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed" in

Count II.  Count II then alleges that each Manufacturer Defendant has engaged in:

> (e) . . . unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. and the Consumers legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq;*
>
> (f) . . . unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105 *et seq*.;
> . . . .
> (j) . . . unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201 *et seq*.;
> . . . .
> (ff) . . . unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.;
> . . . .
> (kk) . . . unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605 *et seq*.;
> (ll) . . . unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq*.;
> . . . .
> (uu) . . . unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010 *et seq*.;
> (vv) . . .  unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101 *et seq*.;

(SMAC at 54-60).

As to each of the above consumer protection acts or statutes, Plaintiffs' SMAC alleges that Defendants violated the statute but *do not specify the provision(s) of each statute that they allege were violated.* [7]  Plaintiffs' motions for class certification also fail to specify the provisions of the statutes that they allege were violated.  For example, Plaintiffs allege that Honda and VW have violated California's CLRA.  "To make out a CLRA violation, a plaintiff

---

[7]This is in contrast to Count I of the SMAC, wherein Plaintiff's assert a claim under the MCPA and specify the provisions they claim were violated.

must show that the defendant committed one of 23 enumerated unlawful practices." *Webb v. Carter's Inc.*, 272 F.R.D. 489, 501 (C.D. Cal. 2011).  Here, Plaintiffs have not identified which enumerated unlawful practice or practices they allege that Honda or VW committed.

Plaintiffs' failure to identify the specific provisions of each statute that they claim the Manufacturer Defendants violated impairs this Court's ability to understand the claims, defenses, and applicable substantive law in order to make the required meaningful determination of the certification issues.  This is because different unlawful practices will have different essential elements, different defenses may apply, and the case law concerning the statutes will differ based upon the provision at issue in a given case.  Nevertheless, the Court concludes that numerous individualized issues would arise under the seven consumer protection acts at issue.[8] *See Pilgrim, supra* at * 2 ("the differences between the consumer-protection laws of the many affected States would cast a long shadow over any common issues of fact plaintiffs might establish.").

Individualized determinations as to causation or reliance are the biggest obstacle to certification of the proposed classes.

Plaintiffs contend that causation and/or reliance can be established class-wide by common proofs, while the Manufacturer Defendants contend that, under the facts of this case, that is simply not possible.  As to each of the states at issue, Plaintiffs and the Manufacturer Defendants direct the Court to cases that support their respective positions.  A review of the parties' positions on this issue under California law illustrates their positions.

Plaintiffs assert that California courts allow an objective "reasonable consumer" standard

---

[8]Individualized issues would also arise under Oregon's consumer protection act, but there is no named Plaintiff who can represent Oregon residents.

59

to be used in consumer protection act cases and assert that Plaintiffs can therefore establish

consumer protection act violations under California law "using common proof."  Plaintiffs direct

the Court to *Williams v. Gerber Prods. Co.*, 523 F.3d 934, 938 (9th Cir. 2008).  That case

involved claims that the packaging for snacks for toddlers violated the UCL and CLRA because

the packaging contained misleading deceptive and false statements as to nutritional content of the

snacks.  A "reasonable consumer" standard can be applied in such a case because the claim is

based on the product label and thus every consumer who purchases those snacks reviews the

same product label.

Defendants, on the other hand, direct the Court to decisions wherein individualized

determinations regarding reliance and causation were required.

"It is well settled that to obtain relief under the CLRA, both the named plaintiff and

unnamed class members must have suffered some damage *caused by* a practice deemed unlawful

under" the statute.  *Sevidal v. Target Corp.*, 189 Cal.App.4th 905, 929 (2010) (emphasis in

original); *see also Gartin v. S&M NuTec, LLC*, 245 F.R.D. 429, 440 (C.D. Cal. 2007) ("Relief is

limited to those who actually suffered damages, so causation is a requirement of relief under

CLRA.").  Defendants assert that any class members who had actual knowledge of the change

and its impact on the OnStar equipment in the vehicle at issue and then purchased the vehicle

anyway (i.e., a consumer like Stein) cannot establish any damages caused by the alleged failure to

disclosure.

In addition, Honda and VW both direct the Court to *Cohen*, wherein the appellate court

affirmed the trial court's denial of a motion for class certification of claims under the CLRA.  In

doing so, the court held that the "trial court correctly ruled that actual reliance must be

established for an award of damages under the CLRA." *Cohen v. DIRECTV, Inc.*, 178 Cal.App.4th 966, 980, 101 Cal.Rptr.3d 37, 47-48 (Ct. App. 2009); *see also In re Ferrero Litigation*, __ F.Supp.2d __, 2011 WL 2579787 at *2 (S.D. Cal. 2011) (actual reliance is required to have standing to sue under both the UCL and the CLRA).

Honda also directs the Court to *Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011), wherein the district court denied a motion seeking to certify claims under the UCL and CLRA. The *Webb* court explained that, in some cases, it is possible for a reasonable consumer standard to be used. However, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, then a reasonable consumer standard cannot be applied and the issue is not subject to common proof. The trial court ruled that, in light of "persuasive evidence that materiality and reliance would vary from consumer to consumer," those elements are "not subject to common proof under the reasonable consumer standard and that individual issues predominate with respect to the CLRA claims." *Id*. at 503.

This Court agrees with Defendants that, under the unique circumstances presented here, it would be impossible for this Court to apply a "reasonable consumer" standard as to reliance class-wide because the putative class members received different disclosures, from a variety of sources, and those disclosures changed over time. Plaintiffs have never identified how a "reasonable consumer" standard could possibly be used in this case (i.e., a "reasonable consumer" who received which disclosures? From which sources? At what times?).

In addition, as explained in the preceding section discussing OnStar, if an individual asserting a consumer protection act claim is required to prove reliance, then applying a "reasonable person" standard in a class action would prevent the Manufacturer Defendants from

asserting a statutory defense that they would be able to assert in an individual action.  To do so

would go against *Wal-Mart Stores, Inc*., *supra*.

Reliance and causation cannot be established class-wide and therefore individualized

determinations will have to be made on those elements.  That alone warrants denial of the

pending class certification motions against Honda, Subaru and VW.

But reliance and causation are not the only issues that will require individualized

determinations.   The individualized damages issues, and issues relating to used car transactions,

discussed above as to OnStar, would also exist with respect to the claims against Honda, Subaru,

and VW.  In addition, the Manufacturer Defendants have identified other individualized issues,

including other damages issues and issues regarding statute of limitations defenses.

### 2.      Individual Determinations As To Express Warranty Claims

Individualized issues also abound as to Plaintiffs' express warranty claims against the

Manufacturer Defendants.

### a.      Threshold Determinations Regarding Mileage / Durational Limits And Unconsionability

Plaintiffs' express warranty claims will require threshold individualized determinations as

to the mileage and durational limits of each warranty and/or individualized determinations as to

unconscionability.

When this Court ruled on the Defendants' Motions to Dismiss, the Court had not made

any choice-of-law rulings.  The Court noted that the vast majority of courts to consider the issue

have ruled that any alleged "defect" that occurs outside of the time or mileage limits of the

applicable written warranty may not be the basis for an express warranty claim. (*See* D.E. No.

100 at 25).  The Court recognized that two outlier cases, *Carlson* and *Bussain,* held that it was premature to dismiss such claims at the pleading stage, where the complaint also alleged that the express warranties were unconscionable and unreasonable.  But this Court noted that the complaint before it *did not* allege unconscionability:

> As Defendants note, however, in both *Carlson* and *Bussain*, the plaintiffs' complaints specifically alleged that the express warranties failed as matter of law because they are unconscionable and unreasonable.  Here, the MAC contains no allegations whatsoever that the express written warranties given by the Manufacturer Defendants, or the mileage or durational limits contained within same, are unconscionable or unreasonable.  Thus, the express warranty claim in the MAC can easily be distinguished from such claims alleged in *Carlson* and *Bussain*.

(Opinion on Motions to Dismiss at 31-32).

Thus, the Court ruled that the express warranty claim in the MAC failed to state a claim for relief as to those named-Plaintiffs whose express written warranties had expired prior to the cut-off of analog service.  The Court *did not rule* whether or not a Plaintiff whose express written warranty had expired, but who also alleged unconscionability, stated a breach of express warranty claim.

Plaintiffs later amended their breach of express warranty claim to include allegations regarding unconscionability but, under the Case Management Order in place, Defendants did not have an opportunity to challenge the amended express warranty claim in a subsequent motion to dismiss.

This Court has since ruled that Plaintiffs' claims against Honda, Subaru, and VW are governed by the law of each Plaintiff's home state (i.e., the law of the state wherein each plaintiff resides).  The only two decisions Plaintiffs identified wherein a court allowed this type of express

warranty claim to proceed based on allegations of unconscionablity are *Bussain* (issued by the Fourth Circuit, which covers West Virginia, Maryland, Virginia, North Carolina and South Carolina) and *Carlson* (issued by a United States District Court in North Carolina.).  Plaintiffs are asking the Court to certify a VW class that would include West Virginia purchasers.  The rest of the states at issue, however, have not adopted the minority position taken in *Bussain* and *Carlson.*  Thus, the Court concludes that the only plaintiffs whose express warranties expired before the cutoff who may proceed with an express warranty claim are those who assert that claim against VW under West Virginia law.

As to all other Plaintiffs, an individualized inquiry would be necessary to determine whether each member of the class was within the time and mileage limits of his/her original express warranty, or any extended warranty.  VW's brief illustrates the practical impact of this issue:

> The evidence shows that three out of five of the VW/Audi plaintiffs were outside of their warranty mileage term.  This alone demonstrates the diversity among putative class members on this issue.  But there is also no way to determine the vehicle mileage of each putative class member as of December 31, 2007 without individual inquiry. [VW] does not have repair records for every vehicle sold or leased, and even if such records were available, they would not indicate whether a putative class member's warranty had expired due to mileage.  For example, if someone had their car repaired at a [VW] dealership in 2005 at 35,000 miles but never brought it in for repair afterwards, there is no way to know if and when they exceeded the 50,000 mile limit, except to seek individualized evidence from the putative class member.

(VW's Br. at 25).

Moreover, even as to the proposed class of West Virginia residents who seek to assert an

express warranty claim against VW, the claim will require individualized determinations.[9]

### b.      Other Individualized Issues

And warranty terms / claims of unconscionability are not the only issues that will require individualized determinations with respect to the breach of express warranty claims.   The Manufacturer Defendants have identified numerous individualized issues, including issues regarding reliance, causation and benefit of the bargain, and damages.

### B.      Superiority:

Although the Court need not proceed further, given its conclusion that Plaintiffs have not met Rule 23(b)'s predominance requirement with respect to any of the pending motions, the Court also concludes that Plaintiffs have not established that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

The matters pertinent to the superiority inquiry include:  "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action."  FED. R. CIV. P. 23(b)(3).  The most important factor as to the

---

[9]Under West Virginia law, "determinations of unconscionability must be made on a 'case-by-case basis.'"  *State ex rel. AT&T Mobility, LLC v. Wilson*, 226 W.Va. 572; 703 S.E.2d 543 (W.Va. 2010).  Under West Virginia law, claims of unconscionability are analyzed "in terms of two component parts: procedural unconsionability and substantive unconscionability."  *Brown v. Genesis Healthcare Corp*., __ S.E.2d __, 2011 WL 2611327 (W.Va. 2011).  "Procedural unconscionability addresses inequities, improprieties, or unfairness in the bargaining process and the formation of the contract."  *Id.*  Procedural unconsionability looks at a variety of factors, including the plaintiff's age, education and literacy, intelligence, and business savvy and experience. *Id.*  Such factors will differ widely among the proposed class members.  For example, some of the named Plaintiffs are attorneys (*see* e.g., Stein Dep. at 5 & Golish Dep. at 7), and would have a more difficult time establishing procedural unconscionability than other proposed class members.

superiority inquiry in this case, where each Plaintiff asserts his or her claims against both OnStar and the Manufacturer Defendant who made his or her vehicle, and where different law would be applied to the claims against OnStar and the manufacturer Defendants, is manageability. Plaintiffs are currently asking the Court to certify claims against four[10] different Defendants under the laws of nine different states.  In addition, Plaintiffs have also stated that, with respect to Defendants Honda, Subaru and VW, they "may seek class certification under the laws of additional states."  As the Sixth Circuit very recently recognized in *Pilgrim*, in multi-state class actions, variations in state law swamp common issues and impose upon the district court the "impossible task of instructing a jury on the relevant law."  *Pilgrim, supra, at * 5.

## ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiffs' Motions for Class Certification (D.E. Nos. 260, 261, 263 & 264) are DENIED.

IT IS FURTHER ORDERED that, within 30 days of this Opinion & Order, Counsel shall meet and confer as to how to best proceed with the individual claims asserted in this action by the named Plaintiffs.  The parties shall appear for a Status Conference to discuss same on **January 31, 2012 at 2:30 p.m.**

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  December 19, 2011

_____

[10]In addition, many individuals who assert claims against OnStar purchased or leased GM vehicles and also assert claims against GM.

66

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re: OnStar Contract Litigation                Case No. 2:07-MDL-01867

Honorable Sean F. Cox

_____/

PROOF OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record

on December 19, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez_____
Case Manager